## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

| | | |
|---|---|---|
| BRIAN JOSEPH HUFFMAN, ESQ., as Administrator of the Estate of ELIUD MONTOYA-ARCOS, Deceased, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | CIVIL ACTION NO. 4:18-CV-184 |
| THE DAVEY TREE EXPERT COMPANY; WOLF TREE, INC.; MARJORIE L. CONNER; CHRISTOPHER BRANCH; OSCAR CRUZ; and PABLO RANGEL, a/k/a PABLO RANGEL-RUBIO, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## <u>AMENDED COMPLAINT</u>

COMES NOW Brian Joseph Huffman, Esq., as the Administrator of the Estate of Eliud Montoya-Arcos, deceased, Plaintiff in the above-captioned case, and hereby files this Amended Complaint against The Davey Tree Expert Company, Wolf Tree, Inc., Marjorie L. Conner, Christopher Branch, Oscar Cruz and Pablo Rangel, a/k/a Pablo Rangel-Rubio, Defendants, showing this Honorable Court the following:

### I.    <u>PARTIES, JURISDICTION AND VENUE</u>

1.    Plaintiff is the Estate of Eliud Montoya-Arcos (Montoya), deceased, by and through the Administrator of the Estate, Brian Joseph Huffman, Esq.

2.    Defendant The Davey Tree Expert Company (Davey Tree) is a foreign business entity organized and existing under the laws of the State of Ohio, with its

principal place of business located at 1500 North Mantua Street, Kent, Portage County, Ohio 44240.

3.     Davey Tree can be served with process through its registered agent, CT Corporation System, 289 South Culver Street, Lawrenceville, Gwinnett County, Georgia, 30046-4805.

4.     Defendant Wolf Tree, Inc. (Wolf Tree) is a foreign business entity organized and existing under the laws of Tennessee, with its principal place of business located at 1500 North Mantua Street, Kent, Portage County, Ohio, 44240.

5.     Wolf Tree can be served with process through its registered agent, CT Corporation System, 289 South Culver Street, Lawrenceville, Gwinnett County, Georgia 30046-4805.

6.     Defendant Wolf Tree is a wholly owned division of Defendant Davey Tree.

7.     Defendant Marjorie L. Conner (Conner) is a citizen and resident of the State of Ohio and can be served with process at 8827 German Church Road, North Benton, Ohio 44449. Conner was the In-House Corporate Counsel for Davey Tree and was a member of its legal team until her termination on January 1, 2018.

8.     Defendant Christopher Branch (Branch) is a citizen and resident of the State of Florida and can be served with process at his residence, located at 586 East Sixth Way, Greenville, Madison County, Florida 32331.  Branch was a Wolf Tree and Davey Tree Area Manager, whose territory included the Savannah Area.  Branch was the direct supervisor of Defendant Pablo Rangel.

-2-

9.     Defendant Pablo Rangel, a/k/a Pablo Rangel-Rubio (Rangel), is a citizen of Mexico and, upon information and belief, can be served with process at Victorville, U.S. Penitentiary, PO Box 3900, Adelanto, CA 92301.  At the time this lawsuit was filed, Rangel's residence was lawfully deemed to be Chatham County, Georgia.

10.     Defendant Oscar Cruz (Cruz) was a citizen and resident of Chatham County, Georgia, specifically located at 11011 Middleground Road, Apartment 11, Savannah, Georgia 31419. At the time this lawsuit was filed, Cruz's residence was Chatham County, Georgia.

11.     The events giving rise to this cause of action took place in Chatham County, Georgia, within the Southern District of Georgia, and elsewhere.

12.     On July 3, 2018, Plaintiff filed this action in the State Court of Chatham County.   On August 2, 2018, Defendants removed this action to this Court. Defendants removed on the grounds that Plaintiff's claims under Georgia RICO law "raise[] issues of substantial importance and serious federal interests," and, therefore, this Court has original jurisdiction over this action. (Doc. 1).

13.     This Court has subject matter jurisdiction over Counts 1 through 3 of this Complaint, Plaintiff's Georgia RICO claims, pursuant to federal question jurisdiction, as the RICO claims raise issues of substantial importance and serious federal interests.   This Court has subject matter jurisdiction over Plaintiff's remaining, non-Georgia RICO claims pursuant to supplemental jurisdiction.

14.     This Court has personal jurisdiction over Defendants because, at all times relevant to this cause of action, Defendants continuously and systematically

conducted business on a regular basis in Chatham County, Georgia, thereby purposely availing themselves of the privileges and benefits of doing business in Georgia, especially this District.  Further, Plaintiff's claims here arise out of the business conducted by Defendants in this District.

15.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391.  A substantial part of the events or omissions giving rise to Plaintiff's claims occurred within the Southern District of Georgia.  See 28 U.S.C § 1391(a)(2).  Venue within the Savannah Division of this Court is appropriate pursuant to this Court's Local Rule 2.1.

## II.    FACTS

### *Davey Tree & Wolf Tree's Illegal Workforce*

16.    Davey Tree and Wolf Tree are in the business of trimming trees along power lines for utility companies.  Davey Tree formed Wolf Tree as a wholly owned division in 2008, after purchasing the assets of Wolf Tree Expert Company.  Dating back years before the asset purchase, the Wolf Tree Expert Company knowingly employed illegal aliens, including Rangel, an illegal alien, who had worked for the Wolf Tree Expert Company since 2003.

17.    After the asset purchase, Davey Tree hired many of the former Wolf Tree Expert Company employees to work for the newly formed Wolf Tree.  In so doing, Davey Tree purposefully chose not to use the U.S. Department of Homeland Security E-Verify program to determine the eligibility of Wolf Tree employees to work in the United States.  During the hiring process, many of the identification documents

-4-

provided by prospective Wolf Tree employees were patently false and fraudulent, and both Davey Tree and Wolf Tree knew it.

18.    With Wolf Tree and Davey Tree's knowledge, many of the individuals hired to work for Wolf Tree in 2008 were illegal aliens.  After 2008, Wolf Tree and Davey Tree continued to knowingly hire and employ illegal aliens.

19.    Wolf Tree and Davey Tree's operation in the Savannah area was called the Savannah Call Center.  From 2008 through August of 2017, the large majority of Wolf Tree and Davey Tree employees working at the Savannah Call Center were illegal aliens.  Rangel, the supervisor of the Savannah Call Center from 2008 through August of 2017, was himself an illegal alien, and both Davey Tree and Wolf Tree knew it, because Rangel told them.  In fact, at all times relevant to this matter, Davey Tree, Wolf Tree, Conner, Branch, Cruz and others knew that the vast majority of the Savannah Call Center workforce comprised of illegal aliens, with some Defendants obtaining knowledge later than others.

### The Recruitment, Employment and Harboring of Illegal Aliens

20.    In addition to serving as the paid supervisor of Davey Tree and Wolf Tree's Savannah Call Center, Rangel operated as an independent labor broker, constantly locating and recruiting illegal aliens to work for Wolf Tree and Davey Tree and providing said illegal aliens with false identities and false identification documents, including, but not limited to, false or fraudulently obtained social security numbers and work authorization documents.  The false identities and false identification documents procured by Rangel served to provide Wolf Tree and Davey

Tree with a cheap, illegal alien workforce and concealed the illegal nature of the workforce from the authorities and from the customers of Wolf Tree and Davey Tree. The false identification documents unlawfully secured by Rangel for illegal aliens, were later placed in the Davey Tree and Wolf Tree I-9 and personnel files, to provide the veneer of legitimacy for the hiring of illegal aliens.

21.     Davey Tree and Wolf Tree knowingly accepted as proof of eligibility for employment false documents or documents that did not match the identity of the Savannah Call Center workers presenting them.  At the job site, the Savannah Call Center workers were called and identified by their given names, which were different from their false identities.  Davey Tree and Wolf Tree also knowingly accepted as proof of eligibility for employment in the Savannah area documents that reflected successive different names for a single person.  For example, between 2013 and 2017, illegal alien JR worked at the Savannah Call Center under three false names.

22.     Rangel charged the illegal aliens he recruited to work for Davey Tree and Wolf Tree at the Savannah Call Center for false identities and false identification documents.  The illegal aliens paid Rangel cash for the false identities and false documents, sometimes hundreds of dollars.  The illegal aliens would also pay Rangel for securing them a job at the Savannah Call Center.

23.     Many of the illegal aliens working at the Savannah Call Center under false identities were unable to establish bank accounts to deposit wages paid to them from Wolf Tree and Davey Tree.  To pay their illegal-alien workforce, Wolf Tree and Davey Tree either mailed illegal alien employee paychecks to Rangel's home address

or his PO Box, to be deposited into Rangel's bank accounts, or direct-deposited the illegal aliens' employee paychecks into bank accounts they knew to be in Rangel's name. Once the wages were in his bank accounts, Rangel would withdraw a large amount of cash, which he would use to pay the Savannah Call Center's illegal workforce. After deducting what the illegal aliens owed Rangel for obtaining false identification documents or the illegal employment, Rangel would pay the remaining amounts in cash. Wolf Tree and Davey Tree sent Rangel paychecks and wire transfers totaling over $3,000,000, which he and others divided among themselves and the illegal alien workforce.

24.  In or around 2013, Rangel solicited Cruz to assist him with his harboring-illegal-aliens scheme. As directed by Rangel, Cruz made cash withdrawals and other financial transactions and provided cash payments to illegal alien workers, knowing the workers were illegal aliens and that Rangel was receiving money in return from the illegal alien workers. Rangel paid Cruz thousands of dollars for his assistance with the harboring-illegal-aliens scheme, which payments derived from Wolf Tree and Davey Tree's laundering of monies into Rangel's bank accounts.

25.  In addition to selling false identities and providing jobs, Rangel also harbored many of the illegal aliens who worked for the Savannah Call Center. Davey Tree and Wolf Tree were well aware Rangel harbored many of their illegal alien workers, because the personnel files kept by Davey Tree and Wolf Tree revealed that many of the illegal alien employees lived at Rangel's residence. In fact, in July of 2016, Rangel wire transferred over $120,000 he had received from Wolf Tree and

Davey Tree to purchase a 26-acre compound, which Rangel then used as a residence; used to harbor and conceal from detection numerous illegal aliens, including many employed at the Savannah Call Center; and used to store Wolf Tree and Davey Tree trucks, cranes and other equipment.

26. Monies wired from Wolf Tree and Davey Tree accounts to Rangel were used, in part, to promote the unlawful harboring of illegal aliens.

### *The Scheme to Defraud and Deceive Wolf Tree and Davey Tree's Customer*

27. In the Savannah area, Wolf Tree and Davey Tree contracted with Georgia Power Company (Georgia Power) to provide tree-trimming services along Georgia Power's utility lines. Georgia Power was the Savannah Call Center's only customer.

28. The Georgia Power contracts with Wolf Tree were very lucrative for both Davey Tree and Wolf Tree. Between 2013 and 2018, for example, Georgia Power paid over $20 million to Wolf Tree and Davey Tree under the tree-trimming contracts. Georgia Power made payments to Davey Tree and Wolf Tree for tree-trimming and other services through electronic transfers of money, often made several times a month. On March 9, 2017, for example, Georgia Power made an interstate wire transfer of $62,296.45 from its bank account to an account controlled by Wolf Tree and Davey Tree, representing payment for services performed under the Georgia Power contracts. Monies wired from Georgia Power accounts to Wolf Tree and Davey Tree accounts were in response to invoices emailed through interstate wires from Wolf Tree and Davey Tree to Georgia Power. Invoices for services performed were

sent by Wolf and Davey Tree several times a month. As examples, Wolf Tree and Davey Tree emailed invoices for services to Georgia Power: on October 1, 2011, for $42,424.96; on May 8, 2017, for $45,020.65; and on June 7, 2017, for $47,295.00.

29. For each bid submitted and each contract signed by Wolf Tree and Davey Tree for the Georgia Power contracts during this time, Davey Tree and Wolf Tree falsely and fraudulently certified and represented to Georgia Power that Davey Tree and Wolf Tree verified the legality of their workforce. The executed agreements were emailed through interstate wire back and forth between Georgia Power and Wolf Tree and Davey Tree on or around the dates of the executed agreements.

30. Davey Tree and Wolf Tree used Cruz and Rangel to provide false and fictitious identification documents to Georgia Power to deceive Georgia Power into issuing Georgia Power identification cards to illegal aliens employed at the Savannah Call Center. Moreover, Wolf Tree and Davey Tree, through Rangel and Cruz, purposefully did not assign many illegal-alien employees to work restricted areas, such as the Port of Savannah, knowing that such restricted areas would scrutinize the illegal aliens' false and fictitious identifications.

31. As part of their contract with Georgia Power, Wolf Tree and Davey Tree periodically received payments for removal and trimming work performed by their Savannah Call Center employees following extreme weather events, such as thunderstorms and hurricanes. Such storm work would often take place outside the Savannah area. During this storm work, Davey Tree and Wolf Tree knowingly and recklessly housed in hotels and transported many of its illegal-alien employees who

were working storm sites outside the Savannah area.

32.     Payments by Davey Tree and Wolf Tree to house its illegal-alien workforce during storm work were made through electronic interstate transfer of monies from Davey Tree bank accounts to various credit card accounts.

33.     Had it known or become aware of the false representations and deception by Wolf Tree and Davey Tree regarding the illegality of its workforce, Georgia Power would never have entered the contracts, or would have canceled the contracts that existed.

34.     Monies wired from Wolf Tree and Davey Tree accounts to Rangel were used, in part, to promote the fraud and deception upon Georgia Power.

### *Control Over the Illegal Workforce*

35.     Rangel often abused the illegal aliens he recruited to work for the Savannah Call Center.  For example, some illegal aliens who were injured while working for the Savannah Call Center were not provided medical attention or workers compensation benefits; instead they were terminated.  Rangel then simply recruited another illegal alien to take the injured worker's place, using the same false identification documents and false identity for the new employee as were previously used by the injured worker.

36.     To cause fear among the Savannah area workforce, Rangel often traveled in Wolf Tree trucks from site to site with firearms in his possession.

37.     In addition to making money from fraudulently obtained contracts with Georgia Power, Wolf Tree and Davey Tree received the following direct and intended

financial benefits from the illegal-alien workforce at the Savannah Call Center: less paid to employees; less paid in insurance, including, but not limited to, workers' compensation insurance; and a compliant workforce controlled by fear.

### *Eliud Montoya-Arcos' Whistleblower Complaints*

38.     Montoya, deceased, was a United States Citizen, a son, a husband, and a father.  For over ten years, Montoya worked as a tree trimmer and team leader for Wolf Tree and its predecessor company on the Savannah-area Georgia Power contracts.

39.     Davey Tree and Wolf Tree's written Whistleblower Policy provided that "Company employees [we]re required to report . . . all evidence of activity by a Company . . . employee . . . that may constitute . . . [a] violation of federal, state, provincial or local law [or] a violation of safety policies, laws or regulations that creates a potential or actual danger to the employee's or public's health and safety."

40.     In their written Whistleblower Policy, Davey Tree and Wolf Tree guaranteed the protection of Whistleblowers against retaliation: "Any Company employee who in good faith reports such incidents will be protected from actual or threatened retaliation as a result of the disclosure of such reports."

41.     Davey Tree and Wolf Tree's written Whistleblower Policy further guaranteed that Whistleblower reports would be investigated "promptly and thoroughly," and that "appropriate action" would be taken.

42.     As a member of the Savannah Call Center workforce, Montoya witnessed numerous violations of Georgia and federal law relating to the employment

of illegal aliens and Rangel's mistreatment of those workers.

43.     In compliance with Davey Tree and Wolf Tree's Whistleblower Policy, Montoya contacted Davey Tree in March of 2016 to report criminal and dangerous conduct by his supervisor, Rangel.

44.     Montoya reported the following in his 2016 whistleblower report to Wolf Tree and Davey Tree: (a) 80% of the Savannah Call Center employees were illegal, including the supervisor, Rangel; (b) Rangel had provided social security numbers of actual U.S. citizens that were illegally used by illegal-alien Savannah Call Center employees; (c) Rangel provided the names and social security numbers of employees who had left the Savannah Call Center to the illegal aliens then working for the Savannah Call Center; (d) Rangel paid illegal-alien Savannah Call Center employees in cash; and (e) many of the illegal-alien employees working at the Savannah Call Center were driving commercial vehicles without licenses to do so.

45.     Also in his 2016 whistleblower report to Davey Tree, Montoya stated he wished to remain anonymous.  Montoya stated he intended to speak with the Department of Transportation and the Department of Labor about the criminal and dangerous conduct he had witnessed.  Both the Georgia Department of Transportation and the Georgia Department of Labor have law enforcement authority.  Both the U.S. Department of Transportation and U.S. Department of Labor have law enforcement authority.

46.     Davey Tree and Wolf Tree's Whistleblower Policy required that Montoya's 2016 complaint of illegal conduct be investigated promptly and thoroughly,

that appropriate action be taken, that Montoya's report be kept confidential, and that Montoya would be protected against actual or threatened retaliation.

47.     Montoya was unaware that Wolf Tree and Davey Tree were well aware of many, if not all, of his complaints.  Indeed, Wolf Tree and Davey Tree were not only aware of Rangel's unlawful activities, they actively participated in and benefited from them.

48.     In violation of Davey Tree and Wolf Tree's Whistleblower Policy, no investigation was conducted concerning Montoya's 2016 report of criminal and dangerous conduct.  Instead, Davey Tree and Wolf Tree simply told Rangel about Montoya's 2016 anonymous whistleblower report and told Rangel that Montoya was the whistleblower, in blatant violation of their Whistleblower Policy.

49.     A year later, in April 2017, Montoya again contacted Davey Tree to report illegal and dangerous conduct.  Montoya did this in compliance with Davey Tree and Wolf Tree's Whistleblower Policy.

50.     Both orally and in writing, Montoya reported to Davey Tree the following in his April of 2017 whistleblower reports: (a) most of the Savannah Call Center workers were illegal aliens; (b) the Savannah Call Center supervisor, Rangel, had sold false identifications to the illegal-alien Savannah Call Center employees; (c) Rangel paid the illegal-alien workers in cash; (d) Rangel took money from the Savannah Call Center's illegal-alien workforce; and (e) Rangel allowed illegal aliens to operate the Savannah Call Center's commercial vehicles without licenses.

51.     In his 2017 oral whistleblower report, Montoya informed Davey Tree

that he intended to speak with the Department of Labor about the criminal and dangerous conduct he had witnessed.  In his written 2017 whistleblower report to Davey Tree and Wolf Tree, Montoya stated he had reported the illegal and dangerous conduct to the Department of Labor.  He further stated that the Department of Labor "recommend to address to your [sic] first and if the problem is not solved they would take the case."

52.     Davey Tree and Wolf Tree's Whistleblower Policy required that Montoya's 2017 report of illegal and dangerous conduct be investigated promptly and thoroughly, that appropriate action be taken, that Montoya's report be kept confidential, and that Montoya be protected against actual or threatened retaliation.

### *Protecting the Unlawful Criminal Enterprise through Assaults, Threats, Deception, Intimidation, Retaliation, and Murder*

53.     Instead of promptly, confidentially and lawfully addressing Montoya's whistleblower reports of serious criminal and dangerous conduct, each of the Defendants, aided and abetted by each other, engaged in a systematic effort to silence Montoya, through physical threats, economic threats, intimidation, retaliation, deception, and eventually murder.

54.     During their efforts to silence Montoya, each Defendant knew Montoya intended to report and had reported to Georgia and federal executive agencies and law enforcement Davey Tree, Wolf Tree, and Rangel's criminal and dangerous conduct.  The Defendants' retaliatory efforts against Montoya were intended to hinder, delay, dissuade, and prevent Montoya from reporting to, providing documents

to, or testifying before law enforcement or official proceedings.

55.     Immediately after receiving Montoya's April 2017 written whistleblower report, Conner, who was Davey Tree's In-House Counsel; Branch, who was Rangel's immediate supervisor; and other Wolf Tree and Davey Tree corporate officers decided not to investigate Montoya's confidential reports promptly and confidentially. Instead, in flagrant disregard of Davey Tree and Wolf Tree's Whistleblower Policy, Conner, Branch, and other Wolf Tree and Davey Tree corporate officers decided to silence Montoya: they provided Montoya's written whistleblower complaint to Rangel and told Rangel that Montoya was the whistleblower.

56.     As agreed by Branch, Conner, and other Wolf Tree and Davey Tree officers, Branch traveled to Rangel's compound, provided Rangel with a copy of Montoya's written whistleblower report, and told Rangel that Montoya was the whistleblower.  Upon reading the whistleblower report, Rangel confirmed to Branch that, in exchange for money, he had provided illegal aliens hired at the Savannah Call Center with false identifications.   Branch reported Rangel's confirmation of serious criminal conduct to Conner and other Wolf Tree and Davey Tree corporate officials.

57.     At no point after either Montoya's 2016 or 2017 whistleblower reports did Davey Tree or Wolf Tree advise Georgia Power that the Savannah area tree-trimming contracts were being performed predominantly by an illegal-alien workforce.  Instead, Davey Tree and Wolf Tree continued to deceive Georgia Power to ensure the receipt of millions of dollars from Georgia Power under the tree-

trimming contracts.

58.    Despite Montoya's 2016 and 2017 whistleblower reports and despite Davey Tree and Wolf Tree's actual knowledge of an illegal-alien workforce and Rangel's scheme to obtain false identification documents for the illegal-alien employees he recruited, Davey Tree and Wolf Tree continued funneling monies to Rangel, to credit card companies for the transportation and harboring of their illegal-alien employees, and to their illegal-alien workforce through deposits into Rangel's bank accounts.

59.    Instead of halting the illegal and dangerous conduct reported by Montoya, the Defendants devoted their efforts to silencing Montoya.

60.    After the meeting at which Branch provided Rangel with Montoya's whistleblower report, Branch, Conner and other Wolf Tree and Davey Tree corporate officers decided to have Rangel deal with Montoya directly.  Branch, Rangel and Cruz discussed calling a meeting of all Savannah Call Center employees during which Rangel would disclose Montoya's whistleblower report, and the fact that Montoya was the whistleblower, to all Savannah Call Center employees.

61.    In early May 2017, Rangel and Cruz called a meeting of the approximately 30 Savannah Call Center employees, including Montoya.  During the meeting, Rangel read Montoya's whistleblower report aloud to all of the employees, stated that Montoya was the whistleblower, and threatened and intimidated Montoya.  After hearing Rangel read the allegations in Montoya's whistleblower report and state that Montoya was the whistleblower, many of the Savannah Call

Center illegal alien employees became enraged, began rioting, and threatened Montoya with physical violence and death.  After purposefully causing a riot and assaults against Montoya, Rangel told Montoya that "nothing was going to come of" Montoya's whistleblower report.  At some point during the riot, Branch contacted Cruz to get an update on what was happening at the employee meeting.

62.     Montoya immediately reported Rangel's threatening and retaliatory actions to Davey Tree and Wolf Tree, but there was no response.  Branch, Conner, and other Davey Tree and Wolf Tree officials were well aware of Rangel's threatening and retaliatory actions against Montoya, but purposefully did nothing to prevent or correct them.

63.     Rangel's retaliation against Montoya was sanctioned and aided by all other Defendants and was meant to deter and intimidate Montoya from making further reports to government authorities.

64.     In mid-May 2017, days after the riot, Montoya asked to speak in private with Davey Tree's Regional Safety Manager, who was in Savannah inspecting the Savannah Call Center.

65.     Montoya provided Davey Tree's Regional Safety Manager with a copy of his written April 2017 whistleblower report.  He also identified for the Regional Safety Manager the Savannah Call Center, illegal-alien employees who were working under false names.  He further informed the Regional Safety Manager that the Davey Tree and Wolf Tree's commercial vehicles were being driven by unlicensed, illegal aliens.

66.     Davey Tree's Regional Safety Manager was stunned and blown away by Montoya's report. He memorialized his conversation with Montoya, then contacted both his own supervisor and Branch to determine what should be done. The Regional Safety Manager's supervisor and Branch both quickly told the Regional Safety Manager not to take any further action except to forward his notes regarding the matter to Conner. Following that instruction, the Regional Safety Manager forwarded his notes to Conner.

67.     Faced again with a decision of whether to halt the illegal and dangerous conduct reported by Montoya, each Defendant chose not to halt or correct the illegal activity, but instead chose to retaliate against, threaten, and intimidate Montoya.

68.     A few days after Montoya provided his whistleblower report to Davey Tree's Regional Safety Manager, Cruz overheard Branch; Branch's supervisor, David Jackson; and another Wolf Tree and Davey Tree corporate officer discussing how to build a paper trail to get rid of Montoya. A short time later, a Wolf Tree and Davey Tree corporate officer directed Cruz to cite Montoya with an "unsatisfactory work" employee violation notice, which Cruz did. In his more than ten years working for Wolf Tree and its predecessor, Montoya had never received an employee violation notice. The employee violation notice issued against Montoya was part of an effort by the Defendants to threaten Montoya with economic harm in order to silence him.

69.     The alleged employee violation was baseless and was concocted by Cruz, Branch and others acting on behalf of Wolf Tree and Davey Tree. The employee violation notice to Montoya was issued in retaliation for his whistleblower reports

and was meant to deter and intimidate Montoya from providing further reports to government authorities.

70.   In the summer of 2017, Montoya was informed that Conner was in charge of addressing his various whistleblower complaints.  Montoya had several conversations with Conner in the summer of 2017 about his knowledge of the criminal and dangerous activities outlined in his various whistleblower complaints.

71.   Wolf Tree and Davey Tree used Conner for purposes other than seeking legal advice.  Instead, Conner engaged herself in ongoing criminal activity related to Defendants' efforts to silence Montoya and cover up various criminal acts.

72.   Conner and Branch falsely assured Montoya that his 2017 whistleblower reports were being promptly investigated and taken seriously by Davey Tree and Wolf Tree, in compliance with the Whistleblower Policy.  Conner's and Branch's statements to Montoya were intentionally misleading and meant to hinder, delay, and prevent reports by Montoya to government authorities regarding the criminal and dangerous conduct outlined in his whistleblower complaints.

73.   In July 2017, Conner requested that Montoya provide her with proof of the statements made in his whistleblower reports.  At the time of this request, Conner knew Rangel had confirmed his criminal activities to Branch and had caused a riot against Montoya.  Conner's request was intended to mislead Montoya and hinder, delay, and prevent Montoya's communications with law enforcement.

74.   In reliance on Conner's representations, Montoya again decided to provide information to Davey Tree and Wolf Tree instead of reporting to state and

federal authorities.  At the time, Montoya still believed Conner, Branch, Davey Tree, and Wolf Tree would take appropriate action to address the criminal and dangerous conduct outlined in his whistleblower complaints.  Montoya did not know Conner, Branch, Cruz, Rangel, Davey Tree, and Wolf Tree were all taking steps together to silence Montoya and to protect their criminal enterprise.

75.    In early August 2017, in response to Conner's request, Montoya provided Conner with signed statements by three Savannah Call Center, illegal-alien employees.  The three statements again confirmed that: (a) many Savannah Call Center employees were illegal; (b) Rangel was providing multiple false identification documents to Savannah Call Center, illegal-alien employees; and (c) Rangel was keeping portions of the illegal-alien employees' pay.  Conner received the three signed statements on August 7, 2017.

76.    Faced yet again with whether to halt Defendants' criminal and dangerous conduct, Wolf Tree, Davey Tree, Conner, Branch, Cruz, and Rangel again chose to protect their criminal enterprise by retaliating against, threatening, and intimidating Montoya.

77.    Despite knowing that Branch provided Rangel with Montoya's written whistleblower complaint and told Rangel that Montoya was the whistleblower, and that these interactions between Branch and Rangel resulted in Montoya's life being threatened, Conner provided the three signed statements to Branch.  Branch then provided the signed statements to Rangel.  Conner and Branch's actions were intended to solicit Rangel to silence Montoya and the three illegal-alien employees

who provided the signed statements.

78.     After receiving the signed statements, Rangel threatened two of the three illegal aliens with physical violence.

79.     Within days of Rangel's threats of violence to the illegal-alien employees, Davey Tree and Wolf Tree again acted to silence Montoya.  On August 16, 2017, David Jackson, who previously discussed with Branch building a paper trail to get rid of Montoya, traveled to Savannah and suspended Montoya for three days on a false and fabricated "safe practice violation."

80.     Wolf Tree and Davey Tree's suspension of Montoya was intended to intimidate Montoya, cause him economic harm, retaliate against him for his continued whistleblower reports, and to deter him from providing further reports to government authorities.

81.     Conner, Branch, Rangel, and Cruz were all aware that Montoya was suspended based on a false and fabricated "safe practice violation."

82.     After his suspension, Montoya realized that Conner, Branch, Davey Tree, and Wolf Tree would not take appropriate action to address the criminal and dangerous conduct outlined in his whistleblower complaints.  On or about August 16, 2017, Montoya informed Conner he was reporting the criminal and dangerous conduct of Rangel, Davey Tree, Wolf Tree and others to the U.S. Equal Employment Opportunity Commission (EEOC).

83.     Knowing that Rangel was a dangerous criminal, Conner made sure Rangel knew of Montoya's efforts to report criminal activities to federal authorities.

In so doing, Conner intended to solicit the obstruction of a federal investigation through violent means.

84.    On Thursday, August 17, 2017, Montoya provided a written report of the illegal and dangerous conduct of Rangel, Davey Tree, Wolf Tree and others to the EEOC. This report was a Charge of Discrimination, EEOC Form 5, filed by Eliud Montoya.

85.    After Montoya's August 17, 2017 report to the EEOC, each of the Defendants were aware their previous efforts to mislead, threaten and intimidate had failed to silence Montoya.

86.    On Friday, August 18, 2017, Rangel and Cruz informed all of the Savannah Call Center employees that work for Saturday, August 19, 2017, had been canceled.  The Savannah Call Center employees always worked Saturdays, and they were already far behind in meeting the requirements of the then-existing Georgia Power contracts.

87.    The next day, on August 19, 2017, Montoya was brutally murdered, shot in the back twice and once in the back of the head.  Higinio Perez-Bravo, who was not employed by Wolf Tree or Davey Tree, drove Juan Rangel, Rangel's illegal-alien brother who worked at the Savannah Call Center, to the neighborhood where Montoya lived, for the purpose of murdering Eliud Montoya.  Rangel planned the murder, paying Perez-Bravo thousands of dollars as the driver, and enlisting his brother Juan Rangel as the trigger man.  Funds used by Rangel to pay Perez-Bravo were derived from monies laundered into Rangel's accounts by Wolf Tree and Davey

Tree.

## *Coverups and Convictions*

88.   Later, a joint state and federal investigation ensued into the murder of Montoya and the criminal activities outlined in Montoya's whistleblower complaints to Wolf Tree and Davey Tree.  Rangel, Cruz, Wolf Tree, and Davey Tree, among others, were targets of the investigation.

89.   In an interview with Garden City Police in 2017, after Montoya's murder, Conner falsely stated she had determined that Montoya's complaints "lacked credibility." Before making this statement, Conner had been provided information verifying the credibility of Montoya's complaints, including the fact that Rangel had provided illegal aliens employed at the Savannah Call Center with false identification documents in exchange for money.  Conner's false statements to law enforcement were made knowingly and with an intent to conceal criminal activities committed by Defendants' criminal enterprise.

90.   In a February 22, 2018, deposition of Conner, taken under oath in a Georgia judicial proceeding, after Conner was no longer employed by Davey Tree, Conner knowingly provided materially false testimony.  Specifically, Conner testified falsely that her investigation of Montoya's complaints was ongoing at the time of his murder.  As Conner then well knew, she had ended her so-called investigation of Montoya's complaints before his murder.  Conner's false testimony was made to conceal criminal activities committed by Defendants' criminal enterprise.

91.   In a February 14, 2018, deposition of Cruz, taken under oath in a

Georgia judicial proceeding, Cruz knowingly provided materially false testimony. Specifically, Cruz testified he was not aware any of the Savannah Call Center employees working before Montoya's murder were illegal aliens. As Cruz then well knew, the vast majority of the employees working at the Savannah Call Center before Montoya's murder were illegal aliens. Cruz's false testimony was made to conceal criminal activities committed by Defendants' criminal enterprise.

92.     On December 6, 2018, after providing false testimony in a civil action, Cruz pled guilty to a four-year conspiracy to conceal, harbor, and shield illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I).

93.     On March 28, 2022, Rangel pled guilty to: conspiring with others, both known and unknown, since 2007, to conceal, harbor, and shield illegal aliens in violation of 8 U.S.C § 1324(a)(1)(A)(v)(I); conspiring with others both known and unknown since 2008 to commit money laundering in violation of 18 U.S.C. § 1956; committing money laundering in violation of 18 U.S.C. § 1957; and aiding and abetting the murder of Montoya with the intent to retaliate against Montoya for providing testimony and producing records in an official proceeding conducted by the EEOC, in violation of 18 U.S.C. § 1513(a)(1)(A).

94.     On April 14, 2022, Higinio Perez-Bavo pled guilty to a conspiracy to commit murder-for-hire in violation of 18 U.S.C. § 1958(a).

95.     On October 31, 2022, Juan Rangel was convicted by a federal jury of numerous counts related to the retaliatory murder of a federal witness, Eliud Montoya.

## III.  CAUSES OF ACTION

### COUNT 1

### *CIVIL RICO*
### *O.C.G.A. §16-4-4(b)*
### *Participating in an Enterprise through a Pattern of Racketeering Activity*

96.  Plaintiff renews and reaffirms the allegations of paragraphs 16 – 95 (Part I, Facts), as if fully restated herein.

97.  O.C.G.A. §16-14-4(b) provides, "It is unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity."

### *The Davey-Rangel Enterprise*

98.  O.C.G.A. § 16-14-3(3) defines an "Enterprise" as "any person, sole proprietorship, partnership, corporation, business trust, union chartered under the laws of this state, or other legal entity; or any unchartered union, association, or group of individuals associated in fact although not a legal entity; and it includes illicit as well as licit enterprises and governmental as well as other entities."

99.  From 2008 through at least 2018, Wolf Tree, Davey Tree, Conner, Branch, Cruz, Rangel and others, both known and unknown, conducted and participated in an association-in-fact enterprise, the Davey-Rangel Enterprise, with some joining, conducting, and participating in the Davey-Rangel Enterprise later than others.

100.  The enterprise was an ongoing association whose members functioned as a continuing unit for the common purpose of achieving its objectives.

101.   The persons and entities that formed the Davey-Rangel Enterprise shared common purposes of making money through a variety of illicit means and concealing and preventing detection of the enterprise's unlawful activities.   The persons and entities that formed the Davey-Rangel Enterprise associated to achieve these common purposes.   There were relationships between the persons and entities that formed the Davey-Rangel Enterprise, as set forth below.

102.   Rangel served multiple roles in the Davey-Rangel Enterprise.   Outside of his duties and responsibilities as the supervisor of Wolf Tree and Davey Tree's Savannah Call Center, for ten years Rangel also served as a labor broker who sought out, found, and recruited illegal aliens for employment by Wolf Tree and Davey Tree, and sold false identities and false identity documents to those illegal aliens in exchange for money, enabling Wolf Tree and Davey Tree to claim they only employed legal workers.

103.   For many years, Rangel also participated in the Davey-Rangel Enterprise by harboring and concealing from detection over 100 illegal aliens, most of whom worked at the Savannah Call Center.

104.   When the crimes of the Davey-Rangel Enterprise were in danger of being exposed, Rangel, with the participation of the other defendants and others, threatened, intimidated, retaliated against, and silenced those who sought to report the enterprise's activities, including Montoya.

105.   Wolf Tree and Davey Tree also served multiple roles in the Davey-Rangel Enterprise.   In addition to defrauding their customer, Georgia Power, out of

millions of dollars, Wolf Tree and Davey Tree funded Rangel's outside recruitment of an illegal-alien workforce and his harboring and concealment of numerous illegal aliens by sending illegal-alien employees' paychecks directly to Rangel, and by depositing illegal-alien employees' wages into Rangel's bank accounts. Wolf Tree and Davey Tree also worked with Rangel and others to intimidate, retaliate against, and silence Montoya and others who reported and intended to report the criminal acts of the enterprise.

106. Cruz, in addition to his duties and responsibilities as assistant supervisor at Wolf Tree and Davey Tree's Savannah Call Center, assisted Rangel with his separate labor broker activities and conducted and participated in efforts to conceal and prevent detection of the enterprise's unlawful activities. Notwithstanding Cruz' termination from employment by Wolf Tree and Davey Tree, his guilty plea to conspiring for years to harbor and shield from detection illegal aliens, and his service of a federal prison sentence, the Davey-Rangel Enterprise remains closely associated, as evidenced by the ongoing payment of Cruz' legal fees by Wolf Tree and Davey Tree and their ongoing assertions in legal proceedings of a common-interest privilege.

107. Conner's role in the Davey-Rangel Enterprise included conducting and participating in efforts to conceal and prevent detection of the enterprise's unlawful activities. For example, even after her termination from Wolf Tree and Davey Tree, Conner attempted to conceal the enterprise's unlawful activities by committing perjury during a deposition in a civil case.

108.    Branch's role in the Davey-Rangel Enterprise included conducting and participating in efforts to conceal and prevent detection of the enterprise's unlawful activities.

### The Pattern of Racketeering Activity

109.    O.C.G.A. § 16-14-3(4) defines "pattern of racketeering activity" as "[e]ngaging in at least two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents . . . ."

110.    Under O.C.G.A. § 16-14-3(5)(A), "racketeering activity" means "to commit, to attempt to commit, or to solicit, coerce, or to intimidate another person to commit any crime which is chargeable by indictment under the laws of" Georgia involving: O.C.G.A. § 16-5-1 (murder); O.C.G.A. § 16-11-37 (Terroristic Threats); O.C.G.A. § 16-8-3 (Theft by Deception); O.C.G.A. § 16-10-70 (Perjury); O.C.G.A. § 16-10-93 (Influencing Witnesses); O.C.G.A. § 16-10-32 (Threatening Witnesses); O.C.G.A. § 16-9-121 (Identity Fraud); and O.C.G.A. § 16-10-20 (False Statements). See O.C.G.A. §§ 16-14-3(5)(A)(iv), (xxx), (xii), (xxv), (xxvii), (xxiv), (xx).

111.    Under O.C.G.A. § 16-14-3(5)(B), racketeering activity also means any act or threat involving murder, . . . theft, . . . obstruction of justice, . . . which is chargeable under the laws of the United States, any territory of the United States, or any state, and which is punishable by imprisonment for more than one year."

112.    Under O.C.G.A. § 16-14-3(5)(C), "racketeering activity" also "means to

commit, to attempt to commit, or to solicit, coerce, or to intimidate another person to commit . . . [a]ny conduct defined as 'racketeering activity' under 18 U.S.C. Section 1961(1)."

113.    Under 18 U.S.C. § 1961(1), racketeering activity includes: wire fraud under 18 U.S.C. § 1343; money laundering under 18 U.S.C. §§ 1956 and 1957; the use of false identification documents to fraudulently verify employment eligibility on 1-9 forms under 18 U.S.C. § 1546; bringing in, harboring and concealing illegal aliens under 8 U.S.C § 1324; and witness retaliation under 18 U.S.C. § 1513.

114.    Wolf Tree, Davey Tree, Conner, Branch, Cruz, Rangel and others, both known and unknown, conducted and participated in the Davey-Rangel Enterprise through a pattern of racketeering activity.

115.    Beginning in and around 2008 and continuing through August of 2017, Rangel, aided and abetted by Cruz, and solicited by Wolf Tree and Davey Tree, obtained false documents prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, knowing the documents to be forged, counterfeited, altered, or falsely made, or to have been otherwise procured by fraud or unlawfully obtained, in violation of 18 U.S.C. § 1546(a).

113.    Beginning in and around 2008 and continuing through at least August of 2017, Wolf Tree, Davey Tree, Rangel, Cruz, and others, both known and unknown, used false identification documents that Wolf Tree, Davey Tree, Rangel, Cruz, and others knew or had reason to believe were false and not lawfully issued to the bearer,

to falsely verify the eligibility of the persons presenting them to work, and recorded information from those documents on I-9 forms, in violation of 18 U.S.C. § 1546(b).

117.    Beginning in and around 2008 and continuing through at least August of 2017, Rangel, Cruz, Wolf Tree, and Davey Tree knowingly and in reckless disregard of the fact that aliens had come to, entered and remained in the United States in violation of law, concealed, harbored and shielded from detection such aliens in Rangel's residence and elsewhere, in violation of 8 U.S.C. § 1324(a)(1)(A).   Both Branch and Conner aided and abetted the shielding from detection of illegal aliens, in violation of 8 U.S.C. § 1324(a)(1)(A), through witness intimidation and false statements to law enforcement.

118.    Beginning in and around 2008 and continuing through at least August of 2017,  Wolf Tree and Davey Tree, aided and abetted by Rangel, Cruz, Conner, Branch and others, obtained millions of dollars from Georgia Power by deceitful means and artful practice; that is: by falsely certifying and representing to Georgia Power on the dates of the contracts that Davey Tree and Wolf Tree would verify the legality of their workforce on the Savannah-area contracts; by creating a false impression on the part of Georgia Power that the Savannah Call Center workforce consisted of legal workers, which Defendants knew to be false; by threatening physical and economic harm, intimidating and engaging in misleading conduct in efforts to prevent disclosure of the illegal alien workforce; by providing false information to law enforcement; and, by failing to correct the false impression of Georgia Power that the Savannah Call Center workforce consisted of legal workers;

all done in violation of O.C.G.A. § 16-8-3 (Theft by Deception).

119.   Beginning in and around 2008 and continuing through at least August of 2017, Wolf Tree and Davey Tree, having devised a scheme and artifice to defraud Georgia Power of millions of dollars, transmitted and caused to be transmitted in interstate commerce, wire communications, such as money transfers as payment for services and emailed invoices and executed contracts, for the purpose of executing the scheme and artifice to defraud Georgia Power, in violation of 18 U.S.C. § 1343 (Wire Fraud).  Rangel and Cruz aided and abetted Wolf Tree and Davey Tree's wire fraud scheme by creating the false impression to Georgia Power that the Wolf Tree workforce consisted of legal workers.  Conner, Branch, Rangel, Cruz and others, aided and abetted Wolf Tree and Davey Tree's wire fraud scheme by threatening physical and economic harm, intimidating and engaging in misleading conduct against those who sought to disclose and report the illegal alien workforce.

120.   Beginning in and around 2008 and continuing through at least August of 2017, Wolf Tree, Davey Tree, Rangel and Cruz, with some joining later than others, willfully and fraudulently used counterfeit and fictitious identifying information concerning fictitious and real persons; that is: the false and fraudulent identification documents sold by Rangel to illegal alien workers of the The Savannah Call Center; for the purpose of committing and facilitating the theft by deception upon Georgia Power, in violation of O.C.G.A. § 16-9-121(a) (Identity Fraud).

121.   Beginning in and around 2008 and continuing through at least August of 2017, Wolf Tree, Davey Tree, Rangel and Cruz, with some joining later than others,

willingly accepted for identification purposes identifying information which they knew to be fraudulent, stolen, counterfeit, or fictitious, in violation of O.C.G.A. § 16-9-121(b) (Identity Fraud).

122.   Beginning in and around 2008 and continuing through at least August of 2017, Davey Tree and Wolf Tree conducted and attempted to conduct financial transactions involving the proceeds of unlawful activity; that is: wire transfers to Rangel and credit card companies involving the proceeds of theft by deception and wire fraud; with the intent to promote the carrying on of certain specified unlawful activities; those are: wire fraud in violation of 18 U.S.C. § 1343 and the unlawful harboring and concealing of illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(iii); all done in violation of 18 U.S.C. § 1956(a)(1)(A)(i)(Money Laundering).

123.   Beginning in and around 2008 and continuing through at least November of 2017, Rangel conducted financial transactions involving the proceeds of unlawful activity; that is: a conspiracy to conceal, harbor, and shield illegal aliens from detection for purpose of commercial advantage or private financial gain, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I), and which funds Rangel knew to be the proceeds of some form of unlawful activity; with the intent to promote the carrying on of the aforesaid specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(A)(i)(Money Laundering).   Several of the financial transactions above referenced included the depositing of more than $2,000,000.00 into Rangel's Bank of America accounts that ended 2385, 8908 and 2147, and Wells Fargo account ending 6752, between December 14, 2007 and November 20, 2017.

124.   Instead of halting the ongoing criminal and dangerous conduct reported by Montoya, the Defendants and others sought to silence Montoya through threats, retaliation, deception, and ultimately, murder.

125.   In or around May of 2017, in front of all the Savannah Call Center employees, Rangel, aided and abetted by Cruz, intimidated and threatened Montoya with the intent to hinder, delay or prevent Montoya's communication to a law enforcement officer relating to the commission or possible commission of criminal offenses, in violation of O.C.G.A. § 16-10-93.   Rangel's actions were solicited by Conner, Branch and others.

126. By reading Montoya's written whistleblower complaint to approximately 30 of the Savannah Call Center workers, which complaint exposed the illegality of almost all the workers, Rangel incited a riot, and caused many of the workers to threaten Montoya with serious bodily injury and death.   In so doing, Rangel, aided and abetted by Cruz and Branch, solicited and coerced others to make terroristic threats against Montoya, in violation of O.C.G.A. § 16-11-37.

127.   On or about June 1, 2017, Cruz, at the direction and solicitation of Branch and other Wolf Tree and Davey Tree officers, threatened economic harm to Montoya by citing him with a false and retaliatory employee violation, with the intent to hinder, delay, prevent or dissuade Montoya from testifying in an official proceeding or reporting in good faith to a law enforcement officer, the commission or possible commission of criminal offenses under the laws of Georgia, in violation of O.C.G.A. § 16-10-32(b).

128.   From on or about April of 2017 through on or about August 7, 2017, Conner and Branch falsely assured Montoya that his whistleblower reports were being investigated and taken seriously by Davey Tree and Wolf Tree.  Conner's and Branch's statements to Montoya were intentionally misleading and were meant to hinder, delay or prevent Montoya's reports to a law enforcement officer of information relating to the commission or possible commission of criminal offenses.  In so doing, Conner and Branch engaged in misleading conduct to influence a witness in violation of O.C.G.A. § 16-10-93(b).

129.   On August 7, 2017, Conner received from Montoya signed statements by three illegal aliens employed by Wolf Tree and Davey Tree which confirmed many of Montoya's reports of criminal conduct by Rangel, Wolf Tree and Davey Tree.  Conner and Branch relayed the three signed statements to Rangel.  Rangel then proceeded to threaten two of the three illegal aliens with bodily injury, in violation of O.C.G.A. § 16-11-37 (Terroristic Threats).  Conner and Branch's actions were intended to solicit Rangel to make terroristic threats against the illegal aliens.

130.   On or about August 16, 2017, David Jackson, a corporate officer of Davey Tree and Wolf Tree, aided, abetted, and solicited by Branch, caused and threatened economic harm to Montoya by citing him with a false, fabricated and retaliatory employee violation and three-day suspension.  The caused and threatened economic harm was made with the intent to hinder, delay, prevent or dissuade Montoya from testifying in an official proceeding or reporting in good faith to a law enforcement officer the commission or possible commission of criminal offenses under the laws of

Georgia, in violation of O.C.G.A. § 16-10-32(b).

131.   On or about August 16, 2017, Montoya informed Conner he was reporting the criminal and dangerous conduct of Rangel, Davey Tree, Wolf Tree and others to the U.S. Equal Employment Opportunity Commission (EEOC).  With the knowledge that Rangel was a dangerous criminal, Conner and Branch informed Rangel of Montoya's reporting of criminal activities to the federal authorities.  In so doing, Conner and Branch aided, abetted and solicited retaliation against a federal witness, in violation of 18 U.S.C. § 1513.

132.   Rangel told Cruz about Montoya's report to federal authorities.  On August 18, 2017, Cruz, at Rangel's direction, informed all the Savannah Call Center employees that work for the next day had been canceled.  No explanation was given for the cancellation.  Cruz's actions were intended to aid and abet the retaliation against a federal witness, in violation of 18 U.S.C. § 1513.

133.   On August 19, 2017, Rangel, with malice aforethought, and with the intent to retaliate against Montoya and to silence Montoya from further reporting criminal conduct to federal and state law enforcement, planned, aided, abetted and caused the murder of Montoya, in violation of 18 U.S.C. § 1513(a) (Federal Witness Retaliation) and O.C.G.A. § 16-5-1 (Murder).

134.   In a 2017 interview with Georgia law enforcement after Montoya's murder, Conner knowingly made false statements relating to Montoya's whistleblower complaints.  Conner's statements to law enforcement were made to conceal criminal activities committed by the enterprise and were in violation of

O.C.G.A. § 16-10-20 (False Statements).

135.   In a January 18, 2018, deposition of Conner, taken under oath in a Georgia judicial proceeding, Conner knowingly provided materially false testimony regarding the timing of her so-called investigation into Montoya's whistleblower reports.  Conner's false testimony was made to conceal criminal activities committed by the enterprise and was in violation of O.C.G.A. § 16-10-70 (Perjury).

136.   In a February 14, 2018, deposition of Cruz, taken under oath in a Georgia judicial proceeding, Cruz knowingly provided materially false testimony relating to the legality of the Savannah Call Center workforce.  Cruz's false testimony was made to conceal criminal activities committed by the enterprise and was in violation of O.C.G.A. § 16-10-70 (Perjury).

137.   Each Defendant engaged in a pattern of racketeering activity by performing at least two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incident period.  The last of such acts occurred within four years, excluding any periods of imprisonment after the commission of a prior act of racketeering activity.

138.   The acts of racketeering had the same or similar intents, including to allow the enterprise to profit from the employment of illegal aliens and to prevent the detection of those activities.

139.   The acts of racketeering had the same or similar results, including to

allow the enterprise to profit from the employment of illegal aliens and to prevent the detection of those activities.

140.    The acts of racketeering had the same or similar victims: Georgia Power was defrauded and deceived; illegal alien workers were exploited; and Montoya and others who reported or sought to report illegal activities were threatened, intimidated and retaliated against.

141.    The acts of racketeering had the same or similar methods of commission, including false assurances to Georgia Power, the use of false identification documents, false and misleading assurances to prevent disclosure of the schemes, false statements to law enforcement, and false testimony under oath.

142.    The acts of racketeering were not isolated acts.  They occurred over an extended period and related to: the hiring and harboring of illegal aliens; procurement and use of false identification documents; and efforts to conceal and prevent the reporting of these crimes, including intimidating, threatening and harming witnesses.

### *Injuries and Damages*

143.    Plaintiff suffered injuries and damages by reason of the Defendants' violations of O.C.G.A. §16-14-4(b).  Many of the racketeering acts were specifically directed at Montoya, intended to cause him injury, and did in fact cause him injury. In addition to the injuries and damages suffered as the result of his murder, Montoya suffered injuries and damages caused by the threats of death and serious bodily injury, in violation of Georgia law, and the attempts to influence and retaliate against

him through intimidation, threats, misleading conduct and economic harms, all in violation of Georgia and federal law.

144.   The Defendants' violations of O.C.G.A. § 16-14-4(b) proximately caused the injuries and damages suffered by Plaintiff.

145.   Plaintiff is entitled to recover threefold the actual damages sustained, as well as attorneys' fees and the costs of investigation and litigation.

146.   In addition, Defendants' actions showed willful misconduct, malice, fraud, wantonness, oppression, and an entire want of care that raises the presumption of conscious indifference to consequences and specific intent to cause harm, entitling Plaintiff to receive punitive damages sufficient to deter, penalize, or punish Defendants in light of the circumstances of the case.

## COUNT 2

### *CIVIL RICO*
### *O.C.G.A. §16-14-4(a)*
### *Maintaining Control of Enterprise and Property*
### *through a Pattern of Racketeering Activity*

147.   Plaintiff hereby incorporates the allegations of paragraphs 16 – 95 (Part I, Facts), as if fully set forth herein.

148.   O.C.G.A. §16-14-4(a) provides, in part, "It is unlawful for any person, through a pattern of racketeering activity . . . to . . . maintain, directly or indirectly, any . . . control of any enterprise . . . ."

### *The Davey-Rangel Enterprise*

149.   Plaintiff hereby adopts Count 1, the Davey-Rangel Enterprise,

paragraphs 98 – 108, as if fully set forth herein.

### Maintaining Interests in and Control of the Davey-Rangel Enterprise Through a Pattern of Racketeering Activity

150.   Davey Tree, Wolf Tree, Conner, Branch, Cruz, and Rangel each maintained, directly and indirectly, control over the Davey-Rangel Enterprise, through the pattern of racketeering activity identified above in Count 1, Pattern of Racketeering Activity, paragraphs 109 – 142.

151.   Wolf Tree and Davey Tree maintained control and influence of the Davey-Rangel Enterprise by funding Rangel's false identification and harboring and concealing of illegal aliens schemes.

152.   When the Davey-Rangel Enterprise was in danger of being exposed and ended, Wolf Tree and Davey Tree maintained control and influence of the enterprise by unlawfully influencing and retaliating against whistleblowers, including Montoya, through intimidation, threats, assaults, misleading conduct, and economic harms, in violation of Georgia and federal law.

153.   Rangel maintained control and influence of the Davey-Rangel Enterprise by locating, recruiting, and harboring the illegal-alien workforce used for the enterprise.

154.   When the Davey-Rangel Enterprise was in danger of being exposed by Montoya, Rangel maintained control of the enterprise by unlawfully influencing and retaliating against Montoya and others, through intimidation, threats, assaults, and ultimately murder, all in violation of Georgia and federal law.

155.   When the Davey-Rangel Enterprise was in danger of being exposed by Montoya, Cruz maintained control of the enterprise through his efforts to unlawfully influence and retaliate against Montoya, and by aiding and abetting Rangel's threats and violent retaliations against Montoya and others, all in violation of Georgia and federal law.

156.   At some point during the existence of the Davey-Rangel Enterprise, but no later than April of 2017, Branch knew that: a large majority of the Savannah Call Center employees were illegal aliens; Rangel recruited the illegal workforce; Rangel was paid by illegal aliens to obtain false identification documents; Rangel harbored and concealed illegal aliens; the Georgia Power contracts were maintained through deception; illegal aliens drove Wolf Tree and Davey Tree commercial vehicles without licenses; and Montoya, a whistleblower, said in formal whistleblower complaints that he had and intended to contact state and federal authorities about the criminal conduct described above.  When the Davey-Rangel Enterprise was in danger of being exposed by Montoya, Branch maintained control of the enterprise through his efforts to unlawfully influence and intimidate Montoya, and by aiding and abetting Rangel's threats and violent retaliations against Montoya and others, all in violation of Georgia and federal law.

157.   At some point during the existence of the Davey-Rangel Enterprise, but no later than April of 2017, Conner knew that: a large majority of the Savannah Call Center employees were illegal aliens; Rangel recruited the illegal workforce; Rangel was paid by illegal aliens to obtain false identification documents; Rangel harbored

and concealed illegal aliens; the Georgia Power contracts were maintained through deception; illegal aliens drove Wolf Tree and Davey Tree commercial vehicles without licenses; and Montoya, a whistleblower, said in formal whistleblower complaints that he had and intended to contact state and federal authorities about the criminal conduct described above.  When the Davey-Rangel Enterprise was in danger of being exposed by Montoya, Conner maintained control of the enterprise through her efforts to unlawfully influence Montoya, and by aiding and abetting Rangel's threats and violent retaliations against Montoya and others, all in violation of Georgia and federal law.

158.   Plaintiff suffered injuries and damages by reason of the Defendants' violation of O.C.G.A. §16-14-4(a).   Many of the racketeering acts committed to maintain control of the enterprise were specifically directed at Montoya, intended to cause injury to him, and did in fact cause injury to him.  In addition to the injuries and damages suffered as the result of his murder, Montoya also suffered injuries and damages caused by threats of death and serious bodily injury in violation of Georgia law and attempts to influence and retaliate against him through intimidation, threats, misleading conduct and economic harms, in violation of Georgia and federal law.

159.   The Defendants' violation of O.C.G.A. §16-14-4(a) proximately caused the injuries and damages suffered by Plaintiff.

160.   Plaintiff is entitled to recover threefold the actual damages sustained, as well as attorneys' fees and the costs of investigation and litigation.

161.    In addition, Defendants' actions showed willful misconduct, malice, fraud, wantonness, oppression, and an entire want of care that raises the presumption of conscious indifference to consequences and specific intent to cause harm, entitling Plaintiff to receive punitive damages sufficient to deter, penalize, or punish Defendants in light of the circumstances of the case.

## COUNT 3

### CIVIL RICO
### O.C.G.A. §16-4-4(c)
### Racketeering Conspiracy and Endeavor

162.    Plaintiff renews and reaffirms the allegations of paragraphs Part I, Facts, paragraphs 16 – 95, as if fully restated herein.

163.    From 2008 through at least 2018, the Defendants endeavored to maintain control of the Davey-Rangel Enterprise through a pattern of racketeering activity, in violation of O.C.G.A. §16-14-4(c)(2).  Each Defendant committed overt acts in furtherance of the endeavor, as alleged in paragraphs 109 through 142, which acts proximately caused injury to Montoya.

164.    From 2008 through at least 2018, the Defendants endeavored to conduct or participate in, directly or indirectly, the Davey-Rangel Enterprise through a pattern of racketeering activity, in violation of O.C.G.A. §16-14-4(c)(2).   Each Defendant committed overt acts in furtherance of the endeavor, as alleged in paragraphs 109 through 142, which acts proximately caused injury to Montoya.

165.    The Defendants have conspired with each other and others to maintain control of the Davey-Rangel Enterprise through a pattern of racketeering activity, in

violation of O.C.G.A. §16-14-4(c)(1).  Each of the Defendants have committed overt acts, which include the acts of racketeering identified above, in furtherance of the conspiracy.

166.   The Defendants have conspired with each other and others to conduct or participate in, directly or indirectly, the Davey-Rangel Enterprise through a pattern of racketeering activity, in violation of O.C.G.A. §16-14-4(c)(1).  Each of the Defendants have committed overt acts, which include the acts of racketeering identified above, in furtherance of the conspiracy.

167.   As part of the conspiracy, Defendants agreed to a common unlawful objective and committed overt acts, including, but not limited to, acts of racketeering activity in furtherance of the conspiracy.

168.   Defendants have pursued, and joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan and design.

169.   Defendants were aware of and agreed to the general criminal objectives of their jointly undertaken scheme.  Defendants knowingly and willfully joined in a conspiracy which itself contained a common plan or purpose to commit two or more predicate acts.

170.   The object or purpose of the conspiracy included facilitating the commission of acts of racketeering activity by the conspirators and committing further acts of racketeering activity to conceal those that had already occurred.

171.   Each Defendant committed overt acts in furtherance of the conspiracy,

as alleged in paragraphs 109 through 142.

172.   Plaintiff suffered injuries and damages by reason of the Defendants' violation of O.C.G.A. §16-14-4(c).   Many of the racketeering acts committed in furtherance of the conspiracy and of the endeavor were specifically directed at Montoya, intended to cause injury to him, and did in fact cause injury to him.   In addition to the injuries and damages suffered as the result of his murder, Montoya also suffered injuries and damages caused by the threats of death and serious bodily injury, in violation of Georgia law, and the attempts to influence and retaliate against him through intimidation, threats, misleading conduct and economic harms, in violation of Georgia and federal law.

173.   The Defendants' violation of O.C.G.A. § 16-14-4(c) proximately caused the injuries and damages suffered by Plaintiff.

174.   Plaintiff is entitled to recover threefold the actual damages sustained, as well as attorneys' fees and the costs of investigation and litigation.

175.   In addition, Defendants' actions showed willful misconduct, malice, fraud, wantonness, oppression and an entire want of care that raises the presumption of conscious indifference to consequences and specific intent to cause harm, entitling Plaintiff to receive punitive damages sufficient to deter, penalize, or punish Defendants in light of the circumstances of the case.

## COUNT 4

### *Battery*

176.   Plaintiff renews and reaffirms Part I, Facts, paragraphs 16 – 95, as if fully restated herein.

177.   Upon information and belief, Defendants put in place actions to the intimidation and physical injury of Eliud Montoya. These actions include, but are not limited to, repeated gunshots made by Juan Rangel, at the direction of Defendant Pablo Rangel, into Montoya's body, causing intense pain and suffering.

178.   The intimidation and gunshot wounds were unlawful.

179.   The conduct of the Defendants was the direct and proximate cause of Montoya's pre-death physical and mental pain and suffering.

## COUNT 5

### *Assault*

180.   Plaintiff renews and reaffirms Part I, Facts, paragraphs 16 – 95, as if fully restated herein.

181.   Defendants, through Cruz and Rangel, threatened Montoya with violence and had the apparent ability to perform said acts of violence. Said threats began in early May of 2017.

182.   Defendants, through Juan Rangel, threatened Montoya with physical injury on August 19, 2017, in the moments leading up to his death. In making these threats, Juan Rangel possessed the apparent ability to harm Eliud Montoya.

183. The assaults caused Montoya to sustain damages, including mental pain and suffering.

184. The conduct of the Defendants was the direct and proximate cause of Montoya's pre-death physical and mental pain and suffering.

## COUNT 6

### *Negligence*

### *Defendant Conner*

185. Plaintiff renews and reaffirms Part I, Facts, paragraphs 16 – 95, as if fully restated herein.

186. Defendant Conner, in her role as corporate counsel for Davey and Wolf, received Montoya's whistleblower report on or around April 24, 2017.

187. Defendant Conner, through her employment as an officer and as corporate counsel for Davey and Wolf, had a duty to provide Montoya and others a safe work environment free from harassment and intimidation by company employees such as Branch, Rangel and Cruz.

188. Defendant Conner had a duty to adequately review and address Montoya's April of 2017 whistleblower reports, which referenced numerous illegal and dangerous activities.

189. After reviewing Montoya's whistleblower report, Conner was involved in providing the report to Rangel and/or Cruz for the purpose of taking steps to silence Montoya.

190. Defendant Conner failed to address the serious criminal and dangerous

conduct outlined in Montoya's whistleblower reports.

191.   Defendant Conner's forwarding of Montoya's whistleblower report to Rangel, who was the subject of said report which outlined a litany of illegal and dangerous activities, breached the duty of ordinary care.

192.   Defendant Conner's failure to seriously address or adequately address the allegations in Montoya's whistleblower report and to simply forward the complaint to Rangel, breached the duty of ordinary care and acted as an acquiescence and encouragement of the above-mentioned criminal actions by Defendants Wolf Tree and Davey Tree.

193.   It was foreseeable that Rangel and others would retaliate against Montoya upon learning of the whistleblower report that described Rangel's and others' illegal and dangerous activities.

194.   As a direct and proximate result of Defendant Conner's breach of the duty of ordinary care, Rangel, Cruz and others took retaliatory actions against Montoya, which ultimately led to Montoya being brutally murdered.

195.   The conduct of Conner was a direct and proximate cause of Montoya's pre-death physical and mental pain and suffering.

## COUNT 7

### *Respondeat Superior*

### *(Conduct of Conner)*

196.   Plaintiff renews and reaffirms Part I, Facts, paragraphs 16 – 95, as if fully restated herein.

197.    At all times relevant to this Complaint, Conner was an employee of Davey Tree.

198.    At all times relevant herein, Conner acted within the course and scope of her employment with Davey Tree.

199.    As such, Davey Tree is responsible for all negligent acts and omissions of Conner, including damages caused thereby, i.e., Montoya's pre-death physical and mental pain and suffering.

## **COUNT 8**

### *Negligence*

### *Defendant Branch*

200.    Plaintiff renews and reaffirms Part I, Facts, paragraphs 16 – 95, as if fully restated herein.

201.    As the Area Supervisor for Defendants Wolf Tree and Davey Tree, Defendant Branch had a duty to provide a safe workplace for Wolf employees including, but not limited to, Montoya.

202.    Defendant Branch had a duty to ensure that Montoya's whistleblower reports, which alleged multiple illegal and dangerous acts on behalf of Rangel and others, was adequately and sufficiently addressed.

203.    Branch had a duty to inquire into Montoya's whistleblower reports, and Branch had a duty to take appropriate action against Defendants Rangel and Cruz.

204.    Branch forwarded Montoya's anonymous whistleblower report to Defendants Rangel and Cruz.

205.   Branch breached the duty of ordinary care by failing to address Montoya's whistleblower reports.

206.   Branch breached the duty of ordinary care by forwarding Montoya's whistleblower report to Defendants Rangel and Cruz, as Montoya had accused Rangel and others of serious illegal and dangerous activities.

207.   It was foreseeable that Rangel and others would retaliate against Montoya upon learning of the whistleblower reports that described Rangel's and others' illegal and dangerous activities.

208.   As a direct and proximate result of Defendant Branch's breach of the duty of ordinary care, Rangel, Cruz and other took retaliatory actions against Montoya, which caused Montoya to suffer pre-death mental and physical pain and suffering, and which ultimately led to Montoya being brutally murdered.

## COUNT 9

### *Respondeat Superior*

### *(Conduct of Branch)*

209.   Plaintiff renews and reaffirms Part I, Facts, paragraphs 16 – 95, as if fully restated herein.

210.   At all times relevant to this Complaint, Branch was an employee of Wolf Tree.

211.   At all times relevant herein, Branch acted within the course and scope of his employment with Wolf Tree.

212.   As such, Wolf Tree is responsible for all negligent acts and omissions of

Branch, including damages caused thereby—i.e., Montoya's pre-death physical and mental pain and suffering.

213. For a period of years, Defendants Davey Tree and Wolf Tree maintained policies, practices and customs of hiring illegal aliens as employees. Their actions, which led to Montoya's death, were for the sole purpose of avoiding attention to their illegal practices.

## **COUNT 10**

### *Negligent Hiring and Retention*

### *Defendants Davey Tree/Wolf Tree*

214. Plaintiff renews and reaffirms Part I, Facts, paragraphs 16 – 95, as if fully restated herein.

215. Davey Tree and Wolf Tree had a duty to exercise reasonable care in the selection of employees to ensure that they were legal, competent, and qualified for the positions for which said employees were hired.

216. Defendants further had a duty, in the exercise of ordinary care, not to retain employees who were not legal, competent, and qualified for the positions for which said employees were hired.

217. Defendants had a duty, in the exercise of ordinary care, not to retain employees who committed such acts as described in Montoya's whistleblower reports.

218. Davey Tree, Wolf Tree, Conner and Branch had a duty to use reasonable care to ensure that Rangel, at the time he was hired and throughout his employment, was competent and legal to act as a manager of work crews.

219.    Throughout his employment with Davey Tree and Wolf Tree, Rangel was continuously engaged in criminal activity.

220.    Rangel was an illegal alien and thereby not legally permitted to be employed in the United States.

221.    Defendants Davey Tree, Wolf Tree, Branch and Conner knew or reasonably should have known that Rangel was not legally permitted to be employed in the United States.

222.    Defendants Davey Tree, Wolf Tree, Branch and Conner knew or reasonably should have known that Rangel had engaged or was engaging in serious criminal activity relating to his employment with Wolf Tree and Davey Tree.

223.    Defendants Davey Tree, Wolf Tree, Branch and Conner breached the aforementioned duties by failing to ensure that Rangel was legally permitted to be employed in the United States prior to hiring him to manage crews of workers.

224.    Defendants Davey Tree, Wolf Tree, Branch and Conner breached the aforementioned duties by continuing to employ Rangel after Montoya's whistleblower reports.

225.    Defendants Davey Tree, Wolf Tree, Branch and Conner breached the aforementioned duties by continuing to employ Rangel and Cruz after Montoya's EEOC complaint.

226.    Defendants Davey Tree, Wolf Tree, Branch and Conner's failure to investigate Rangel's background prior to or during his employment, when said Defendants gave him control over numerous employees and employee payroll,

-51-

constitutes negligence in both the hiring and retention of Rangel.

227.   Defendants Davey Tree, Wolf Tree, Branch and Conner's retention of Rangel as an employee when said Defendants knew or reasonably should have known that he would retaliate against Montoya for his whistleblower reports, and reports to Georgia and federal authorities and the EEOC.

228.   It was foreseeable that Rangel and others would retaliate against Montoya upon learning of the whistleblower reports that described Rangel's and others' illegal and unlawful activities.

229.   For a period of years, Defendants Davey Tree and Wolf Tree maintained policies, practices and customs of hiring illegal aliens. Their actions, which lead to Eliud Montoya's death and his pre-death mental and physical pain and suffering, were for the sole purpose of avoiding attention to their illegal activities.

230.   The conduct of the Defendants was a direct and proximate cause of Montoya's pre-death physical and mental pain and suffering.

## COUNT 11

### *Intentional Infliction of Emotional Distress*

### *Defendant Pablo Rangel*

231.   Plaintiff renews and reaffirms Part I, Facts, paragraphs 16 – 95, as if fully restated herein.

232.   Defendant Rangel engaged in a course of extreme and outrageous conduct as fully set forth above with the intention of causing, or reckless disregard of the probability of causing, emotional distress to Eliud Montoya.

233.   These actions caused severe emotional distress to Eliud Montoya, up until the point of his murder.

234.   Specifically, Defendant Rangel acted with the specific intent to retaliate against Eliud Montoya, causing him severe emotional distress, for purposes of deterring future reports, which would threaten the criminal activities committed by the Defendants.

235.   The conduct of Defendant Rangel was a direct and proximate cause of Montoya's pre-death physical and mental pain and suffering.

## COUNT 12

### *Respondeat Superior*

### *(Conduct of Pablo Rangel)*

236.   Plaintiff renews and reaffirms Part I, Facts, paragraphs 16 – 95, as if fully restated herein.

237.   Defendant Davey/Wolf Tree, by and through its employees Defendants Conner and Branch, failed to fully and properly investigate the facts and circumstances surrounding Rangel's extreme and outrageous conduct and harassment as described herein.

238.   Furthermore, Davey Tree/Wolf Tree's actions in repeatedly exposing Eliud Montoya's identity following complaints and taking steps to "build a paper trail" to get rid of Eliud Montoya demonstrate their tacit involvement in the underlying retaliatory scheme.

239.   Accordingly, Davey Tree/Wolf Tree ratified Rangel's misconduct and can

be found liable therefore.

## COUNT 13

### *Intentional Infliction of Emotional Distress*

### *Defendant Oscar Cruz*

240.    Plaintiff renews and reaffirms Part I, Facts, paragraphs 16 – 95, as if fully restated herein.

241.    Defendant Cruz engaged in a course of extreme and outrageous conduct as fully set forth above with the intention of causing, or reckless disregard of the probability of causing, emotional distress to Eliud Montoya.

242.    These actions caused severe emotional distress to Eliud Montoya, up until the point of his murder.

243.    Specifically, Defendant Oscar Cruz called the subject meeting dissolved into a Riot, causing Eliud Montoya severe emotional distress and conveyed threatening messages on Pablo Rangel's behalf.

244.    The conduct of Defendant Cruz was a direct and proximate cause of Montoya's pre-death physical and mental pain and suffering.

## COUNT 14

### *Respondeat Superior*

### *(Conduct of Defendant Oscar Cruz)*

245.    Plaintiff renews and reaffirms Part I, Facts, paragraphs 16 – 95, as if fully restated herein.

246.    Defendant Davey/Wolf Tree, by and through its employees Defendants

Conner and Branch, failed to fully and properly investigate the facts and circumstances surrounding Cruz's extreme and outrageous conduct and harassment as described herein.

247.    Furthermore, Davey Tree/Wolf Tree's indemnification of Oscar Cruz, despite having admitted to crimes while working in their employee, demonstrates Davey/Wolf's acquiescence to Cruz's criminal conduct.

248.    Accordingly, Davey Tree/Wolf Tree ratified Cruz's misconduct and can be found liable therefore.

## COUNT 15

### *Intentional Infliction of Emotional Distress*

### *Defendant Christopher Branch*

249.    Plaintiff renews and reaffirms Part I, Facts, paragraphs 16 – 95, as if fully restated herein.

250.    Defendant Branch engaged in a course of extreme and outrageous conduct as fully set forth above with the intention of causing, or reckless disregard of the probability of causing, emotional distress to Eliud Montoya.

251.    These actions caused severe emotional distress to Eliud Montoya, up until the point of his murder.

252.    Specifically, Branch acted with the specific intent to expose Eliud Montoya's identity and complaints to Pablo Rangel, in an effort to silence Montoya.

253.    The conduct of Defendant Branch was a direct and proximate cause of Montoya's pre-death physical and mental pain and suffering.

## COUNT 16

### *Respondeat Superior*

### *(Conduct of Defendant Branch)*

254.    Plaintiff renews and reaffirms Part I, Facts, paragraphs 16 – 95, as if fully restated herein.

255.    Defendant Davey/Wolf Tree, by and through its employees Defendant Conner, failed to fully and properly investigate the facts and circumstances surrounding Branch's extreme and outrageous conduct and harassment as described herein.

256.    Accordingly, Davey Tree/Wolf Tree ratified Branch's misconduct and can be found liable therefore.

## COUNT 17

### *Intentional Infliction of Emotional Distress*

### *Defendant Marjorie Conner*

257.    Plaintiff renews and reaffirms Part I, Facts, paragraphs 16 – 95, as if fully restated herein.

258.    Defendant Conner engaged in a course of extreme and outrageous conduct as fully set forth above with the intention of causing, or reckless disregard of the probability of causing, emotional distress to Eliud Montoya.

259.    These actions caused severe emotional distress to Eliud Montoya, up until the point of his murder.

260.    Specifically, Defendant Conner acted with the specific intent to cause

emotional distress in repeatedly exposing Eliud Montoya's identity and complaints, as well as the identity and complaints of other whistleblowers, in an attempt to silence these individuals.

261.   The conduct of Defendant Conner was a direct and proximate cause of Montoya's pre-death physical and mental pain and suffering.

## COUNT 18

### *Respondeat Superior*

### *(Conduct of Defendant Conner)*

262.   Plaintiff renews and reaffirms Part I, Facts, paragraphs 16 – 95, as if fully restated herein.

263.   Defendant Davey/Wolf Tree, by and through its employees, failed to fully and properly investigate the facts and circumstances surrounding Conner's extreme and outrageous conduct and harassment as described herein.

264.   Furthermore, Davey Tree/Wolf Tree's indemnification of Defendant Conner, despite her gross mishandling of the subject "investigation" demonstrates Davey/Wolf's acquiescence to her misconduct.

265.   Accordingly, Davey Tree/ Wolf Tree ratified Conner's misconduct and can be found liable therefore.

## COUNT 19

### *Intentional Infliction of Emotional Distress*

### *Defendant Davey Tree*

266.   Plaintiff renews and reaffirms Part I, Facts, paragraphs 16 – 95, as if

fully restated herein.

267.    Defendant Davey Tree engaged in a course of extreme and outrageous conduct as fully set forth above with the intention of causing, or reckless disregard of the probability of causing, emotional distress to Eliud Montoya.

268.    These actions caused severe emotional distress to Eliud Montoya, up until the point of his murder.

269.    The conduct of the Defendants was a direct and proximate cause of Montoya's pre-death physical and mental pain and suffering.

## COUNT 20

### *Survival Claim*

270.    Plaintiff renews and reaffirms Part I, Facts, paragraphs 16 – 95, as if fully restated herein.

271.    Plaintiff brings this action to recover damages for personal injury, pain and suffering inflicted upon Montoya prior to his death, together with funeral, burial and other expenses incurred in connection with the final rites and burial of Montoya.

## COUNT 21

### *Attorney's Fees*

272.    Plaintiff renews and reaffirms Part I, Facts, paragraphs 16 – 95, as if fully restated herein.

273.    Defendants' have acted in bad faith, been stubbornly litigious, and caused Plaintiff unnecessary trouble and expense.

274.    Therefore, Plaintiff is entitled to recover attorneys' fees and expenses

of litigation from each Defendant.

## COUNT 22

### *Punitive Damages*

275.   Plaintiff renews and reaffirms Part I, Facts, paragraphs 16 – 95, as if fully restated herein.

276.   The acts and omissions of the Defendants set forth above show willful misconduct, malice, fraud, wantonness, oppression and/or the entire want of care which would raise the presumption of conscious indifference to the consequences.

277.   The acts and omissions of the Defendants demonstrate a specific intent to harm Montoya.

278.   Imposition of punitive damages against each Defendant is necessary to punish, penalize and deter each Defendant pursuant to O.C.G.A. § 51-12-5.1.

**WHEREFORE**, Plaintiff prays:

(a)   That service be perfected upon Defendants as provided by law;

(b)   For trial by jury comprised of 12 persons;

(c)   That Plaintiff has judgment against all Defendants in an amount to be proved at trial;

(d)   That, under RICO Counts 1 through 3, Plaintiff recover threefold the actual damages sustained, as well as attorneys' fees and the costs of investigation and litigation;

(e)   That Plaintiff be awarded attorneys' fees;

(f)   That Plaintiff be awarded punitive damages; and

(g)     That Plaintiff have such other relief as this Court deems just and proper, including, but not limited to, revocation of a certificate authorizing Wolf Tree and Davey Tree to conduct business within the State of Georgia pursuant to O.C.G.A. § 16-14-6.

Respectfully submitted this 14th day of July, 2023.


/s/ *James D. Durham*
James D. Durham
Georgia Bar No. 235515

**GRIFFIN, DURHAM, TANNER & CLARKSON**
104 W. State Street
Savannah, Georgia 31401
(912) 867-9140


/s/ *R. Bartley Turner*
R. Bartley Turner
Georgia Bar No. 006440
Carolyn Adams Spellman
Georgia Bar No. 680898

**SAVAGE, TURNER, PINCKNEY, SAVAGE & SPROUSE**
102 East Liberty Street, 8th Floor
P. O. Box 10600
Savannah, Georgia 31412
(912) 231-1140


/s/ *John E. Floyd*
John E. Floyd
Georgia Bar No. 266413

**BONDURANT, MIXON & ELMORE LLP**
One Atlantic Center
1201 West Peachtree Street NW
Suite 3900
Atlanta, Georgia 30309

/s/ *John Charles Watts, Jr.*
John Charles Watts, Jr.
Georgia Bar No. 741960

**WATTS & WATTS**
145 Habersham Street
Savannah, Georgia 31401
(912) 234-1482

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served the foregoing through the Court

ECF system upon all counsel registered to receive service, and that I have served the

foregoing via U.S. mail on the following:

Pablo Rangel-Rubio (*Pro Se*)
Register No. 22405-021
USP Victorville
U.S. Penitentiary
P.O. Box 3900
Adelanto, California 92301

This 14th day of July, 2023.

GRIFFIN DURHAM TANNER & CLARKSON LLC

By:  /s/ *James D. Durham*
James D. Durham
Georgia Bar No. 235515
jdurham@griffindurham.com
104 West State Street, Suite 200
Savannah, GA 31401
Ph/Fax: 912-867-9140

*Attorneys for Plaintiff*
