## IN THE UNITED STATES DISCTRICT COURT FOR
## THE SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

|  |  |  |
|---|---|---|
| BRIAN J. HUFFMAN, ESQ., as Administrator of the Estate of ELIUD MONTOYA-ARCOS, Deceased, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | CASE NO. CV418-184 |
| THE DAVEY TREE EXPERT COMPANY, ET AL, | ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFF'S CONSOLIDATED RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AMENDED COMPLAINT

Brian J. Huffman, Esq., as Administrator of the Estate of Eliud Montoya-Arcos, Deceased, hereby responds in opposition the motions to dismiss Plaintiff's Amended Complaint (Doc. 123), filed by Defendants The Davey Tree Expert Company (Davey Tree) and Wolf Tree, Inc. (Wolf Tree) ("the Corporate Defendants") (Doc. 144), Christopher Branch (Doc. 142), Oscar Cruz (Doc. 151) and Marjorie Connor (Doc. 141). For the reasons that follow, all foregoing motions to dismiss should be denied.

### I.    Preliminary Statement

In late 2017, Montoya's widow filed a wrongful death case in the State Court of Chatham County, *Maria Montoya v. Davey Tree, et al.* (STCV17-01873), against many of those responsible for her husband Eliud Montoya's August 19, 2017 murder. After additional investigation, Montoya's Estate filed claims in the State Court of Chatham County that only it could bring, including claims under the Georgia RICO Act. Defendants removed the Estate's claims to this Court.

Both actions remained stayed during the DOJ's multi-year investigation and prosecution of crimes related to Montoya's murder.  Two of the individual Defendants here, who were supervisors of the Corporate Defendants, pled guilty to a host of crimes surrounding Montoya's murder, including conspiracy, the retaliation against a federal witness resulting in death, harboring and concealing illegal aliens and money laundering.  The Corporate Defendants recently paid to the United States almost $4 million to resolve criminal allegations associated with the murder of Montoya.  *See*  https://www.justice.gov/usao-sdga/pr/companies-employed-labor-whistleblower-and-his-killers-reach-criminal-civil-resolution (last visited Sept. 11, 2023).

## II.    Statement of Especially Pertinent Facts[1]

Davey Tree and Wolf Tree (formed by Davey Tree as a wholly owned division in 2008) were in the business of trimming trees along power lines for utility companies. (Doc. 123, par. 16) Davey Tree and Wolf Tree's operation in the Savannah area was called the Savannah Call Center. (Id., par. 19) From 2008 through most of 2017, the vast majority of the employees working at the Savannah Call Center were illegal aliens, and Davey Tree and Wolf Tree knew it.  Indeed, all of the Defendants knew that the vast majority of the Savannah Call Center workforce were illegal aliens, with some learning later than others. (Id.).

Defendant Rangel, himself an illegal alien, was the paid supervisor of the Savannah Call Center. (Id.) In addition to serving as Davey Tree and Wolf Tree's paid supervisor, Rangel operated as an independent labor broker, locating and recruiting illegal aliens to work for Davey Tree and Wolf Tree and providing them with false identities and false identification documentation.  The false identities and false identification documents served to provide Wolf Tree and Davey Tree with a cheap, illegal workforce and concealed the illegal nature of that workforce from the authorities and from Davey Tree and Wolf Tree's customers. (Id., par. 20).

---

[1] The following facts are alleged in the Amended Complaint (Doc. 123), but do not constitute *all* pertinent facts alleged therein.

Rangel charged the illegal aliens he recruited to work for Davey Tree and Wolf Tree for false identities and false identification documents.  The illegal aliens would also pay Rangel for securing them a job at the Savannah Call Center.  Davey Tree and Wolf Tree sent directly to Rangel paychecks and wire transfers totaling over $3 million, which Rangel and others divided among themselves and the illegal alien workforce. (Id., pars. 22-23).

In addition to selling false identities, Rangel harbored and concealed many of the illegal aliens who worked for the Savannah Call Center.  Davey Tree and Wolf Tree were aware of Rangel's separate, illegal-alien harboring scheme and wired monies to Rangel, in part to promote Rangel's harboring and concealing scheme.  In 2013, Defendant Cruz began assisting Rangel with his harboring-concealing-illegal-aliens scheme. (Id., pars. 24-25).

Georgia Power was the Savannah Call Center's only customer.  Georgia Power paid Davey Tree and Wolf Tree millions of dollars each year to provide tree-trimming services. For each Georgia Power contract signed, Davey Tree and Wolf Tree fraudulently certified and represented to Georgia Power that they verified the legality of their workforce.  Davey Tree and Wolf Tree also used Rangel and Cruz to provide fictitious identification documents to Georgia Power to deceive Georgia Power into issuing identification cards to illegal aliens. Based on false representations of the legality of the Savannah Call Center workforce, Georgia Power transferred millions of dollars by interstate wires into Davey Tree and Wolf Tree's accounts. (Id., pars. 27-29).

Eliud Montoya was a U.S. citizen who worked as a tree trimmer and team leader for Wolf Tree and Davey Tree at the Savannah Call Center for over ten years before his murder in August 2017. (Id., par. 38).  While a member of the Savannah Call Center, Montoya witnessed numerous violations of Georgia and federal law relating to the employment and mistreatment of illegal aliens. (Id., par. 42). In April 2017, pursuant to Davey Tree and Wolf Tree's whistleblower policy, Montoya contacted Davey Tree to report illegal and dangerous conduct. (Id., par. 49).  Both orally

-3-

and in writing, Montoya reported the following to Davey Tree and Wolf Tree: (a) most of the Savannah Call Center workers were illegal aliens; (b) the Savannah Call Center supervisor, Rangel, had sold false identifications to the illegal-alien employees; (c) Rangel paid the illegal-alien workers in cash; (d) Rangel took money from the illegal-alien workforce; and, (e) Rangel allowed illegal aliens to operate the Savannah Call Center's commercial vehicles without licenses. In his reports to Davey Tree and Wolf Tree, Montoya stated he had reported, and intended to report again to law enforcement, the illegal and dangerous conduct he had observed. (Id., pars. 50-51).

Montoya did not know that Wolf Tree and Davey Tree were already aware of many, if not all, of the reported criminal conduct.  Instead of lawfully addressing Montoya's reports of serious criminal and dangerous conduct, each of the Defendants, aided and abetted by each other, engaged in a systematic effort to *silence* Montoya, through *physical threats, economic threats, intimidation, retaliation, deception, and eventually murder*. (Id., par. 52).

Immediately after receiving Montoya's April 2017 written report, Defendant Conner, Davey Tree's In-House Counsel; Defendant Branch, Rangel's immediate supervisor; and other Wolf Tree and Davey Tree corporate officers decided not to investigate Montoya's confidential reports promptly or confidentially.  Instead, in flagrant disregard of Davey Tree and Wolf Tree's whistleblower policy, Conner, Branch and other Wolf Tree and Davey Tree corporate officers decided to provide Montoya's written whistleblower complaint *to Rangel*, intending to *silence* Montoya.[2] (Id., par. 55).

As agreed by Branch, Conner and other Wolf Tree and Davey Tree officers, Branch provided Rangel with a copy of Montoya's written whistleblower report, and told Rangel that Montoya was

---

[2] As alleged in the Amended Complaint, in 2016, Montoya made a similar oral whistleblower report to Davey Tree and Wolf Tree pursuant to the companies' whistleblower policy.  In his report, Montoya stated his intent to report the criminal activity he observed to both the Department of Transportation and the Department of Labor, agencies on the State or federal side with law enforcement authority. As in 2017, Davey Tree and Wolf Tree blatantly violated their own policy by not investigating Montoya's report and by revealing the report *to Rangel*, including telling Rangel that Montoya was the whistleblower. (Doc. 123, pars. 43-48)

the whistleblower.  Upon reading Montoya's report, Rangel confirmed to Branch that he had provided illegal aliens hired at the Savannah Call Center with false identifications in exchange for money.  Branch reported to Conner and other Wolf Tree and Davey Tree corporate officials Rangel's confirmation of serious criminal conduct. (Id., par. 56).

After the meeting with Rangel, Branch, Conner and other Wolf Tree and Davey Tree officers decided to have Rangel deal with Montoya directly.  Branch, Rangel and Cruz then discussed calling a meeting of all Savannah Call Center employees during which Rangel would disclose Montoya's whistleblower report to the other employees. (Id., par. 60).

In early May 2017, Rangel and Cruz called a meeting of the approximately 30 Savannah Call Center employees, including Montoya.  During the meeting, Rangel read Montoya's whistleblower report aloud, all the while threatening and intimidating Montoya.  Immediately, many of the illegal-alien employees became enraged, and **threatened Montoya with physical violence and death**.  After purposefully causing a **riot** and **assaults** against Montoya, Rangel told Montoya that "nothing was going to come of" his whistleblower report.  Cruz kept Branch updated on what was happening during the riot. (Id., par. 61).

Montoya immediately reported Rangel's threatening and retaliatory actions to Davey Tree and Wolf Tree, but there was no response.  Branch, Conner and other Davey Tree and Wolf Tree officials were well aware of Rangel's threatening and retaliatory actions against Montoya, but they **purposefully did nothing** to prevent or correct them.  Rangel's retaliation against Montoya was sanctioned, ratified and aided by all Defendants and was meant to **deter** and **intimidate** Montoya from making further reports to law enforcement. (Id., pars. 62-63).

In mid-May 2017, days after the riot, Montoya asked to speak in private with Davey Tree's Regional Safety Manager, who was in Savannah inspecting the Savannah Call Center.  Montoya provided the Safety Manager with a copy of his written, April 2017 whistleblower report.  He also identified for the Safety Manager the illegal-alien employees who were working under false

names.  The Safety Manager was stunned and blown away by Montoya's report.  He contacted both his own supervisor and Branch to determine what should be done. His supervisor and Branch both quickly told the Regional Safety Manager not to take any further action, except to forward his notes regarding the matter to Conner. (Id., par. 64-66).

Faced again with a decision of whether to halt the illegal and dangerous conduct reported by Montoya, the Defendants chose not to halt or correct the illegal activity, but instead chose to *retaliate*, *threaten* and *intimidate* Montoya.  A few days after Montoya provided his whistleblower report to Davey Tree's Regional Safety Manager, Branch and a Wolf Tree and Davey Tree corporate official directed Cruz to cite Montoya with an "unsatisfactory work" employee violation notice, which he did. The alleged employee violation was baseless and concocted by Cruz, Branch and others acting on behalf of Wolf Tree and Davey Tree.  The employee violation notice to Montoya was issued in retaliation for his whistleblower reports and meant to deter and intimidate Montoya from providing further reports to government authorities, including law enforcement. (Id., pars. 67-69, 127).

In the summer of 2017, Montoya was informed that Conner was in charge of addressing his various whistleblower complaints.  Montoya had several conversations with Conner in the summer of 2017 about his knowledge of the criminal and dangerous activities outlined in his various whistleblower complaints.  Both Conner and Branch falsely assured Montoya that his 2017 whistleblower reports were being promptly investigated and taken seriously by Davey Tree and Wolf Tree in compliance with the companies' whistleblower policy. Conner and Branch's statements to Montoya were intentionally misleading, and were meant to *hinder*, *delay* and *prevent* reports by Montoya to law enforcement and other government authorities regarding Montoya's knowledge of criminal and dangerous conduct. (Id., pars. 70-72).

In July 2017, Conner requested that Montoya provide her with proof of the statements made in his whistleblower reports.  At the time of this request, Conner knew Rangel had confirmed his

criminal activities to Branch and had caused a riot against Montoya.  Conner's request was intended to mislead Montoya, made with an intent to *hinder*, *delay* and *prevent* Montoya's communications with law enforcement. (Id., par. 73).

In reliance upon Conner's representations, Montoya again decided to provide information to Davey Tree and Wolf Tree instead of making reports to state and federal authorities.  At the time, Montoya still believed Conner, Branch and Davey Tree and Wolf Tree would take appropriate action to address the criminal conduct he outlined in his whistleblower complaints.  Montoya did not know Conner, Branch, Cruz, Rangel, Davey Tree, Wolf Tree and others were all working together to *silence* Montoya in an effort to protect their criminal enterprise. (Id., par. 74).

On August 7, 2017, in response to Conner's request, Montoya provided Conner signed statements by three illegal-alien employees at the Savannah Call Center.  The statements again confirmed that: (a) many Savannah Call Center employees were illegal; and (b) Rangel was providing multiple false identification documents to illegal-alien employees. (Id., par. 75).

Faced yet again with whether to halt Defendants' criminal and dangerous conduct, Wolf Tree, Davey Tree, Conner, Branch, Cruz, and Rangel again chose to protect their criminal enterprise by *retaliating against*, *threatening* and *intimidating* Montoya.  Despite knowing that Branch provided Rangel with Montoya's written whistleblower resulted in Montoya's life being threatened, Conner provided the three signed statements to Branch.  *Branch then provided the signed statements to Rangel*.  Conner and Branch's actions were intended to solicit Rangel to *silence* Montoya and the three illegal-alien employees who provided the signed statements. (Id., pars. 76-77).

On August 16, 2017, Davey Tree and Wolf Tree again acted to *silence* Montoya. That day, an officer of Davey Tree and Wolf Tree traveled to Savannah and suspended Montoya for three days on a false and fabricated "safe practice violation." Wolf Tree and Davey Tree's suspension of Montoya was intended to *intimidate* Montoya, cause him *economic harm*, *retaliate* against him

for his continued whistleblower reports, and to **deter** him from providing further reports to government authorities, including law enforcement. Conner, Branch, Rangel and Cruz all were aware that Montoya was suspended based upon a false and fabricated violation. (Id., pars. 79-81)

After his suspension, Montoya realized Conner, Branch, Davey Tree and Wolf Tree would not take appropriate action to address the criminal and dangerous conduct outlined in his whistleblower complaints. On August 16, 2017, Montoya informed Conner he was reporting the criminal and dangerous conduct of Rangel, Davey Tree, Wolf Tree and others to the EEOC, which he did on August 17, 2017. (Id., pars. 82 and 84).

Knowing that Rangel was a dangerous criminal, Conner and Branch **informed Rangel of Montoya's efforts to report criminal activities to federal authorities**. In so doing, Conner intended to solicit the obstruction of a federal investigation through **violent** means. After Montoya's August 17, 2017, report to the EEOC, each of the Defendants were aware their previous efforts to **mislead**, **threaten** and **intimidate** had failed to silence Montoya. On Friday, August 18, 2017, Rangel and Cruz informed all Savannah Call Center employees that work for Saturday, August 19, 2017, had been canceled. The Savannah Call Center employees always worked Saturdays and were already far behind in meeting the then-existing Georgia Power contracts. (Id., pars. 83, 85-86).

The next day, August 19, 2017, Montoya was brutally murdered, shot in the back twice and once in the back of the head. Rangel planned the murder, enlisting his brother Juan, a Savannah Call Center employee, as the trigger man. (Id., par. 87).

### III.    Defendants' Motions to Dismiss are Meritless.

In considering a motion to dismiss, this Court must "accept the allegations in the complaint as true, construing them in the light most favorable to the plaintiff." *Murphy v. FDIC*, 208 F.3d 959, 962 (11th Cir. 2000). All that is typically required is "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), that "give[s] the defendant

fair notice of what the . . . claim is and the grounds upon which it rests," *Bell Atl. Co. v. Twombly*, 550 U.S. 544, 555 (2007).

### A.  The Georgia RICO Counts (Counts 1, 2 and 3)

Plaintiff has alleged three separate violations of the Georgia RICO Act against Defendants: that Defendants conducted and participated in an enterprise through a pattern of racketeering activity, in violation of O.C.G.A. § 16-14-4(b) (Count 1); that Defendants acquired and maintained interest in an enterprise and property through a pattern of racketeering activity, in violation of O.C.G.A. § 16-14-4(a) (Count 2), and that Defendants conspired and endeavored to violate § 16-14-4(a) and § 16-14-4(b), in violation of O.C.G.A. § 16-14-4(c) (Count 3).  None of Defendants' challenges to the allegations set out in those Counts demonstrate with certainty that dismissal is appropriate.

### 1.  The RICO Counts Adequately Allege Proximate Cause.

A claim under Georgia's RICO Act requires Plaintiffs to "show that [their] injury flowed directly from at least one of the predicate acts."  *Wylie v. Denton*, 323 Ga. App. 161, 166 (2013). "[T]o survive a motion to dismiss, [Plaintiffs] asserting a RICO claim must allege more than that an act of racketeering occurred and [they were] injured."  *Id.*  Plaintiffs also must allege some "direct nexus" between a racketeering act and their injury, and that "[their] injury was the direct result of a predicate act targeted toward [them], such that [they were] the intended victim."  *Id.*

Each of the Defendants contend that the Amended Complaint fails to sufficiently allege a direct nexus between any predicate act alleged to have been committed, attempted, solicited or coerced and Montoya's injuries. In this regard, each of the Defendants advance two main arguments: (1) many of the predicate acts alleged to have been committed, attempted, solicited or coerced by certain Defendants did not injure Montoya; and, (2) the predicate acts that did injure Montoya are insufficiently pled.  Both arguments are without merit.

### a. There Is No Requirement that Montoya Be Injured by *Each* Predicate of a Pattern of Racketeering Activity.

The moving Defendants argue that Montoya was not directly injured by several of the predicate acts alleged in the Amended Complaint, including: Rangel and Cruz's harboring and concealing from detection illegal aliens; Rangel's sale of false identity documents to illegal aliens; Davey Tree and Wolf Tree's laundering of monies to fund Rangel's outside recruitment-harboring-concealing-illegal-alien scheme; Davey Tree and Wolf Tree's scheme to defraud Georgia Power; Rangel's assaults on illegal-alien employees; Cruz and Conner's perjury; and Conner's false statements to law enforcement.

However, "[w]hile it is certain that a plaintiff in a civil RICO suit must show an injury by reason of a violation . . . , there is no requirement that plaintiff suffer direct harm from **each and every** predicate act introduced to show a pattern of racketeering activity." *InterAgency, Inc. v. Danco Fin. Corp.*, 203 Ga. App. 418, 424 (1992) (emphasis added).

Pattern and proximate cause are separate requirements. A claim based upon a substantive violation of O.C.G.A. § 16-14-4(a) or (b) requires proof of a pattern of racketeering activity. Under Georgia RICO, this requires only two related predicate acts. *Dorsey v. State,* 279 Ga. 534, 539-540 (2005); *Overton v. State,* 295 Ga. App. 223, 232 (2008); *Dover v. State,* 192 Ga. App. 429, 432 (1983). Notably, "[t]his does not mean that *each* RICO defendant must commit at least two acts to come under the Act's prohibitions," *Faillace v. Columbus Bank & Trust Co.,* 269 Ga. App. 866, 868 (2004), because where a pattern of racketeering activity is present, each defendant that participates in that pattern, whether by one act or more, is liable. *Id.* Also, a pattern of racketeering activity may consist in part of acts which caused no harm, as well as acts which caused harm to persons other than the plaintiff. *InterAgency*, 203 Ga. App. at 423-24 (affirming verdict in favor of plaintiff based on a pattern of racketeering activity that consisted in part of acts committed against third parties).

Proximate cause, meanwhile, requires that a plaintiff be injured by one or more of the predicate acts that comprise the pattern: "To satisfy the proximate cause element of RICO, a plaintiff must show that [his] injury flowed directly from at least *one* of the predicate acts." *Wylie*, 323 Ga. App. at 165 (emphasis added). *Accord, Nicholson v. Windham,* 257 Ga. App. 429, 430 (2002) (plaintiff must show a direct nexus between at least one predicate act and the injury she purportedly sustained). Accordingly, even if Defendants are correct that there is no direct nexus between any particular predicate act and Montoya's injuries, that is no reason to dismiss the RICO Counts.

### b. The Amended Complaint Has Adequately Pled a Direct Nexus Between Racketeering Activity and All of Montoya's Injuries.

Defendants participated in an association-in-fact enterprise, the Davey-Rangel Enterprise, for the common purpose of making money illegally and concealing and preventing detection of the enterprise's illegal activities. In April 2017, years into the commission of numerous state and federal crimes relating to harboring and concealing an illegal-alien workforce and a multi-million dollar fraud scheme, Eliud Montoya submitted a written whistleblower complaint to Defendants Davey Tree and Wolf Tree, outlining a number of crimes associated with the Savannah Call Center workforce and advising that he had spoken with and planned to speak again with law enforcement about the various crimes he had witnessed. At this point, the Defendants' participation in the Davey-Rangel Enterprise was for the common purpose of concealing and preventing detection of the enterprise's illegal activities, by means of "a systematic effort to silence Montoya through physical threats, economic threats, intimidation, retaliation, deception, and eventually murder." (Doc. 123, par. 54).

Davey Tree, Wolf Tree and Cruz argue that the Court should reject "attempts to transform garden-variety employment retaliation into criminal interference." (Doc. 144, p. 14; 151, p. 11) First, these Defendants cannot seriously claim that terroristic threats, threatening witnesses, witness retaliation, and murder are garden-variety conduct. Second, Georgia has declined to

disregard claims as being "garden-variety." *InterAgency*, 203 Ga. App. at 418. Third, these predicate acts and their direct nexus to Montoya's injuries are adequately pled.

> *There is a direct nexus between Montoya's injuries and all Defendants' May 2017*
> *influencing witness and terroristic threats.*

As alleged in the Amended Complaint, upon receipt of Montoya's confidential whistleblower report in April 2017, which outlined vast criminal conduct and stated an intent to continue speaking with law enforcement, Defendants Branch, Conner and officers of Davey Tree and Wolf Tree agreed to provide Montoya's confidential written whistleblower complaint to Rangel so that Rangel would deal with Montoya directly. (Doc. 123, pars. 55, 60).  Then, in early May 2017, Rangel and Cruz called a meeting of the approximately 30 Savannah Call Center employees, where Rangel read Montoya's written whistleblower report aloud, identified Montoya as the whistleblower, and threatened and intimidated Montoya. (Id., par. 61). Immediately, many of Davey Tree and Wolf Tree's illegal alien employees became enraged, began rioting, and threatened Montoya with physical violence and death, which was Rangel's intended purpose of his actions. (Id.).  Cruz kept Branch updated on what was happening during the riot. (Id.).  After the threats and assaults by Davey Tree and Wolf Tree illegal-alien employees, Rangel turned to Montoya and said "nothing was going to come of" his whistleblower report. (Id.).

O.C.G.A. § 16-10-93(b)(1)(C) (Influencing Witnesses) provides, "It shall be unlawful for any person knowingly to use intimidation, physical force, or threats . . . with intent to . . . [h]inder, delay, or prevent the communication to a law enforcement officer . . . of this state of information relating to the commission or possible commission of a criminal offense . . . ."

Montoya specifically stated in his 2017 whistleblower report that most of the Davey Tree and Wolf Tree Savannah employees were illegal aliens, that Rangel had sold false identification documents to these illegal aliens, that illegal aliens were operating Davey Tree and Wolf Tree commercial vehicles without licenses, and that he had reported the illegal and dangerous conduct

to the Department of Labor, a law enforcement agency.  (Id., pars. 45 and 53).  In his written report, Montoya also expressed a continued intent to speak with law enforcement "if the problem [was] not solved by Davey Tree and Wolf Tree.  (Id., par 51).

With knowledge of widespread, ongoing vast criminal conduct, Montoya's contact with law enforcement and his stated intent to continue doing so, Davey Tree, Wolf Tree, Conner and Branch, in blatant violation of the companies' whistleblower policy, solicited Rangel intimidate and threaten Montoya, with the intent to hinder, delay and prevent Montoya's communication with law enforcement, which Rangel did. (Id., pars. 59-63, 125)

The early May 2017 "handling" of Montoya's whistleblower complaint by Rangel also constituted terroristic threats under Georgia law.  Per O.C.G.A. § 16-11-37(b)(1), "[a] person commits the offense of a terroristic threat when he or she threatens to . . . [c]omit any crime of violence . . . ."  As alleged in the Amended Complaint, in addition to personally threatening and intimidating Montoya, Rangel read aloud Montoya's whistleblower complaint to the illegal-alien workforce to purposefully cause a riot and assaults against Montoya.  (Id., par. 61).  Rangel's actions produced his intended results: members of the illegal-alien workforce threatened Montoya with serious bodily harm and death.  "In so doing, Rangel, aided and abetted by Cruz and Branch, solicited and coerced other [Davey Tree and Wolf Tree illegal-alien employees] to make terroristic threats against Montoya." (Id., par. 126). Thus, the Amended Complaint has adequately pleaded a direct nexus between these two RICO predicate act and Montoya's injuries.

> *There is also a direct nexus between Montoya's injuries and all Defendants' continued efforts to silence Montoya after the riot.*

Despite threats and intimidation, Montoya continued to pursue his complaints of illegal and dangerous conduct he witnessed. (Id., pars. 64-65). Montoya's additional actions were again met with efforts by Defendants to silence him with additional threats and intimidation. (Id., par. 67).

After the riot, Montoya reported Rangel's threatening and retaliatory actions to Davey Tree and Wolf Tree and provided his written whistleblower complaint to Davey Tree's Regional Safety Manager. (Id., pars. 62, 64 and 65). Montoya further identified for the Safety Manager which Savannah Call Center, illegal-alien employees were working under false names. (Id., par. 65). Upon instruction by Branch and his own supervisor, the Regional Safety Manager took no action except to forward his notes to Conner. (Id., par. 66).

After Montoya's continued efforts to expose ongoing criminal activity, which included making his intent known to have further communications with law enforcement, all Defendants again chose to retaliate against, threaten and intimidate Montoya through the following predicate acts:

- After a discussion with Branch and Davey Tree and Wolf Tree corporate officials, Cruz was instructed on or about June 1, 2017, to threaten Montoya with economic harm by citing him with a baseless and concocted employee violation notice, with the intended purpose of delaying hindering, preventing or dissuading Montoya from further providing information to law enforcement. (Id., par. 68, 69 and 127);

- From April through August 7, 2017, both Branch and Conner had multiple conversations with Montoya where they knowingly and intentionally provided him with false and misleading information which was intended to hinder, delay and prevent further reports by Montoya to law enforcement and government authorities; that is, Branch and Conner falsely told Montoya his whistleblower reports were being promptly investigated and taken seriously by Davey Tree and Wolf Tree in compliance with the companies' whistleblower policy. (Id., pars. 70, 72);

- In July of 2017, Conner requested that Montoya provide her with proof of the statements made in his whistleblower reports. (Id., par. 73). At the time of this request, Conner knew Rangel had confirmed his criminal activities to Branch and had caused a riot against Montoya. (Id.) Conner's request was intended to mislead Montoya, made with an intent to hinder, delay or prevent Montoya's communications with law enforcement. (Id.);

- On August 16, 2017, an officer of Davey Tree and Wolf Tree officer suspended Montoya on a false and fabricated "safe practice violation." (Id., par. 79). Wolf Tree and Davey Tree's suspension of Montoya was intended to intimidate Montoya and cause him economic harm, and was made in retaliation for Montoya's continued whistleblower reports and to deter and intimidate Montoya from providing further reports to government authorities, including law enforcement. (Id., par. 80).

With regard to each of the predicate acts listed above, alleging violations of  O.C.G.A. § 16-10-32(b) (Threatening Witnesses), Davey Tree, Wolf Tree and Cruz claim the Amended Complaint: (1) "fails to allege" Montoya ever "indicated to anyone at Wolf Tree or Davey Tree that he planned to go to a law enforcement officer – such as the local police or ICE;" (2) fails to allege that Davey Tree and Wolf Tree verbally threatened Montoya with economic harm to dissuade him from testifying in any official proceeding; and (3) fails to allege that an official proceeding even existed.

As to argument (1), as alleged multiple times in the Amended Complaint, Montoya revealed to ***all*** Defendants in his written whistleblower complaint that he had reported to law enforcement, the Department of Labor, the criminal and dangerous conduct he observed, and intended to again if the "problem [was] not solved" by Davey Tree and Wolf Tree. (Doc. 123, par. 51). This paragraph alone negates argument (1). Defendants' claim that Montoya should have initially made his report to a different law enforcement agency is irrelevant to whether the Amended Complaint has been adequately pled.

As to argument (2), in paragraphs 127 and 130 of the Amended Complaint, Plaintiff alleges that Defendants Davey Tree and Wolf Tree, on June 1, 2017, and August 16, 2017, respectfully, "***threatened economic harm to Montoya . . . with the intent to hinder, delay prevent or dissuade Montoya from testifying in an official proceeding or reporting in good faith to a law enforcement officer***, the commission or possible commission of criminal offenses under the laws of Georgia, in violation of O.C.G.A. § 16-10-32(b)." (Emphasis added). Thus, argument (2) is false.

As to argument (3), whether an official proceeding existed at the time Montoya notified Defendants that he was speaking to the Department of Labor is irrelevant to whether the Amended Complaint has been adequately pled.  As O.C.G.A. § 16-10-93(b)(3) states, "[a]n official proceeding ***need not be pending*** or about to be instituted at the time of any offense defined in [O.C.G.A. § 16-10-32(b)]." (Emphasis added). Thus, argument (3) fails too.

Regarding each of the predicate acts listed above, alleging violations of O.C.G.A. § 16-10-93 (Influencing Witnesses), Davey Tree and Wolf Tree advance arguments on behalf of Defendants Branch and Conner.  According to the Corporate Defendants, while the Amended Complaint alleges that Branch and Conner made false assurances to Montoya that his 2017 whistleblower reports were being promptly investigated and taken seriously by Davey Tree and Wolf Tree in compliance with the whistleblower policy, the Amended Complaint "only alleges that Ms. Conner and Mr. Branch sought to prevent 'reports' to unspecified 'government authorities' – not that they intended to prevent Mr. Montoya from going to a bona fide law enforcement officer." (Doc. 144, p. 15). This is a distinction without a difference. As alleged in the Amended Complaint, Montoya's 2017 whistleblower reports, provided to both Branch and Conner, indicated he would return to law enforcement "if the problem [was] not solved" by Davey Tree and Wolf Tree. The Georgia Department of Labor is law enforcement. (Id., par. 45). Further, Branch and Conner's false and misleading assurances to Montoya, as alleged in the Amended Complaint, "were meant to hinder, delay or prevent Montoya's reports to a law enforcement officer of information relating to the commission or possible commission of criminal offenses." (Doc. 123, par. 128). Accordingly, the arguments advanced by the Corporate Defendants on behalf of Branch and Conner lack merit.

> *Violent retaliation against a federal witness is another predicate with a direct nexus to Montoya's injuries.*

As alleged in the Amended Complaint, after his suspension by Davey Tree and Wolf Tree, Montoya informed Conner on or about August 16, 2017, that he was reporting the criminal and dangerous conduct of Rangel, Davey Tree and Wolf Tree and others to the EEOC. (Id., par. 131). Knowing Rangel was a dangerous criminal, Conner and Branch informed Rangel of Montoya's efforts to report criminal activities to federal authorities, with the intent to solicit the violent retaliation against a federal witness, in violation of 18 U.S.C. § 1513. (Id., pars. 83 and 131). Rangel told Cruz about Montoya's report to federal authorities. (Id., par. 132). On August 18,

2017, at Rangel's direction, Cruz informed all of the Savannah Call Center employees that work for the next day had been cancelled, with the intent to aid and abet the retaliation against a federal witness, in violation of 18 U.S.C. § 1513. (Id., par. 132). The next day, August 19, 2017, Rangel caused the murder of Montoya, in violation of 18 U.S.C. § 1513 (Federal Witness Retaliation) and O.C.G.A. § 16-5-1 (Murder). (Id., par. 133).

Each Defendant denies any involvement in Montoya's murder. Defendants' denials of factual allegations in the Amended Complaint, however, have no relevance in determining whether the Amended Complaint has been properly pled. The direct nexus of each Defendant's involvement in the violent retaliation against Montoya, a federal witness, has been properly pled.

And, with regard to the Defendants' direct nexus to Montoya's injuries, it should be noted that Defendants Branch and Conner erroneously argue that the only injury alleged to have been suffered by Montoya relates to damages arising from the Retaliation Against a Federal Witness / Murder predicates. As alleged in the Amended Complaint, however:

> Plaintiff suffered injuries and damages by reason of the Defendants' violation of O.C.G.A. §16-14-4(b). Many of the racketeering acts were specifically directed at Montoya; intended to cause him injury; and did in fact cause him injury. ***In addition to the injuries and damages suffered as the result of his murder, Montoya suffered injuries and damages caused by the threats of death and serious bodily injury in violation of Georgia law***, and the attempts to influence and retaliate against him through intimidation, threats, misleading conduct and economic harms, all in violation of Georgia and federal law.

(Id., par. 143 (emphasis added)). Thus, Branch and Conner's attempts to cabin the direct nexuses between their acts and Montoya's injuries to only retaliation against a federal witness and murder is invalid.

### c. Predicate Acts to Silence Montoya are Not Attenuated.

Conflating standing and proximate cause, Davey Tree and Wolf Tree claim that "adverse employment actions" are "too attenuated to confer civil RICO standing" and "collateral" to the harboring-concealing-illegal-alien scheme and the Georgia Power fraud scheme. In support, the

companies cite *Parker v. Diverse Staffing Georgia, Inc.*, 2020 WL 10575029 (N.D. Ga Dec. 23, 2020)(R&R) and *Anderson v. Brown Indus.*, 2012 WL 12860887 (N.D. Ga. June 13, 2012).  (Doc. 144, p. 13) These cases are inapposite.

Both *Parker* and *Brown* addressed whether proximate cause existed under a Georgia RICO claim when an employee was terminated for allegedly refusing to participate in unlawful activity. In that regard, any injury was proximately caused by the termination, rather than the alleged racketeering activity.  Here, Montoya is alleged to have been injured by the predicate acts of terroristic threats, influencing witnesses, threatening witnesses, witness retaliation by violent means and murder in violations of Georgia and federal laws, which predicate acts were committed, attempted, solicited and coerced for the purpose of preventing detection of the enterprise's unlawful activities.  The Eleventh Circuit has found proximate cause in the whistleblower context under Georgia RICO when the whistleblower was himself injured by predicate acts.  *See O'Neal v. Garrison*, 263 F.3d 1317 (11th Cir. 2001)(in a Southern District of Georgia case, reversing summary judgment against whistleblower on Georgia RICO claims and finding proximate cause where adverse employment actions were intended to deter whistleblower from giving truthful testimony or injure the whistleblower for doing so); *see also Dorsey,* 279 Ga. at 541 (pattern includes influencing witnesses and tampering with evidence); *DeGuelle v. Camilli*, 664 F.3d 192, 201 (7th Cir. 2011)(reversing district court's dismissal of whistleblower's federal RICO claim based upon retaliation under 18 U.S.C. § 1513, and stating that "[r]etaliatory acts are inherently connected to the underlying wrongdoing exposed by the whistleblower").

### 2.   The Amended Complaint Has Adequately Pled a RICO enterprise.

Defendants Davey, Wolf, Conner and Cruz argue that under O.C.G.A. § 16-14-4(b) Plaintiff must allege an enterprise distinct from the Defendants themselves and that he has failed to do so. Defendants are wrong in both respects.[3]

### a. The Davey-Rangel Enterprise

O.C.G.A. § 16-14-4(b) provides that:

> It is unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity.

A RICO enterprise may consist of an association-in-fact. O.C.G.A. § 16-14-3(3). ("'Enterprise' means any . . . group of individuals associated in fact although not a legal entity. . . ."). "[T]he Supreme Court has 'succinctly' defined an association-in-fact enterprise as 'any group of persons associated together for a common purpose of engaging in a course of conduct.'" *Al-Rayes v. Willingham*, 914 F.3d 1302, 1307 (11th Cir. 2019) (citing *Boyle v. United States*, 556 U.S. 938, 946 (2009); *United States v. Turkette*, 452 U.S. 576, 583 (1981)). Because a corporation is a person for purposes of RICO, *Williams General Corp. v. Stone,* 280 Ga. 631, 632 (2006), the association may include one or more corporations. *See, e.g., United States v. Goldin Industries, Inc.,* 219 F.3d 1271, 1274-1277 (11th Cir. 2000) (enterprise consisting of three related corporations was distinct from the corporations themselves); *Williams v. Mohawk Industries, Inc.,* 465 F.3d 1277, 1284 (11th Cir. 2006) (association-in-fact enterprise consisting of corporation and third-party recruiters who offered a pool of illegal workers and were sometimes assisted by the corporation's employees, who supplied social security cards to prospective or existing employees who needed to assume a new identity).[4]

---

[3] Defendant Branch does not make this argument.

[4] As the Eleventh Circuit put it in *Goldin Industries,* "we recognize that a defendant can clearly be a person under the statute and also be *part of the enterprise.* The prohibition against the unity of person and enterprise applies only when the singular person or entity is defined as both the person and the only entity comprising the enterprise." 219 F.3d at 1275 (internal citations omitted).

The Davey-Rangel Enterprise included Davey Tree, Wolf Tree, Conner, Branch, Rangel and Cruz. (Doc. 123, pars. 98-108). Associations may be "formal or informal." *Al-Rayes*, 914 F.3d at 1307 (internal citations omitted). Here, Rangel had both formal and informal associations with Wolf and Davey. Formally, he was an employee, specifically a crew chief. (Doc. 123, pars. 19, 218).[5] Informally, he was a participant in an enterprise the criminal activities of which directly benefited both himself and his employers. (Id., pars. 37, 102-104). Like Rangel, Cruz also had formal and informal associations with Wolf and Davey. Formally, Cruz was an assistant supervisor at Wolf Tree and Davey Tree's Savannah Call Center. (Id., par. 106). Informally, Cruz assisted Rangel with his separate labor broker activities and conducted and participated in efforts to conceal and prevent detection of the enterprise's unlawful activities. (Id.)[6]

There is no requirement that the association originally form for a wrongful purpose; it is enough that from an existing relationship the defendants later came to share a wrongful purpose. *Al-Rayes*, 914 F.3d at 1308 (an association-in-fact enterprise may consist of parties who had preexisting relationships and later joined together for the common purpose of engaging in illegal activity); *Bibb County School Dist. v. Dallemand*, 2019 WL 1519301, *12 n.18 (M.D. Ga. April 8, 2019) (citing *Al-Rayes* and holding enterprise existed where "the Defendants later shared the wrongful purpose through an existing relationship, even without forming a business or a separate business entity."). Rangel and Cruz's employer-employee relationship with Davey and Wolf did not preclude them from forming a RICO enterprise together with those entities and other employees of Davey Tree and Wolf Tree. Likewise, the fact that Rangel was an employee of Davey Tree and Wolf Tree did not preclude him from also associating with them for purposes beyond the

---

[5] Rangel, an illegal alien (Id., pars. 16, 19) worked for Wolf Tree from 2003-2017.
[6] Davey Tree and Wolf Tree knew that the vast majority of the Savannah Call Center workforce was comprised of illegal aliens, because Rangel repeatedly told them that was the case. (Id., par. 19).

scope of that employment, and no Defendant cites any authority for the proposition that employee status somehow precludes or negates other forms of association outside of that employment.

**b. The Federal Distinctness Requirement Does Not Apply to This Case.**

Defendants rely exclusively upon federal cases applying federal RICO, but Georgia courts applying Georgia RICO take a different view of distinctness. These Georgia cases (none of which any Defendant cites) apply a different test. In *Reaugh v. Inner Harbour Hosp., Ltd.*, 214 Ga. App. 259 (1994), the defendant corporation argued that it could not also be the RICO enterprise. 214 Ga. App. at 262. The argument was rejected, and the grant of summary judgment to the defendant on plaintiff's RICO claims was reversed, because there was evidence—as there are allegations in this case[7]—that the defendant corporation was both a perpetrator and a direct beneficiary of the pattern of racketeering activity. 214 Ga. App. at 263. *Reaugh* held that where evidence that agents or employees of the corporate defendant committed predicate offenses[8] and material issues of fact existed with regard to whether the corporation was a party to or involved in the commission of those offenses, the enterprise may consist of the corporation and its agents or employees. *Id.* at 264.

Georgia courts continue to apply *Reaugh* for this principle. For example, *Duvall v. Cronic*, 347 Ga. App. 763, 774-775 (2018), quoted *Reaugh* in affirming denial of summary judgment to a corporate co-defendant whose employee engaged in criminal acts, relying upon *Reaugh's* holding that an enterprise may consist of a corporation and its agents or employees if the entity was a party to or involved in the commission of the underlying offenses. *Duvall*, 347 Ga. App. at 774-775. And just six months ago, a district court in the Northern District of Georgia recognized that under Georgia law a RICO enterprise may consist of a corporation and its agents or employees. *Maverick*

---

[7] See Doc. 123, pars. 16-37.
[8] Acts of racketeering activity are commonly referred to as predicate offenses or predicate acts. *See, e.g., Dorsey*, 279 Ga. at 539.

*Fund, Ltd. v. Mohawk Industries, Inc.*, No. 4:21-cv-00118-VMC, 2023 WL 2887603, *14 n.6 (N.D.Ga. March 31, 2023) (quoting both *Duvall* and *Reaugh*).

Instead of citing the Georgia cases that control the application of Georgia RICO, Defendants rely upon inapposite cases regarding the distinctness requirement for federal RICO. For example, Defendants rely heavily on *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340 (11th Cir. 2016). (Doc. 144, p. 19), but that case involved *federal* RICO, not Georgia RICO. *Ray*, 836 F.3d at 1345. Similarly, Defendants assert that "[t]he Fifth Circuit's decision in *Atkinson v. Anadarko Bank and Trust . . .* is particularly apt," (Doc. 144, p. 21), but in *Atkinson*, as in *Ray*, only federal RICO was at issue. *See generally Atkinson*, 808 F.2d 438. In fact, not one of the cases cited by any Defendant having a distinctness argument involved a claim under O.C.G.A. § 16-14-4(b). Defendants' arguments fail because they rely upon federal cases that did not even involve Georgia RICO claims, much less apply Georgia's distinctness rule, which in this case requires a different result from the federal rule.

### c.  If the Federal Requirement Did Apply, the Amended Complaint Would Satisfy It.

Even if the federal distinctness requirement did apply, the Amended Complaint would satisfy it. Under the law a natural person is legally distinct from a corporation. *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001). But, while "plaintiffs may not plead the existence of a RICO enterprise between a corporate defendant and its agents or employees *acting within the scope of their roles for the corporation*," *Ray*, 836 F.3d at 1357 (emphasis added), the corollary to that limitation is that if a corporate defendant associates with an employee to violate RICO through conduct *outside* the scope of their employment, there is no distinctness problem. *See, e.g.*, *Valenzuela v. Swift Beef Co., Inc.*, No. 3:06-CV-2322-N, 2007 WL 9723147, at *8 (N.D. Tex. Dec. 20, 2007) (in federal RICO case brought by U.S.-citizen employees against employer for hiring illegal immigrants, court found no distinctness issue, as false documentation middlemen

"maintained their own business operations," and court could not say middlemen "provided false documentation as mere agents/employees" of employer).

Indeed, the case upon which the Defendants who assert a distinctness requirement rely most heavily, *Ray*, repeatedly acknowledges that the exception holding that employees are not distinct from their corporate employer is limited to situations "when those individuals *are operating in their official capacities* for the corporation." *Id.* at 1355 (emphasis added). Cases upon which *Ray* relied also recognize this limitation. *See, e.g.*, *Ray*, 836 F.3d at 1356 (describing the Second Circuit's holding in *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 121 (2nd Cir. 2013), as holding that "a defendant corporation cannot form a RICO enterprise with its own employees or agents *who are carrying out the normal work of the corporation*." (Emphasis added). This is also made clear by *Ray's* summary of its own holding

> We, too, hold that plaintiffs may not plead the existence of a RICO enterprise between a corporate defendant and its agents or employees *acting within the scope of their roles for the corporation* because a corporation necessarily acts through its agents and employees.

836 F.3d at 1357 (emphasis added).

*Ray* and the cases it relied upon present no obstacle to Plaintiff, because the Amended Complaint recites multiple ways in which Rangel's participation in the enterprise was outside the ordinary duties of his employment as a crew chief. For example, Rangel ran an illegal labor recruiting/labor broker operation that supplied illegal alien workers to Davey and Wolf. (Doc. 123, pars. 20, 102). To further that illegal alien labor recruiting/labor broker operation, Rangel also procured false identifications and false identification documents for those illegal alien employees, which were used to paper Davey and Wolf's files in case Georgia Power or a governmental agency inquired into the immigration status of those employees. (Id., pars. 20, 30, 102, 115-116). And Rangel harbored over 100 illegal aliens—most of them employed by Davey and Wolf—at his own compound. (Doc. 123, pars. 25, 102). This was no secret to Davey and Wolf, because they stored

equipment at Rangel's compound and mailed paychecks to illegal alien employees at that address. (Id., pars. 23, 25).

Davey and Wolf participated in and facilitated these illegal activities by (1) mailing the illegal alien employees' paychecks to Rangel, and later (2) directly depositing the illegal alien's wages into a bank account controlled by Rangel. (Id., pars. 23, 105). These paychecks and wire transfers totaled over $3,000,000.  (Id., par. 23). After receiving the wages of those employees from Davey and Wolf, Rangel reimbursed himself for providing false identities and false identification documents and harboring the illegal aliens at his compound. (Id., par. 22-23, 25). Cruz was paid thousands of dollars for his assistance in the illegal alien harboring scheme. (Id., par. 24).

These activities by Rangel and Cruz were not within the scope of their responsibilities as employees of the Corporate Defendants; rather, they were in furtherance of an enterprise's unlawful activities. (Doc. 123, par. 102). A look at Pablo Rangel's "off the clock" activities make this clear. Before and after regular working hours, Rangel procured fraudulent identification for Davey and Wolf's illegal alien employees and harbored them on his property. (Doc. 123, pars. 20, 23, 25, 53, 87, 104, 105). By their very nature, Rangel's harboring activities occurred outside of his work hours as a crew chief for Davey and Wolf, e.g., when the illegal alien employees were sleeping and during their days off. Rangel was not directly paid for those activities by Davey and Wolf, instead he was enabled to steal from their illegal alien employees. (Id., pars. 22-23, 75).[9] The illegal alien employees' paychecks and wages were sent directly to Rangel, enabling him to deduct the costs of fraudulent documentation and harboring before the illegal employees received any compensation. (Id.). None of the defendants argue these were the ordinary duties of a crew chief at a tree trimming company, nor could they. The fact that Rangel's compensation for the

_____

[9] Note that the Savannah Call Center employees would have normally worked on Saturday, August 19, 2017—the date of Montoya's murder—and Pablo Cruz cancelled work for that day.  (Id., par. 86). Rangel's illegal-alien brother, Juan Rangel, who also worked at the Savannah Call Center, then drove Higinio Perez-Bravo to Montoya's neighborhood, where they murdered Montoya. (Id., par. 87). This conduct was not part of either Rangel's normal work responsibilities, it was an integral part of Pablo Cruz's criminal association with Davey Tree and Wolf Tree.

illegal labor recruiting, false identification and harboring operations was separate from the wages he received from Davey and Wolf demonstrates that those activities were not within the scope of his ordinary job duties. (Id., pars. 22, 102). Further, Davey Tree and Wolf Tree do not claim that these criminal activities fell within the scope of Rangel and Cruz's job duties.

A fundamental component of the relationship between Rangel on the one hand, and Davey and Wolf on the other, was as partners in crime. *Cf.*, *Hicks v. State*, 295 Ga. 268, 272 (2014) (conspirators are partners in crime). Rangel's relationship with Davey and Wolf included crimes committed for their mutual benefit that were far outside the scope of any normal employee-employer relationship. And ultimately, Rangel participated in Montoya's murder, paying the driver and enlisting his brother, Juan Rangel—another employee of Davey Tree and Wolf Tree—to be the shooter. (Id., par. 87) In other words, many if not most of Rangel's interactions with Davey Tree and Wolf Tree consisted of, furthered, or contemplated criminal activity. The Davey-Rangel enterprise relied on these integrated and mutually beneficial acts of criminal activity[10] to provide Davey Tree and Wolf Tree with an inexpensive and obedient workforce of illegal aliens and prevent the disclosure of those illegal activities. (Id., par. 37). When illegal aliens working for the Savannah Call Center were injured, they were not provided with medical attention or workers compensation benefits, they were simply terminated. (Id., par. 35). Rangel would then recruit another illegal alien to take the injured worker's place, using the injured worker's identification documents and false identity. (Id., par. 35). When Montoya complained about these activities he was harassed, assaulted and ultimately murdered.

Just as a "marriage certificate does not transform alleged mail and wire fraud into ordinary household management," *Al-Rayes*, 914 F.3d at 1310, an employer-employee relationship does not transform the provision of false identities and identification documents, harboring of illegal

---

[10] For examples of the benefits to Davey Tree and Wolf Tree, *see* Id. at pars. 28-30, 37. For examples of the benefits to Rangel, *see* Id. at pars. 23-25.

aliens, intimidation of witnesses or the murder of a whistleblower into ordinary job responsibilities. *See Trollinger v. Tyson Foods, Inc.*, No. 402-CV-23, 2007 WL 1574275 (E.D. Tenn. May 29, 2007) (in federal RICO suit against company and its officers/employees for alleged "Illegal Immigrant Hiring Scheme," court rejected company's argument that it could not be liable for conducting its own affairs, reasoning complaint alleged company was *not* conducting its own affairs, but rather was carrying out "Illegal Immigrant Hiring Scheme").

The Defendants also claim that the § 16-14-4(b) claim fails "because a parent company and its subsidiaries cannot form an 'enterprise' for RICO purposes." (Doc. 144, p. 20). They are incorrect because, as set forth above, the enterprise did not consist solely of Davey Tree and Wolf Tree. There were other persons associated with the enterprise who acted outside the scope of any employment they had with Davey Tree and Wolf Tree and that is all that is required.

### 3.   Count 2 and "Acquisition Injury"

Only Defendants Davey Tree, Wolf Tree and Cruz urge the Court to apply federal cases interpreting O.C.G.A. § 1962(b) to Plaintiffs claims under O.C.G.A. § 16-14-4(a) and require "an injury that stems not from a defendant's predicate acts, but from the defendants acquisition or maintenance of an interest in, or control over, the enterprise, real property, or personal property." (Doc. 144, at 22). There are several reasons why the Court should not do this.

First, Davey Tree and Wolf Tree wrongly suggest that interpretations of federal RICO provisions control the interpretation of Georgia RICO. (Doc. 144, p. 22 and 11). That is not the case. Georgia courts have repeatedly held that Georgia RICO has a broader application than federal RICO. *See, e.g., Chancey v. State*, 256 Ga. 415, 418 (1986) (listing differences); *Dover*, 192 Ga. App. at 432 (rejecting federal continuity requirement and holding that two acts of racketeering activity are sufficient to establish a pattern), *Faillace,* 269 Ga. App. at 869 (rejecting federal

requirement that defendant must participate in the operation or management of an enterprise).[11]

There is no basis to conclude that in enacting § 16-14-4(a) the General Assembly intended to enact the acquisition injury requirement later adopted by some federal courts. Federal RICO was enacted in 1970. Georgia RICO was enacted in 1980, and, while Georgia courts assume that the General Assembly is aware of interpretations federal courts or other states' courts have given to a statute subsequently enacted in Georgia, that assumption only applies to cases decided *before* the statute was enacted by the General Assembly. *Haley v. State*, 289 Ga. 515, 524 (2011). Decisions that come after the enactment of Georgia RICO "could not be judicial interpretations the General Assembly considered in drafting the Georgia statute." *Id.* at 526.   Because the federal cases interpreting 18 U.S.C. § 1962(b) were decided after O.C.G.A. § 16-14-4(a) were enacted, they could not have influenced the General Assembly's intent and therefore should not influence the interpretation of § 16-14-4(a).

<u>Second</u>, Defendants' proposed interpretation of § 16-14-4(a) fails to read the RICO Act as a whole.  *Tibbles v. Teachers Ret. Sys. of Ga.,* 297 Ga. 557, 558 (2015) ("For context, we may look to the other provisions of the same statute, the structure and history of the whole statute, and the other law – constitutional, statutory and common law alike – that forms the legal background of the statutory provision in question.").  The many differences between federal RICO and Georgia RICO show that the General Assembly did not intend to limit O.C.G.A. § 16-14-4(a) in the manner that federal courts have limited 18 U.S.C. § 1962(b).

From the beginning Congress made it clear that federal RICO was not intended to preempt or control the scope of other laws, providing that "nothing in [RICO] shall supersede any provision of Federal, State, or other law imposing criminal remedies or affording civil remedies in addition to those provided for in this title." Pub. L. No. 91-452, § 904(b), 84 STAT. 922, 947 (1970). The

---

[11] This interpretation of Georgia RICO was later unanimously approved by the Supreme Court of Georgia.  *Dorsey,* 279 Ga. at 540-41 (proof of two separate but related acts is sufficient to establish a pattern of racketeering activity).

General Assembly took Congress at its word and enacted a statute with a much broader application and much broader remedies than federal RICO. At present, Georgia RICO defines racketeering activity to include 43 specific categories of criminal activity[12] as well as twelve categories of criminal conduct specified in O.C.G.A. § 16-14-3(5)(B), all of the conduct defined as racketeering activity by the federal RICO statute *and* several additional violations of federal law.[13] These features make Georgia RICO's definition of racketeering activity—and therefore the statute's application—far broader than its federal counterpart.

The General Assembly further expanded Georgia RICO's application by rejecting federal RICO's restrictions on the types of injuries for which recovery could be had. While Congress limited recovery under 18 U.S.C. § 1964(c) to "injury to business or property," the General Assembly authorized recovery for physical and emotional injuries suffered as a result of a violation of the statute, *Reaugh v. Inner Harbour Hosp., Ltd.*, 214 Ga. App. 259 (1994), demonstrating its intent that recovery be available for the full spectrum of injuries caused by racketeering activity. The General Assembly also authorized the recovery of punitive damages, O.C.G.A. § 16-14-6(c), which are not available under federal RICO.

The General Assembly also authorized the recovery of categories of costs and expenses not authorized by federal RICO, such as costs of investigation and attorney's fees on appeal. *Dee v. Sweet*, 268 Ga. 346, 351 (1997) (holding provisions covered fees and costs incurred in the collection of a RICO judgment because "[a]s in the case of civil rights laws, the compensatory goals of the Georgia RICO Act would be undermined if fees and costs were not also available when defendants oppose the collection of RICO judgments."). To facilitate effective recovery, Georgia RICO gives plaintiffs priority over the state in the recovery of forfeited assets and the proceeds derived therefrom. O.C.G.A. § 16-14-4(d).

---

[12] O.C.G.A. § 16-14-3(5)(A).
[13] O.C.G.A. § 16-14-3(5)(C).

To further ensure that RICO violations are identified and stopped, Georgia RICO gives aggrieved private parties the same ability to obtain extraordinary non-monetary relief as the State. O.C.G.A. § 16-14-6(b). And so that plaintiffs are not forced to elect between remedies, Georgia RICO remedies are "supplemental and not mutually exclusive." O.C.G.A. § 16-14-9.

Finally, to make its intent unmistakable, the General Assembly emphasized the need to provide compensation to private persons injured by reason of any RICO violation and directed that "[t]his chapter shall be liberally construed to effectuate the remedial purposes embodied in its operative provisions." O.C.G.A. § 16-14-2(b). Consequently, when confronted with competing interpretations, "it would be error to give a more restrictive meaning to the term, thus limiting the remedial purposes of the Act and violating the liberal construction imperative of the legislature, as 'the purpose of the RICO Act is to provide compensation to private persons injured or aggrieved by reason of any RICO violation.'" *Williams Gen. Corp. v. Stone*, 280 Ga. 631, 632 (2006) (quoting *Williams Gen. Corp. v. Stone*, 279 Ga. 428, 429 (2005)).

In addition to these general features, the General Assembly modified O.C.G.A. § 16-14-4(a) to make it significantly broader than 18 U.S.C. 1962(b). *Chancey*, 256 Ga. at 418. Thus, the Georgia provision prohibits acquisition of an interest in or control of an enterprise, real property, or personal property, including money, while 18 U.S.C. § 1962(b) only prohibits the acquisition or maintenance of control over an enterprise. *Id.*

Third, none of the three cases relied upon by Davey Tree and Wolf Tree provides any analysis of O.C.G.A. § 16-14-4(a). The first case is *Club Car, Inc. v. Club Car (Quebec) Import, Inc.*, 276 F. Supp. 2d 1276 (S.D. Ga. 2003). Davey Tree and Wolf Tree first cite to page 1282, which states that Georgia RICO is "essentially identical to the federal RICO provisions" and therefore the same analysis that applies to federal claims applies to claims under the Georgia statute. But as explained above, that statement is plainly wrong. The second cite is to page 1282 of the opinion, which references 18 U.S.C. § 1962(b) but makes no mention at all of O.C.G.A. § 16-14-4(a). Not only

does *Club Car* fail to support Davey Tree and Wolf Tree's argument, *no Georgia Appellate decision has ever cited Club Car, much less relied upon it.*

The second case is *Compagnie de Reassurance d'Ile de France v. New England Reinsurance Corp.*, 57 F.3d 56 (1st Cir. 1995), a decision that contains no discussion of Georgia RICO and cites only one case in support of its ruling, *Danielsen v. Burnside-Ott Aviation Training Ctr., Inc.*, 941 F.2d 1220, 1230-31 (D.C. Cir. 1990). *Danielsen*, in turn, cites only *Old Time Enterprises, Inc. v. International Coffee Corp.*, 862 F.2d 1213, 1219 (5th Cir. 1989) as authority, and *Old Time Enterprise* itself cites **no authority** for the proposition stated in *Danielsen*.

The third case is *D'Addario v. D'Addario*, 901 F.3d 80 (2nd Cir. 2018). While *D'Addario* does describe the federal rule, the arson example it gives only serves to illustrate the difference between federal RICO and Georgia RICO. *Id.* at 98. In that example, the court hypothesized a racketeer who uses a pattern of physical threats and violence, including an act of arson against the plaintiff's property, to extort from the plaintiff an interest in his business. In that scenario, *D'Addario* stated that the cost of replacing or repairing property damaged in the fire would be a loss caused by the predicate act of arson, not the ultimate acquisition of an interest in the plaintiff's business, concluding that the separate and distinct damages caused by the acquisition would be the value of the share of the plaintiff's business obtained. *Id.*

This analysis is inapplicable for two reasons. First, under *D'Addario's* own scenario, the loss of a share in the plaintiff's business *was* caused by acts of racketeering activity: the threats and arson that forced him to surrender that share. Second, if the *D'Addario* scenario were adjusted to this case, with the plaintiff being murdered to prevent him from testifying about the threats and arson, his estate *would* have a Georgia RICO claim based upon that death, because Georgia RICO claims are not limited to recovery for injury to business or property.

Fourth, no Georgia appellate court has adopted the interpretation of § 16-14-4(a) espoused by Defendants. Nor has any Georgia appellate court cited any of the three cases relied upon by Wolf

Tree and Davey Tree. And while Davey Tree and Wolf Tree argue that an O.C.G.A § 16-14-4(a) a plaintiff cannot recover for an injury that stems from a defendant's predicate acts (Doc. 144, at 22), numerous Georgia cases have authorized just that. *See, e.g., Interagency.,* 203 Ga. App. at 418-19 (affirming award of treble damages and attorney's fees where defendant obtained money from plaintiff through fraud); *Reaugh,* 214 Ga. App. at 263-64 (reversing summary judgment on § 16-14-4(a) claim where defendant company obtained money through acts of racketeering activity); *Faillace,* 269 Ga. App. at 868 (affirming summary judgment in favor of plaintiff where defendants obtained money through acts of racketeering activity); *Cobb Cnty. v. Jones Group, P.L.C.,* 218 Ga. App. 149, 154 (1995) (affirming denial of motion to dismiss where defendant was aware of and participated in acts of bribery that resulted in the obtaining of interest in or control of real and personal property). In each of these cases one or more plaintiff(s) was allowed to seek or actually obtain recovery under O.C.G.A § 16-14-4(a) for the harm they suffered from acts of racketeering activity, without additional requirements or conditions.

O.C.G.A. § 16-14-4(a) authorizes any person injured by another's efforts to maintain control over an enterprise through a pattern of racketeering activity to recover for that injury. This means a person injured by one or more of racketeering activities committed to maintain control over an enterprise has a claim under RICO. There is no basis in the structure of Georgia RICO, the language of subsection 16-14-4(a), or Georgia case law, to require an injury separate from or in addition to the injuries caused by acts of racketeering activity and doing so would contravene the General Assembly's liberal construction mandate.

### 4. Plaintiff Need Not Allege Any Continuous Pattern Beyond Two Acts of Racketeering Activity.

Defendant Branch claims Plaintiff "must show that [Branch] engaged in criminal conduct of a *continuing* nature," and that his alleged illegal activity took place only "over a short timeframe."

(Doc. 142, pp. 7-8). Therefore, Branch concludes, the Amended Complaint fails to establish a pattern of racketeering activity. (Id., p. 8). This argument is frivolous.

For decades, Georgia RICO law has been clear: there is no "continuity" requirement beyond showing two acts of racketeering activity. Per Georgia's RICO Act, "'[p]attern of racketeering activity' means: (A) [e]ngaging in *at least two acts* of racketeering activity . . . ." O.C.G.A. § 16-14-3(4)(A) (emphasis added). This means that the federal continuity requirement does not apply to Georgia RICO. *See Dover*, 192 Ga. App. at 432 (1989); *see also Dorsey*, 279 Ga. at 540 ("Evidence of two predicate acts *will* sustain the RICO conviction . . . [where] the evidence authorized the jury to find that [defendant] committed at least two predicate acts . . . [w]e need not consider the remaining predicate acts charged." (Internal citation and quotation marks omitted)(emphasis added)). This very Court has followed the same rule when analyzing Georgia RICO claims. *Peery v. CSB Behav. Health Sys.*, No. CV106-172, 2008 WL 4425364, at *21 (S.D. Ga. Sept. 30, 2008) (Moore, J.) ("for the Georgia RICO to attach, [the claimant] must *only* show evidence of two criminal acts." (Emphasis added). Thus, it is clear that a Georgia RICO plaintiff need not plead any continuing criminal acts beyond two acts of racketeering activity.

### 5. Count 3 Adequately Alleges a RICO Conspiracy.

Defendants contend that Count 3, which alleges a conspiracy to violate the Georgia RICO Act, must fail because the substantive RICO counts (Counts 1 and 2) fail. As explained *supra*, Counts 1 and 2 are adequately pleaded, and so by extension is Count 3.

Moreover, in contrast to a substantive violation of O.C.G.A. § 16-14-4(a) or (b), a conspiracy to violate that provision does not, as the language of subsection (c)(1) makes clear, require that a defendant commit or agree personally to commit two acts of racketeering activity. *Faillace*, 269 Ga. App. at 870 (citing *Salinas v. United States*, 522 U.S. 52, 63 (1997)).  Under Georgia law, a person violates subsection (c)(1) "if they knowingly and willfully *join a conspiracy* which itself contains a common plan or purpose to commit two or more predicate acts." *Cotman v. State*, 342

Ga. App. 569, 585 (2017) (emphasis added).  While Georgia RICO, unlike federal RICO, requires that one of the conspirators commit an overt act, there is no requirement that the defendant himself commit an overt act because "each actor in a conspiracy is responsible for the overt actions undertaken by all the other co-conspirators in furtherance of the conspiracy."  *Pasha v. State*, 273 Ga. App. 788 (2005) (citing *Causey v. State*, 154 Ga. App. 76, 79 (1980); *accord Akintoye v. State*, 340 Ga. App. 777, 780 (2017)("It is well settled that when individuals associate themselves in an unlawful enterprise, any act done in pursuance of the conspiracy by one or more of the conspirators is in legal contemplation the act of all.").[14]

Because "[a] conspiracy is a partnership in crime . . .", *Pinkerton v. United States*, 328 U.S. 640, 644 (1946),[15] the gravamen of a RICO conspiracy is "premised not upon the commission of the predicates of racketeering, or even an agreement to commit predicate acts, but upon an agreement to participate in the affairs of the criminal enterprise through a pattern of racketeering activity."[16]

Defendants' argument that plaintiff's RICO conspiracy claim necessarily fails if their substantive RICO claims are dismissed is not correct.  A defendant may be acquitted of a substantive RICO charge and still be convicted of conspiracy to violate RICO.  *Salinas*, 522 U.S. at 63-66.  The same is true in a civil action.  *Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1269 (11th Cir. 2004) (It is "undoubtedly correct" that "a party may be liable for RICO conspiracy even if it is not liable for the substantive RICO offense.").

### 6.  To the Extent Necessary, the Amended Complaint Clears the Heightened Standard of Fed. R. Civ. P. 9(b).

---

[14] The Supreme Court of Georgia has held that a corporate officer or employee can conspire with his corporate employer to violate RICO. *Williams General Corp.*, 280 Ga. at 632 (corporation conspired with its president to violate RICO); *see also Duvall*, 347 Ga. App. at 774 (officer may conspire with corporation to violate RICO).

[15] Georgia courts have applied *Pinkerton*. *McLeod v. State*, 297 Ga. 99, 102 (2015).  Thus, "[as] a co-conspirator and party to a crime, the racketeering activity underlying Whaley's RICO violation included not only the acts of himself, but also of Rice." *Whaley v. State*, 343 Ga. App. 701, 704 (2017).

[16] *de la Osa v. State*, 158 So.3d 712, 731 (Fla. App. 2015) (citing, *inter alia*, *Salinas,* 522 U.S. at 63-66).

Defendants argue, sporadically and without specificity, that the Amended Complaint does not satisfy the heightened pleading standard of Fed. R. Civ. P. 9(b) and, therefore, should be dismissed. Rule 9(b) provides, "[i]n alleging *fraud* or *mistake*, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b) (emphasis added).[17] "Despite the heightened standard . . . the purpose of Rule 9(b) remains that a complaint must provide the defendant with 'enough information to formulate a defense to the charges.'" *United States v. Southerncare, Inc.*, No. CV410-124, 2015 WL 5278413, at *2 (S.D. Ga. Sept. 9, 2015) (Moore, J.) (citing *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1313 n.24 (11th Cir. 2002)). "The Eleventh Circuit has emphasized that [t]he application of Rule 9(b) . . . must not abrogate the concept of notice pleading.'' *Id.* (citing *Tello v. Dean Witter Reynolds, Inc.*, 494 F.3d 956, 972 (11th Cir. 2007) (internal quotation marks omitted). "Rule 9(b)'s standard should not be conflated with that used on a summary judgment motion." *Id.* (citing *United States ex rel. Rogers v. Azmat,* 2011 WL 10935176, at *3 (S.D. Ga. May 17, 2011) (unpublished)). "[U]nder Rule 9(b), it is sufficient to plead the who, what, when, where, and how of the allegedly false statements and then allege generally that those statements were made with the requisite intent." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008).  Under any applicable standard, the Amended Complaint is properly pled.

### B.  The Non-RICO Counts

---

[17] Only *some* of the RICO predicate acts alleged by the Amended Complaint, those requiring proof of fraud or a misrepresentation, must satisfy the heightened pleading standard of Rule 9(b). *See Liquidation Comm'n of Banco Intercontinental, S.A. v. Renta*, 530 F.3d 1339, 1355–56 (11th Cir. 2008) ("RICO predicate acts *not sounding in fraud* need not necessarily be pleaded with the particularity required by Fed.R.Civ.P. 9(b)." (Emphasis added)). Many of the predicate acts alleged in the Amended Complaint require no proof of fraud or a misrepresentation. *See, e.g.*, Doc. 123, pars. 133 (murder); 125 (intimidating and threatening with intent to hinder, delay or prevent communication to a law enforcement officer, in violation of O.C.G.A. § 16-10-93); 126 (soliciting and coercing others to make terroristic threats, in violation of O.C.G.A. § 16-11-37); 129 (making terroristic threats, in violation of O.C.G.A. § 16-11-37); and 131-132 (aiding, abetting and soliciting retaliation against a federal witness, in violation of 18 U.S.C. § 1513). These predicate acts are subject only to "Rule 8's more relaxed notice-pleading standard." *Sec. & Exch. Comm'n v. Bankatlantic Bancorp, Inc.*, No. 12-60082-CIV, 2012 WL 12837291, at *2 (S.D. Fla. Dec. 7, 2012).

Defendants argue, "[w]ith the dismissal of the RICO claims, this Court does not have an independent basis to *exercise original jurisdiction* over the remaining common law claims." (Doc. 144, p. 24). Therefore, Defendants conclude, Plaintiff's non-RICO claims should be dismissed along with his RICO claims. (Id., p. 25). As noted in Plaintiff's responses to Defendants' motions to stay, however, even if the Court were to dismiss the RICO claims, it should still retain this case pursuant to 28 U.S.C. § 1367. *See, e.g.* Doc. 119, p. 5 (quoting *Smith v. City of Tallahassee*, 789 Fed. Appx. 783, 789 (11th Cir. 2019)).

Also, regarding some of the non-RICO alleged counts, Defendant Branch argues the Amended Complaint fails to state claims against him for intentional infliction of emotional distress (IIED), assault and battery. "To prevail on a claim for [IIED], Plaintiffs must show that: (1) defendants' conduct was intentional or reckless; (2) defendants' conduct was extreme and outrageous; (3) a causal connection existed between the wrongful conduct and the emotional distress; and (4) the emotional harm was severe." *Gifford v. City of Broxton, Georgia*, No. CV 508-084, 2010 WL 11607353, at *12 (S.D. Ga. Sept. 24, 2010) (internal citation and quotation marks omitted). In *Gifford*, this Court denied summary judgment on plaintiff's IIED claim where the defendant police officer threatened to kill the plaintiff. *Id.* at *6, 12.

"A cause of action for battery will lie for ***any*** unlawful touching . . . ." *Lawson v. Bloodsworth*, 313 Ga. App. 616, 618 (2012) (internal citation omitted) (emphasis added). "To constitute an assault ***no actual injury need be shown***, it being only necessary to show an intention to commit an injury, coupled with an apparent ability to do so." *Wallace v. Stringer*, 250 Ga. App. 850, 853 (2001) (internal citations and quotation marks omitted) (emphasis added).

Here, the Amended Complaint states claims against Branch for all three torts by alleging Branch: (1) inspired ***death threats*** against Montoya, by helping incite a riot against him; (2) aided, abetted and solicited retaliation against Montoya; and (3) acted with the specific intent to expose Montoya's identity and complaints to Rangel, in an effort to ***silence*** Montoya. (Docs. 123, pars.

60-62, 131, 252). At the above-mentioned riot against Montoya, Davey Tree and Wolf Tree employees under Branch threatened to kill Montoya, and Cruz updated Branch about this. (Id., par. 61). Branch then "*purposefully did nothing to prevent or correct*" these threats and retaliatory actions. (Id., par. 62 (emphasis added)). Branch thus played a key role in the scheme to *silence*, *threaten*, and *retaliate* against Montoya, culminating in *death threats* against Montoya and Montoya's *murder*. (Id., par. 53, 124, 158, 251). These allegations satisfy the requirements for pleading claims for IIED, assault, and battery against Branch.

## IV.   Conclusion

For the foregoing reasons, Defendants' motions to dismiss should be denied.

Respectfully submitted this 11th day of September, 2023.

<table>
<tr><td><strong>GRIFFIN DURHAM TANNER &amp; CLARKSON</strong></td><td><strong>BONDURANT, MIXSON &amp; ELMORE LLP</strong></td></tr>
<tr><td>By:  <u>/s/ James D. Durham</u><br>James D. Durham<br>Georgia Bar No. 235515<br>Samuel L. Mikell<br>Georgia Bar No. 24114<br>104 West State Street, Suite 200<br>Savannah, Georgia 31401<br>Ph/Fax: (912) 867-9140</td><td>By:  <u>/s/ John E. Floyd</u><br>John E. Floyd<br>Georgia Bar No. 266413<br>One Atlantic Center<br>1201 West Peachtree Street NW<br>Suite 3900<br>Atlanta, Georgia 30309<br>(404) 881-4100</td></tr>
</table>

**SAVAGE, TURNER, PINCKNEY, SAVAGE & SPROUSE**

By:  <u>/s/R. Bartley Turner</u>
      R. Bartley Turner
      Georgia Bar No. 006440
      102 East Liberty, 8th Floor
      Savannah, Georgia 31401
      Ph: (912) 231-1140

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served the foregoing through the Court ECF system

upon all counsel registered to receive service, and that I have served the foregoing via U.S. mail

on the following:

Pablo Rangel-Rubio (*Pro Se*)
Register No. 22405-021
USP Atwater
Post Office Box 019001 6A-123
Atwater, California 95301

This <u>11</u>th day of September, 2023.

**GRIFFIN DURHAM TANNER & CLARKSON**

By:      <u>/s/ *James D. Durham*</u>
          James D. Durham
          Georgia Bar No. 235515
          104 West State Street, Suite 200
          Savannah, Georgia 31401
          Ph/Fax: (912) 867-9140