**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

| | | |
|---|---|---|
| BRIAN J. HUFFMAN, as Administrator of the Estate of ELIUD MONTOYA-ARCOS, Deceased, | ) ) ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
|         v. | ) | No. 18-cv-00184 |
| | ) | |
| THE DAVEY TREE EXPERT COMPANY; WOLF TREE, INC; MARJORIE L. CONNER; CHRISTOPHER BRANCH; OSCAR CRUZ; and PABLO RANGEL, also known as Pablo Rangel-Rubio, | ) ) ) ) ) | |
| | ) | |
|     Defendants. | ) | |

**THE DAVEY TREE EXPERT COMPANY AND WOLF TREE, INC.'S**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

Defendants The Davey Tree Expert Company ("Davey Tree") and Wolf Tree, Inc. ("Wolf Tree," and collectively, "Company Defendants"), by and through their undersigned counsel, hereby move pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss, with prejudice, Plaintiff's Amended Complaint dated July 14, 2023 (ECF No. 123) ("Complaint" or "Compl.").

## PRELIMINARY STATEMENT

Defendant Wolf Tree is a wholly-owned subsidiary of Defendant Davey Tree, a storied, Ohio-based, 143-year old, employee-owned company that has provided tree-trimming, utility-clearing, and landscaping services on some of America's most hallowed grounds, like the Arlington National Cemetery. A year ago, the Company Defendants moved to dismiss Plaintiff's original complaint – exposing not only the fundamental deficiencies of the civil RICO claims, but showing that this case is essentially the same as a negligence-based, wrongful death case brought in the State Court of Chatham County – *Montoya v. The Davey Tree Expert Company*, No.

STCV1701873 (the "State Court Action") – more than six years ago.  It is the exact same story, with the exact same events, the exact same participants, and the exact same tragic outcome: unbeknownst to the Company Defendants, Pablo Rangel – a former Wolf Tree supervisor – operated a fraudulent scheme to hire undocumented employees to work on a tree-trimming and utility line clearing contract that Wolf Tree had with the Georgia Power Company ("Georgia Power") in Savannah, Georgia.  When Eliud Montoya, a Wolf Tree field employee, internally reported Mr. Rangel's alleged misconduct and ultimately complained about it to the Equal Employment Opportunity Commission ("EEOC"), Mr. Rangel did something that *no one* reasonably expected:  he and two co-conspirators arranged to have Mr. Montoya assassinated.

Recognizing that his flawed complaint could not survive the Company Defendants' motion to dismiss, Plaintiff elected to amend it.  (The amended complaint is referred to herein as the "Complaint").  While the Defendants again moved to dismiss, this Court ultimately found that it could not address those motions until the Plaintiff rectified his deficient RICO Statement under Local Rule 9.1.  Thus, this Court denied the Defendants' motions to dismiss the Complaint without prejudice, allowing them to renew those motions once the Plaintiff re-filed an acceptable RICO Statement.

The Complaint and the recently-filed RICO Statement – spanning 108 pages – parrot the same factually and facially deficient narrative that under 11th Circuit and other controlling authorities doomed the Plaintiff's civil RICO claims the first time around.  The latest Complaint largely sprinkles in a few more purported "predicate acts" and re-styles the alleged RICO enterprise with a catchier but factually *false* name – the "Davey–Rangel Enterprise."  But otherwise relies on the same insufficient factual grounds, and leaves Plaintiff's flawed and deficient theory of liability from the original complaint *untouched*.  And the RICO Statement –

which largely seeks to ascribe the alleged misconduct of Pablo Rangel onto the Company Defendants in wholly conclusory terms – offers nothing new, and thus fails to remedy or otherwise bolster the insufficient allegations of the Complaint.

In other words, Plaintiff has doubled down on his failed attempt to try to convert the allegations from an otherwise "standard" negligence-based wrongful death case in the State Court Action into a sprawling civil RICO conspiracy, under which the Defendants here – two companies and their employees operating a tree-trimming business – allegedly operated an intentional racketeering enterprise that was somehow aimed at having a road crew member executed. Despite getting a second chance to cure the deficiencies in his original complaint, there is simply no factual universe in which Plaintiff possibly could advance a plausible claim under the framework of Georgia's civil RICO statute. Plaintiff's Complaint and RICO Statement therefore are nothing more than an ordinary negligence claim that has been dressed up in RICO language, and the Complaint must be dismissed for at least *five* reasons.

*First,* Plaintiff has failed to plead the required *proximate causation* element of all three of his RICO claims. The law is unequivocal: there must be a *direct nexus* between a racketeering act and the *harm* suffered by the plaintiff. Stated differently, Plaintiff must show that the injury (here, Mr. Montoya's assassination) was the *direct result* of a racketeering act targeted *towards* Mr. Montoya *as the intended victim*. Despite packing his Complaint with six categories of alleged RICO predicate acts, Plaintiff has failed to sufficiently plead any such act by *Wolf Tree or Davey Tree* with a direct connection to Mr. Montoya's injuries.

*Second*, Plaintiff asserts a Section 4(a) RICO claim, alleging that the Company Defendants harmed Mr. Montoya through their alleged acquisition or maintenance of an interest in the enterprise or property. But such a harm – an "acquisition injury" as courts have termed it – must

arise from the "acquisition of control over the enterprise."  And must be *different* from the damages that flow from the racketeering activity *itself*.  Here, however, the alleged "acquisition injury" is *identical* to the alleged harms resulting from the racketeering conduct:  Mr. Montoya's death and the payments received from Georgia Power.  Plaintiff's failure to identify a distinct acquisition injury is fatal to his Section 4(a) claim.

*Third*, Plaintiff's Section (b) RICO claim does not allege anything *remotely* resembling a distinct "RICO enterprise" under the applicable standards.  Plaintiff has concocted the term "Davey–Rangel Enterprise" to suggest some intentional criminal partnership between the Company Defendants and their murderous, low-level, rogue employee, Mr. Rangel.  But all that Plaintiff actually alleges in his Complaint is that Mr. Rangel (along with the Company Defendants' other employees) undertook routine tasks attendant to the tree-trimming business.  That is:  hiring and paying workers, bidding for contracts, and certifying worker authorizations.  The 11th Circuit has made clear that Plaintiff's alleged enterprise is wholly impermissible: "permitting plaintiffs to plead an enterprise consisting of a defendant corporation and its officers, agents, and employees acting within the scope of their employment would broaden RICO beyond any reasonable constraints" and "turn every claim of corporate fraud into a RICO violation."  *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1357 (11th Cir. 2016).

*Fourth*, because the substantive RICO claims fail, Plaintiff's RICO conspiracy claim must also fail.  This claim also is deficient because it is little more than a formulaic recitation of the elements of conspiracy – *i.e.*, the "defendants" (as a nebulous group) conspired with one another.

*Fifth*, with the RICO claims gone, this Court does not have an independent basis to exercise subject matter jurisdiction.  This Court should decline to exercise supplemental jurisdiction over the remaining state law claims – which are substantially the same as the negligence-based,

wrongful death claims already pending in the State Court Action – and dismiss the RICO claims with prejudice.[1] Additionally, the Court should dismiss Plaintiff's intentional tort claims as insufficiently plead.

## FACTUAL ALLEGATIONS

### I.     Wolf Tree's Work on Behalf of Georgia Power.

Wolf Tree, a wholly owned subsidiary[2] of Davey Tree, provides tree maintenance along power lines on behalf of utility companies.  (Compl. ¶ 16.)  In the Savannah area, Wolf Tree contracted with Georgia Power.  (*Id.* ¶ 27.)  According to the Complaint, a majority of Wolf Tree's employees in Savannah were not authorized to work in the United States.  (*Id.* ¶ 19.)[3]

### II.    Pablo Rangel's Scheme to Hire Undocumented Workers and Defraud Both the Company Defendants – and Georgia Power.

Pablo Rangel, a former Wolf Tree work crew supervisor in Savannah, is at the center of the alleged RICO scheme.  (*Id.* ¶¶ 20–26.)  Mr. Rangel, an undocumented worker himself, operated

---

[1]     *See e.g., Christian v. Okefenokee Charlton Tr.*, 2020 WL 5242931, at *6 (S.D. Ga. Sept. 2, 2020) (emphasis added) (dismissing RICO claims **with prejudice**, where as here, the plaintiff had been provided multiple opportunities to "put together a complaint (and accompanying RICO statement) that complies, as it must, with Federal Rules of Civil Procedure 8(a)(2), 9(b), 10(b), and Local Rule 9.1").

[2]     Plaintiff disingenuously claims that Wolf Tree is a "division" of Davey Tree (Compl. ¶ 16). This assertion that is entirely belied by the Company Defendants' Rule 7.1 disclosure, stating that Davey Tree "owns 100% of the stock of Wolf Tree, Inc."  (ECF No. 17 at 2.)

In the RICO Statement, Plaintiff asserts that the "acts committed by Davey Tree were also committed by Wolf Tree, and vice versa." (RICO Statement at 12 n.2.)  This sweeping statement conflicts with centuries of precedent that parent corporations are not responsible for the acts of their subsidiaries unless certain conditions, not alleged here, are met.  *United States v. Bestfoods*, 524 U.S. 51, 61 (1998); *Kissun v. Humana, Inc.*, 267 Ga. 419, 421 (1997).  The issue of whether Davey Tree is liable for the acts of Wolf Tree is the subject of motion practice in the State Court Action.  *See e.g.,* The Davey Tree Expert Company's Mem. of Law 2nd Mot. for S. J., *Montoya v. The Davey Tree Expert Company*, No. STCV1701873 (filed April 16, 2024.)

[3]     On a motion to dismiss, a complaint's allegations are presumed true.  *See Ray,* 836 F.3d at 1347.  However, Plaintiff takes extensive liberties – and makes allegations directly contradicting evidence from the record in the State Court Action.

a scheme where he hired and "provid[ed] . . . illegal aliens with false identities and false identification documents," which were then used to "conceal[] the illegal nature of the workforce." (*Id.* ¶ 20.)  Mr. Rangel also arranged for employee paychecks to be mailed "to [his] home address or his PO Box" and for paychecks to be deposited into his bank accounts.  (*Id.* ¶ 23.)  Mr. Rangel charged the "illegal aliens . . . for the false identities and false documents."  (*Id.* ¶ 22.)

The Complaint alleges that Davey Tree and Wolf Tree "falsely and fraudulently certified and represented to Georgia Power" that they had "verified the legality of their workforce," and through Mr. Rangel (and Defendant Oscar Cruz) "provide[d] false and fictitious identification documents to Georgia Power to deceive Georgia Power into issuing Georgia Power identifications to illegal aliens employed [in] Savannah."  (*Id.* ¶¶ 29–30.)

## III.   Eliud Montoya Reports Pablo Rangel's Scheme.

Mr. Montoya "worked as a tree trimmer and team leader for Wolf Tree" in Savannah. (*Id.* ¶ 38.)  In March 2016, Mr. Montoya filed an internal HR complaint with Davey Tree, alleging that Mr. Rangel provided stolen identification documents to unauthorized workers to hire them as Wolf Tree employees.  (*Id.* ¶¶ 43–44.)  The Complaint alleges that the Company Defendants told Mr. Rangel about Mr. Montoya's HR complaint, allegedly in violation of the Company Defendants' whistleblower policy.  (*Id.* ¶ 48.)

In April 2017, Mr. Montoya again complained orally and then submitted a written internal HR complaint.  (*Id.* ¶¶ 49–50.)  His HR complaint said that Mr. Rangel had hired undocumented workers using stolen identities, paid them in cash, and stole a portion of their wages.  (*Id.*)  The HR complaint claimed that Mr. Montoya reported this conduct to the Department of Labor.  (*Id.* ¶ 51.)  Defendant Christopher Branch provided a copy of Mr. Montoya's complaint to Mr. Rangel, and Mr. Rangel allegedly admitted to Mr. Branch that he provided false identification to workers

in exchange for money.  (*Id.* ¶ 56.)

After receiving Mr. Montoya's written complaint, Defendants Marjorie Conner and Mr. Branch allegedly "assured" Mr. Montoya that his HR complaint was being investigated internally – and allegedly did so to "hinder, delay and prevent reports by Montoya to government authorities regarding the criminal and dangerous conduct."  (*Id.* ¶ 72.)

Mr. Rangel responded to the HR complaint by allegedly retaliating against Mr. Montoya. (*Id.* ¶¶ 61–63.)  At a meeting in May 2017 (the "May 2017 Meeting"), Mr. Rangel "read Montoya's whistleblower report aloud to all of the employees . . . and threatened and intimidated Montoya." (*Id.* ¶ 61.)  After hearing the HR complaint read aloud, a number of employees allegedly "became enraged, began rioting, and threatened Montoya with physical violence and death."  (*Id.*)

In May 2017, Mr. Montoya provided Davey Tree's Regional Safety Manager with a copy of the internal HR complaint that he had submitted in April 2017.  (*Id.* ¶¶ 64–65.)  Later that month, Mr. Montoya was cited with an "'unsatisfactory work' employee violation notice," allegedly in retaliation for complaining about Mr. Rangel's scheme.  (*Id.* ¶¶ 68–69.)

Mr. Montoya also provided Ms. Conner with statements from three other employees, reporting similar violations.  (*Id.* ¶ 75)  According to the Complaint, Ms. Conner allegedly provided the statements to Mr. Branch, who in turn provided them to Mr. Rangel, and Mr. Rangel then threatened two of the three employees with physical violence.  (*Id.* ¶¶ 77–78.)

Plaintiff contends that in August 2017, Mr. Montoya was suspended from work for a pretextual "'safe practice violation,'" which represented another attempt "to silence Montoya" and "deter him from providing further reports to governmental authorities."  (*Id.* ¶¶ 79–80.)

## IV.   Pablo Rangel Arranges for the Assassination of Eliud Montoya.

According to the Complaint, after being suspended from work on August 16, 2017, Mr.

Montoya informed Ms. Conner that he planned to submit a complaint to the EEOC, which Ms. Conner allegedly relayed to Mr. Rangel.  (*Id.* ¶¶ 82–83.)  On August 17, 2017, Mr. Montoya reported Mr. Rangel's fraudulent scheme and the Company Defendants' allegedly retaliatory conduct to the EEOC.  (*Id.* ¶ 84.)

Mr. Rangel then arranged for the assassination of Mr. Montoya.  (*Id.* ¶ 87.)  He paid Higinio Perez-Bravo (a non-employee with zero connection to the Company Defendants) to drive the getaway car, and enlisted his brother, Juan Rangel, to commit the murder.  (*Id.*)  On August 19, 2017, Juan Rangel ambushed, shot and executed Mr. Montoya.  (*Id.*)

**V.    Pablo Rangel is Charged and Convicted of Murdering Eliud Montoya.**

In December 2018, Pablo Rangel, Juan Rangel, and Mr. Perez-Bravo were indicted on charges relating to the murder Mr. Montoya.[4]  In March 2022, Pablo Rangel was convicted in this District, by plea of guilty, with aiding and abetting the murder of Mr. Montoya as well as harboring illegal aliens and money laundering, among other crimes.  (*Id.* ¶ 93.)  Mr. Rangel admitted to arranging the assassination of Mr. Montoya.  (*Id.*)

In April 2022, after the prosecution presented its evidence at trial, Mr. Perez-Bravo pled guilty to conspiracy to commit murder for hire.  (*Id.* ¶ 94.)  And in October 2022, Juan Rangel, was convicted of the retaliatory murder of a federal witness, among other crimes. (*Id.* ¶ 95.)[5]

---

[4]    This Court may take judicial notice of public records, like an indictment or a judgment in a criminal action, to consider them on a motion to dismiss.  *See Curry v. TD Ameritrade, Inc.*, 662 F. App'x 769, 771 n.3 (11th Cir. 2016) (taking judicial notice of defendant's indictment and related settlement); *Tatum v. Ellien*, 2014 WL 4774629, at *1 n.1 (S.D. Ga. Sept. 24, 2014) (court "may take judicial notice of [the] conviction and [the] sentence in [a] criminal case" and "all matters of public record" on a motion to dismiss).  Here, Pablo Rangel's indictment was entered in *United States v. Rangel-Rubio*, No. 4:18-cr-00274-2 (S.D. Ga. Dec. 7, 2018), ECF No. 2.

[5]    *See* J., *United States v. Rangel-Rubio*, No. 4:22-cr-00030-1 (S.D. Ga. Nov. 21, 2022) (Mr. Rangel sentenced to 584 months), ECF No. 33; Plea Agreement, *United States v. Perez-Bravo*, No. 4:18-cr-00274-3 (S.D. Ga. Apr. 14, 2022), ECF No. 605; J., *United States v. Rangel-Rubio*, No. 4:18-cr-00274-2 (S.D. Ga. Apr. 18, 2023), ECF No. 741.

## VI.   The Aftermath of Mr. Montoya's Murder.

According to the Complaint, following the execution of Mr. Montoya, Ms. Conner falsely told a Garden City Police officer that she had determined that Mr. Montoya's complaints "lacked credibility," and falsely testified at a deposition in the State Court Action that her investigation of Mr. Montoya's internal HR complaint remained ongoing at the time of his death.  (*Id.* ¶¶ 89–90.) Plaintiff also says that Mr. Cruz falsely testified at his deposition that he was not aware that the Company Defendants had employed undocumented workers.  (*Id.* ¶ 91.)

## VII.   The RICO Enterprise Allegations.

The Complaint alleges that Wolf Tree, Davey Tree, its in-house counsel Ms. Conner in Ohio, Mr. Branch, Mr. Cruz and "others" joined together with Mr. Rangel to form an "association-in-fact enterprise" – naming it the so-called "Davey-Rangel Enterprise."[6]  Plaintiff alleges that the "Davey-Rangel Enterprise" had a common purpose "of making money through a variety of illicit means and concealing and preventing detection of the enterprise's unlawful activities" (*id.* ¶ 101) – *i.e.*, the alleged scheme to hire undocumented workers and defraud Georgia Power.  (*Id.* ¶¶ 99–108.)

According to Plaintiff, Mr. Rangel's recruitment of undocumented workers allegedly was "[o]utside of his duties and responsibilities as the supervisor" of the Savannah cost center.  (*Id.* ¶ 102.)  Davey Tree and Wolf Tree's alleged role in the enterprise was to defraud Georgia Power out of "millions of dollars"; to "fund[] Rangel's outside recruitment of an illegal-alien workforce" and his harboring of undocumented workers by sending their paychecks to Mr. Rangel's address,

---

[6]   In the RICO Statement, Plaintiff also names Davey Tree CFO Joseph Paul, Wolf Tree supervisor David Jackson, Juan Rangel, and Mr. Perez-Bravo as members of the enterprise.  (RICO Stat. at 72.)  Because there are no allegations concerning Mr. Paul in the Complaint – and the allegations as to his conduct in the RICO Statement are wholly conclusory (RICO Stat. at 47, 74) – the Court should not consider him as an alleged member of the enterprise.

and/or by depositing their paychecks into his bank accounts; and to work with Rangel to intimidate and silence Mr. Montoya. (*Id.* ¶ 105.) Mr. Cruz's alleged role was to assist Mr. Rangel in his scheme. And Ms. Conner and Mr. Branch attempted to conceal the alleged Davey–Rangel Enterprise. (*Id.* ¶¶ 106–08.) These allegations are not plausible.

## ARGUMENT

### I.   Applicable Pleading Standards.

To survive a motion to dismiss, a plaintiff "must state a claim to relief that is plausible on its face." *Smith v. United States*, 873 F.3d 1348, 1351 (11th Cir. 2017) (citations omitted). Facial plausibility "asks for more than a sheer possibility" of liability – because only pleading "facts that are 'merely consistent with' a defendant's liability . . . stops short of the line between possibility and plausibility." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). A plaintiff must plead "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. A court should reject "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts." *Oxford Asset Mgmt., v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).

The 11th Circuit standard in civil RICO cases is even *more* exacting. "Civil RICO claims, which are essentially a certain breed of fraud claims, must be pled with an increased level of specificity." *Ambrosia Coal & Constr. v. Pages Morales*, 482 F.3d 1309, 1316 (11th Cir. 2007). The substantive allegations underlying the claim "must comply not only with the plausibility criteria articulated in *Twombly* and *Iqbal* but also with [Rule] 9(b)'s heightened pleading standard." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010). In "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." *Id*. Thus, to survive a motion to dismiss here, Plaintiff must allege: "(1) the precise statements, documents, or misrepresentations made; (2) the time and place of and person

responsible for the statement; (3) <u>the content and manner in which these statements misled the</u> <u>Plaintiffs</u>; and (4) what the Defendants gained by the alleged fraud." *Ambrosia*, 482 F.3d at 1316–17 (emphasis added). But the Complaint here, on its face, fails all of these tests.

## II.    The Alleged Racketeering Acts Did Not Proximately Cause Plaintiff's Injuries.

The Complaint also fails to plead a critical and essential element of all Georgia RICO claims – *proximate causation. See Petlechkov v. FedEx Corp.*, 2024 WL 729006, at *3 (11th Cir. Feb. 22, 2024) (citation and quotation omitted) ("To state a RICO claim under Georgia law, a plaintiff must show (1) that the defendants violated or conspired to violate the RICO statute; (2) that as a result of this conduct the plaintiff has suffered injury; and (3) that the defendant[s'] violation of or conspiracy to violate the RICO statute was the proximate cause of the injury.")

To have *standing* under Georgia's civil RICO statute, a plaintiff must show both a pattern of racketeering activity – *i.e.*, at least two predicate acts – by *each* defendant,[7] and "a **direct nexus** between at least **one** of the predicate acts listed under the RICO Act and the **injury** [the plaintiff] purportedly sustained." *Rosen v. Protective Life Ins.*, 817 F. Supp. 2d 1357, 1381 (N.D. Ga. 2011) (emphasis added and citation omitted), *aff'd sub nom. Rosen v. Am. Guar. & Liab. Ins.*, 503 Fed. App'x 768 (11th Cir. 2013).

---

[7]    Plaintiff erroneously asserts that he need only plead that *each* defendant committed *one* predicate act (RICO Stat. at 66), but this is not the law in this Circuit. As explained recently by the 11th Circuit, "[t]o state a RICO claim under Georgia law . . .  a plaintiff must demonstrate that the statute has been violated, including that the defendant engaged in at least two predicate acts of racketeering activity." *Petlechkov*, 2024 WL 729006, at *3; O.C.G.A. § 16-14-3(4); *Turk v. Morris, Manning & Martin, LLP*, 593 F. Supp. 3d 1258, 1300 (N.D. Ga. 2022), *reconsideration denied,* 661 F. Supp. 3d 1276 (N.D. Ga. 2023) ("In analyzing Plaintiffs' Georgia RICO claims, the Court will begin with the requirement that Plaintiffs establish a pattern of racketeering activity *as to each Defendant*."); *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1208–09, 1217 (11th Cir. 2020) (dismissing federal RICO claim on the basis that "plaintiff must plead that each defendant engaged in the conduct of the affairs of the RICO enterprise through a pattern of racketeering activity involving at least two predicate criminal acts" and then dismissing the Georgia RICO Section (b) *and* (c) claims "for the same reasons that the federal RICO claims were dismissed").

To satisfy the "**direct nexus**" requirement, a plaintiff "must show that one of the predicate acts directly harmed [*him*], not a third party," and that his "injury flowed directly from the predicate acts targeted at [*him*], not merely that [his] injury was an eventual consequence of the [acts] or that [he] would not have been injured but for the [acts]." *Smith v. Morris, Manning & Martin, LLP*, 293 Ga. App. 153, 165–66 (2008) (citation omitted). "Thus, to survive a motion to dismiss, a plaintiff asserting a RICO claim must allege more than that an act of racketeering occurred and that she was injured . . . Rather, she must show that her injury was the ***direct result of a predicate act targeted toward her***, such that she was the intended victim." *Wylie v. Denton*, 323 Ga. App. 161, 166 (2013) (emphasis added); *Petlechkov,* 2024 WL 729006, at *4 (citation and quotation omitted) ("The standard for establishing causation is high: When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."). [8] The Complaint alleges no such injury.

Here, the Complaint fails to establish a direct nexus between ***any*** predicate act allegedly committed ***by Davey Tree or Wolf Tree*** – and the ***harms*** allegedly suffered by Mr. Montoya. The primary harms Plaintiff alleges are Mr. Montoya's murder, pain in the "moments leading up to his death," and lost years of income. He also claims unspecified injuries caused by intimidation, threats, misleading conduct, and unenumerated "economic harms." (RICO Stat. at 103.)

The alleged predicate acts purportedly causing these harms fall into six categories: (1)

---

[8]     The direct-relation standing requirement arises from the federal RICO civil remedy language that "[a]ny person injured . . . *by reason* of a [RICO] violation" may bring suit. *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 463 (2006) (Thomas, J., concurring) (emphasis added) (quoting 18 U.S.C. § 1964(c)). Since Georgia's civil RICO statute also includes the "by reason of" language, "Georgia RICO cases require some direct relation between the alleged injury and the prohibited conduct." *KJ's Gen. Contractors, Inc. v. J.E. Dunn Constr. Co.*, 2015 WL 5680379, at *4 (S.D. Ga. Sept. 25, 2015); *see* O.C.G.A. § 16-14-6.

Pablo Rangel's scheme to hire undocumented workers (the "Unauthorized Workers Scheme"); (2) an alleged scheme to defraud Georgia Power (the "Georgia Power Scheme"); (3) threatening/interfering with a witness; (4) the events of the May 2017 Meeting; (5) murder; and (6) the alleged "cover up" of the Unauthorized Workers Scheme and Georgia Power Scheme.

However, a close examination of each predicate act alleged *as to the Company Defendants* reveals that the Plaintiff either (1) failed to adequately plead the elements of that predicate act; and/or (2) failed to establish a "***direct nexus***" between that predicate act and any of Mr. Montoya's injuries.  At the end of this examination, *not <u>one</u> predicate act* – that was allegedly committed ***by*** the Company Defendants and ***targeted towards*** Mr. Montoya – is sufficient.  The Plaintiff's failure to sufficiently allege that *a single predicate act* by the Company Defendants' *proximately caused* Mr. Montoya's injuries – is *fatal* to his claims.

*Turk v. Morris, Manning & Martin, LLP* – a Georgia RICO case involving multiple defendants – describes the correct analytical analysis.  593 F. Supp. 3d 1258 (N.D. Ga. 2022). Specifically, the *Turk* court analyzed – on a *defendant-by-defendant* basis – whether the plaintiffs had sufficiently pled the predicate acts alleged against *each particular* defendant.  And then also analyzed whether "that same conduct *proximately caused* Plaintiffs' alleged damages."  *Id.* at 1300, 1303–10.  The *Turk* court then dismissed the RICO claims against every defendant where *no predicate acts remained. Id.*[9]  This Court should do the same for the Company Defendants.

---

[9]     *See Lechter v. Aprio, LLP*, 565 F. Supp. 3d 1279, 1331 (N.D. Ga. 2021) (considering proximate causation with respect to the predicate acts allegedly committed by each defendant in a multi-defendant Georgia RICO claim); *Pierson v. Zuber*, 2010 WL 11496944, at *10 (N.D. Ga. Jan. 13, 2010) (dismissing claim against RICO defendant, in part, because complaint failed to allege that particular defendant "harmed the Plaintiffs"); *see also Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*, 341 F.3d 1292, 1308 (11th Cir. 2003) (affirming judgment on pleadings because plaintiffs could not "establish any valid predicate acts" where plaintiff failed to show proximate cause for some predicate acts and the elements of the crime for others).

### A.   The "Unauthorized Workers Scheme" and "Georgia Power Scheme" Did Not Directly Harm or Target Mr. Montoya.

The Unauthorized Workers Scheme and Georgia Power Scheme predicate acts – immediately fail because, as alleged, they did not – and could not – target *Mr. Montoya*.

Under the Unauthorized Workers Scheme, the Company Defendants allegedly accepted and used false identification documents, harbored undocumented workers, engaged in identity fraud, and participated in money laundering.  (Compl. ¶¶ 115–117, 121–123) (alleging violations of 18 U.S.C. §§ 1546(a), (b); 8 U.S.C. § 1324(a)(1)(A);[10] O.C.G.A. §§ 16-9-121(a), (b); 18 U.S.C. § 1956(a)(1)(A)(i)).[11]  But even if these allegations were in fact true – and they are not – they still did *not directly target or harm* Mr. Montoya or cause any of the injuries he claims.  (RICO Statement at 102-03.)

Here, the Complaint absolutely fails to sufficiently allege that Mr. Montoya was injured *as a result of* these predicate acts.  That is, Mr. Montoya did not lose any money, or otherwise suffer any harm, when Mr. Rangel allegedly "hired and harbored undocumented workers."  If any party was harmed by the immigration-related predicate acts that Plaintiff alleges, it would have been the United States Government.  *See Anza*, 547 U.S. at 460 (civil RICO plaintiff lacked standing to bring claims for alleged tax fraud because the State was proper party to pursue remedies); *Walters v. McMahen*, 684 F.3d 435, 443–44 (4th Cir. 2012) (finding no direct harm to civil RICO employee plaintiff for employer's use of false verification documents).

---

[10]   The allegations in paragraph 117 of the Complaint are insufficient to support 8 U.S.C. § 1324(a)(1)(A) – harboring aliens – as a predicate act.  The statute sets out five separate criminal offenses in subsections(a)(1)(A)(i) to (v), but the Complaint does not specify *which* of these offenses any *particular defendant* has allegedly committed.  Nor does it adequately plead the elements of any of those offenses.  *See* 8 U.S.C. § 1324(a)(1)(A)(i)–(v).

[11]   The allegations in paragraph 122 are also insufficient under Rule 9(b) because the wire fraud element of the alleged predicate act of money laundering is not plead with specificity.

Likewise, Plaintiff cannot boot-strap adequate "standing" through the alleged Georgia Power Scheme, where the Company Defendants purportedly "obtained millions of dollars" from Georgia Power – and *not from Mr. Montoya* – by allegedly falsely certifying that Wolf Tree had assigned authorized workers to the contract.  (*See* Compl. ¶¶ 118–20.)  According to Plaintiff, the predicate acts underlying this scheme include, among others, theft by deception (O.C.G.A. § 16-8-3); wire fraud (18 U.S.C. § 1343); and identity fraud (O.C.G.A. § 16-9-121(a)).  (*Id.*)[12]  But Plaintiff has *not* alleged that *any* of this conduct was directed at, or harmed, *Mr. Montoya*.  *See Lockhart v. Columbian Chemicals Co.*, 2007 WL 9706424, at *3–4 (N.D. Ga. Aug. 31, 2007) (theft by deception fails as predicate act where theft *victimizes a third party*).  Indeed, these alleged predicate acts are inextricably linked to Georgia Power – and the retention of the Georgia Power contract – so there is no world in which they could have "injured" Mr. Montoya.

To the extent that Plaintiff claims there is a direct nexus between the *predicate acts* alleged as part of the Unauthorized Workers Scheme (*i.e.*, hiring unauthorized workers and fraudulent misuse of documents) – and any economic injury Mr. Montoya suffered when he was suspended from work on a supposedly "fabricated" safety violation (Compl. ¶¶ 79–81), such injury is far too attenuated to confer RICO standing.  The 3-day suspension was completely unrelated to the alleged hiring of workers or fraudulent use of identity documents.

---

[12]     These fraud-based predicate acts also fail because Plaintiff failed to plead fraud with the specificity required under Rule 9(b).  Plaintiff does not set out the "precise" "misrepresentations" or "misstatements" Davey or Wolf made to Georgia Power in carrying out the alleged wire fraud or theft by deception, *Am. Dental Ass'n,* 605 F.3d at 1291 – alleging only that by mailing contracts and invoices Davey Tree somehow created a "false impression" that the workforce was legal. (Compl. ¶¶ 118, 119.)  Plaintiff half-heartedly attempts to address this deficiency in Section 5(c) of the RICO Statement.  (RICO Stat. at 63.)  But his after-the-fact assertions that the fraudulent statements were made at *unknown* times in a 9-year span, at Davey Tree's headquarters, or Georgia Power or in other "unknown" location(s), by Rangel or Cruz (who both worked for Wolf in Savannah not at Davey Tree headquarters) or by other unknown persons are insufficient to meet the "heightened pleading standards" of Rule 9(b).  *Cisneros,* 972 F.3d at 1216.

Courts in the 11th Circuit routinely *dismiss* civil RICO claims where a plaintiff's purported injury is employment-related retaliation for reporting alleged racketeering activity. For example, the Northern District of Georgia – in a case on all fours with this one – *rejected* a civil RICO claim alleging that the plaintiff was fired for complaining internally about a scheme to hire undocumented workers. And found that such an injury did *not* directly result from the alleged racketeering activity – but rather, "from the tangentially related decision to fire him." *Parker v. Diverse Staffing Georgia, Inc.*, 2020 WL 10575029, at *10 (N.D. Ga. Dec. 23, 2020) (citation and brackets omitted), *rep. & rec. adopted*, 2021 WL 3367263, at *1 (N.D. Ga. Jan. 12, 2021); *see also Anderson v. Brown Indus.*, 2012 WL 12860887, at *8–9 (N.D. Ga. June 13, 2012) (retaliatory termination, "harassment" and "discrimination" resulting from complaints about an alleged undocumented workers scheme are "insufficient to confer standing" under RICO).

Here, the *direct* harms resulting from hiring undocumented workers – under the Unauthorized Workers Scheme – are those that federal employment verification laws seek to mitigate. And the direct harms resulting from the Georgia Power Scheme are those that are directly suffered by Georgia Power. Adverse employment actions resulting from retaliatory conduct – of the kind allegedly suffered by Mr. Montoya – are *collateral* (and not direct consequences) to the alleged predicate acts underlying both of those schemes and are not cognizable.

## B. Plaintiff Has *Failed to Sufficiently* Plead the Predicate Acts of "Threatening" or "Influencing a Witness."

Plaintiff's attempts to transform alleged garden-variety employment retaliation into *criminal* interference with a witness – under two different statutes – also must be rejected. The statutes here never were intended to criminalize these acts (which are better addressed under applicable *employment* laws). And, in any event, the Complaint *fails to articulate* a violation of the criminal statutes at issue here: § 16–10–32(b) and § 16–10–93(b)(1)(C).

16

*First*, Plaintiff makes the unfounded contention that the issuance of allegedly fabricated employment notices somehow constitutes the crime of threatening a witness (O.C.G.A. § 16-10-32(b)).  (Compl. ¶¶ 68–69, 79–80, 127, 130.)  The elements of this crime are:

> threaten[ing] or caus[ing] physical or economic harm to another person . . . with the intent to hinder, delay, prevent or dissuade any person from:  1. Attending or testifying in an ***official proceeding***; [or] 2. Reporting in good faith to a ***law enforcement officer***, . . . the commission or possible commission of an offense under the laws of this state.

O.C.G.A. § 16-10-32(b)(1), (2) (emphasis added).  Plaintiff alleges that Wolf Tree committed this crime when it issued pretextual citations to Mr. Montoya – for "unsatisfactory work" and a "safety violation" resulting in his three-day suspension.  (Compl. ¶¶ 68–69, 79–80, 127, 130.)  But these alleged workplace citations – even if they were pretextual or retaliatory – simply are not the *crimes* that Plaintiff wants them to be.

For starters, the Complaint *does not – because it cannot – allege* that Davey Tree or Wolf Tree verbally threatened Mr. Montoya with *economic or physical harm* to dissuade him from testifying in *a proceeding* or reporting to law enforcement.  *See Scouten v. Amerisave Mortg. Corp.*, 284 Ga. App. 242, 243 (2007), *rev'd on other grounds*, 291 Ga. 493 (2008) ("witness tampering" theory fails without specific allegation of a threat).

Next, the Complaint fails to sufficiently plead a violation of the "*official proceeding*" element.  While an "official proceeding" need not be "pending" per se, Plaintiff nevertheless fails to explain how an alleged attempt to deter *a report* to the Department of Labor (Compl. ¶¶ 45, 51) would – by *itself* – somehow constitute interference with an "official proceeding."  Which is a term that the statute defines as any "*hearing* or *trial* conducted by . . . an agency of the executive, legislative, or judicial branches of government of this state."  O.C.G.A. § 16-10-32(c)(1) (emphasis added).  The Complaint does not specify whether an actual or hypothetical *hearing* ever existed.

The Complaint also *fails to allege* that Mr. Montoya ever indicated to *anyone* at Wolf Tree

or Davey Tree that he planned to go to a *law enforcement officer* – such as the local police or ICE– to report the Unauthorized Workers Scheme.  Instead, Plaintiff alleges only that the pretextual write-ups were "retaliation" for Mr. Montoya's *internal* HR complaints, and were designed to deter him from "further reports to [unspecified] government authorities."  (Compl. ¶¶ 69, 80.)  Further, while the Plaintiff has contended that the Georgia Department of Labor – a <u>civil</u> agency has "law enforcement authority" (Compl. ¶ 45), he has never cited any authority for this "patently untrue" assertion.[13]  Nor has he explained how a Department of Labor employee could ever meet the legal definition of a "law enforcement officer" – which the Georgia Code defines as "a person employed or appointed by a state or political subdivision who is granted, by state law, the authority **to enforce criminal, traffic, or penal laws** of his or her respective state and **who possesses the power to effect arrests**."  O.C.G.A. § 35-1-15(a)(2).

Plaintiff's failed reliance on Section 16–10–93(b)(1)(C) fares no better.  This crime prohibits a person "knowingly . . . to engage in misleading conduct toward another person with intent to . . . [h]inder, delay, or prevent the communication to a law enforcement officer . . . of information relating to the commission or possible commission of a criminal offense."  O.C.G.A. § 16–10–93(b)(1)(C).  Here again, the allegations that Ms. Conner and Mr. Branch attempted to assure Mr. Montoya that his complaint was being investigated (when it allegedly was not) simply do not amount to a *crime*.  (Compl. ¶¶ 72, 128.)  The Complaint alleges only that Ms. Conner and Mr. Branch sought to prevent "reports" to unspecified "government authorities."  But fails to allege

---

[13]     This Court need not credit Plaintiff's demonstrably false allegation that the Georgia Department of Labor is a law enforcement agency.  *See e.g.*, *Jacobsen v. Bank of Am., N.A.*, 2010 WL 5140686, at *3 (W.D. Va. Dec. 13, 2010) ("Although the court owes the complaint a presumption of truth, it need not accept as true that which is demonstrably false."); *Francis v. Giacomelli*, 588 F.3d 186, 195 (4th Cir. 2009) (granting motion to dismiss where the allegations were "patently untrue").

that they *intended* to prevent Mr. Montoya from going to a *law enforcement officer*.

Not surprisingly, there is not a single reported decision in Georgia in which a supervisor was *criminally prosecuted* under either § 16–10–32 or § 16–10–93 for issuing a pretextual work violation, suspending or terminating an employee, or falsely stating that an internal investigation of an HR complaint was ongoing.   This Court should not allow Plaintiff to convert a routine employment dispute into a wide-ranging civil RICO conspiracy.   *See Lockhart v. Columbian Chemicals Co., Inc.*, 2007 WL 9706424, at *7 (N.D. Ga. Aug. 31, 2007) (concluding that defendant's termination of an employee – and refusal to consider him for promotion – were not "explicit allegations of threats or actual physical or economic harm" and that, as a result, the putative RICO claimant had therefore *failed to allege a predicate act* under Section 16–10–32.)[14]

### C.        The Predicate Acts Linked to the May 2017 Meeting are Insufficiently Pled

Plaintiff erroneously contends that a May 2017 work crew meeting at which Mr. Montoya's HR complaint was read aloud – and which then allegedly prompted certain workers to allegedly threaten Mr. Montoya – amounted to the crimes of "influencing a witness" (O.C.G.A. § 16-10-93) and "terroristic threats" (O.C.G.A. § 16-11-37).   But the conduct as pled fails to meet the plain language in those two statutes.   Starting with this:  the Georgia statutes criminalizing the acts of "influencing a witness" and of making "terroristic threats" each contain *multiple subsections* that

---

[14]     In Section 5(b) of the RICO Statement, Plaintiff adds conclusory boilerplate language from the statutory definition of "racketeering activity" in Section 16-14-3 to his description of certain of the alleged predicate acts, including to threatening a witness and  influencing a witness, claiming, "this conduct also constitutes acts and threats involving obstruction of justice, chargeable under the laws of Georgia and punishable by imprisonment for more than one year.  O.C.G.A. § 16-14-3(B)."  (*See* RICO Stat. at 57–58.)  Those two specific crimes are already enumerated in Section 16-14-3(A) as "racketeering activity."  The addition of the boilerplate statutory language claiming that the alleged conduct (which does not amount to a violation of the *specific* named crime) somehow constitutes a violation of an unnamed "obstruction of justice" statute is insufficient to plead that the conduct is a predicate act.

criminalize a variety of *different conduct* (of different acts). The Complaint, however, fails to plead any *specific sub-sections* of these statutes. That is: it fails to plead as it is required to do *which section* of the statute was violated by *which defendant*–whether by Rangel, Cruz, Branch, or any other party. (Compl. ¶¶ 61, 125–26.)[15]

In her prior opposition to the motions to dismiss, Plaintiff alleged violations of O.C.G.A. § 16-10-93 *subsection* (b)(1)(C) and O.C.G.A. § 16-11-37 *subsection* (b)(1). Even *if* this Court were to evaluate the sufficiency of the Complaint under the rubric of these specific crimes – not identified in the Complaint – it would still conclude that Plaintiff's *factual allegations* – as plead – do not satisfy *each and every element* of these crimes.

*First*, subsection 93(b)(1)(C) prohibits a person to "knowingly [] use intimidation, physical force, or threats . . . with intent to . . . [h]inder, delay, or prevent the communication to a ***law enforcement officer*** . . . of information relating to the commission or possible commission of a criminal offense." O.C.G.A. § 16-10-93(b)(1)(C) (emphasis added.)

As explained above, Department of Labor employees are not law enforcement officers. Plaintiff cannot point to single case or example where anyone has been prosecuted under Section 93(b)(1)(C) for hindering or delaying a communication specifically to the *Department of Labor*. As a result, the Complaint utterly fails on its face to plead the requisite elements in support of a Section 93(b)(1)(C) violation.

Plaintiff also fails to sufficiently plead and allege ***solicitation*** of terroristic threats by Pablo Rangel. (Compl. ¶ 126.) The elements of O.C.G.A § 16-11-37 (b)(1) are: "(a) that the defendant threatened to commit a crime of violence against the victim, and (b) that the defendant did so with the purpose of terrorizing the victim." *State v. Stubbs*, 365 Ga. App. 630, 633 (2022). Here, the

---

[15]   The RICO Statement simply repeats this error. (RICO Stat. at 57.)

required *intent* element is *missing* from the Complaint.  The Plaintiff also fails to specify the *content* of the alleged threats – other than vague, generalized references to bodily injury and death – and *which* worker at the May 2017 meeting made them.  Moreover, there are no allegations of **solicitation** – *i.e.*, that there was a "relatively overt statement or request intended to bring about" the commission of a **felony**.  *Eng. v. State*, 290 Ga. App. 378, 380 (2008); O.C.G.A. § 16-4-7.[16] The crime of terroristic threats is a **misdemeanor**, unless there is a death threat (O.C.G.A. § 16-11-37(d)(1)); and nowhere does the Plaintiff allege that Pablo Rangel overtly asked the other employees to make threats on Mr. Montoya's life.[17]

Even *if* the Plaintiff had adequately pled each of the elements of these crime – and he did *not* – these acts were not alleged as to Wolf Tree or Davey Tree and therefore cannot create standing to bring a RICO claim against the Company Defendants.

### D.    The Company Defendants Were Not Involved in the Murder.

Plaintiff's primary injuries stem from the predicate acts of intentional murder (O.C.G.A. § 16-5-1) and retaliating against a federal witness (18 U.S.C. § 1513(a)).  (Compl. ¶ 133.)  But, Davey Tree and Wolf Tree did not commit Mr. Montoya's murder.  The public record in this District makes it clear that Pablo Rangel and his two co-conspirators _alone_ were indicted and convicted for their role in Mr. Montoya's assassination.  Given these convictions, and the extensive trial testimony from the criminal trials of Mr. Perez-Bravo and Juan Rangel in this very District,

---

[16]    "A person commits the offense of criminal **solicitation** when, with intent that another person engage in conduct constituting a felony, he solicits, requests, commands, importunes, or otherwise attempts to cause the other person to engage in such conduct."  O.C.G.A. § 16-4-7(a) (emphasis added).

[17]    Mr. Rangel's alleged threats against two *other* workers who sent statements to Davey Tree do not confer *standing*, because the purported threats were directed towards *other* people – and *not* to Mr. Montoya.  (*See* Compl. ¶ 129.)

there is no way that the Plaintiff can credibly allege that the Company Defendants were involved, *in any way*, with Mr. Montoya's death.  As a result, murder and retaliating against a federal witness *cannot* serve as predicate acts to confer RICO standing for Plaintiff to bring a claim *against the Company Defendants.*

      **E.**      **The Purported "Cover Up" Did Not Target Mr. Montoya.**

The final purported predicate acts – "perjury" and "false statements" – do *not* confer RICO standing – because *Mr. Montoya could not have been injured* by a purported "cover up" that occurred *after* his death.  Plaintiff alleges that, *after the murder*, to "conceal criminal activities committed by Defendants' criminal enterprise," Ms. Conner made "false statements" to a police officer and committed "perjury" at her deposition in the State Court Action.  (Compl. ¶¶ 89–90, 134–35.)  Plaintiff says that Mr. Cruz perjured himself when he testified that he was not aware that the Company Defendants had hired unauthorized workers prior to the murder.  (*Id.* ¶¶ 91, 136.)

At most, Plaintiff has alleged that Ms. Conner and Mr. Cruz made false statements to "cover up" the Unauthorized Workers Scheme.  But as discussed above, Plaintiff lacks standing to bring a RICO claim predicated on the Unauthorized Workers Scheme because there is no direct nexus between those acts and Mr. Montoya's injuries.

Moreover, since Ms. Conner and Mr. Cruz's alleged statements were made *after* Mr. Montoya's death, these acts were not and could not have been *directly targeted towards <u>him</u>*.  *See Testone v. Niagara Mohawk Power Corp.*, 1992 WL 72145, at *10 (N.D.N.Y. Mar. 26, 1992) (emphasis added) (in civil RICO case, "plaintiff destroys standing by pleading predicate acts which *occur after the injury* or which have no causal connection to the injury").  Indeed, that these supposed acts were committed *after* the alleged injuries underscores the proximate causation problem.  Finally, Plaintiff has failed to plead or allege *any involvement* by the Company

Defendants in these purported acts.  Thus, the so-called (after the fact) "cover-up" does not confer standing on Plaintiff to bring a RICO claim specifically against the Company Defendants.

## III.    Plaintiff Has Not Alleged a Distinct "Acquisition Injury."

Under Section 4(a) of the Georgia RICO statute, "[i]t shall be unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain . . . any interest in or control of any enterprise, real property, or personal property." O.C.G.A. § 16-14-4(a).  Georgia's RICO statute, which largely mirrors the federal RICO statute,[18] confers standing on a plaintiff only if he has suffered an "acquisition injury."  *Club Car, Inc. v. Club Car (Quebec) Imp., Inc.*, 276 F. Supp. 2d 1276, 1282, 1288 (S.D. Ga. 2003), *aff'd*, 362 F.3d 775 (11th Cir. 2004), *abrogated on other grounds*, *Innov. Clinic. & Consult. Servs. v. First Nat'l Bank of Ames, Iowa*, 279 Ga. 672 (2005).

In the simplest terms, to have standing to assert a Section 4(a) claim, the plaintiff must allege that his injury stems *not* from a defendant's predicate acts, but from the defendant's *acquisition* or *maintenance* of an interest in, or control over, the enterprise, real property, or personal property.  *See e.g.*, *Compagnie De Reassurance D'Ile de France v. New England Reins. Corp.*, 57 F.3d 56, 91–92 (1st Cir. 1995).  As a practical matter, the "damages arising from the acquisition or maintenance of control of the enterprise . . . must be different from the damages that flow from the predicate acts themselves."  *D'Addario v. D'Addario*, 901 F.3d 80, 98 (2d Cir. 2018). In *D'Addario*, the court provided a helpful example:

> [A] racketeer might use a pattern of physical threats and violence, including an act of arson . . . to extort an interest in the plaintiff's business.  The cost of replacing or repairing property damaged in the fire is a loss caused by the predicate act, the

---

[18]    Georgia courts routinely treat the federal and Georgia RICO statutes co-extensively, finding that if a plaintiff cannot establish standing to maintain a federal RICO claim, he lacks standing under Georgia RICO as well.  *See, e.g.*, *Harris v. Orange S.A.*, 2014 WL 11822768, at *2 (N.D. Ga. Nov. 28, 2014) ("if a party lacks standing to assert a federal RICO claim, she also lacks standing to assert a Georgia RICO claim"), *aff'd*, 636 Fed. App'x 476 (11th Cir. 2015).

arson . . . . The "separate and distinct" damages caused by the RICO violation, as opposed to by the predicate acts, is the value of the share of the plaintiff's business that the owner turned over to the defendant.

*Id.* at 98. Thus, acquisition injury under Section 4(b) is a *distinct form of harm* that must be alleged.

Here, Plaintiff has not alleged this distinct form of injury. The Complaint tries desperately to make out an acquisition injury – using buzz words like "*maintained control and influence* of the Davey-Rangel Enterprise by funding Rangel's false identification and harboring and concealing of illegal aliens schemes" (*see e.g.*, Compl. ¶ 151 (emphasis added)) – but those allegations merely parrot the predicate acts underlying Plaintiff's deficient Section 4(b) claim. Indeed, a close reading of the Complaint reveals that the principal injury allegedly caused by the predicate acts – Mr. Montoya's death – *also is* claimed to be the same harm tied to the Company Defendants' alleged acquisition and maintenance of the "Davey-Rangel Enterprise."

The Complaint's "new" injury allegations in support of the Section 4(a) claim are the exact same injuries for the other RICO claims (*i.e.*, Section 4(b)), and do not delineate a distinct form of harm. (*Compare id.* ¶ 158 *with* ¶ 143.) That is, the purported acquisition injury under Section 4(a) – Mr. Montoya's death – is also the alleged consequence of the predicate acts under Section 4(b). *Club Car*, 276 F. Supp. 2d at 1288 (dismissal is warranted where a plaintiff "fail[s] to demonstrate any injury resulting from [defendant's] acquisition of an enterprise").[19]

## IV. The Complaint Fails to Plead a Distinct RICO Enterprise.

Under Georgia RICO, Section 4(b) confers liability on a "person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a

---

[19]     Section 14 of Plaintiff's RICO Statement reinforces that Plaintiff has not and cannot allege a distinct *acquisition* injury. Plaintiff claims that the Company Defendants *acquired* "money" from Georgia Power. But, any money received from Georgia Power flowed directly from the predicate acts comprising the Georgia Power Scheme; and had no nexus to any injury suffered by Mr. Montoya. (RICO Stat. at 87.)

pattern of racketeering activity."  O.C.G.A. § 16-14-4(b).  Because an enterprise cannot be employed by or associated with itself, *McCullough v. Suter*, 757 F.2d 142, 144 (7th Cir. 1985), the U.S. Supreme Court – and virtually every Court of Appeals, including the 11th Circuit – require a "distinction between the defendant 'person' and the 'enterprise' itself."  *Ray,* 836 F.3d at 1355; *Cedric Kushner Promos., Ltd. v. King*, 533 U.S. 158, 161–62 (2001) (listing cases).  An "enterprise may not simply be a 'person' referred to by a different name."  *Ray*, 836 F.3d at 1355 (citation omitted); *accord Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013) ("a corporate person cannot violate the [RICO] statute by corrupting itself.").

Moreover, where, as here, the Plaintiff has alleged an "association-in-fact" enterprise (*see, e.g.,* Compl. ¶¶ 99–101), he must allege that a "group of persons shares three structural features: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose." *Cisneros v. Petland*, *Inc.*, 972 F.3d 1204, 1211 (11th Cir. 2020).  "Although the very concept of an association in fact is expansive, these requirements make pleading an association-in-fact enterprise more challenging." *Id.* (citations omitted).  In particular, the "purpose" prong requires *more* than an "abstract common purpose, such as a generally shared interest in making money."  *Id*.

Here, despite the nefarious undertones of the "Davey-Rangel Enterprise," the Complaint essentially alleges that the Defendants each played their respective roles in operating the same tree-trimming business consisting of Davey Tree, Wolf Tree, and their former and current employees.[20]  Alleging a "RICO enterprise that consists merely of a corporate defendant associated

---

[20]     The RICO Statement seeks to sweep in other individuals as members of the association-in-fact enterprise – like non-party Mr. Jackson – but again, they were employees of Wolf Tree's tree-trimming business who were allegedly simply doing their jobs within the ordinary scope of their employment.  And other than referencing his alleged knowledge in conclusory terms, the RICO Statement does not actually specify what Mr. Paul did to further an illicit purpose of the enterprise.

with its own employees or agents carrying on the regular affairs of the defendant" does not satisfy

the distinctness requirement. *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30

F.3d 339, 344 (2d Cir. 1994), *abrogated on other grounds*, *Cedric*, 533 U.S. 158.

The 11th Circuit's decision in *Ray* is instructive.  There, the court rejected an alleged RICO

enterprise consisting of a corporation, two officers, and four employees.  *Ray*, 836 F.3d at 1352–

58.  The court held that "in an association-in-fact enterprise, a defendant corporation cannot be

distinct for RICO purposes from its own officers, agents, and employees when those individuals

are operating in their official capacities for the corporation."  *Id*. at 1355.  "[P]ermitting plaintiffs

to plead an enterprise consisting of a defendant corporation and its officers, agents, and employees

acting within the scope of their employment would broaden RICO beyond any reasonable

constraints" and "turn every claim of corporate fraud into a RICO violation."  *Id*. at 1357.

Nothing in this Complaint remotely suggests that the alleged activities of the "Davey-

Rangel Enterprise" were part of the distinct affairs of *another* enterprise.  In the Unauthorized

Workers Scheme, for example, employees were hired by Pablo Rangel to work on the Georgia

Power contract and render ordinary course services.  (Compl. ¶¶ 19–20.)  In the Georgia Power

Scheme, the Company Defendants submitted certifications to Georgia Power, just as they would

have in any ordinary course scenario.  (*Id.* ¶¶ 29–30.)  *See Shrum v. Metro. Life Ins. Co.*, 2008 WL

11474876, at *8 (S.D. Tex. Jan. 14, 2008) ("RICO plaintiff cannot circumvent" the distinctiveness

requirement "by creative pleading," where the allegations of "an independent consultant[] is not

enough to define an enterprise separate and apart from the pattern of activity" because "[h]e, too,

---

*DJ Lincoln Enters., Inc. v. Google LLC*, 2022 WL 203365, at *2 (11th Cir. Jan. 24, 2022) (plaintiff
"fails to explain how Alphabet, Inc. (the parent company of Google), YouTube (which is owned
by Google), or any of the individuals associated with those organizations, operated outside their
official capacity").

performed the business of Defendant MetLife on the insurance company's behalf" and the acts "consisted of nothing more than Defendant MetLife's ordinary course business"), *rep. & rec. adopted*, 2008 WL 11474875 (S.D. Tex. Feb. 5, 2008).

And while the Plaintiff attempts to cast the Company Defendants as willing participants in an illicit enterprise "[o]utside of [Rangel's] duties and responsibilities as the supervisor of Wolf Tree and Davey Tree's Savannah Call Center" (*Id.* ¶ 102), the Complaint – at its core – alleges *Mr. Rangel's* fraudulent conduct. Plaintiff makes no specific allegations regarding the Company Defendants' participation in Mr. Rangel's fraudulent conduct and thus is asking this Court to "speculate that [Mr. Rangel] decided at some point to pursue fraud, and that [the Company Defendants] were involved in that decision" – but the Court should not "indulge that speculation" because Plaintiff was "required to allege not just that [Mr. Rangel] had a fraudulent purpose, but that it was a *common* purpose, formed *in collaboration* with [the Company Defendants]" and others. *Cisneros*, 972 F.3d at 1214; *Ray*, 836 F.3d at 1352-53; *Wade Park Land Holdings, LLC v. Kalikow*, 522 F. Supp. 3d 1341, 1351 (N.D. Ga. 2021).

All of this dooms Plaintiff's claim because a parent company and its subsidiaries cannot form an "enterprise" for RICO purposes unless there are plausible allegations that the vehicle of corporate separateness was deliberately used to facilitate unlawful activity. *See Bucklew v. Hawkins, Ash, Baptie & Co.*, 329 F.3d 923, 934 (7th Cir. 2003) (separate incorporation does not constitute "sufficient distinctness to trigger RICO liability . . . unless the enterprise's decision to operate through subsidiaries rather than divisions somehow facilitated its unlawful activity"); *Bessette v. Avco Fin. Servs., Inc.*, 230 F.3d 439, 449 (1st Cir. 2000) ("Without further allegations, the mere identification of a subsidiary and a parent in a RICO claim fails the distinctiveness requirement."); *Chagby v. Target Corp.*, 2009 WL 398972, at *1 n.2 (C.D. Cal. Feb. 11, 2009)

27

("If, as alleged, Target Corp. and its subsidiaries are a RICO enterprise, then every corporation that has subsidiaries and commits fraud is an enterprise for RICO purposes.  That is not the law.").

The Fifth Circuit's decision in *Atkinson v. Anadarko Bank and Trust*, 808 F.2d 438 (5th Cir. 1987), is particularly apt.  In *Atkinson*, the plaintiff alleged that a bank, its holding company, and three employees formed an association-in-fact enterprise for the purpose of mailing fraudulent loan statements.  *Id*. at 439–40.  The district court set aside a jury verdict for lack of distinctness in the claimed enterprise.  *Id*.  The Fifth Circuit affirmed, finding that there was "no evidence that the bank, its holding company, and the three employees were associated in any manner apart from the activities of the bank, and that the alleged illegal activity was the activity of the bank, not of some separate, alleged association-in-fact enterprise.  *Id*. at 441–42; *see also Chi v. MasterCard Int'l, Inc.*, 2014 WL 5019917, at *4 (N.D. Ga. Oct. 7, 2014) (even assuming Mastercard knew third-party merchant's conduct was fraudulent, it merely "process[ed] the credit card transactions as it did with every transaction, not that it substantially assisted or encouraged the fraud"); *Flagg v. First Premier Bank*, 257 F. Supp. 3d 1351, 1363 (N.D. Ga. 2017) ("Plaintiff fails to distinguish how this alleged contractual arrangement is any different from or less routine than, for instance, a credit card company's processing of transactions, *even those it knows to be fraudulent*.")

Here, as in *Atkinson*, the Complaint essentially alleges that the predicate acts were the activities of the Company Defendants:  verifying employment, mailing invoices and statements, and conducting financial transactions of the Company Defendants, all of which constitute their typical corporate activities.  Because the Defendants here are nothing more than a corporation, a subsidiary, and their employees, the distinctness requirement has not been satisfied, and the Section 4(b) claim must be dismissed for lack of standing.

## V.     The Complaint Fails to Plead a RICO Conspiracy.

Plaintiff's conspiracy claim under Section 4(c) – which makes it unlawful for someone to

"conspire or endeavor to violate" Sections 4(a) or 4(b) – fails because the substantive RICO claims are *deficient*, and because it relies on nothing more than a rote recitation of the statutory elements. Not a single *specific* fact is alleged as to any of the Defendants.  (Compl. ¶¶ 162–175.)

To establish a violation of Section (c), Plaintiff must plead either "that the defendant agreed to the overall objective of the conspiracy" or "that the defendant agreed to commit two predicate acts." *Am. Dental Ass'n,* 605 F.3d at 1293 (citation omitted).

But, where, as here, the underlying substantive RICO claims are deficient, and the conspiracy claim adds ***no new allegations***, courts in the 11th Circuit routinely dismiss civil RICO conspiracy claims.  *See Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1269 (11th Cir. 2004) (dismissal where court "already found that the complaint failed to state a substantive RICO claim, and the RICO conspiracy adds nothing"); *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 728 (11th Cir. 2021) (dismissing Section 4(c) conspiracy claim because it relies on the "same threadbare allegations as the substantive RICO claims").  Thus, as pled, the conspiracy claim rises and falls with the substantive RICO claims.  And since Plaintiff *fails* to allege a primary violation of either Section 4(a) or 4(b), the conspiracy claim must *also fail*.

In addition, the Section 4(c) claim is a "'formulaic recitation[]' of a conspiracy claim that the Supreme Court declared insufficient in *Twombly* and *Iqbal*."  *Omnipol, A.S. v. Multinat'l Def. Servs., LLC*, 32 F.4th 1298, 1310 (11th Cir. 2022).  That is, Plaintiff has done no more than "simply allege[]" that Defendants collectively endeavored to violate Sections 4(a) and (b) – without a single specific factual detail about the alleged agreement or when an agreement was reached.  *See Id.* at 1309–10; *Parker*, 2020 WL 10575029, at *11 (dismissing RICO conspiracy claim that failed to allege with particularity an agreement to commit a conspiracy, the dates when such conspiracy formed, or when the specific defendants joined the conspiracy).  In other words, the Plaintiff

"cannot simply include magic words such as 'conspiracy' . . . in a complaint to plead a claim where years of relatively clear, consistent jurisprudence have set forth clear standards. Those standards require plaintiff[] to put defendants on notice of **specific acts, statements, documents, places, and people** behind the magic words." *Hi-Tech Pharms., Inc. v. Hodges Consulting, Inc.,* 230 F. Supp. 3d 1323, 1334 (N.D. Ga. 2016) (emphasis added).

Moreover, the conspiracy count treats all of the Defendants indiscriminately, ascribing the alleged conduct constituting the purported conspiracy on "the Defendants" generally, rather than assigning specific conduct to each of them, so that they (and this Court) can understand what it is that they allegedly have done to violate this section of the RICO statute. *See Christian*, 2020 WL 5242931, at *3–4 (citation omitted) (dismissing RICO claims because, *inter alia*, plaintiff failed to differentiate the defendants which "is particularly troubling [where] Plaintiffs pled . . . RICO claims"); *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young*, 1994 WL 88129, at *31 (S.D.N.Y. Mar. 15, 1994) ("Grouping defendants is no more permissible in a RICO conspiracy claim, which must allege that *each* defendant agreed to commit at least two predicate acts.").

Plaintiff's RICO Statement does not cure the flawed conspiracy count.  Plaintiff's list of "overt" acts in Section 14 is simply a copy and paste of allegations found elsewhere in the Complaint (and in Section 2(c) of the RICO Statement).  (RICO Stat. at 89-101.)  And, Section 14 of the RICO Statement does not include a single allegation concerning the required element that there be an *agreement*.  *See Am. Dental Ass'n,* 605 F.3d at 1293.

Plaintiff pays short shrift to this requirement, claiming that the existence of an agreement can be inferred.  (RICO Stat. at 101.)  However, the "formulaic recitations of a conspiracy claim", offered by Plaintiff here "do not support an inference of an agreement to the overall objective of the conspiracy or an agreement to commit two predicate acts."  *Am. Dental Ass'n.*, 605 F.3d at

1293–94; *Lechter*, 565 F. Supp. 3d at 1315 (same); *Mason v. Midland Funding LLC*, 2017 WL 6994577, at *24 (N.D. Ga. July 27, 2017) (RICO conspiracy claim "due to be dismissed" where plaintiff "offer[ed] no facts to support their conclusory allegation that defendants agreed to violate" the statute), *rep. & rec. adopted as modified,* 2017 WL 8186866 (N.D. Ga. Sept. 29, 2017).

**VI.    This Court Lacks Subject Matter Jurisdiction Over the Remaining State Claims.**

With the dismissal of the RICO claims, this Court does not have an independent basis to *exercise original jurisdictio*n over the remaining common law claims.  (*See* ECF No. 1, Notice of Removal at 1 (removal on the basis of federal question, 28 U.S.C. § 1331)).  "The Court may decline to exercise jurisdiction over state-law claims, where the Court has dismissed all the federal claims over which it has original jurisdiction."  *McCulloch v. PNC Bank Inc.*, 298 F.3d 1217, 1227 (11th Cir. 2002) (citing 28 U.S.C. § 1367(c)(3)).  In fact, the 11th Circuit has "encouraged district courts to dismiss any remaining state claims" in such cases.  *Raney v. Allstate Ins.*, 370 F.3d 1086, 1088–89 (11th Cir. 2004).  As a result, the remaining common law, state claims (*i.e.*, Counts 4– 22) should be dismissed.

**VII.    Plaintiff Has Failed to Plead the Intentional Tort Claims.**

To the extent that the Court elects to retain jurisdiction over the remaining claims, the Court should dismiss the intentional tort claims (Counts 4, 5, 12, 14, 16, 18, and 19).

*First,* the Court should dismiss the intentional infliction of emotional distress ("IIED") claims based on the insufficiency of allegations concerning "severe emotional distress".

> In order to properly allege a claim based on the intentional infliction of emotional distress, a complaint must contain at least four elements:  '(1) [t]he conduct must be intentional or reckless; (2) [t]he conduct must be extreme and outrageous; (3) [t]here must be a causal connection between the wrongful conduct and the emotional distress; and (4) [t]he emotional distress must be severe.'

*Joyner v. Lifeshare Mgmt. Grp., LLC*, 2018 WL 6092743, at *4 (S.D. Ga. Nov. 21, 2018) (citation omitted).  Ordinary mental distress is not enough.  "The law intervenes *only where the distress*

*inflicted is so severe that no reasonable man could be expected to endure it*." *Bridges v. Winn-Dixie Atlanta, Inc.*, 176 Ga. App. 227, 230 (1985) (emphasis added).[21]

Crucially, Plaintiff has not set forth a single fact concerning emotional distress, let alone *severe* emotional distress. For example, he does not allege that Mr. Montoya suffered from any particular type of emotional distress (*e.g.*, terror, anxiety), experienced any physical manifestations or mental health symptoms (*e.g.*, psychotic break, despondency), or that he sought out or obtained any treatment. The absence of such allegations is fatal to the IIED claim. *See e.g.*, *Monsrud*, 2020 WL 12654451, at *10 (dismissal where plaintiff "fail[ed] to allege facts showing that she has suffered extreme emotional distress" and that plaintiff was "under stress and forced to seek medical care, with no allegation about any resulting treatment or diagnosis of severe emotional distress, [were] insufficient"); *Roberts v. JP Morgan Chase Bank, Nat'l Ass'n*, 342 Ga. App. 73, 77 (2017) (citation omitted) (dismissal where complaint "says nothing at all about humiliation, embarrassment, fright, extreme outrage, or severe emotional distress"); *Timmons v. Bryson*, 2016 WL 4082710, at *7 (S.D. Ga. Aug. 1, 2016). The deficiency also dooms the *respondeat superior* claims as there can be no IIED claim against the individual defendants without adequate allegations concerning the element of severe emotional distress.

*Second*, the assault and battery claims fail. The tort of battery requires an unlawful touching. *Lawson v. Bloodsworth*, 313 Ga. App. 616, 618 (2012); O.C.G.A. § 51-1-13. And assault requires the "intention to commit an injury, coupled with an apparent ability to do so." *Wallace v. Stringer*, 250 Ga. App. 850, 853 (2001) (citation omitted); O.C.G.A. § 51-1-14. But

---

[21]    The IIED claims also fail because they are a rote recitation of the elements of the tort plus blanket citations to the entire fact section of the Complaint. *See, e.g.*, *Monsrud v. Regnerative Orthopaedics & Spine Inst., P.C.*, 2020 WL 12654451, at *9 (N.D. Ga. Sept. 9, 2020) ("mostly formulaic recitations of the elements of the IIED claim[] fall short of meeting the relevant pleading standard"), *rep. and rec. adopted*, 2020 WL 12654449 (N.D. Ga. Sept. 29, 2020).

the only acts alleged in these counts of the Complaint are that *Juan Rangel* shot Mr. Montoya; that *Juan Rangel* "threatened" him with "physical injury . . . in the moments leading up to his death;" and that *Pablo Rangel* and *Mr. Cruz* made unspecified threats of violence "beginning in early May of 2017." (Compl. ¶¶ 177, 181–82.)   There are *zero* allegations that the Company Defendants unlawfully touched or intended to injure Mr. Montoya.   And these torts cannot be committed "through" someone else, or brought about through a chain of events, as alleged by Plaintiff.

## <u>CONCLUSION</u>

For the foregoing reasons, the Company Defendants respectfully request that this Court dismiss, with prejudice, Complaint Counts 1–3 for lack of standing and failure to state a claim; Counts 4–22 for lack of jurisdiction; and Counts 4, 5, 12, 14, 16, 18, and 19 for failure to state a claim; and grant all such other and further relief as is just and proper.

Dated: June 21, 2024
     New York, New York


KASOWITZ BENSON TORRES LLP

*/s/ Edward E. McNally*
Edward E. McNally (admitted *pro hac vice*)
Brian S. Choi (*pro hac vice forthcoming*)
Marcellene E. Hearn (*pro hac vice forthcoming*)
1633 Broadway
New York, New York 10019
Telephone:  (212) 506-1700
Facsimile:  (212) 506-1800
Email:  emcnally@kasowitz.com

Christopher W. Phillips
Georgia Bar No. 002920
HUNTER, MACLEAN, EXLEY & DUNN P.C.
P.O. Bo 9848
Savannah, GA 31412-0048
Telephone:  (912) 236-0261
Facsimile:  (912) 236-4936
Email:  cphillips@huntermaclean.com

*Attorneys for Defendants The Davey Tree Expert Company and Wolf Tree, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on this 21st day of June, 2024, the foregoing was served through the

Court ECF system upon all counsel registered to receive service, and I caused the foregoing to be

served via regular U.S. mail on the following:

Pablo Rangel-Rubio (*Pro Se*)
Register No. 22405-021
USP Atwater, U.S. Penitentiary
P.O. BOX 019001
Atwater, CA  95301

KASOWITZ BENSON TORRES LLP

   */s/ Edward E. McNally*
Edward E. McNally (admitted *pro hac vice*)
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, New York 10019
Telephone:  (212) 506-1700
Facsimile:  (212) 506-1800
Email:  emcnally@kasowitz.com