**IN THE UNITED STATES DISCTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

| | | |
|---|---|---|
| BRIAN J. HUFFMAN, ESQ., as Administrator of the Estate of ELIUD MONTOYA-ARCOS, Deceased, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACTION FILE NO. 4:18-cv-00184 |
| THE DAVEY TREE EXPERT COMPANY, et al., | ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS DAVEY TREE &
WOLF TREE'S MOTION TO DISMISS AMENDED COMPLAINT**

Brian J. Huffman, Esq., as Administrator of the Estate of Eliud Montoya-Arcos ("Montoya"),

Deceased, hereby responds in opposition to the motion to dismiss Plaintiff's Amended Complaint

(Doc. 123), filed by Defendants The Davey Tree Expert Company (Davey Tree) and Wolf Tree,

Inc. (Wolf Tree) (collectively "the Corporate Defendants") (Doc. 209). For the reasons that follow,

the Corporate Defendants' motion to dismiss should be denied.

## I.    Preliminary Statement

In late 2017, Montoya's widow filed a wrongful death case in the State Court of Chatham

County, *Maria Montoya v. Davey Tree, et al.* (STCV17-01873), against many of those responsible

for her husband Eliud Montoya's August 19, 2017 murder. After additional investigation,

Montoya's Estate filed claims in the State Court of Chatham County that only it could bring,

including claims under the Georgia RICO Act. Defendants removed the Estate's claims to this

Court.

Both actions remained stayed during the DOJ's multi-year prosecution of some of the crimes related to Montoya's murder. Two individual Defendants in this case, who were supervisors of the Corporate Defendants, pled guilty to a host of crimes surrounding Montoya's murder, including conspiracy, retaliation against a federal witness resulting in death, harboring and concealing illegal aliens and money laundering. Last year, the Corporate Defendants paid to the United States almost $4 million to resolve criminal allegations associated with the murder of Montoya. *See* https://www.justice.gov/usao-sdga/pr/companies-employed-labor-whistleblower-and-his-killers-reach-criminal-civil-resolution (last visited Sept. 11, 2023).

Plaintiff filed an Amended Complaint on July 14, 2023. In compliance with the Court's March 27, 2024 Order (Doc. 193), Plaintiff filed a 108-page RICO Statement on April 24, 2024.[1] (Doc. 196). Afterwards, the Corporate Defendants filed a renewed motion to dismiss, which regurgitates arguments previously made.

## II.    Statement of Especially Pertinent Facts[2]

Davey Tree and Wolf Tree (formed by Davey Tree as a wholly owned division in 2008)[3] were in the business of trimming trees along power lines for utility companies. (AC, ¶ 16; RS, p. 3). The Corporate Defendants' operation in the Savannah area was called the Savannah Call Center. (AC, ¶ 19; RS, p. 3). From 2008 through most of 2017, the vast majority of the employees working at

---

[1] A RICO Statement is considered as part of the pleadings on a motion to dismiss. *O'Malley v. O'Neill*, 887 F.2d 1557, 1559 (11th Cir. 1989) (utilizing both complaint and RICO case statement filed by plaintiffs pursuant to an order entered by the district court to analyze plaintiffs' claims). *See also LABMD Inc. v. Boback*, 47 F.4th 164, 179 n.11 (3rd Cir. 2022); *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 13 (1st Cir. 2000) ("We narrate the allegations contained in the complaint *and RICO case statement* in the light most favorable to appellant." (Emphasis added)); *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992) (in determining whether complaint states a claim, facts set forth in a RICO case statement required by the local rules must be considered); *Tal v. Hogan*, 453 F.3d 1244, 1262 n.18 (10th Cir. 2006) (considering the allegations made in a plaintiff's RICO case statement in conjunction with the complaint).

[2] The following facts are alleged in the Amended Complaint ("AC," Doc. 123) and RICO Statement ("RS," Doc. 196), but do not constitute all pertinent facts alleged therein.

[3] As alleged in the RICO Statement, the conduct of the Corporate Defendants is indistinguishable. (RS, p. 12).

the Savannah Call Center were illegal aliens, and the Corporate Defendants knew it. (AC, ¶ 19; RS, p. 3).

Defendant Rangel, an illegal alien, was the paid supervisor of the Savannah Call Center. (Id.). In addition to serving as the Corporate Defendants' paid supervisor, Rangel operated as an independent labor broker, locating and recruiting illegal aliens to work for the Corporate Defendants and providing them with false identities and false identification documentation. (AC, ¶ 20; RS, p. 3). The false identities and false identification documents served to provide the Corporate Defendants with a cheap, illegal workforce and concealed the illegal nature of that workforce from the authorities and from the Corporate Defendants' customers. (AC, ¶ 20; RS, pp. 3-4). Rangel charged the illegal aliens he recruited for the false identities and false identification documents. (AC, ¶ 22; RS, p. 4). The illegal aliens would also pay Rangel for securing them a job at the Savannah Call Center. (Id.). The Corporate Defendants sent Rangel paychecks and wire transfers totaling over $3 million, which Rangel and others divided among themselves and the illegal alien workforce. (AC, ¶ 23; RS, p. 4).

In addition to selling false identities, Rangel harbored and concealed many of the illegal aliens who worked for the Savannah Call Center. (AC, ¶ 25; RS, p. 4). The Corporate Defendants were aware of Rangel's separate, illegal-alien harboring scheme and wired employees' pay to Rangel, in part to promote Rangel's harboring and concealing scheme. (AC, ¶¶ 25-26; RS, p. 4). In 2013, Defendant Cruz began assisting Rangel with his harboring-concealing-illegal-aliens scheme. (AC, ¶ 24; RS, p. 4).

Georgia Power was the Savannah Call Center's only customer. (AC, ¶ 27; RS, p. 4). Georgia Power paid the Corporate Defendants millions of dollars each year to provide tree-trimming services. (AC, ¶ 28; RS, p. 4). For each Georgia Power contract signed, the Corporate Defendants

fraudulently certified and represented to Georgia Power that they verified the legality of their workforce. (AC, ¶ 29; RS, p. 4). The Corporate Defendants also used Rangel and Cruz to provide fictitious identification documents to Georgia Power to deceive Georgia Power into issuing identification cards to illegal aliens. (AC, ¶ 30; RS, pp. 4-5). Based on false representations of the legality of the Savannah Call Center workforce, Georgia Power transferred millions of dollars by interstate wires into the Corporate Defendants' accounts. (AC, ¶¶ 28-29; RS, pp. 4-5).

Eliud Montoya was a U.S. citizen who worked as a tree trimmer and team leader for the Corporate Defendants at the Savannah Call Center for over ten years before his murder in August 2017. (AC, ¶ 38; RS, p. 5). While a member of the Savannah Call Center, Montoya witnessed numerous violations of Georgia and federal law relating to the employment and mistreatment of illegal aliens. (AC, ¶ 42; RS, p. 5). In April 2017, pursuant to the Corporate Defendants' whistleblower policy, Montoya contacted Davey Tree to report illegal and dangerous conduct. (AC, ¶ 49; RS, p. 5). Both orally and in writing, Montoya reported the following to both Davey Tree and Wolf Tree: (a) most of the Savannah Call Center workers were illegal aliens; (b) the Savannah Call Center supervisor, Rangel, had sold false identifications to the illegal-alien employees; (c) Rangel paid the illegal-alien workers in cash; (d) Rangel took money from the illegal-alien workforce; and, (e) Rangel allowed illegal aliens to operate the Savannah Call Center's commercial vehicles without licenses. (AC, ¶ 50; RS, p. 5). In his reports to Davey Tree and Wolf Tree, Montoya stated he had reported, and intended to report again to law enforcement, the illegal and dangerous conduct he had observed. (AC, ¶ 51; RS, p. 5).

Montoya did not know that the Corporate Defendants were already aware of many, if not all, of the reported criminal conduct. (AC, ¶ 47; RS, p. 5). Instead of lawfully addressing Montoya's reports of serious criminal and dangerous conduct, the Corporate Defendants and others engaged

in a systematic effort to **silence** Montoya, through **physical threats, economic threats, intimidation, retaliation, deception, and ultimately murder**. (AC, ¶ 53; RS, pp. 5-6).

Immediately after receiving Montoya's April 2017 written report, the Corporate Defendants, through Conner, Branch, and other corporate officers, decided not to investigate Montoya's confidential reports promptly or confidentially. (AC, ¶ 55; RS, p. 6). Instead, in flagrant disregard of their own whistleblower policy, the Corporate Defendants, through Conner, Branch and other corporate officers, decided to provide Montoya's written whistleblower complaint **to Rangel**, intending that he would **silence** Montoya.[4] (Id.).

Through Branch, the Corporate Defendants provided Rangel with a copy of Montoya's written whistleblower report, and told Rangel that Montoya was the whistleblower. (AC, ¶ 56; RS, p. 6). Upon reading Montoya's report, Rangel admitted to Branch that he had provided illegal aliens hired at the Savannah Call Center with false identifications in exchange for money. (Id.). Branch reported to Conner and other corporate officials Rangel's confirmation of serious criminal conduct. (Id.). Next, the Corporate Defendants, through Branch, Conner and other corporate officers, determined to have Rangel deal with Montoya directly, for the purpose of retaliating against and silencing Montoya, hindering, delaying dissuading and preventing Montoya from reporting to, providing documents to, or testifying before law enforcement or official proceedings. (AC, ¶¶ 53-54, 59-60; RS, pp. 6, 37). Branch, Rangel and Cruz then discussed calling a meeting of all Savannah Call Center employees during which Rangel would disclose Montoya's whistleblower

---

[4] In 2016, Montoya made a similar oral whistleblower report to Davey Tree and Wolf Tree pursuant to the companies' whistleblower policy. (AC, ¶¶ 43-45; RS, pp. 17-18, 93). In his report, Montoya stated his intent to report the criminal activity he observed to both the Department of Transportation and the Department of Labor, agencies on the State or federal side with law enforcement authority. (AC, ¶ 45). As in 2017, the Corporate Defendants blatantly violated their own policy by not investigating Montoya's report and by revealing the report *to Rangel*, including telling Rangel that Montoya was the whistleblower. (AC, ¶¶ 43-48; RS, p. 18).

report, and the fact that Montoya was the whistleblower, to all the other employees. (AC, ¶ 60; RS, p. 37).

In early May 2017, Rangel and Cruz called a meeting of the approximately 30 Savannah Call Center employees, including Montoya. (AC, ¶ 61; RS, p. 6). During the meeting, Rangel read Montoya's whistleblower report aloud, all the while threatening and intimidating Montoya. (Id.). Immediately, many of the illegal-alien employees became enraged, and **threatened Montoya with physical violence and death**. (Id.). After purposefully causing a **riot** and **assaults** against Montoya, Rangel told Montoya that "nothing was going to come of" his whistleblower report. (Id.). Cruz kept Branch updated on what was happening during the riot. (AC, ¶ 61; RS, pp. 6-7).

Montoya immediately reported Rangel's threatening and retaliatory actions to the Corporate Defendants, but there was no response. (AC, ¶ 62; RS, p. 7). The Corporate Defendants, through Branch, Conner and other Davey Tree and Wolf Tree officials, were well aware of Rangel's threatening and retaliatory actions against Montoya, but they **purposefully did nothing** to prevent or correct them. (Id.). Rangel's retaliation against Montoya was solicited, sanctioned, and ratified by the Corporate Defendants and others, and was meant to **deter** and **intimidate** Montoya from making further reports to law enforcement. (AC, ¶ 63; RS, p. 7).

In mid-May 2017, days after the riot, Montoya asked to speak in private with Davey Tree's Regional Safety Manager, who was in Savannah inspecting the Savannah Call Center. (AC, ¶ 64; RS, p. 7). Montoya provided the Safety Manager with a copy of his written, April 2017 whistleblower report. (AC, ¶ 65; RS, p. 7). He also identified for the Safety Manager the illegal-alien employees who were working under false names. (Id.). The Safety Manager was stunned and blown away by Montoya's report. (AC, ¶ 66; RS, p. 7). He contacted the Corporate Defendants to determine what should be done. (Id.). The Corporate Defendants advised the Regional Safety

Manager not to take any further action, except to forward his notes regarding the matter to Conner. (Id.).

Faced again with a decision of whether to halt the illegal and dangerous conduct reported by Montoya, the Corporate Defendants chose to ***retaliate, threaten*** and ***intimidate*** Montoya. (AC, ¶ 67; RS, p. 7). A few days after Montoya provided his whistleblower report to Davey Tree's Regional Safety Manager, Branch and another corporate official discussed how to "get rid of" Montoya; then directed Cruz to cite Montoya with an "unsatisfactory work" employee violation notice, which he did. (AC, ¶ 68; RS, pp. 7-8). The alleged employee violation was baseless and concocted by Cruz, Branch and others acting on behalf of the Corporate Defendants. (AC, ¶ 69; RS, p. 8). The employee violation notice to Montoya was issued in retaliation for his whistleblower reports and meant to deter and intimidate Montoya from providing further reports to government authorities, including law enforcement. (AC, ¶¶ 69, 127; RS, p. 8).

In the summer of 2017, Montoya was informed that Conner was in charge of addressing his various whistleblower complaints. (AC, ¶ 70; RS, p. 8). Montoya had several conversations with Conner in the summer of 2017 about his knowledge of the criminal and dangerous activities outlined in his various whistleblower complaints. (Id.). The Corporate Defendants, through both Conner and Branch, falsely assured Montoya that his 2017 whistleblower reports were being promptly investigated and taken seriously by the Corporate Defendants in compliance with the companies' whistleblower policy. (AC, ¶ 72; RS, p. 8). Conner and Branch's statements to Montoya were intentionally misleading, and were meant to ***hinder, delay*** and ***prevent*** reports by Montoya to law enforcement and other government authorities regarding Montoya's knowledge of criminal and dangerous conduct. (AC, ¶ 72; RS, p. 8).

In July 2017, the Corporate Defendants, through Conner, requested that Montoya provide proof of the statements made in his whistleblower reports. (AC, ¶ 73; RS, p. 8). At the time of this request, the Corporate Defendants knew Rangel had admitted to his criminal activities and had caused a riot against Montoya. (Id.). The Corporate Defendants' request was intended to mislead Montoya, made with an intent to ***hinder, delay*** and ***prevent*** Montoya's communications with law enforcement. (Id.).

In reliance upon the Corporate Defendants' representations, Montoya again decided to provide information to the Corporate Defendants instead of making reports to state and federal authorities. (AC, ¶ 74; RS, p. 9). At the time, Montoya still believed the Corporate Defendants would take appropriate action to address the criminal conduct he outlined in his whistleblower complaints. (AC, ¶ 74). Montoya did not know Conner, Branch, Cruz, Rangel, the Corporate Defendants and others were all working together to ***silence*** Montoya in an effort to protect their criminal enterprise. (Id.).

On August 7, 2017, in response to the Corporate Defendants' request, Montoya provided Conner signed statements by three illegal-alien employees at the Savannah Call Center. (AC, ¶ 75; RS, p. 9). The statements again confirmed that: (a) many Savannah Call Center employees were illegal; and (b) Rangel was providing multiple false identification documents to illegal-alien employees. (Id.).

Faced yet again with whether to halt Defendants' criminal and dangerous conduct, the Corporate Defendants, Conner, Branch, Cruz, and Rangel again chose to protect their criminal enterprise by ***retaliating against, threatening*** and ***intimidating*** Montoya. (AC, ¶ 76; RS, p. 9). The Corporate Defendants, through Conner and Branch, provided the three signed statements to Rangel. (AC, ¶ 77; RS, p. 9). Rangel responded with threats of violence against two of the three

illegal aliens. (AC, ¶ 78). The actions of the Corporate Defendants, through Conner and Branch, were intended to solicit Rangel to silence Montoya and the three illegal-alien employees who provided the signed statements. (AC, ¶ 77; RS, p. 9).

On August 16, 2017, the Corporate Defendants again acted to *silence* Montoya. (AC, ¶ 79; RS, p. 9). That day, an officer of the Corporate Defendants traveled to Savannah and suspended Montoya for three days on a false and fabricated "safe practice violation." (Id.). The Corporate Defendants' suspension of Montoya was intended to *intimidate* Montoya, cause him *economic harm, retaliate* against him for his continued whistleblower reports, and to *deter* him from providing further reports to government authorities, including law enforcement. (AC, ¶ 80; RS, pp. 9-10).

After his suspension, Montoya realized the Corporate Defendants would not take appropriate action to address the criminal and dangerous conduct outlined in his whistleblower complaints. (AC, ¶ 82; RS, p. 10). On August 16, 2017, Montoya informed Conner he was reporting the criminal and dangerous conduct of Rangel, the Corporate Defendants and others to the EEOC, which he did on August 17, 2017. (AC, ¶¶ 82, 84; RS, p. 10).

Knowing that Rangel was a dangerous criminal who previously attempted to silence Montoya and others through threats of violence, the Corporate Defendants, through Conner and Branch, *informed Rangel of Montoya's efforts to report criminal activities to federal authorities*. (AC, ¶ 83; RS, p. 10). In so doing, the Corporate Defendants intended to solicit the obstruction of a federal investigation through **violent** means. (AC, ¶ 83). After Montoya's August 17, 2017, report to the EEOC, each of the Defendants were aware their previous efforts to *mislead, threaten* and *intimidate* had failed to silence Montoya. (AC, ¶ 85; RS, p. 10). On Friday, August 18, 2017, Rangel and Cruz informed all Savannah Call Center employees that work for Saturday, August

19, 2017, had been canceled. (AC, ¶ 86; RS, p. 10). There was no legitimate reason for the cancellation: The Savannah Call Center employees always worked Saturdays and were already far behind in meeting the then-existing Georgia Power contracts. (Id.).

The next day, August 19, 2017, Montoya was brutally murdered, shot in the back twice and once in the back of the head. (AC, ¶ 87; RS, p. 10). Rangel planned the murder and enlisted his brother Juan, a Savannah Call Center employee, as the trigger man. (Id.).

### III.   The Corporate Defendants' Motion to Dismiss is Meritless.

In considering a motion to dismiss, this Court must "accept the allegations in the complaint as true, construing them in the light most favorable to the plaintiff." *Murphy v. FDIC*, 208 F.3d 959, 962 (11th Cir. 2000). All that is required is "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), that "give[s] the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Bell Atl. Co. v. Twombly*, 550 U.S. 544, 555 (2007).

### A.  The Georgia RICO Counts (Counts 1, 2 and 3)

Plaintiff has alleged three separate violations of the Georgia RICO Act against the Corporate Defendants:  that the Corporate Defendants conducted and participated in an enterprise through a pattern of racketeering activity, in violation of O.C.G.A. § 16-14-4(b) (Count 1); that the Corporate Defendants acquired and maintained interest in an enterprise and property through a pattern of racketeering activity, in violation of O.C.G.A. § 16-14-4(a) (Count 2), and that the Corporate Defendants conspired and endeavored to violate § 16-14-4(a) and § 16-14-4(b), in violation of O.C.G.A. § 16-14-4(c) (Count 3). None of the Corporate Defendants' challenges to the allegations set out in those Counts demonstrate that dismissal is appropriate.

### 1.  The RICO Counts Adequately Allege Proximate Cause.

A claim under Georgia's RICO Act requires Plaintiffs to "show that [their] injury flowed directly from at least one of the predicate acts." *Wylie v. Denton*, 323 Ga. App. 161, 166 (2013). "[T]o survive a motion to dismiss, [Plaintiffs] asserting a RICO claim must allege more than that an act of racketeering occurred and [they were] injured." *Id*. Plaintiffs also must allege some "direct nexus" between a racketeering act and their injury, and that "[their] injury was the direct result of a predicate act targeted toward [them], such that [they were] the intended victim." *Id*.

The Corporate Defendants contend that the Amended Complaint fails sufficiently to allege a direct nexus between any predicate act alleged to have been committed, attempted, solicited or coerced by them and Montoya's injuries. In this regard, the Corporate Defendants advance two main arguments: (1) many of the predicate acts alleged to have been committed, attempted, solicited or coerced by certain Defendants did not injure Montoya; and, (2) the predicate acts alleged to have been committed by the Corporate Defendants that did injure Montoya are insufficiently pled. Both arguments are without merit.

### a.  There Is No Requirement that Montoya Be Injured by *Each* Predicate of a Pattern of Racketeering Activity.

The Corporate Defendants argue that Montoya was not directly injured by several of the predicate acts alleged in the Amended Complaint, including as examples: Rangel and Cruz's harboring and concealing from detection illegal aliens; Rangel's sale of false identity documents to illegal aliens; the Corporate Defendants laundering of monies to fund Rangel's outside recruitment-harboring-concealing-illegal-alien scheme; the Corporate Defendants' scheme to defraud Georgia Power; and Cruz and Conner's perjury.

However, "[w]hile it is certain that a plaintiff in a civil RICO suit must show an injury by reason of a violation . . . , there is no requirement that plaintiff suffer direct harm from ***each and***

*every* alleged predicate act introduced to show a pattern of racketeering activity." *InterAgency, Inc. v. Danco Fin. Corp.*, 203 Ga. App. 418, 424 (1992) (emphasis added).

The Corporate Defendants miss the point. Pattern and proximate cause are separate requirements. A claim based upon a substantive violation of O.C.G.A. § 16-14-4(a) or (b) requires proof of a pattern of racketeering activity. Under Georgia RICO, this requires only two related predicate acts. *Dorsey v. State,* 279 Ga. 534, 539-540 (2005); *Overton v. State,* 295 Ga. App. 223, 232 (2008); *Dover v. State,* 192 Ga. App. 429, 432 (1983). "This does not mean that *each* RICO defendant must commit at least two acts to come under the Act's prohibitions," *Faillace v. Columbus Bank & Trust Co.,* 269 Ga. App. 866, 868 (2004), because where a pattern of racketeering activity is present, each defendant that participates in that pattern, whether by one act or more, is liable. *Id.* Also, a pattern of racketeering activity may consist in part of acts which caused no harm, as well as acts which caused harm to persons other than the plaintiff. *InterAgency*, 203 Ga. App. at 423-24 (affirming verdict in favor of plaintiff based on a pattern of racketeering activity that consisted in part of acts committed against third parties).

Proximate cause, meanwhile, only requires that a plaintiff be injured by one or more of the predicate acts that comprise the pattern: "To satisfy the proximate cause element of RICO, a plaintiff must show that [his] injury flowed directly from at least *one* of the predicate acts." *Wylie*, 323 Ga. App. at 165 (emphasis added). *Accord, Nicholson v. Windham,* 257 Ga. App. 429, 430 (2002) (plaintiff must show a direct nexus between at least one predicate act and the injury she purportedly sustained). Accordingly, even if the Corporate Defendants are correct that there is no direct nexus between some predicate acts and Montoya's injuries, that is no reason to dismiss the RICO Counts.

**b. The Amended Complaint Has Adequately Pled a Direct Nexus Between Racketeering Activity and All of Montoya's Injuries.**

The Corporate Defendants participated in an association-in-fact enterprise, the Davey-Rangel Enterprise, for the common purpose of making money illegally and concealing and preventing detection of the enterprise's illegal activities. In April 2017, years into the commission of numerous state and federal crimes relating to harboring and concealing an illegal-alien workforce and a multi-million dollar fraud scheme, Eliud Montoya submitted a written whistleblower complaint to the Corporate Defendants, outlining a number of crimes associated with the Savannah Call Center workforce and advising that he had spoken with and planned to speak again with law enforcement about the various crimes he had witnessed. At this point, the Corporate Defendants' participation in the Davey-Rangel Enterprise was for the common purpose of concealing and preventing detection of the enterprise's illegal activities, by means of "a systematic effort to silence Montoya, through physical threats, economic threats, intimidation, retaliation, deception, and eventually murder." (AC, ¶ 53).

The Corporate Defendants argue that the Court should reject "attempts to transform garden-variety employment retaliation into criminal interference." (Doc. 209, p. 16). First, the Corporate Defendants cannot seriously claim that terroristic threats, threatening witnesses, witness retaliation, and murder are garden-variety conduct. Second, Georgia has declined to disregard so-called "garden-variety" RICO claims. *InterAgency*, 203 Ga. App. at 418. Third, these predicate acts and their direct nexus to Montoya's injuries are adequately pled.

> *The Amended Complaint and RICO Statement allege a direct nexus between Montoya's injuries and the Corporate Defendants' Actions Involving the May 2017 influencing witness and terroristic threats.*

Upon receipt of Montoya's confidential whistleblower report in April 2017, which outlined vast criminal conduct and stated an intent to continue speaking with law enforcement, the

Corporate Defendants, through Conner, Branch, Cruz and other corporate officers determined to have Rangel deal with Montoya directly, for the purpose of retaliating against and silencing Montoya, hindering, delaying dissuading and preventing Montoya from reporting to, providing documents to, or testifying before law enforcement or official proceedings. (AC, ¶¶ 53-54, 59-60; RS, pp. 6, 37). Then, in early May 2017, Defendants Rangel and Cruz called a meeting of the approximately 30 Savannah Call Center employees, where Rangel read Montoya's written whistleblower report aloud, identified Montoya as the whistleblower, and threatened and intimidated Montoya. (AC, ¶ 61). Immediately, many of the Corporate Defendants' illegal alien employees became enraged, began rioting, and threatened Montoya with physical violence and death, which was Rangel's intended purpose of his actions. (Id.). The Corporate Defendants, through Cruz and Branch, were kept updated on what was happening during the riot. (Id.). After the threats and assaults by the Corporate Defendants' illegal-alien employees, Rangel turned to Montoya and said "nothing was going to come of" his whistleblower report. (Id.).

O.C.G.A. § 16-10-93(b)(1)(C) (Influencing Witnesses) provides, "It shall be unlawful for any person knowingly to use intimidation, physical force, or threats . . . with intent to . . . [h]inder, delay, or prevent the communication to a law enforcement officer . . . of this state of information relating to the commission or possible commission of a criminal offense . . . ."

Montoya stated in his 2017 whistleblower report that most of the Corporate Defendants' Savannah employees were illegal aliens, that Rangel had sold false identification documents to these illegal aliens, that illegal aliens were operating the Corporate Defendants' commercial vehicles without licenses, and that he had reported the illegal and dangerous conduct to the Department of Labor, a law enforcement agency. (AC, ¶ 50). In his written report, Montoya also

expressed a continued intent to speak with law enforcement "if the problem [was] not solved" by the Corporate Defendants (Id., ¶ 51).

With knowledge of widespread, ongoing vast criminal conduct, Montoya's contact with law enforcement and his stated intent to continue doing so, the Corporate Defendants, as adequately alleged in the Amended Complaint and RICO Statement, solicited Rangel to intimidate and threaten Montoya, with the intent to hinder, delay and prevent Montoya's communication with law enforcement, which Rangel did. (AC, ¶¶ 59-63, 125; RS, p. 26).

As further alleged in the Amended Complaint, in addition to threatening and intimidating Montoya, Rangel read aloud Montoya's whistleblower complaint to the illegal-alien workforce purposefully to cause threats and assaults against Montoya. (AC, ¶ 61). Rangel's actions produced his intended results: members of the illegal-alien workforce threatened Montoya with serious bodily harm and death. "In so doing, Rangel, aided and abetted by [the Corporate Defendants'' agents,] Cruz and Branch, solicited and coerced other [Corporate Defendants' illegal-alien employees] to make terroristic threats against Montoya" In violation of O.C.G.A. § 16-11-37(b)(1). (Id., ¶ 126). Thus, the Amended Complaint has adequately pleaded a direct nexus between the Corporate Defendants, these two RICO predicate acts and Montoya's injuries.

> *Plaintiff has alleged a direct nexus between Montoya's injuries and the Corporate Defendants' continued efforts to silence Montoya after the riot.*

After the riot, Montoya reported Rangel's threatening and retaliatory actions to the Corporate Defendants and provided his written whistleblower complaint to Davey Tree's Regional Safety Manager. (Id., ¶¶ 62, 64-65). Montoya further identified for the Safety Manager which Savannah Call Center, illegal-alien employees were working under false names. (Id., ¶ 65). Upon instruction by the Corporate Defendants, the Regional Safety Manager took no action except to forward his notes to Conner. (Id., ¶ 66).

After Montoya's continued efforts to expose ongoing criminal activity, which included making his intent known to have further communications with law enforcement, the Corporate Defendants again chose to retaliate against, threaten and intimidate Montoya through the following predicate acts:

- The Corporate Defendants, through Branch, Cruz and other corporate officials, on or about June 1, 2017, threatened Montoya with economic harm by citing him with a baseless and concocted employee violation notice, with the intended purpose of delaying hindering, preventing or dissuading Montoya from further providing information to law enforcement. (Id., ¶¶ 68, 69 and 127);

- From April through August 7, 2017, the Corporate Defendants, through Branch and Conner, knowingly and intentionally provided Montoya with false and misleading information which was intended to hinder, delay and prevent further reports by Montoya to law enforcement and government authorities; that is, the Corporate Defendants falsely told Montoya his whistleblower reports were being promptly investigated and taken seriously by the Corporate Defendants in compliance with the their whistleblower policy. (Id., ¶¶ 70, 72);

- In July of 2017, the Corporate Defendants, through Conner, requested that Montoya provide proof of the statements made in his whistleblower reports. (Id., ¶ 73). At the time, the Corporate Defendants knew Rangel had admitted his criminal activities and had caused a riot against Montoya. (Id.). The Corporate Defendants' request was intended to mislead Montoya, made with an intent to hinder, delay or prevent Montoya's communications with law enforcement. (Id.);

- On August 16, 2017, the Corporate Defendants suspended Montoya on a false and fabricated "safe practice violation." (Id., ¶ 79). The Corporate Defendants' suspension of Montoya was intended to intimidate Montoya and cause him economic harm and was made in retaliation for Montoya's continued whistleblower reports and to deter and intimidate Montoya from providing further reports to government authorities, including law enforcement. (Id., ¶ 80).

With regard to each of the predicate acts listed above, alleging violations of O.C.G.A. § 16-10-32(b) (Threatening Witnesses), the Corporate Defendants claim the Amended Complaint: (1) "fails to allege" Montoya ever "indicated to anyone at Wolf Tree or Davey Tree that he planned to go to a law enforcement officer – such as the local police or ICE;" (2) fails to allege that the Corporate

Defendants verbally threatened Montoya with economic harm to dissuade him from testifying in any official proceeding; and (3) fails to allege that an official proceeding even existed.

As to argument (1), as alleged multiple times in the Amended Complaint and RICO statement, Montoya revealed to the Corporate Defendants in his written whistleblower complaint that he had reported to law enforcement, the Department of Labor, the criminal and dangerous conduct he observed, and intended to again if the "problem [was] not solved" by the Corporate Defendants. (AC, ¶ 51). This paragraph alone negates argument (1). Defendants' claim that Montoya should have initially made his report to a different law enforcement agency is irrelevant to whether the Amended Complaint has been adequately pled.[5]

As to argument (2), in paragraphs 127 and 130 of the Amended Complaint, Plaintiff alleges that the Corporate Defendants, on June 1, 2017, and August 16, 2017, respectfully, "***threatened economic harm to Montoya . . . with the intent to hinder, delay, prevent or dissuade Montoya from testifying in an official proceeding or reporting in good faith to a law enforcement officer***, the commission or possible commission of criminal offenses under the laws of Georgia, in violation of O.C.G.A. § 16-10-32(b)." (AC, ¶¶ 128, 130 (emphasis added)). Thus, argument (2) is false.

As to argument (3), whether an official proceeding existed at the time Montoya notified Defendants that he was speaking to the Department of Labor is irrelevant to whether the Amended Complaint has been adequately pled. As O.C.G.A. § 16-10-93(b)(3) states, "[a]n official

---

[5] Perhaps revealing the weaknesses of their arguments, the Corporate Defendants frequently stray beyond the four-corners of the Amended Complaint and RICO Statement by claiming that properly pled allegations are "patently untrue" or "unfounded" or "demonstrably false." Such protestations are irrelevant to the Court's inquiry here, and Plaintiff looks forward to demonstrating the accuracy of its allegations when it is procedurally relevant. *See Rainge v. Fay Servicing Ctr.*, LLC, No. CV 116-016, 2016 WL 6824390, at *4 (S.D. Ga. Nov. 17, 2016) ("Defendant's argument presents an issue of disputed fact inappropriate for determination on a motion to dismiss. Under the motion-to-dismiss standard, the Court may only look at the 'four corners of the complaint' and limited documents attached to the complaint.") (citing *Speaker v. U.S. Dep't of Health & Hum. Servs. Ctrs. for Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010)).

proceeding ***need not be pending*** or about to be instituted at the time of any offense defined in [O.C.G.A. § 16-10-32(b)]." (Emphasis added). Thus, argument (3) fails too.

Regarding each of the predicate acts listed above, alleging violations of O.C.G.A. § 16-10-93 (Influencing Witnesses), the Corporate Defendants argue that, while the Amended Complaint alleges that their agents, Branch and Conner, made false assurances to Montoya that his 2017 whistleblower reports were being promptly investigated and taken seriously by the Corporate Defendants in compliance with the whistleblower policy, the Amended Complaint "alleges only that Ms. Conner and Mr. Branch sought to prevent 'reports' to unspecified 'government authorities.' But fails to allege that they *intended* to prevent Mr. Montoya from going to a *law enforcement officer*." (Doc. 209, pp. 18-19). This is a distinction without a difference. As alleged in the Amended Complaint, Montoya's 2017 whistleblower reports, provided to both Branch and Conner, indicated he would return to law enforcement "if the problem [was] not solved" by the Corporate Defendants. As alleged, the Georgia Department of Labor is law enforcement. (AC, ¶ 51). Further, Branch and Conner's false and misleading assurances to Montoya, *as alleged in the Amended Complaint*, "were meant to hinder, delay or prevent Montoya's reports to a law enforcement officer of information relating to the commission or possible commission of criminal offenses." (Id., ¶ 128).

> *As the Amended Complaint and RICO Statement allege, the violent retaliation against a federal witness is another predicate with a direct nexus to Montoya's injuries.*

As alleged, after his suspension by the Corporate Defendants, Montoya informed the Corporate Defendants, through Conner, on or about August 16, 2017, that he was reporting the criminal and dangerous conduct of Rangel, the Corporate Defendants and others to the EEOC. (Id., ¶ 131). Knowing Rangel was a dangerous criminal, the Corporate Defendants, through Conner and Branch, informed Rangel of Montoya's efforts to report criminal activities to federal authorities,

with the intent to solicit the violent retaliation against a federal witness, in violation of 18 U.S.C. § 1513. (Id., ¶¶ 83, 131). Rangel told Cruz about Montoya's report to federal authorities. (Id., ¶ 132). On August 18, 2017, at Rangel's direction, Cruz informed all of the Savannah Call Center employees that work for the next day had been cancelled, with the intent to aid and abet retaliation against a federal witness, in violation of 18 U.S.C. § 1513. (Id., ¶ 132). The next day, August 19, 2017, Rangel caused the murder of Montoya, in violation of 18 U.S.C. § 1513 (Federal Witness Retaliation) and O.C.G.A. § 16-5-1 (Murder). (Id., ¶ 133).

The Corporate Defendants deny any involvement in Montoya's murder. The denials of factual allegations in the Amended Complaint, however, have no relevance in determining whether the Amended Complaint has been properly pled. The direct nexus of the Corporate Defendants' involvement in the violent retaliation against Montoya, a federal witness, has been properly pled.

### c.  Predicate Acts to Silence Montoya are Not Attenuated.

Conflating standing and proximate cause, the Corporate Defendants claim that "adverse employment actions" are "too attenuated to confer civil RICO standing" and "collateral" to the harboring-concealing-illegal-alien scheme and the Georgia Power fraud scheme. In support, the companies cite *Parker v. Diverse Staffing Georgia, Inc.*, No. 1:20-cv-01913-TWT-RGV, 2020 WL 10575029 (N.D. Ga Dec. 23, 2020)(R&R) and *Anderson v. Brown Indus.*, No. 4:11-cv-00225-HLM-WEJ, 2012 WL 12860887 (N.D. Ga. June 13, 2012). (Doc. 209, p. 15-16) These cases are inapposite.

Both *Parker* and *Brown* addressed whether proximate cause existed under a Georgia RICO claim when an employee was terminated for allegedly refusing to participate in unlawful activity. In that regard, any injury was proximately caused by the termination, rather than the alleged racketeering activity. Here, Montoya is alleged to have been injured by the predicate acts of

terroristic threats, influencing witnesses, threatening witnesses, witness retaliation by violent means and murder in violations of Georgia and federal laws, which predicate acts were committed, attempted, solicited and coerced for the purpose of preventing detection of the enterprise's unlawful activities. The Eleventh Circuit has found proximate cause in the whistleblower context under Georgia RICO when the whistleblower was himself injured by predicate acts. *See O'Neal v. Garrison*, 263 F.3d 1317 (11th Cir. 2001)(in a Southern District of Georgia case, reversing summary judgment against whistleblower on Georgia RICO claims and finding proximate cause where adverse employment actions were intended to deter whistleblower from giving truthful testimony or injure the whistleblower for doing so); *see also Dorsey,* 279 Ga. at 539-40 (pattern includes influencing witnesses and tampering with evidence); *DeGuelle v. Camilli*, 664 F.3d 192, 201 (7th Cir. 2011)(reversing district court's dismissal of whistleblower's federal RICO claim based upon retaliation under 18 U.S.C. § 1513, and stating that "[r]etaliatory acts are inherently connected to the underlying wrongdoing exposed by the whistleblower").

2. <u>Count 2 and "Acquisition Injury":</u> **O.C.G.A. § 16-14-4(a) does not require an "acquisition or maintenance injury" separate from the injury caused by the acts of racketeering activity.**

The Corporate Defendants urge the Court to apply federal cases interpreting 18 U.S.C. § 1962(b) to Plaintiffs' claims under O.C.G.A. § 16-14-4(a) and require an "injury [that] stems not from a defendant's predicate acts, but from the defendants' acquisition or maintenance of an interest in, or control over, the enterprise, real property, or personal property." (Doc. 209, p. 23 (emphasis omitted)). There are numerous reasons why the Court should not do this.

<u>First</u>, the Corporate Defendants suggest that federal RICO cases control the interpretation of Georgia RICO because federal RICO is "essentially identical" to Georgia RICO. (Doc. 209, p. 23, n. 18). This argument is untenable. Congress made it clear that federal RICO does not preempt or

limit the scope of other laws, providing that "nothing in [RICO] shall supersede any provision of Federal, State, or other law imposing criminal remedies or affording civil remedies in addition to those provided for in this title."  Pub. L. No. 91-452, § 904(b), 84 STAT. 922, 947 (1970).

The General Assembly took Congress at its word and enacted a statute with broader application and far more extensive remedies than federal RICO. Comparison of the two statutes establishes that they differ in material respects, differences which the Georgia appellate courts have recognized on many occasions, interpreting Georgia RICO to differ from federal RICO. Indeed, one of the earliest RICO decisions by the Supreme Court of Georgia lists numerous differences between the two statutes, noting in almost every instance that the Georgia RICO provision has a broader application. *Chancey v. State*, 256 Ga. 415 (1986).[6]  Time and again, Georgia courts have recognized these differences, rejecting suggestions that federal case law controls the interpretation of Georgia RICO. *See, e.g., Dover*, 192 Ga. App. at 432 (rejecting federal continuity requirement and holding that two acts of racketeering activity are sufficient to establish a pattern); *Faillace,* 269 Ga. App. at 869 (rejecting federal requirement that a defendant must participate in the operation or management of an enterprise); *Reaugh v. Inner Harbour Hosp., Ltd.*, 214 Ga. App. 259, 264 (1994) (recognizing argument to limit the scope of recoverable damages because, "[u]nlike the federal act, [Georgia RICO] does not limit damages to injuries to business or property.").

---

[6] Some of the many ways that Georgia RICO differs materially from federal RICO include: (1) the statutes create materially different offenses:  Georgia RICO does not contain a counterpart provision to 18 U.S.C. § 1962(a), while federal RICO does not contain a counterpart provision to O.C.G.A. § 16-14-4(c)(2); (2) the statutes have materially different definitions: Georgia RICO contains a far more expansive definition of racketeering activity, with all of the conduct constituting racketeering activity under federal RICO forming just one subset thereof (O.C.G.A. § 16-14-3(5)(A)(c)), and a pattern of racketeering activity under Georgia RICO requires only two related acts (*Dorsey*, 279 Ga. at 540–42); (3) Georgia RICO provides for far broader remedies: the federal limitation on recoverable damages to those for injury to business or property does not exist under Georgia RICO (O.C.G.A. § 16-14-6(c)), Georgia RICO authorizes the recovery of punitive damages in addition to treble damages (O.C.G.A. § 16-14-6(c)),; and Georgia RICO's remedies are explicitly made "supplemental and not mutually exclusive" (O.C.G.A. § 16-14-9); and (4) the statutes have different limitations: Georgia RICO has a longer statute of limitations for recovery of damages (five years instead of four) (O.C.G.A. § 16-14-8).

Second, Georgia RICO was enacted in 1980, ten years *after* federal RICO. The cases relied upon by the Corporate Defendants were decided 15,[7] 23,[8] and 38 years[9] *after* Georgia RICO became law. They provide no basis to conclude that in 1980 the General Assembly intended § 16-14-4(a) to codify an acquisition injury requirement that no federal court had so much as mentioned. While Georgia courts assume the General Assembly is aware of interpretations that federal courts or other states' courts have given to a statute subsequently enacted in Georgia, that assumption only applies to cases decided ***before*** the statute was enacted by the General Assembly. *Haley v. State*, 289 Ga. 515, 524, 526 (2011) (federal decisions occurring after Georgia statute was enacted "could not be judicial interpretations the General Assembly considered in drafting the Georgia statute."). The Corporate Defendants cite no such case and Plaintiff has found none. Moreover, as noted above, because Georgia RICO differs in many respects from federal RICO, the assumption mentioned in *Haley* would not apply even if the federal decisions predated 1980.

Third, O.C.G.A. § 16-14-4(a) is broader than 18 U.S.C. § 1962(b). *Chancey*, 256 Ga. at 418. The Georgia provision prohibits acts of racketeering activity committed to acquire or maintain an interest in or control of an enterprise, *or* real property, *or* personal property, including money, while 18 U.S.C. § 1962(b) only prohibits the acquisition or maintenance of control over an enterprise. *Id.*

The expanded scope of O.C.G.A. § 16-14-4(a) must be read in context with Georgia's expansion on loss of recoverable damages to those resulting from injury to business or property.[10] While federal RICO limits recovery to injury to businesses or properties, Georgia rejected that

---

[7] *Compagnie de Reassurance d'Ile de France v. New England Reinsurance Corp.,* 57 F.3d 56 (1st Cir 1995).

[8] *Club Car, Inc. v. Club Car (Quebec) Import, Inc.,* 276 F. Supp. 2d 1276 (S.D. Ga. 2003).

[9] *D'Addario v. D'Addario*, 901 F.3d 80 (2d Cir. 2018).

[10] *Tibbles v. Teachers Ret. Sys. of Ga.*, 297 Ga. 557, 558 (2015) ("For context, we may look to the other provisions of the same statute, the structure and history of the whole statute, and the other law—constitutional, statutory and common law alike—that forms the legal background of the statutory provision in question.").

limitation. *Compare* 18 U.S.C. § 1964(c) with O.C.G.A. § 16-14-6(c). This change expands the application of O.C.G.A. § 16-14-4(a), permitting recovery for physical injuries that result from defendants' efforts to acquire money and maintain control of enterprises. *Reaugh*, 214 Ga. App. at 264. Under federal RICO, there could be no recovery when a witness who is injured or killed to keep him from exposing the acts of racketeering activity through which a defendant acquires money or maintains control of an enterprise. That is not the case with Georgia RICO.

These fundamental departures from federal RICO must also be read in the context of the General Assembly's emphasis on providing compensation to injured persons, mandating that "[t]his chapter shall be liberally construed to effectuate the remedial purposes embodied in its operative provisions." O.C.G.A. § 16-14-2(b). The Supreme Court of Georgia has held that, as a result of this language, when addressing competing interpretations "it would be error to give a more restrictive meaning to the term, thus limiting the remedial purposes of the Act and violating the liberal construction imperative of the legislature, as 'the purpose of the RICO Act is to provide compensation to private persons injured or aggrieved by reason of any RICO violation.'" *Williams Gen. Corp. v. Stone*, 280 Ga. 631, 632 (2006) (quoting *Williams Gen. Corp. v. Stone*, 279 Ga. 428, 429 (2005)).

O.C.G.A. § 16-14-4(a) proscribes the acquisition or maintenance of an interest in an enterprise, real property, or personal property, including money, through a pattern of racketeering activity. The proscription is set forth in the disjunctive, i.e., it is forbidden either to acquire or maintain the prohibited interest. To maintain is to "preserve from failure or decline" and "sustain against opposition or danger." (Webster's Third New International Dictionary). This meaning fits the application of O.C.G.A. § 16-14-4(a) to this case, in that Montoya was murdered in order to eliminate his opposition and the danger it posed to continued acquisition of money through

racketeering activity, as well as defending the enterprise against exposure, investigation, and prosecution. Injury caused by acts of racketeering activity intended to maintain an interest in or control over personal property or an enterprise falls within the language of O.C.G.A. § 16-14-4(a), and the substantial departures from federal RICO reflected in the text of O.C.G.A. § 16-14-4(a) and the recoverable injuries provided for in O.C.G.A. § 16-14-6(c), as well as the purpose and intent expressed by the General Assembly in O.C.G.A. § 16-14-2(b).

Fourth, since Georgia RICO was enacted, Georgia courts have consistently allowed plaintiffs to proceed under O.C.G.A. § 16-14-4(a) for harm suffered from acts of racketeering activity, without allegation or proof of a separate acquisition or maintenance injury. *See, e.g., Faillace*, 269 Ga. App. at 868 (affirming summary judgment in favor of plaintiff where defendants obtained money through acts of racketeering activity); *Cobb Cnty. v. Jones Group, P.L.C.,* 218 Ga. App. 149, 154 (1995) (affirming denial of motion to dismiss where defendant was aware of and participated in acts of racketeering activity through which interests in or control of real and personal property were obtained); *Reaugh,* 214 Ga. App. at 263–64 (reversing summary judgment on § 16-14-4(a) claim where defendant company obtained money through acts of racketeering activity); *InterAgency*, 203 Ga. App. at 418–19 (affirming award of treble damages and attorney's fees where defendant obtained money through acts of racketeering activity); *Larson v. Smith*, 194 Ga. App. 698, 699 (1990) (reversing dismissal of complaint under O.C.G.A. § 16-14-4(a) where plaintiffs alleged that defendants operated a facility for pecuniary gain through fraud and misrepresentation, converted funds paid by patients and acquired real estate with the proceeds).

None of the cases relied upon by the Corporate Defendants provide a basis for this court to disregard the Georgia courts' long-standing application of O.C.G.A. § 16-14-4(a). The first case, and the only one that even mentions O.C.G.A. § 16-14-4(a), is *Club Car, Inc. v. Club Car (Quebec)*

*Import, Inc.*, 276 F. Supp. 2d 1276 (S.D. Ga. 2003). The Corporate Defendants first cite to page 1282, which states that because Georgia RICO is "essentially identical to the federal RICO provisions," the same analysis that applies to federal claims applies to claims under the Georgia statute, a statement that is incorrect for the reasons cited above. The second cite is to page 1288 of the opinion, which references 18 U.S.C. § 1962(b), *but makes no mention at all of O.C.G.A. § 16-14-4(a)*. Most importantly, *Club Car* did *not* apply the acquisition injury requirement to O.C.G.A. § 16-14-4(a); it dismissed the Georgia RICO claims on different grounds. *Id.* at 1289, 1292. No Georgia appellate decision has ever cited *Club Car*.

The second case is *Compagnie de Reassurance d'Ile de France v. New England Reinsurance Corp.*, 57 F.3d 56 (1st Cir. 1995). This First Circuit decision contains no discussion of Georgia RICO and cites only a single case in support of its ruling, *Danielsen v. Burnside-Ott Aviation Training Ctr., Inc.*, 941 F.2d 1220, 1230–31 (D.C. Cir. 1990). *Danielsen*, in turn, cites only one case, *Old Time Enterprises, Inc. v. International Coffee Corp.*, 862 F.2d 1213, 1219 (5th Cir. 1989), but *Old Time Enterprises* is *not* itself authority for the proposition stated in *Danielsen*. No Georgia appellate decision has ever cited *Compagnie de Reassurance d'Ile de France*.

The third case is *D'Addario v. D'Addario*, 901 F.3d 80 (2d Cir. 2018). *D'Addario* describes the federal rule, but the arson example it gives only serves to illustrate crucial differences between federal RICO and Georgia RICO. *Id.* at 98. The *D'Addario* court hypothesized a racketeer who uses a pattern of physical threats and violence, including an act of arson against the plaintiff's property, to extort from the plaintiff an interest in his business. In that scenario, *D'Addario* stated that the cost of replacing or repairing property damaged in the fire would be a loss caused by the predicate act of arson, but the ultimate acquisition of an interest in the plaintiff's business would

not, concluding the value of the share of the plaintiff's business obtained would be separate and distinct damages caused by the acquisition. *Id.*

That analysis is unpersuasive for two reasons. First, in the scenario set forth in *D'Addario* the loss of a share in the plaintiff's business did stem from the acts of racketeering activity, because those acts—threats and arson—were what forced the plaintiff to surrender a share of his business. Second, if the *D'Addario* scenario is adjusted to the allegations in this case, with the plaintiff being murdered to prevent him from testifying about the threats and arson, his estate *would* have a Georgia RICO claim based upon that death, because Georgia RICO claims are not limited to recovery for injury to business or property. *Reaugh*, 214 Ga. App. at 265. No Georgia appellate decision has ever cited *D'Addario*.

### 3.  The Amended Complaint Has Adequately Pled a RICO enterprise.

The Corporate Defendants argue that under O.C.G.A. § 16-14-4(b) Plaintiff must allege an enterprise distinct from the Defendants themselves and that he has failed to do so. The Corporate Defendants are wrong in both respects.

#### a.  The Federal Distinctness Requirement Does Not Apply to This Case.

The Corporate Defendants' distinctness argument relies upon federal cases dealing with federal RICO claims, but Georgia courts applying Georgia RICO take a different view of distinctness. These Georgia cases—none of which are cited by the Corporate Defendants in any distinctness argument—apply a different test. In *Reaugh v. Inner Harbour Hospital, Ltd.*, 214 Ga. App. 259 (1994), the defendant corporation argued that it could not also be the RICO enterprise. 214 Ga. App. at 262. The argument was rejected, and the grant of summary judgment to the defendant on plaintiff's RICO claims was reversed, because there was evidence—as there are allegations in this case—that the defendant corporation was both a perpetrator and a direct beneficiary of the pattern

of racketeering activity. *Id.* at 263. *Reaugh* held that where there is evidence that agents or employees of the corporate defendant committed predicate offenses and material issues of fact existed with regard to whether the corporation was a party to or involved in the commission of those offenses, the enterprise may consist of the corporation and its agents or employees. *Id.* at 264.

Georgia courts continue to apply *Reaugh* for this principle. For example, *Duvall v. Cronic*, 347 Ga. App. 763, 774–75 (2018), quoted *Reaugh* in reversing the grant of summary judgment to a corporate co-defendant whose employee engaged in criminal acts, relying upon *Reaugh's* holding that an enterprise may consist of a corporation and its agents or employees if the entity was a party to or involved in the commission of the underlying offenses. *Id.* And just last year, a district court in the Northern District of Georgia recognized that under Georgia law a RICO enterprise may consist of a corporation and its agents or employees. *Maverick Fund, Ltd. v. Mohawk Indus., Inc.*, No. 4:21-cv-00118-VMC, 2023 WL 2887603, *14 n.6 (N.D. Ga. Mar. 31, 2023) (quoting both *Duvall* and *Reaugh*).

Instead of addressing the Georgia cases that control the application of Georgia RICO, the Corporate Defendants rely upon inapposite cases dealing with the federal distinctness requirement. For example, they rely on *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340 (11th Cir. 2016). (Doc. 209, p. 25). But that case involved federal RICO, *not* Georgia RICO. *Ray*, 836 F.3d at 1345. In fact, no case cited by the Corporate Defendants addresses a distinctness argument involving a claim under O.C.G.A. § 16-14-4(b).

> **b. Even if the federal distinctness requirement did apply, the Amended Complaint would satisfy it.**

Even if the federal distinctness requirement did apply, the Amended Complaint would satisfy it. The Corporate Defendants argue that under O.C.G.A. § 16-14-4(b) Plaintiff must allege an

enterprise distinct from the themselves and he has failed to do so. As set forth above, they are wrong in the first respect, and as set forth below, they are also wrong in the second.

O.C.G.A. § 16-14-4(b) provides that:

It shall be unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity.

A RICO enterprise may consist of an association-in-fact. O.C.G.A. § 16-14-3(3). ("'Enterprise' means any . . . group of individuals associated in fact although not a legal entity. . . .") "[T]he Supreme Court has 'succinctly' defined an association-in-fact enterprise as 'any group of persons associated together for a common purpose of engaging in a course of conduct.'" *Al-Rayes v. Willingham*, 914 F.3d 1302, 1307 (11th Cir. 2019) (citing *Boyle v. United States*, 556 U.S. 938, 946 (2009)). The associations that form an enterprise may be "formal or informal." *Al-Rayes*, 914 F.3d at 1307. Because a corporation is a person for purposes of RICO, *Williams General Corp. v. Stone,* 280 Ga. 631 (2006), an association-in-fact enterprise may include one or more corporations. *See, e.g., United States v. Goldin Indus., Inc.,* 219 F.3d 1271, 1274–77 (11th Cir. 2000) (enterprise consisting of three related corporations was distinct from the corporations themselves); *Williams v. Mohawk Industries, Inc.,* 465 F.3d 1277, 1284 (11th Cir. 2006) (association-in-fact enterprise consisting of corporation and recruiters who offered a pool of illegal workers and were sometimes assisted by the corporation's employees, who supplied social security cards to prospective or existing employees so they could assume a new identity).

An enterprise can have both legitimate and illegitimate purposes. *United States v. Turkette*, 452 U.S. 576, 584 (1981) (RICO applies to both legitimate and illegitimate enterprises); *United States v. Andino-Morales*, 73 F.4th 24, 34 (1st Cir. 2023) (nothing in the statutory definition of enterprise requires that the enterprise be defined solely by a criminal purpose). Also, there is no requirement that the association originally form for a wrongful purpose; it is enough that from an

existing relationship the defendants later came to share a wrongful purpose. *Al-Rayes*, 914 F.3d at 1308 (an association-in-fact enterprise may consist of parties who had preexisting relationships and later joined together for the common purpose of engaging in illegal activity). Moreover, a person associated with an enterprise may have more than one role in that enterprise. *Boyle v. United States*, 556 U.S. 938, 948 (2009) ("different members may perform different roles at different times.").

Rangel and Cruz's employer-employee relationship with the Corporate Defendants did not preclude them from forming a RICO enterprise together with those entities and other employees of the Corporate Defendants. Likewise, the fact that Rangel and Cruz were  employees of the Corporate Defendants did not preclude them from also associating with the Corporate Defendants for purposes beyond the scope of that employment, and the Corporate Defendants cite no authority for the proposition that employee status somehow precludes or negates other forms of association outside of that employment.

The Davey-Rangel Enterprise included the Corporate Defendants, Branch, Rangel, Conner, Cruz and others. (AC, ¶¶ 98–108; RS, pp. 72–74, 80). Rangel, for example, associated with the Corporate Defendants both formally and informally. Formally, he was an employee, specifically a crew chief. (AC, ¶¶ 19, 218; RS, p. 3). Informally, he participated as an associate in the Davey-Rangel Enterprise, engaging in criminal activities for the mutual benefit of the associates, including the Corporate Defendants. (AC, ¶¶ 37, 102–104; RS, pp. 29–30).

The Corporate Defendants wrongly assume that a person can only play one role within an enterprise, i.e., if a person is an employee, that is the end of the analysis no matter what other roles that person may assume. But they cite no authority for the proposition that status as an employee somehow precludes other forms of association beyond or in addition to the employment

relationship and Plaintiff has found no such authority. The employer-employee relationship with the Corporate Defendants did not preclude Rangel and Cruz from also forming part of an association-in-fact enterprise engaged in activities beyond the scope of their employment.

The false dichotomy the Corporate Defendants promote is similar to the invalid argument that a person who is associated with one enterprise cannot also be associated with another. *See United States v. Connolly*, 341 F.3d 16, 28 (1st Cir. 2003) ("Membership in the Winter Hill Gang does not, ipso facto, preclude membership in another criminal enterprise."). Just as a person can associate with two different enterprises, he can play two different roles in the same enterprise, one as an employee and another as a co-venturer. *Boyle*, 556 U.S. at 948 (person associated with enterprise may perform different roles at different times); *Williams General*, 280 Ga. 631 (2006)(corporation may be held directly liable for conspiring with its officers).

A natural person is legally distinct from a corporation. *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001). Only when an employee is acting within the scope of his role for the corporation is a limited exception to that legal distinctness recognized, under federal RICO. *Id.* at 164. Thus, while under federal RICO "plaintiffs may not plead the existence of a RICO enterprise between a corporate defendant and its agents or employees *acting within the scope of their roles for the corporation*," *Al-Rayes*, 836 F.3d at 1357 (emphasis supplied), that language itself recognizes there is no distinctness issue if a corporate defendant associates with an employee to violate RICO through conduct *outside* the scope of that person's employment. *See, e.g.*, *Valenzuela v. Swift Beef Co.*, No. 3:06-CV-2322-N, 2007 WL 9723147, at *8 (N.D. Tex. Dec. 20, 2007) (no distinctness issue in federal RICO action brought by American-citizen employees against employer for hiring illegal immigrants, where false documentation middlemen "maintained their

own business operations," and court could not say documentation middlemen "provided false documentation as mere agents/employees" of employer).

Indeed, *Ray*, a case upon which the Corporate Defendants rely, *acknowledges four separate times* that the exception treating employees as not being distinct from their corporate employer is limited to situations "when those individuals *are operating in their official capacities for the corporation*." 836 F.3d at 1355, "*are carrying on the normal work of the corporation*," *id.* at 1356; are "*acting within the scope of their roles for the corporation*," *id.* at 1357; and are "*acting within the scope of their employment . . . .*" *id.* (emphasis added to each quote). Cases upon which *Ray* relied also recognize this limitation. *See, e.g.*, *Ray*, 836 F.3d at 1356 (describing the Second Circuit as holding in *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 121 (2nd Cir. 2013), that "a defendant corporation cannot form a RICO enterprise with its own employees or agents *who are carrying out the normal work of the corporation*.") (emphasis added). So do Eleventh Circuit cases subsequent to *Ray*. For example, *DJ Lincoln Enterprises, Inc. v. Google LLC*, No. 21-12894, 2022 WL 203365 (11th Cir. Jan. 24, 2022), emphasized that the plaintiff failed to explain how "any of the individuals associated with those organizations, *operated outside their official capacity*." *Id.* at \*2 (emphasis added), citing *Ray*, 836 F.3d at 1355. Consequently, where individuals who formed part of an enterprise "did not merely act as officers or employees of enterprise members, but instead acted in their dual roles as Standard employees and enterprise associates," the association-in-fact enterprise "is distinct from any of the particular company or individual defendants." *Standard Chlorine of Del., Inc. v. Sinibaldi*, 821 F. Supp. 232, 249 (D. Del. 1992).

The Corporate Defendants' efforts to apply the exception for employees acting exclusively within their official capacity relies upon ignoring the allegations of the Amended Complaint and the RICO Statement, asserting that the associated members of the enterprise were engaged in

nothing other than the Corporate Defendants' supposed ordinary course of business. (Doc. 209, pp. 26–27). The flaw in this argument is that the Plaintiff's well-pleaded allegations—which must be accepted as true at this stage of the proceedings—are to the contrary.[11]

The Amended Complaint and the RICO Statement recite multiple ways in which Rangel's participation in the enterprise, for example, included conduct outside the ordinary duties of his employment as a crew chief. For example, Rangel ran an illegal labor recruiting/labor broker operation that supplied illegal alien workers hired by the Corporate Defendants. (AC, ¶¶ 20, 102; RS, pp. 28–29). To further that illegal alien labor recruiting/labor broker operation, Rangel procured false identifications and false identification documents for those illegal alien employees, which were used to paper the Corporate Defendants' files in case Georgia Power or a governmental agency inquired into the immigration status of those employees. (AC, ¶¶ 20, 30, 102, 115–116; RS, pp. 29–30). Rangel further harbored much of the illegal-alien workforce at his 26-acre compound. (AC, ¶¶ 25-26).

The Corporate Defendants were aware of, participated in and facilitated these illegal activities by (1) mailing the illegal-alien employees' paychecks to Rangel, and later (2) depositing the illegal-alien employees' wages into a bank account controlled by Rangel. (AC, ¶¶ 23, 105). These paychecks and wire transfers totaled over $3,000,000. (AC, ¶ 23; RS, p. 29). After receiving the wages of those employees from the Corporate Defendants, Rangel paid himself for providing false identities and false identification documents and harboring the illegal aliens at his compound. (AC, ¶¶ 22–23, 25; RS, pp. 29–30). For his part, Cruz was paid thousands of dollars for his assistance in the illegal-alien-employment-harboring scheme. (AC, ¶ 24; RS, p. 34).

---

[11] In addition to the conduct of Rangel and Cruz outside of their ordinary duties of employment, Conner, as alleged, participated in the enterprise's unlawful activities, in part, by committing perjury to conceal the enterprise's unlawful activities, which perjury was committed after her termination from the Corporate Defendants. (AC, ¶ 107).

Under these allegations, Rangel and Cruz on the one hand, and the Corporate Defendants, on the other, were not just employees and employers, they were partners in crime. *Hicks v. State*, 295 Ga. 268, 275 (2014) (conspirators are partners in crime). Rangel's relationship with the Corporate Defendants included crimes committed for their mutual benefit that ranged far outside the scope of any normal employee-employer relationship.[12] While Rangel's activities were not within the scope of his responsibilities as a crew chief for the Corporate Defendants, they were in furtherance of the enterprise's unlawful activities. (AC, ¶ 102). Rangel's "off the clock" activities make this clear. Before and after regular working hours, he procured fraudulent identification for the Corporate Defendants' illegal-alien employees and harbored them on his property. (AC, ¶¶ 20, 23, 25; RS, pp. 29-30). By their nature, Rangel's harboring activities occurred outside of his work hours as a crew chief for the Corporate Defendants, *e.g.*, when the illegal-alien employees were sleeping and during their days off. The Corporate Defendants did not directly pay Rangel for those activities; instead, the illegal alien employees' paychecks and wages were sent to Rangel, enabling him to deduct monies for the fraudulent documentation and the harboring. (AC, ¶¶ 22–23, 75; RS, pp. 29-30). These are not the "routine tasks" of a crew chief at a tree trimming company. The fact that Rangel's compensation for the illegal labor recruiting, false identification, and harboring operations was separate from the wages he received from the Corporate Defendants further demonstrates that those activities were not within the scope of his ordinary job duties. (AC, ¶¶ 22, 102).

Rangel's interactions with the Corporate Defendants consisted of, furthered, or contemplated criminal activity. The Davey-Rangel enterprise relied on these coordinated and mutually beneficial

---

[12] Under Georgia law, a defendant need only *participate* in the enterprise; the federal RICO requirement that a defendant *operate or manage* the enterprise does not apply. *Faillace*, 269 Ga. App. at 869.

acts of criminal activity[13] to provide the Corporate Defendants with an inexpensive and obedient workforce of illegal aliens and prevent the disclosure of those illegal activities. (AC, ¶ 37; RS, p. 17). When illegal aliens working for the Savannah Call Center were injured, they were not provided with medical attention or workers compensation benefits; they were terminated. Rangel would then recruit another illegal alien to take the injured worker's place, assuming the injured worker's identity and using his identification documents. (AC, ¶ 35; RS, pp. 30–31). When Montoya complained about these and other illegal activities and threatened to tell law enforcement, the Davey-Rangel enterprise retaliated, harassed, misled, assaulted and murdered him.

Just as a "marriage certificate does not transform alleged mail and wire fraud into ordinary household management," *Al-Rayes*, 914 F.3d at 1310, an employer-employee relationship does not transform the provision of false identities and identification documents, harboring of illegal aliens, intimidation of witnesses or the murder of a whistleblower into ordinary job responsibilities.[14]

The Corporate Defendants also argue that the § 16-14-4(b) claim fails "because a parent company and its subsidiaries cannot form an 'enterprise' for RICO purposes." (Doc. 209 at 27–28). That argument is inapposite because, as set forth above, the enterprise did not consist solely of Davey Tree and Wolf Tree. There were other persons associated with the enterprise who acted outside the scope of any employment they had with the Corporate Defendants and that is all that is required. *Williams v. Mohawk Indus.,* 465 F.3d at 1284 (association-in-fact enterprise consisting of corporation and third-party recruiters who offered a pool of illegal workers and were sometimes

---

[13] For examples of the benefits to the Corporate Defendants, *see* AC, ¶¶ 28–30, 37; RS, p. 17. For examples of the benefits to Rangel, *see* AC, ¶¶ 23–25; RS, pp. 29–30.

[14] *See also Trollinger v. Tyson Foods, Inc.*, No. 402-CV-23, 2007 WL 1574275 (E.D. Tenn. May 29, 2007) (rejecting, in federal RICO suit against poultry processor and officers/employees for alleged "Illegal Immigrant Hiring Scheme," processor's argument that it could not be liable for conducting its own affairs, reasoning that complaint alleged processor was *not* conducting its own affairs, but rather was carrying out the "Illegal Immigrant Hiring Scheme").

assisted by the corporation's employees, who supplied social security cards to prospective or existing employees who needed to assume a new identity). And, under Georgia law, a corporate officer and the corporation by which he is employed are sufficiently distinct that they can conspire to violate RICO. *Williams General*, 280 Ga. at 631-32.

### 4. Count 3 Adequately Alleges a RICO Endeavor and Conspiracy.

O.C.G.A. § 16-14-4(c) differs from federal RICO's conspiracy provision, 18 U.S.C. § 1962(d), providing for two separate violations. Subsection (c)(1) provides for a conspiracy violation, while subsection (c)(2) provides for an endeavor violation, a violation which does not exist under federal RICO. The Amended Complaint alleges that the Defendants endeavored to maintain control of the Davey-Rangel Enterprise through a pattern of racketeering activity, in violation of subsection (c)(2). (AC, ¶¶ 163-164, 172). The Corporate Defendants' motion to dismiss does not challenge Plaintiff's endeavor claim.

While the Corporate Defendants do challenge Plaintiff's conspiracy claim under subsection (c)(1), their argument that it fails because the substantive RICO counts (Counts 1 and 2) are subject to dismissal is wrong because Counts 1 and 2 are adequately alleged, as described above.

In addition, even if Counts 1 and 2 were themselves subject to dismissal, that would not require dismissal of Count 3. The fundamental premise of the Corporate Defendants' argument, that substantive liability is a prerequisite to conspiracy liability, is contrary to Georgia law. *Hendricks v. State*, 277 Ga. 61, 62 (2003) ("There is no requirement that the underlying crime be committed.").[15] Indeed, "[i]t is elementary that a conspiracy may exist and be punished *whether or not the substantive crime ensues*, for the conspiracy is a distinct evil, dangerous to the public,

---

[15] Federal courts agree. *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1269 (11th Cir. 2004) (It is "undoubtedly correct" that "a party may be liable for RICO conspiracy even if it is not liable for the substantive RICO offense."). *Smith v. Berg*, 247 F.3d 532, 537 (3d Cir. 2001) ("*Salinas* makes clear that § 1962(c) liability is not a prerequisite to § 1962(d) liability.") (internal quotation marks omitted).

and so punishable in itself." *Nordahl v. State*, 306 Ga. 15, 25 (2019), quoting *Salinas v. United States*, 522 U.S. 52, 65 (1997). This is why Georgia courts have affirmed RICO conspiracy convictions where no substantive RICO violation was even charged. *Cotman v. State*, 342 Ga. App. 569 (2017).

Because the elements of a Georgia RICO conspiracy are different from—and not dependent upon—those of a substantive violation, an allegation or proof of a substantive violation is not a prerequisite to conspiracy liability. "[A] conspiracy is a partnership in crime . . .", *Pinkerton v. United States*, 328 U.S. 640, 644 (1946), it does not require that a defendant commit or agree personally to commit two acts of racketeering activity. *Faillace*, 269 Ga. App. at 870. Thus, if the Corporate Defendants conspired with Rangel to have Montoya killed, his actions are their actions under O.C.G.A. § 16-14-4(c). Nor does it require that the defendant itself commit an overt act because "each actor in a conspiracy is responsible." *Pasha v. State*, 273 Ga. App. 788 (2005) (citing *Causey v. State*, 154 Ga. App. 76, 79 (1980). If the Corporate Defendants conspired with Rangel to have Montoya killed, his actions are their actions and they are liable under O.C.G.A. § 16-14-4(c). *Williams General*, 280 Ga. at 631-32 (corporation liable under RICO for conspiracy with its own officer).

## 5. To the Extent Necessary, the Amended Complaint Clears the Heightened Standard of Fed. R. Civ. P. 9(b).

The Corporate Defendants argue that the Amended Complaint does not satisfy the heightened pleading standard of Fed. R. Civ. P. 9(b) and, therefore, should be dismissed. Rule 9(b) provides, "[i]n alleging ***fraud*** or ***mistake***, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be

alleged generally." Fed. R. Civ. P. 9(b) (emphasis added).[16] "Despite the heightened standard . . . the purpose of Rule 9(b) remains that a complaint must provide the defendant with 'enough information to formulate a defense to the charges.'" *United States v. SouthernCare, Inc.*, No. CV410-124, 2015 WL 5278413, at *2 (S.D. Ga. Sept. 9, 2015) (Moore, J.) (citing *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1313 n.24 (11th Cir. 2002)). "The Eleventh Circuit has emphasized that [t]he application of Rule 9(b) . . . must not abrogate the concept of notice pleading.'' *Id.* (citing *Tello v. Dean Witter Reynolds, Inc.*, 494 F.3d 956, 972 (11th Cir. 2007) (internal quotation marks omitted). "Rule 9(b)'s standard should not be conflated with that used on a summary judgment motion." *Id.* (citing *United States ex rel. Rogers v. Azmat,* No. CV 507-092, 2011 WL 10935176, at *3 (S.D. Ga. May 17, 2011) (unpublished)). "[U]nder Rule 9(b), it is sufficient to plead the who, what, when, where, and how of the allegedly false statements and then allege generally that those statements were made with the requisite intent." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008). Under any applicable standard, the Amended Complaint is properly pled.

### B.   The Non-RICO Counts

The Corporate Defendants argue, "[w]ith the dismissal of the RICO claims, this Court does not have an independent basis to *exercise original jurisdiction* over the remaining common law claims." (Doc. 209, p. 31). As Plaintiff previously outlined, however, even if the Court were to

---

[16] Only ***some*** of the RICO predicate acts alleged by the Amended Complaint, those requiring proof of fraud or a misrepresentation, must satisfy the heightened pleading standard of Rule 9(b). *See Liquidation Comm'n of Banco Intercontinental, S.A. v. Renta*, 530 F.3d 1339, 1355–56 (11th Cir. 2008) ("RICO predicate acts ***not sounding in fraud*** need not necessarily be pleaded with the particularity required by Fed.R.Civ.P. 9(b)." (Emphasis added)). Many of the predicate acts alleged in the Amended Complaint require no proof of fraud or a misrepresentation. *See, e.g.*, AC, ¶¶ 133 (murder); 125 (intimidating and threatening with intent to hinder, delay or prevent communication to a law enforcement officer, in violation of O.C.G.A. § 16-10-93); 126 (soliciting and coercing others to make terroristic threats, in violation of O.C.G.A. § 16-11-37); 129 (making terroristic threats, in violation of O.C.G.A. § 16-11-37); and 131-132 (aiding, abetting and soliciting retaliation against a federal witness, in violation of 18 U.S.C. § 1513). These predicate acts are subject only to "Rule 8's more relaxed notice-pleading standard." *SEC v. Bankatlantic Bancorp, Inc.*, No. 12-60082-CIV, 2012 WL 12837291, at *2 (S.D. Fla. Dec. 7, 2012).

dismiss the RICO claims, it should still retain this case pursuant to 28 U.S.C. § 1367. *See, e.g.*, Doc. 119, p. 5 (quoting *Smith v. City of Tallahassee*, 789 Fed. Appx. 783, 789 (11th Cir. 2019)).

The Corporate Defendants next argue that the Amended Complaint fails to state claims against them for intentional infliction of emotional distress (IIED). "To prevail on a claim for [IIED], Plaintiffs must show that: (1) defendants' conduct was intentional or reckless; (2) defendants' conduct was extreme and outrageous; (3) a causal connection existed between the wrongful conduct and the emotional distress; and (4) the emotional harm was severe." *Gifford v. City of Broxton, Georgia*, No. CV 508-084, 2010 WL 11607353, at *12 (S.D. Ga. Sept. 24, 2010) (internal citation and quotation marks omitted). In *Gifford*, this Court denied summary judgment on the plaintiff's IIED claim where the defendant police officer threatened to kill the plaintiff. *Id.* at *6, 12.

Here, the Amended Complaint states claims against the Corporate Defendants for IIED by alleging that those Defendants' employees: (1) orchestrated ***death threats*** against Montoya, by helping incite a riot against him; (2) aided, abetted, and solicited retaliation against Montoya; and (3) acted with the specific intent to expose Montoya's identity and complaints to Rangel, in an effort to ***silence*** Montoya. (*See, e.g.*, AC, ¶¶ 60-62, 131, 252). The Corporate Defendants thus played a key role in the scheme to ***silence***, ***threaten***, and ***retaliate*** against Montoya, culminating in ***death threats*** against Montoya, and then the violent retaliation resulting in Montoya's ***murder***. (Id., ¶¶ 53, 124, 158, 251). Also, contrary to the Corporate Defendants' argument that Plaintiff does not allege that Montoya suffered emotional distress, the Amended Complaint states that the Corporate Defendants' actions "caused severe emotional distress to Eliud Montoya, up until the point of his murder." (Id., ¶ 268). Accordingly, the Amended Complaint satisfies the requirements for pleading IIED.

The Corporate Defendants next assert that the Amended Complaint fails to state claims against them for assault and battery. "To constitute an assault no actual injury need be shown, it being only necessary to show an intention to commit an injury, coupled with an apparent ability to do so." *Wallace v. Stringer*, 250 Ga. App. 850, 853 (2001) (internal citations and quotation marks omitted) (emphasis added). The Corporate Defendants claim, "[t]here are *zero* allegations that the Company Defendants . . . intended to injure Mr. Montoya." (Doc. 209, p. 33). The Amended Complaint, however, outlines in detail how each of the Defendants, including Davey Tree and Wolf Tree, "engaged in a systematic effort to silence Montoya, through *physical threats*, economic threats, intimidation, retaliation, deception, and eventually *murder*." (AC, ¶ 53 (emphasis added)). The Amended Complaint further states that many of the Corporate Defendants' racketeering acts "***intended to cause injury to [Montoya]***." (Id., ¶ 158 (emphasis added)). The Amended Complaint makes plain that the Corporate Defendants, through employees Cruz and Rangel, "threatened Montoya with violence and had the apparent ability to perform said acts of violence. Said threats began in early May of 2017." (Id., ¶ 181). The Amended Complaint continues that the Corporate Defendants—through another employee, Juan Rangel—"***threatened Montoya with physical injury on August 19, 2017, in the moments leading up to his death***." (Id., ¶ 182 (emphasis added)). Thus, Plaintiff has adequately pled that the Corporate Defendants intended to injure Montoya, and the Amended Complaint states a claim against the Corporate Defendants for assault.

Lastly, the Corporate Defendants contend that the Amended Complaint fails to state a claim for battery. "A cause of action for battery will lie for ***any*** unlawful touching . . . ." *Lawson v. Bloodsworth*, 313 Ga. App. 616, 618 (2012) (internal citation omitted) (emphasis added). The Corporate Defendants argue that they never unlawfully touched Montoya, and, therefore, cannot be held liable for battery. As the Amended Complaint explains, however, the Corporate

Defendants "put in place actions to the intimidation and physical injury of Eliud Montoya. These actions include, but are not limited to, repeated ***gunshots*** made by [their employee] Juan Rangel, at the direction of [their employee] Defendant Pablo Rangel, ***into Montoya's body*** . . . ." (AC, ¶ 177 (emphasis added)).

The Corporate Defendants argue, without citing any authority, that neither assault nor battery can "be committed 'through' someone else, or brought about through a chain of events, as alleged by Plaintiff," (Doc. 209, p. 33). This is incorrect. In *Georgia Messenger Services, Inc. v. Bradley*, 311 Ga. App. 148 (2011), the court affirmed the denial of summary judgment for a messenger service sued for battery under a theory of vicarious liability after one of its couriers kicked the plaintiff in the head. In *Ellison v. Burger King Corp.*, 294 Ga. App. 814 (2008), the court reversed summary judgment in favor of a Burger King franchisee as to "respondeat superior for the battery" after a Burger King manager put a customer in a head lock. *Id.* at 822. Here, similarly, the Corporate Defendants should be held liable for the violence—including murder—their employees visited on Montoya, and the Amended Complaint sufficiently claims as much.

## IV.    Conclusion

For the foregoing reasons, the Corporate Defendants' June 2024 motion to dismiss the Amended Complaint should be denied.

Respectfully submitted this 26th day of July, 2024.


[*Signatures on following page.*]

**GRIFFIN DURHAM TANNER & CLARKSON**

By:  */s/ James D. Durham*
      James D. Durham
      Georgia Bar No. 235515
      Samuel L. Mikell
      Georgia Bar No. 24114
      104 West State Street, Suite 200
      Savannah, Georgia 31401
      Ph/Fax: (912) 867-9140

**BONDURANT,  MIXSON  &  ELMORE LLP**

By:  */s/ John E. Floyd*
      John E. Floyd
      Georgia Bar No. 266413
      One Atlantic Center
      1201 West Peachtree Street NW
      Suite 3900
      Atlanta, Georgia 30309
      (404) 881-4100

**SAVAGE, TURNER, PINCKNEY, SAVAGE & SPROUSE**

By:  */s/R. Bartley Turner*
      R. Bartley Turner
      Georgia Bar No. 006440
      102 East Liberty, 8th Floor
      Savannah, Georgia 31401
      Ph: (912) 231-1140

## <u>CERTIFICATE OF SERVICE</u>

I certify that I have this day served the foregoing through the Court's ECF system upon all counsel registered to receive service, and that I have served the foregoing via U.S. mail on the following: Pablo Rangel-Rubio (*Pro Se*), Register No. 22405-021, USP Atwater, Post Office Box 019001 6A-123, Atwater, California 95301

This 26th day of July, 2024.

**GRIFFIN DURHAM TANNER & CLARKSON**

By:    <u>/s/ *James D. Durham*</u>
James D. Durham
Georgia Bar No. 235515
104 West State Street, Suite 200
Savannah, Georgia 31401
Ph/Fax: (912) 867-9140