## IN THE UNITED STATES DISCTRICT COURT FOR
## THE SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

BRIAN J. HUFFMAN, ESQ., as )
Administrator of the Estate of ELIUD )
MONTOYA-ARCOS, Deceased, )
           )
        Plaintiff, )
           )       **CIVIL ACTION FILE**
v. )       **NO. 4:18-cv-00184**
           )
THE DAVEY TREE EXPERT COMPANY, )
et al., )
           )
        Defendants. )
           )

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT OSCAR CRUZ'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

Brian J. Huffman, Esq., as Administrator of the Estate of Eliud Montoya-Arcos, Deceased, hereby responds in opposition to Defendant Oscar Cruz's June 2024 motion to dismiss Plaintiff's Amended Complaint (Doc. 208). For the reasons that follow, Cruz's motion to dismiss should be denied.[1]

### I.      Preliminary Statement

In late 2017, Montoya's widow filed a wrongful death case in the State Court of Chatham County, *Maria Montoya v. Davey Tree, et al.* (STCV17-01873), against many of those responsible for her husband Eliud Montoya's August 19, 2017 murder. After additional investigation, Montoya's Estate filed claims in the State Court of Chatham County that only it could bring, including claims under the Georgia RICO Act. Defendants removed the Estate's claims to this Court.

---

[1] Cruz's motion is in large part a cut-and-paste duplicate of most of the arguments made in Davey Tree and Wolf Tree's motion to dismiss. See Doc. 209. Accordingly, to the extent Cruz's and the Davey Tree and Wolf Tree's arguments are the same, Plaintiff adopts those arguments made in his response to Davey Tree and Wolf Tree's motion to dismiss.

Both actions remained stayed during the DOJ's multi-year investigation and prosecution of some of the crimes related to Montoya's murder. Individual Defendants Cruz and Rangel, who were supervisors of the Corporate Defendants, pled guilty to a host of crimes surrounding Montoya's murder, including conspiracy, retaliation against a federal witness resulting in death, harboring and concealing illegal aliens and money laundering. Last year, the Davey Tree Company ("Davey Tree") and Wolf Tree, Inc. ("Wolf Tree") (collectively the "Corporate Defendants") recently paid to the United States almost $4 million to resolve criminal allegations associated with the murder of Montoya. *See* https://www.justice.gov/usao-sdga/pr/companies-employed-labor-whistleblower-and-his-killers-reach-criminal-civil-resolution (last visited Sept. 11, 2023).

Plaintiff filed an Amended Complaint on July 14, 2023. In compliance with the Court's March 27, 2024 Order (Doc. 193), Plaintiff filed a 108-page RICO Statement on April 24, 2024.[2] (Doc. 196). Afterwards, Cruz filed a renewed motion to dismiss, which regurgitates arguments previously made.

## II.     Statement of Especially Pertinent Facts[3]

Davey Tree and Wolf Tree (formed by Davey Tree as a wholly owned division in 2008) were in the business of trimming trees along power lines for utility companies. (AC, ¶ 16; RS, p. 3). The Corporate Defendants' operation in the Savannah area was called the Savannah Call Center. (AC, ¶ 19; RS, p. 3). From 2008 through most of 2017, the vast majority of the employees working at the Savannah Call Center were illegal aliens. Cruz and the other Defendants all knew that the vast

---

[2] A RICO case statement is considered as part of the pleadings on a motion to dismiss. *O'Malley v. O'Neill*, 887 F.2d 1557, 1559 (11th Cir. 1989) (utilizing both complaint and RICO case statement filed by plaintiffs pursuant to an order entered by the district court to analyze plaintiffs' claims). *See also LABMD Inc. v. Boback*, 47 F.4th 164, 179 n. 11 (3d Cir. 2022); *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992) (in determining whether complaint states a claim, facts set forth in a RICO case statement required by the local rules must be considered); *Tal v. Hogan*, 453 F.3d 1244, 1262 n. 18 (10th Cir. 2006) (considering the allegations made in a plaintiff's RICO case statement in conjunction with the complaint).

[3] The following facts are alleged in the Amended Complaint ("AC," Doc. 123) and RICO Case Statement ("RS," Doc. 196), but do not constitute all pertinent facts alleged therein.

majority of the Savannah Call Center workforce were illegal aliens, with some learning later than others. (AC, ¶ 19; RS, p. 3). Defendant Rangel, an illegal alien, was the paid supervisor of the Savannah Call Center. (Id.). In addition to serving as Davey Tree and Wolf Tree's paid supervisor, Rangel operated as an independent labor broker, locating and recruiting illegal aliens to work for Davey Tree and Wolf Tree and providing them with false identities and false identification documentation. (AC, ¶ 20; RS, p. 3). The false identities and false identification documents served to provide Wolf Tree and Davey Tree with a cheap, illegal workforce and concealed the illegal nature of that workforce from the authorities and from Davey Tree and Wolf Tree's customers. (AC, ¶ 20; RS, pp. 3-4).

Rangel charged the illegal aliens he recruited to work for Davey Tree and Wolf Tree for false identities and false identification documents. (AC, ¶ 22; RS, p. 4). The illegal aliens would also pay Rangel for securing them a job at the Savannah Call Center. (Id.). Davey Tree and Wolf Tree sent directly to Rangel paychecks and wire transfers totaling over $3 million, which Rangel and others divided among themselves and the illegal alien workforce. (AC, ¶ 23; RS, p. 4).

In addition to selling false identities, Rangel harbored and concealed many of the illegal aliens who worked for the Savannah Call Center. (AC, ¶ 25; RS, p. 4). Davey Tree and Wolf Tree were aware of Rangel's separate, illegal-alien harboring scheme and wired employees' pay to Rangel, in part to promote Rangel's harboring and concealing scheme. (AC, ¶¶ 25-26; RS, p. 4). In 2013, Defendant Cruz began assisting Rangel with his harboring-concealing-illegal-aliens scheme. (AC, ¶ 24; RS, p. 4). As directed by Rangel, Cruz made cash withdrawals and provided cash to illegal alien workers, knowing the workers were illegal aliens and that Rangel was receiving money in return from the illegal alien workers. Rangel paid Cruz thousands of dollars for his assistance with the harboring-illegal-aliens scheme. (Id.).

Georgia Power was the Savannah Call Center's only customer. (AC, ¶ 27; RS, p. 4). Georgia Power paid the Corporate Defendants millions of dollars each year to provide tree-trimming services. (AC, ¶ 28; RS, p. 4). For each Georgia Power contract signed, the Corporate Defendants fraudulently certified and represented to Georgia Power that they verified the legality of their workforce. (AC, ¶ 29; RS, p. 4). Davey Tree and Wolf Tree also used Rangel and Cruz to provide fictitious identification documents to Georgia Power to deceive Georgia Power into issuing identification cards to illegal aliens. (AC, ¶ 30; RS, pp. 4-5). Based on false representations of the legality of the Savannah Call Center workforce, Georgia Power transferred millions of dollars by interstate wires into the Corporate Defendants' accounts. (AC, ¶¶ 28-29; RS, pp. 4-5).

Eliud Montoya was a U.S. citizen who worked as a tree trimmer and team leader for Wolf Tree and Davey Tree at the Savannah Call Center for over ten years before his murder in August 2017. (AC, ¶ 38; RS, p. 5). While a member of the Savannah Call Center, Montoya witnessed numerous violations of Georgia and federal law relating to the employment and mistreatment of illegal aliens. (AC, ¶ 42; RS, p. 5). In April 2017, pursuant to Davey Tree and Wolf Tree's whistleblower policy, Montoya contacted Davey Tree to report illegal and dangerous conduct. (AC, ¶ 49; RS, p. 5). Both orally and in writing, Montoya reported the following to Davey Tree and Wolf Tree: (a) most of the Savannah Call Center workers were illegal aliens; (b) the Savannah Call Center supervisor, Rangel, had sold false identifications to the illegal-alien employees; (c) Rangel paid the illegal-alien workers in cash; (d) Rangel took money from the illegal-alien workforce; and, (e) Rangel allowed illegal aliens to operate the Savannah Call Center's commercial vehicles without licenses. (AC, ¶ 50; RS, p. 5). In his reports to Davey Tree and Wolf Tree, Montoya stated he had reported, and intended to report again to law enforcement, the illegal and dangerous conduct he had observed. (AC, ¶ 51; RS, p. 5).

Montoya did not know that Wolf Tree and Davey Tree were already aware of many, if not all, of the reported criminal conduct. (AC, ¶ 47; RS, p. 5). Instead of lawfully addressing Montoya's reports of serious criminal and dangerous conduct, Cruz and the other Defendants, aided and abetted by each other, engaged in a systematic effort to ***silence*** Montoya, through ***physical threats, economic threats, intimidation, retaliation, deception, and ultimately murder***. (AC, ¶ 53; RS, pp. 5-6).

Immediately after receiving Montoya's April 2017 written report, Defendant Conner, Davey Tree's In-House Counsel; Defendant Branch, Rangel's immediate supervisor; and other Wolf Tree and Davey Tree corporate officers decided not to investigate Montoya's confidential reports promptly or confidentially. (AC, ¶ 55; RS, p. 6). Instead, in flagrant disregard of Davey Tree and Wolf Tree's whistleblower policy, Conner, Branch and other Wolf Tree and Davey Tree corporate officers decided to provide Montoya's written whistleblower complaint ***to Rangel***, intending that he would ***silence*** Montoya.[4] (Id.).

As agreed by Branch, Conner and other Wolf Tree and Davey Tree officers, Branch provided Rangel with a copy of Montoya's written whistleblower report, and told Rangel that Montoya was the whistleblower. (AC, ¶ 56; RS, p. 6). Upon reading Montoya's report, Rangel admitted to Branch that he had provided illegal aliens hired at the Savannah Call Center with false identifications in exchange for money. (Id.). Branch reported to Conner and other Wolf Tree and Davey Tree corporate officials Rangel's confirmation of serious criminal conduct. (Id.).

---

[4] As alleged in the Amended Complaint and RICO Statement, in 2016, Montoya made a similar oral whistleblower report to Davey Tree and Wolf Tree pursuant to the companies' whistleblower policy. (AC, ¶¶ 43-45; RS, pp. 17-18, 93). In his report, Montoya stated his intent to report the criminal activity he observed to both the Department of Transportation and the Department of Labor, agencies on the State or federal side with law enforcement authority. (AC, ¶ 45). As in 2017, Davey Tree and Wolf Tree blatantly violated their own policy by not investigating Montoya's report and by revealing the report ***to Rangel***, including telling Rangel that Montoya was the whistleblower. (AC, ¶¶ 43-48; RS, p. 18).

After the meeting with Rangel, Branch, Conner and other Wolf Tree and Davey Tree officers decided to have Rangel deal with Montoya directly. (AC, ¶¶ 59-60; RS, pp. 6, 37). Branch, Rangel and Cruz then discussed calling a meeting of all Savannah Call Center employees during which Rangel would disclose Montoya's whistleblower report, and the fact that Montoya was the whistleblower, to the other employees, for the purpose of silencing, intimidating and retaliating against Montoya. (AC, ¶¶ 53-54, 60; RS, p. 37).

In early May 2017, Rangel and Cruz called a meeting of the approximately 30 Savannah Call Center employees, including Montoya. (AC, ¶ 61; RS, p. 6). During the meeting, Rangel read Montoya's whistleblower report aloud, all the while threatening and intimidating Montoya. (Id.). Immediately, many of the illegal-alien employees became enraged, and **threatened Montoya with physical violence and death**. (Id.). After purposefully causing a **riot** and **assaults** against Montoya, Rangel told Montoya that "nothing was going to come of" his whistleblower report. (Id.). Cruz kept Branch updated on what was happening during the riot. (AC, ¶ 61; RS, pp. 6-7).

Montoya immediately reported Rangel's threatening and retaliatory actions to Davey Tree and Wolf Tree, but there was no response. (AC, ¶ 62; RS, p. 7). Branch, Conner and other Davey Tree and Wolf Tree officials were well aware of Rangel's threatening and retaliatory actions against Montoya, but they **purposefully did nothing** to prevent or correct them. (Id.). Rangel's retaliation against Montoya was sanctioned, ratified and aided by all Defendants and was meant to **deter** and **intimidate** Montoya from making further reports to law enforcement. (AC, ¶ 63; RS, p. 7).

In mid-May 2017, days after the riot, Montoya asked to speak in private with Davey Tree's Regional Safety Manager, who was in Savannah inspecting the Savannah Call Center. (AC, ¶ 64; RS, p. 7). Montoya provided the Safety Manager with a copy of his written, April 2017 whistleblower report. (AC, ¶ 65; RS, p. 7). He also identified for the Safety Manager the illegal-

alien employees who were working under false names. (Id.). The Safety Manager was stunned and blown away by Montoya's report. (AC, ¶ 66; RS, p. 7). He contacted both his own supervisor and Branch to determine what should be done. (Id.). His supervisor and Branch both quickly told the Regional Safety Manager not to take any further action, except to forward his notes regarding the matter to Conner. (Id.).

Faced again with a decision of whether to halt the illegal and dangerous conduct reported by Montoya, Cruz and the other Defendants chose to *retaliate, threaten* and *intimidate* Montoya. (AC, ¶ 67; RS, p. 7). A few days after Montoya provided his whistleblower report to Davey Tree's Regional Safety Manager, Branch and a Wolf Tree and Davey Tree corporate official directed Cruz to cite Montoya with an "unsatisfactory work" employee violation notice, which he did. (AC, ¶ 68; RS, pp. 7-8). The alleged employee violation was baseless and concocted by Cruz, Branch and others acting on behalf of Wolf Tree and Davey Tree. (AC, ¶ 69; RS, p. 8). The employee violation notice to Montoya was issued in retaliation for his whistleblower reports and meant to deter and intimidate Montoya from providing further reports to government authorities, including law enforcement. (AC, ¶¶ 69, 127; RS, p. 8).

In the summer of 2017, Montoya was informed that Conner was in charge of addressing his various whistleblower complaints. (AC, ¶ 70; RS, p. 8). Montoya had several conversations with Conner in the summer of 2017 about his knowledge of the criminal and dangerous activities outlined in his various whistleblower complaints. (Id.). Both Conner and Branch falsely assured Montoya that his 2017 whistleblower reports were being promptly investigated and taken seriously by Davey Tree and Wolf Tree in compliance with the companies' whistleblower policy. (AC, ¶ 72; RS, p. 8). Conner and Branch's statements to Montoya were intentionally misleading, and were meant to *hinder, delay* and *prevent* reports by Montoya to law enforcement and other government

authorities regarding Montoya's knowledge of criminal and dangerous conduct. (AC, ¶ 72; RS, p. 8).

In July 2017, Conner requested that Montoya provide her with proof of the statements made in his whistleblower reports. (AC, ¶ 73; RS, p. 8). At the time of this request, Conner knew Rangel had confirmed his criminal activities to Branch and had caused a riot against Montoya. (Id.). Conner's request was intended to mislead Montoya, made with an intent to **hinder, delay** and **prevent** Montoya's communications with law enforcement. (Id.).

In reliance upon Conner's representations, Montoya again decided to provide information to Davey Tree and Wolf Tree instead of making reports to state and federal authorities. (AC, ¶ 74; RS, p. 9). At the time, Montoya still believed Conner, Branch and Davey Tree and Wolf Tree would take appropriate action to address the criminal conduct he outlined in his whistleblower complaints. (AC, ¶ 74). Montoya did not know Conner, Branch, Cruz, Rangel, Davey Tree, Wolf Tree and others were all working together to **silence** Montoya in an effort to protect their criminal enterprise. (Id.).

On August 7, 2017, in response to Conner's request, Montoya provided Conner signed statements by three illegal-alien employees at the Savannah Call Center. (AC, ¶ 75; RS, p. 9). The statements again confirmed that: (a) many Savannah Call Center employees were illegal; and (b) Rangel was providing multiple false identification documents to illegal-alien employees. (Id.).

Faced yet again with whether to halt Defendants' criminal and dangerous conduct, Wolf Tree, Davey Tree, Conner, Branch, Cruz, and Rangel again chose to protect their criminal enterprise by **retaliating against, threatening** and **intimidating** Montoya. (AC, ¶ 76; RS, p. 9). Despite knowing that Branch provided Rangel with Montoya's written whistleblower report resulted in Montoya's life being threatened, Conner provided the three signed statements to Branch. (AC, ¶ 77; RS, p. 9).

Branch then provided the signed statements to Rangel, who then responded with threats of violence against two of the three illegal-alien employees. (AC, ¶ 77-78; RS, p. 9). Conner and Branch's actions were intended to solicit Rangel to silence Montoya and the three illegal-alien employees who provided the signed statements. (Id.).

On August 16, 2017, Davey Tree and Wolf Tree again acted to *silence* Montoya. (AC, ¶ 79; RS, p. 9). That day, an officer of Davey Tree and Wolf Tree traveled to Savannah and suspended Montoya for three days on a false and fabricated "safe practice violation." (Id.). Wolf Tree and Davey Tree's suspension of Montoya was intended to *intimidate* Montoya, cause him *economic harm, retaliate* against him for his continued whistleblower reports, and to *deter* him from providing further reports to government authorities, including law enforcement. (AC, ¶ 80; RS, pp. 9-10). Conner, Branch, Rangel and Cruz all were aware that Montoya was suspended based upon a false and fabricated violation. (AC, ¶ 81; RS, p. 10)

After his suspension, Montoya realized Conner, Branch, Davey Tree and Wolf Tree would not take appropriate action to address the criminal and dangerous conduct outlined in his whistleblower complaints. (RS, p. 10). On August 16, 2017, Montoya informed Conner he was reporting the criminal and dangerous conduct of Rangel, Davey Tree, Wolf Tree and others to the EEOC, which he did on August 17, 2017. (AC, ¶¶ 82, 84; RS, p. 10).

Knowing that Rangel was a dangerous criminal, Conner and Branch *informed Rangel of Montoya's efforts to report criminal activities to federal authorities*. (AC, ¶ 83; RS, p. 10). In so doing, Conner intended to solicit the obstruction of a federal investigation through **violent** means. (AC, ¶ 83). After Montoya's August 17, 2017, report to the EEOC, Cruz and the other Defendants were aware their previous efforts to *mislead, threaten* and *intimidate* had failed to silence Montoya. (AC, ¶ 85; RS, p. 10). On Friday, August 18, 2017, Cruz, who was aware of Montoya's

report to the EEOC, assisted Rangel in canceling work for all Savannah Call Center employees for Saturday, August 19, 2017. (AC, ¶ 86; RS, p. 10). There was no legitimate reason for the cancellation: The Savannah Call Center employees always worked Saturdays and were already far behind in meeting the then-existing Georgia Power contracts. (Id.).

The next day, August 19, 2017, Montoya was brutally murdered, shot in the back twice and once in the back of the head. (AC, ¶ 87; RS, p. 10). Rangel planned the murder and enlisted his brother Juan, a Savannah Call Center employee, as the trigger man. (Id.).

In a February 14, 2018, deposition, taken under oath and in a Georgia judicial proceeding, Cruz knowingly provided materially false testimony. Specifically, Cruz testified he was not aware any of the Savannah Call Center employees working before Montoya's murder were illegal aliens. As Cruz then well knew, the vast majority of the employees working at the Savannah Call Center before Montoya's murder were illegal aliens. Cruz's false testimony was made to conceal criminal activities committed by Defendants' criminal enterprise. (AC, ¶ 92, RS, p. 36). On December 6, 2018, after providing false testimony in a civil action, Cruz pled guilty to four-year conspiracy to conceal, harbor and shield illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I). (AC, ¶ 93)

### III.    Cruz's Motion to Dismiss is Meritless.

In considering a motion to dismiss, this Court must "accept the allegations in the complaint as true, construing them in the light most favorable to the plaintiff." *Murphy v. FDIC*, 208 F.3d 959, 962 (11th Cir. 2000). All that is required is "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), that "give[s] the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Bell Atl. Co. v. Twombly*, 550 U.S. 544, 555 (2007).

### A.  The Georgia RICO Counts (Counts 1, 2 and 3)

Plaintiff has alleged three separate violations of the Georgia RICO Act against Cruz and the other Defendants:  that Cruz and the other Defendants conducted and participated in an enterprise through a pattern of racketeering activity, in violation of O.C.G.A. § 16-14-4(b) (Count 1); that Cruz and the other Defendants acquired and maintained interest in an enterprise and property through a pattern of racketeering activity, in violation of O.C.G.A. § 16-14-4(a) (Count 2), and that Cruz and the other Defendants conspired and endeavored to violate § 16-14-4(a) and § 16-14-4(b), in violation of O.C.G.A. § 16-14-4(c) (Count 3). None of Cruz's challenges to the allegations set out in those Counts demonstrate that dismissal is appropriate.

### 1.  The RICO Counts Adequately Allege Proximate Cause.

A claim under Georgia's RICO Act requires Plaintiffs to "show that [their] injury flowed directly from at least one of the predicate acts." *Wylie v. Denton*, 323 Ga. App. 161, 166 (2013). "[T]o survive a motion to dismiss, [Plaintiffs] asserting a RICO claim must allege more than that an act of racketeering occurred and [they were] injured." *Id*. Plaintiffs also must allege some "direct nexus" between a racketeering act and their injury, and that "[their] injury was the direct result of a predicate act targeted toward [them], such that [they were] the intended victim." *Id*.

Cruz contends that the Amended Complaint fails sufficiently to allege a direct nexus between any predicate act alleged to have been committed, attempted, solicited or coerced and Montoya's injuries. In this regard, Cruz advances two main arguments: (1) many of the predicate acts alleged to have been committed, attempted, solicited or coerced by certain Defendants did not injure Montoya; and, (2) the predicate acts that did injure Montoya are insufficiently pled. Cruz's proximate cause arguments are lifted almost verbatim from the Corporate Defendants' motion to dismiss. Like the Corporate Defendants' arguments, Cruz's arguments are without merit.

### a. There Is No Requirement that Montoya Be Injured by *Each* Predicate of a Pattern of Racketeering Activity.

Cruz argues that Montoya was not directly injured by several of the predicate acts alleged in the Amended Complaint, including: Rangel and Cruz's harboring and concealing from detection illegal aliens; Rangel's sale of false identity documents to illegal aliens; Davey Tree and Wolf Tree's laundering of monies to fund Rangel's outside recruitment-harboring-concealing-illegal-alien scheme; Davey Tree and Wolf Tree's scheme to defraud Georgia Power; Rangel's assaults on illegal-alien employees; Cruz and Conner's perjury; and Conner's false statements to law enforcement.

However, "[w]hile it is certain that a plaintiff in a civil RICO suit must show an injury by reason of a violation . . . , there is no requirement that plaintiff suffer direct harm from **each and every** alleged predicate act introduced to show a pattern of racketeering activity." *InterAgency, Inc. v. Danco Fin. Corp.*, 203 Ga. App. 418, 424 (1992) (emphasis added).

Cruz misses the point. Pattern and proximate cause are separate requirements. A claim based upon a substantive violation of O.C.G.A. § 16-14-4(a) or (b) requires proof of a pattern of racketeering activity. Under Georgia RICO, this requires only two related predicate acts. *Dorsey v. State,* 279 Ga. 534, 539-540 (2005); *Overton v. State,* 295 Ga. App. 223, 232 (2008); *Dover v. State,* 192 Ga. App. 429, 432 (1983). "This does not mean that *each* RICO defendant must commit at least two acts to come under the Act's prohibitions," *Faillace v. Columbus Bank & Trust Co.,* 269 Ga. App. 866, 868 (2004), because where a pattern of racketeering activity is present, each defendant that participates in that pattern, whether by one act or more, is liable. *Id.* Also, a pattern of racketeering activity may consist in part of acts which caused no harm, as well as acts which caused harm to persons other than the plaintiff. *InterAgency*, 203 Ga. App. at 423-24 (affirming

verdict in favor of plaintiff based on a pattern of racketeering activity that consisted in part of acts committed against third parties).

Proximate cause, meanwhile, only requires that a plaintiff be injured by one or more of the predicate acts that comprise the pattern: "To satisfy the proximate cause element of RICO, a plaintiff must show that [his] injury flowed directly from at least *one* of the predicate acts." *Wylie*, 323 Ga. App. at 165 (emphasis added). *Accord, Nicholson v. Windham,* 257 Ga. App. 429, 430 (2002) (plaintiff must show a direct nexus between at least one predicate act and the injury she purportedly sustained). Accordingly, even if Defendants are correct that there is no direct nexus between some predicate acts and Montoya's injuries, that is no reason to dismiss the RICO Counts.

### b. The Amended Complaint Has Adequately Pled a Direct Nexus Between Cruz's Racketeering Activity and All of Montoya's Injuries.

Cruz and the other Defendants participated in an association-in-fact enterprise, the Davey-Rangel Enterprise, for the common purpose of making money illegally and concealing and preventing detection of the enterprise's illegal activities. In April 2017, years into the commission of numerous state and federal crimes relating to harboring and concealing an illegal-alien workforce and a multi-million dollar fraud scheme, Eliud Montoya submitted a written whistleblower complaint to Defendants Davey Tree and Wolf Tree, outlining a number of crimes associated with the Savannah Call Center workforce and advising that he had spoken with and planned to speak again with law enforcement about the various crimes he had witnessed. At this point, Cruz's participation in the Davey-Rangel Enterprise was for the common purpose of concealing and preventing detection of the enterprise's illegal activities, by means of "a systematic effort to silence Montoya through physical threats, economic threats, intimidation, retaliation, deception, and eventually murder." (AC, ¶ 53).

*There is a direct nexus between Montoya's injuries and Cruz and other Defendants' May 2017 influencing witness and terroristic threats.*

As alleged in the Amended Complaint, upon receipt of Montoya's confidential whistleblower report in April 2017, which outlined vast criminal conduct and stated an intent to continue speaking with law enforcement, Defendants Branch, Conner and officers of Davey Tree and Wolf Tree agreed to provide Montoya's confidential written whistleblower complaint to Rangel so that Rangel would deal with Montoya directly. (AC, ¶¶ 55, 60). Afterwards, Branch, Rangel and Cruz discussed calling a meeting of all Savannah Call Center employees during which Rangel would disclose Montoya's whistleblower report, and the fact that Montoya was the whistleblower, to all Savannah Call Center employees. (AC, ¶ 60). At the time, Cruz knew Montoya intended to report and had reported to law enforcement the Corporate Defendants' and Rangel's criminal and dangerous conduct. (AC, ¶ 54).

Then, in early May 2017, Rangel and Cruz called a meeting of the approximately 30 Savannah Call Center employees, with the intent to hinder, delay, dissuade and prevent Montoya from reporting to, providing documents to, or testifying before law enforcement or official proceedings. (Id., ¶¶ 54, 61). At the meeting, Rangel read Montoya's written whistleblower report aloud, identified Montoya as the whistleblower, and threatened and intimidated Montoya. (Id., ¶ 61). Immediately, many of the Corporate Defendants' illegal-alien employees became enraged, began rioting, and threatened Montoya with physical violence and death, which was Rangel's intended purpose of his actions. (Id.). Cruz kept Branch updated on what was happening during the riot. (Id.). After the threats and assaults by Davey Tree and Wolf Tree illegal-alien employees, Rangel turned to Montoya and said "nothing was going to come of" his whistleblower report. (Id.).

O.C.G.A. § 16-10-93(b)(1)(C) (Influencing Witnesses) provides, "It shall be unlawful for any person knowingly to use intimidation, physical force, or threats . . . with intent to . . . [h]inder,

delay, or prevent the communication to a law enforcement officer . . . of this state of information relating to the commission or possible commission of a criminal offense . . . ."

Montoya stated in his 2017 whistleblower report that most of the Davey Tree and Wolf Tree Savannah employees were illegal aliens, that Rangel had sold false identification documents to these illegal aliens, that illegal aliens were operating Davey Tree and Wolf Tree commercial vehicles without licenses, and that he had reported the illegal and dangerous conduct to the Department of Labor, a law enforcement agency. (AC, ¶ 50). In his written report, Montoya also expressed a continued intent to speak with law enforcement "if the problem [was] not solved" by the Corporate Defendants. (Id., ¶ 51).

With knowledge of widespread, ongoing, and vast criminal conduct, Montoya's contact with law enforcement and his stated intent to continue doing so, Cruz, the Corporate Defendants, Conner, and Branch solicited Rangel intimidate and threaten Montoya, with the intent to hinder, delay and prevent Montoya's communication with law enforcement, which Rangel did. (AC, ¶¶ 59-63, 125; RS, p. 26).

The early May 2017 "handling" of Montoya's whistleblower complaint by Rangel also constituted terroristic threats under Georgia law. Per O.C.G.A. § 16-11-37(b)(1), "[a] person commits the offense of a terroristic threat when he or she threatens to . . . [c]omit any crime of violence . . . ."  As alleged in the Amended Complaint, in addition to personally threatening and intimidating Montoya, Rangel read aloud Montoya's whistleblower complaint to the illegal-alien workforce to purposefully cause a riot and assaults against Montoya. (Id., ¶ 61). Rangel's actions produced his intended results: members of the illegal-alien workforce threatened Montoya with serious bodily harm and death. "In so doing, Rangel, aided and abetted by Cruz and Branch, solicited and coerced other [Davey Tree and Wolf Tree illegal-alien employees] to make terroristic

threats against Montoya." (Id., ¶ 126). Thus, the Amended Complaint has adequately pleaded a direct nexus between Cruz's participation in these two RICO predicate acts and Montoya's injuries.

> *There is also a direct nexus between Montoya's injuries and Cruz and the other Defendants' continued efforts to silence Montoya after the riot.*

Despite threats and intimidation, Montoya continued to pursue his complaints of illegal and dangerous conduct he witnessed. (AC, ¶¶ 64-65). Montoya's additional actions were again met with efforts by Defendants to silence him with additional threats and intimidation. (Id., ¶ 67).

After the riot, Montoya reported Rangel's threatening and retaliatory actions to Davey Tree and Wolf Tree and provided his written whistleblower complaint to Davey Tree's Regional Safety Manager. (Id., ¶¶ 62, 64-65). Montoya further identified for the Safety Manager which Savannah Call Center, illegal-alien employees were working under false names. (Id., ¶ 65). Upon instruction by Branch and his own supervisor, the Regional Safety Manager took no action except to forward his notes to Conner. (Id., ¶ 66).

After Montoya's continued efforts to expose ongoing criminal activity, which included making his intent known to have further communications with law enforcement, all Defendants again chose to retaliate against, threaten and intimidate Montoya through the following predicate acts:

- After a discussion with Branch and Davey Tree and Wolf Tree corporate officials, Cruz, on or about June 1, 2017, threatened Montoya with economic harm by citing him with a baseless and concocted employee violation notice, with the intended purpose of delaying hindering, preventing or dissuading Montoya from further providing information to law enforcement. (Id., ¶¶ 68, 69 and 127);

- On August 16, 2017, an officer of Davey Tree and Wolf Tree officer suspended Montoya on a false and fabricated "safe practice violation." (Id., ¶ 79). Wolf Tree and Davey Tree's suspension of Montoya was intended to intimidate Montoya and cause him economic harm and was made in retaliation for Montoya's continued whistleblower reports and to deter and intimidate Montoya from providing further reports to government authorities, including law enforcement. (Id., ¶ 80).

With regard to each of the predicate acts listed above, alleging violations of O.C.G.A. § 16-10-32(b) (Threatening Witnesses), Cruz claims the Amended Complaint: (1) "fails to allege" Montoya ever "indicated to anyone at Wolf Tree or Davey Tree that he planned to go to a law enforcement officer – such as the local police or ICE;" (2) fails to allege that Cruz and the Corporate Defendants verbally threatened Montoya with economic harm to dissuade him from testifying in any official proceeding; and (3) fails to allege that an official proceeding even existed.

As to argument (1), as alleged multiple times in the Amended Complaint, Montoya revealed to **all** Defendants, including Cruz, that he had reported to law enforcement, the Department of Labor, the criminal and dangerous conduct he observed, and intended to again if the "problem [was] not solved" by Davey Tree and Wolf Tree. (AC, ¶ 51). This paragraph alone negates argument (1). Cruz's claim that Montoya should have initially made his report to a different law enforcement agency is irrelevant to whether the Amended Complaint has been adequately pled.[5]

As to argument (2), in paragraph 127 of the Amended Complaint, Plaintiff alleges that Cruz, on June 1, 2017, "*threatened economic harm to Montoya . . . with the intent to hinder, delay prevent or dissuade Montoya from testifying in an official proceeding or reporting in good faith to a law enforcement officer*, the commission or possible commission of criminal offenses under the laws of Georgia, in violation of O.C.G.A. § 16-10-32(b)." (AC, ¶ 127 (emphasis added)). Thus, argument (2) is false.

---

[5] Perhaps revealing the weaknesses of their arguments, Cruz frequently strays beyond the four-corners of the Amended Complaint and RICO Statement by claiming that properly pled allegations are "patently untrue" or "unfounded" or "demonstrably false." Such protestations are irrelevant to the Court's inquiry here, and Plaintiff looks forward to demonstrating the accuracy of his allegations when it is procedurally relevant. *See Rainge v. Fay Servicing Ctr., LLC*, No. CV 116-016, 2016 WL 6824390, at *4 (S.D. Ga. Nov. 17, 2016) ("Defendant's argument presents an issue of disputed fact inappropriate for determination on a motion to dismiss. Under the motion-to-dismiss standard, the Court may only look at the 'four corners of the complaint' and limited documents attached to the complaint.") (citing *Speaker v. U.S. Dep't of Health & Hum. Servs. Ctrs. for Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010).

As to argument (3), whether an official proceeding existed at the time Montoya notified Cruz and the other Defendants that he was speaking to the Department of Labor is irrelevant to whether the Amended Complaint has been adequately pled. As O.C.G.A. § 16-10-93(b)(3) states, "[a]n official proceeding ***need not be pending*** or about to be instituted at the time of any offense defined in [O.C.G.A. § 16-10-32(b)]." (Emphasis added). Thus, argument (3) fails too.

> *Violent retaliation against a federal witness is another predicate with a direct nexus to Montoya's injuries.*

As alleged in the Amended Complaint, after his suspension by Davey Tree and Wolf Tree, Montoya informed Conner on or about August 16, 2017, that he was reporting the criminal and dangerous conduct of Rangel, Davey Tree and Wolf Tree and others to the EEOC. (Id., ¶ 131). Knowing Rangel was a dangerous criminal, Conner and Branch informed Rangel of Montoya's efforts to report criminal activities to federal authorities, with the intent to solicit the violent retaliation against a federal witness, in violation of 18 U.S.C. § 1513. (Id., ¶¶ 83, 131). Rangel told Cruz about Montoya's report to federal authorities. (Id., ¶ 132). At the time, Cruz was already aware that, in early August 2017, Rangel had threatened with bodily harm two other illegal-alien employees after the employees signed declarations describing various criminal conduct. (RS, p. 35)

On August 18, 2017, aware that Montoya had taken his allegations of criminal activities to federal authorities, Cruz informed all of the Savannah Call Center employees that work for the next day had been cancelled, with the intent to aid and abet retaliation against a federal witness, in violation of 18 U.S.C. § 1513. (Id., ¶ 132). The next day, August 19, 2017, Rangel caused the murder of Montoya, in violation of 18 U.S.C. § 1513 (Federal Witness Retaliation) and O.C.G.A. § 16-5-1 (Murder). (Id., ¶ 133).

Cruz denies any involvement in Montoya's murder. His denials of factual allegations in the Amended Complaint, however, have no relevance in determining whether the Amended Complaint has been properly pled. The direct nexus of Cruz's involvement in the violent retaliation against Montoya, a federal witness, has been properly pled.

**2.   The Amended Complaint Has Adequately Pled a RICO enterprise.**

Cruz argues that under O.C.G.A. § 16-14-4(b) Plaintiff must allege an enterprise distinct from the Defendants themselves and that he has failed to do so. Cruz is wrong in both respects.

**a.      The Federal Distinctness Requirement Does Not Apply to This Case.**

Cruz's distinctness argument relies upon federal cases dealing with federal RICO claims, but Georgia courts applying Georgia RICO take a different view of distinctness. These Georgia cases—none of which are cited by the Corporate Defendants in any distinctness argument—apply a different test. In *Reaugh v. Inner Harbour Hospital, Ltd.*, 214 Ga. App. 259 (1994), the defendant corporation argued that it could not also be the RICO enterprise. 214 Ga. App. at 262. The argument was rejected, and the grant of summary judgment to the defendant on plaintiff's RICO claims was reversed, because there was evidence—as there are allegations in this case—that the defendant corporation was both a perpetrator and a direct beneficiary of the pattern of racketeering activity. *Id.* at 263. *Reaugh* held that where there is evidence that agents or employees of the corporate defendant committed predicate offenses and material issues of fact existed with regard to whether the corporation was a party to or involved in the commission of those offenses, the enterprise may consist of the corporation and its agents or employees. *Id.* at 264.

Georgia courts continue to apply *Reaugh* for this principle. For example, *Duvall v. Cronic*, 347 Ga. App. 763, 774–75 (2018), quoted *Reaugh* in reversing the grant of summary judgment to a corporate co-defendant whose employee engaged in criminal acts, relying upon *Reaugh's* holding

that an enterprise may consist of a corporation and its agents or employees if the entity was a party

to or involved in the commission of the underlying offenses. *Id.* And just last year, a district court

in the Northern District of Georgia recognized that under Georgia law a RICO enterprise may

consist of a corporation and its agents or employees. *Maverick Fund, Ltd. v. Mohawk Indus., Inc.*,

No. 4:21-cv-00118-VMC, 2023 WL 2887603, *14 n.6 (N.D. Ga. Mar. 31, 2023) (quoting both

*Duvall* and *Reaugh*).

Instead of addressing the Georgia cases that control the application of Georgia RICO, Cruz

relies upon inapposite cases dealing with the federal distinctness requirement. For example, Cruz

relies on *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340 (11th Cir. 2016). (Doc. 144, p. 19). But that

case involved federal RICO, *not* Georgia RICO. *Ray*, 836 F.3d at 1345. Similarly, Cruz asserts

that "[t]he Fifth Circuit's decision in *Atkinson v. Anadarko Bank and Trust*, 808 F.2d 438 (5th Cir.

1987), is particularly apt." (Doc. 208, p. 19). But in *Atkinson*, as in *Ray*, *only* federal RICO was at

issue. *See generally Atkinson*, 808 F.2d at 439. In fact, no case cited by Cruz addresses a

distinctness argument involving a claim under O.C.G.A. § 16-14-4(b). Cruz's arguments fail

because they are contrary to Georgia law.

> **b.  Even if the federal distinctness requirement did apply, the Amended Complaint would satisfy it.**

Even if the federal distinctness requirement did apply, the Amended Complaint would satisfy

it. Cruz argues that under O.C.G.A. § 16-14-4(b) Plaintiff must allege an enterprise distinct from

the Defendants themselves and he has failed to do so. As set forth above, Cruz is wrong in the first

respect, and as set forth below, he is also wrong in the second.

O.C.G.A. § 16-14-4(b) provides that:

> It shall be unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity.

A RICO enterprise may consist of an association-in-fact. O.C.G.A. § 16-14-3(3). ("'Enterprise' means any . . . group of individuals associated in fact although not a legal entity. . . ."). "[T]he Supreme Court has 'succinctly' defined an association-in-fact enterprise as 'any group of persons associated together for a common purpose of engaging in a course of conduct.'" *Al-Rayes v. Willingham*, 914 F.3d 1302, 1307 (11th Cir. 2019) (citing *Boyle v. United States*, 556 U.S. 938, 946 (2009). The associations that form an enterprise may be "formal or informal." *Al-Rayes*, 914 F.3d at 1307. Because a corporation is a person for purposes of RICO, *Williams General Corp. v. Stone*, 280 Ga. 631 (2006), an association-in-fact enterprise may include one or more corporations. *See, e.g., United States v. Goldin Indus., Inc.,* 219 F.3d 1271, 1274–77 (11th Cir. 2000) (enterprise consisting of three related corporations was distinct from the corporations themselves); *Williams v. Mohawk Indus., Inc.,* 465 F.3d 1277, 1284 (11th Cir. 2006) (association-in-fact enterprise consisting of corporation and recruiters who offered a pool of illegal workers and were sometimes assisted by the corporation's employees, who supplied social security cards to prospective or existing employees so they could assume a new identity).

An enterprise can have both legitimate and illegitimate purposes. *United States v. Turkette*, 452 U.S. 576, 584 (1981) (RICO applies to both legitimate and illegitimate enterprises); *United States v. Andino-Morales*, 73 F.4th 24, 34 (1st Cir. 2023) (nothing in the statutory definition of enterprise requires that the enterprise be defined solely by a criminal purpose). Also, there is no requirement that the association originally form for a wrongful purpose; it is enough that from an existing relationship the defendants later came to share a wrongful purpose. *Al-Rayes*, 914 F.3d at 1308 (an association-in-fact enterprise may consist of parties who had preexisting relationships and later joined together for the common purpose of engaging in illegal activity). Moreover, a person associated with an enterprise may have more than one role in that enterprise. *Boyle v. United*

*States*, 556 U.S. 938, 948 (2009) ("different members may perform different roles at different times.").

Rangel and Cruz's employer-employee relationship with the Corporate Defendants did not preclude them from forming a RICO enterprise together with those entities and other employees of the Corporate Defendants. Likewise, the fact that Rangel and Cruz were employees of the Corporate Defendants did not preclude them from also associating with the Corporate Defendants for purposes beyond the scope of that employment, and the Corporate Defendants cite no authority for the proposition that employee status somehow precludes or negates other forms of association outside of that employment.

The Davey-Rangel Enterprise included the Corporate Defendants, Branch, Rangel, Conner, Cruz and others. (AC, ¶¶ 98–108; RS, pp. 72–74, 80). Rangel, for example, associated with the Corporate Defendants both formally and informally. Formally, he was an employee, specifically a crew chief. (AC, ¶¶ 19, 218; RS, p. 3). Informally, he participated as an associate in the Davey-Rangel Enterprise, engaging in criminal activities for the mutual benefit of the associates, including Cruz and the Corporate Defendants. (AC, ¶¶ 37, 102–104; RS, pp. 29–30).

Cruz wrongly assumes that a person can only play one role within an enterprise, i.e., if a person is an employee, that is the end of the analysis no matter what other roles that person may assume. But he cites no authority for the proposition that status as an employee somehow precludes other forms of association beyond or in addition to the employment relationship and Plaintiff has found no such authority. The employer-employee relationship with the Corporate Defendants did not preclude Rangel and Cruz from also forming part of an association-in-fact enterprise engaged in activities beyond the scope of their employment.

The false dichotomy the Cruz promotes is similar to the invalid argument that a person who is associated with one enterprise cannot also be associated with another. *See United States v. Connolly*, 341 F.3d 16, 28 (1st Cir. 2003) ("Membership in the Winter Hill Gang does not, ipso facto, preclude membership in another criminal enterprise."). Just as a person can associate with two different enterprises, he can play two different roles in the same enterprise, one as an employee and another as a co-venturer. *Boyle*, 556 U.S. at 948 (person associated with enterprise may perform different roles at different times); *Williams General*, 280 Ga. 631 (2006)(corporation may be held directly liable for conspiring with its officers).

A natural person is legally distinct from a corporation. *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001). Only when an employee is acting within the scope of his role for the corporation is a limited exception to that legal distinctness recognized, under federal RICO. *Id.* at 164. Thus, while under federal RICO "plaintiffs may not plead the existence of a RICO enterprise between a corporate defendant and its agents or employees *acting within the scope of their roles for the corporation*," *Al-Rayes*, 836 F.3d at 1357 (emphasis supplied), that language itself recognizes there is no distinctness issue if a corporate defendant associates with an employee to violate RICO through conduct *outside* the scope of that person's employment. *See, e.g.*, *Valenzuela v. Swift Beef Co.*, No. 3:06-CV-2322-N, 2007 WL 9723147, at *8 (N.D. Tex. Dec. 20, 2007) (no distinctness issue in federal RICO action brought by American-citizen employees against employer for hiring illegal immigrants, where false documentation middlemen "maintained their own business operations," and court could not say documentation middlemen "provided false documentation as mere agents/employees" of employer).

Indeed, *Ray*, a case upon which Cruz relies, *acknowledges four separate times* that the exception treating employees as not being distinct from their corporate employer is limited to

situations "when those individuals *are operating in their official capacities for the corporation*." 836 F.3d  at 1355, "*are carrying on the normal work of the corporation*," *id*. at 1356; are "*acting within the scope of their roles for the corporation*," *id*. at 1357; and are "*acting within the scope of their employment . . . .*" *id*. (emphasis added to each quote). Cases upon which *Ray* relied also recognize this limitation. *See, e.g.*, *Ray*, 836 F.3d at 1356 (describing the Second Circuit as holding in *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 121 (2nd Cir. 2013), that "a defendant corporation cannot form a RICO enterprise with its own employees or agents *who are carrying out the normal work of the corporation*.") (emphasis added). So do Eleventh Circuit cases subsequent to *Ray*. For example, *DJ Lincoln Enterprises, Inc. v. Google LLC*, No. 21-12894, 2022 WL 203365 (11th Cir. Jan. 24, 2022), emphasized that the plaintiff failed to explain how "any of the individuals associated with those organizations, *operated outside their official capacity*." *Id*. at *2 (emphasis added), citing *Ray*, 836 F.3d at 1355. Consequently, where individuals who formed part of an enterprise "did not merely act as officers or employees of enterprise members, but instead acted in their dual roles as Standard employees and enterprise associates," the association-in-fact enterprise "is distinct from any of the particular company or individual defendants." *Standard Chlorine of Del., Inc. v. Sinibaldi*, 821 F. Supp. 232, 249 (D. Del. 1992).

Cruz's efforts to apply the exception for employees acting exclusively within their official capacity relies upon ignoring the allegations of the Amended Complaint and the RICO Statement, asserting that the associated members of the enterprise were engaged in nothing other than the Corporate Defendants' supposed ordinary course of business. (Doc. 209 pp. 26–27). The flaw in

this argument is that the Plaintiff's well-pleaded allegations—which must be accepted as true at this stage of the proceedings—are to the contrary.[6]

The Amended Complaint and the RICO Statement recite multiple ways in which Rangel's participation in the enterprise, for example, included conduct outside the ordinary duties of his employment as a crew chief. For example, Rangel ran an illegal labor recruiting/labor broker operation that supplied illegal alien workers hired by the Corporate Defendants. (AC, ¶¶ 20, 102; RS, pp. 28–29). To further that illegal alien labor recruiting/labor broker operation, Rangel procured false identifications and false identification documents for those illegal-alien employees, which were used to paper the Corporate Defendants' files in case Georgia Power or a governmental agency inquired into the immigration status of those employees. (AC, ¶¶ 20, 30, 102, 115–116; RS, pp. 29–30). Rangel further harbored much of the illegal-alien workforce at his 26-acre compound. (AC, ¶¶ 25-26).

The Corporate Defendants were aware of, participated in and facilitated these illegal activities by (1) mailing the illegal-alien employees' paychecks to Rangel, and later (2) depositing the illegal-alien employees' wages into a bank account controlled by Rangel. (AC, ¶¶ 23, 105). These paychecks and wire transfers totaled over $3,000,000. (AC, ¶ 23; RS, p. 29). After receiving the wages of those employees from the Corporate Defendants, Rangel paid himself for providing false identities and false identification documents and harboring the illegal aliens at his compound. (AC, ¶ 22–23, 25; RS, pp. 29–30). For his part, Cruz was paid thousands of dollars for his assistance in the illegal-alien-employment-harboring scheme. (AC, ¶ 24; RS, p. 34).

---

[6] In addition to the conduct of Rangel and Cruz outside of their ordinary duties of employment, Conner, as alleged, participated in the enterprise's unlawful activities, in part, by committing perjury to conceal the enterprise's unlawful activities, which perjury was committed after her termination from the Corporate Defendants. (AC, ¶ 107).

Under these allegations, Rangel and Cruz on the one hand, and the Corporate Defendants, on the other, were not just employees and employers, they were partners in crime. *Cf.*, *Hicks v. State*, 295 Ga. 268, 275 (2014) (conspirators are partners in crime). Rangel's relationship with the Corporate Defendants included crimes committed for their mutual benefit that ranged far outside the scope of any normal employee-employer relationship.[7] While Rangel's activities were not within the scope of his responsibilities as a crew chief for the Corporate Defendants, they were in furtherance of the enterprise's unlawful activities. (AC, ¶ 102). Rangel's "off the clock" activities make this clear. Before and after regular working hours, he procured fraudulent identification for the Corporate Defendants' illegal-alien employees and harbored them on his property. (AC, ¶¶ 20, 23, 25; RS, pp. 29-30). By their nature, Rangel's harboring activities occurred outside of his work hours as a crew chief for the Corporate Defendants, *e.g.*, when the illegal-alien employees were sleeping and during their days off. The Corporate Defendants did not directly pay Rangel for those activities; instead, the illegal-alien employees' paychecks and wages were sent to Rangel, enabling him to deduct monies for the fraudulent documentation and the harboring. (AC, ¶¶ 22–23, 75; RS, pp. 29-30). These are not the "routine tasks" of a crew chief at a tree trimming company. The fact that Rangel's compensation for the illegal labor recruiting, false identification, and harboring operations was separate from the wages he received from the Corporate Defendants further demonstrates that those activities were not within the scope of his ordinary job duties. (AC, ¶¶ 22, 102).

Rangel's interactions with the Corporate Defendants consisted of, furthered, or contemplated criminal activity. The Davey-Rangel enterprise relied on these coordinated and mutually beneficial

---

[7] Under Georgia law, a defendant need only *participate* in the enterprise; the federal RICO requirement that a defendant *operate or manage* the enterprise does not apply. *Faillace*, 269 Ga. App. at 869.

acts of criminal activity[8] to provide the Corporate Defendants with an inexpensive and obedient workforce of illegal aliens and prevent the disclosure of those illegal activities. (AC, ¶ 37; RS, p. 7). When Montoya complained about these and other illegal activities and threatened to tell law enforcement, the Davey-Rangel enterprise retaliated, harassed, misled, assaulted and murdered him.

Just as a "marriage certificate does not transform alleged mail and wire fraud into ordinary household management," *Al-Rayes*, 914 F.3d at 1310, an employer-employee relationship does not transform the provision of false identities and identification documents, harboring of illegal aliens, intimidation of witnesses or the murder of a whistleblower into ordinary job responsibilities.[9]

### 3. Count 3 Adequately Alleges a RICO Conspiracy.

O.C.G.A. § 16-14-4(c) differs from federal RICO's conspiracy provision, 18 U.S.C. § 1962(d), providing for two separate violations. Subsection (c)(1) provides for a conspiracy violation, while subsection (c)(2) provides for an endeavor violation, a violation which does not exist under federal RICO. The Amended Complaint alleges that the Defendants endeavored to maintain control of the Davey-Rangel Enterprise through a pattern of racketeering activity, in violation of subsection (c)(2). (AC, ¶¶ 163-164, 172). Cruz's motion to dismiss does not challenge Plaintiff's endeavor claim.

---

[8] For examples of the benefits to the Corporate Defendants, *see* AC, ¶¶ 28–30, 37; RS, p. 17. For examples of the benefits to Rangel, *see* AC, ¶¶ 23–25; RS, pp. 29–30.

[9] *See also Trollinger v. Tyson Foods, Inc.*, No. 402-CV-23, 2007 WL 1574275 (E.D. Tenn. May 29, 2007) (rejecting, in federal RICO suit against poultry processor and officers/employees for alleged "Illegal Immigrant Hiring Scheme," processor's argument that it could not be liable for conducting its own affairs, reasoning that complaint alleged processor was *not* conducting its own affairs, but rather was carrying out the "Illegal Immigrant Hiring Scheme").

While Cruz does challenge Plaintiff's conspiracy claim under subsection (c)(1), their argument that it fails because the substantive RICO counts (Counts 1 and 2) are subject to dismissal is wrong because Counts 1 and 2 are adequately alleged, as described above.

### B. The Non-RICO Counts

Cruz contends that the Amended Complaint fails to state claims against him for assault and battery. "A cause of action for battery will lie for **any** unlawful touching . . . ." *Lawson v. Bloodsworth*, 313 Ga. App. 616, 618 (2012) (internal citation omitted) (emphasis added). Cruz argues that the Amended Complaint contains no allegations that *he* unlawfully touched Montoya, and, therefore, he cannot be held liable for battery. (Doc. 208, p. 22). As the Amended Complaint explains, however, Cruz "put in place actions to the intimidation and physical injury of Eliud Montoya. These actions include, but are not limited to, repeated **gunshots** made by [Cruz's colleague] Juan Rangel, at the direction of [Cruz's other colleague] Defendant Pablo Rangel, ***into Montoya's body*** . . . ." (AC, ¶ 177 (emphasis added)). As the Amended Complaint also states, on August 18, 2017, Cruz informed all the Savannah Call Center employees that work for the next day had been cancelled. (AC, ¶ 132). In doing so, Cruz "intended to aid and abet the retaliation against a federal witness . . . ." (AC, ¶ 132). Thus, the allegations in the Amended Complaint sufficiently state a claim against Cruz for battery.

Cruz next asserts that the Amended Complaint fails to state a claim against him for assault. "To constitute an assault no actual injury need be shown, it being only necessary to show an intention to commit an injury, coupled with an apparent ability to do so." *Wallace v. Stringer*, 250 Ga. App. 850, 853 (2001) (internal citations and quotation marks omitted) (emphasis added). Cruz argues that Plaintiff's Amended Complaint contains no allegations that Cruz "himself" threatened Montoya or that Cruz "himself" had an intention to commit an injury to Mr. Montoya, coupled

with the apparent ability to do so. (Doc. 208, p. 22). The Amended Complaint, however, outlines in detail how each of the Defendants, including Cruz, "engaged in a systematic effort to silence Montoya, through *physical threats*, economic threats, intimidation, retaliation, deception, and eventually *murder*." (AC, ¶ 53 (emphasis added)). The Amended Complaint further states that many of the racketeering acts of Defendants, including Cruz, "were specifically directed at Montoya, ***intended to cause him injury***, and did in fact cause him injury." (AC, ¶ 143 (emphasis added)). Moreover, the Amended Complaint makes plain that Cruz—along with his colleague, Rangel—"***threatened Montoya with violence and had the apparent ability to perform said acts of violence. Said threats began in early May of 2017.***" (Id., ¶ 181 (emphasis added)). Thus, Plaintiff has sufficiently pled that Cruz intended to injure Montoya, and the Amended Complaint sufficiently states a claim against him for assault.

Next, Cruz avers that the Amended Complaint fails to state a claim against him for intentional infliction of emotional distress (IIED). "To prevail on a claim for [IIED], Plaintiffs must show that: (1) defendants' conduct was intentional or reckless; (2) defendants' conduct was extreme and outrageous; (3) a causal connection existed between the wrongful conduct and the emotional distress; and (4) the emotional harm was severe." *Gifford v. City of Broxton, Georgia*, No. CV 508-084, 2010 WL 11607353, at *12 (S.D. Ga. Sept. 24, 2010) (internal citation and quotation marks omitted). In *Gifford*, this Court denied summary judgment on the plaintiff's IIED claim where the defendant police officer threatened to kill the plaintiff. *Id.* at *6, 12.

Here, the Amended Complaint states a claim against Cruz for IIED. First, it alleges, "Defendant Cruz engaged in a course of extreme and outrageous conduct as fully set forth above with the intention of causing, or reckless disregard of the probability of causing, emotional distress to Eliud Montoya." (AC, ¶ 258). Some of Cruz's extreme and outrageous conduct outlined in the

Amended Complaint are that he: (1) inspired **death threats** against Montoya, by helping incite a riot against him; (2) conveyed to Montoya threatening messages on Pablo Rangel's behalf; and (3) aided, abetted, and solicited retaliation against Montoya, in part by calling off work for all Savannah Call Center employees on the day Montoya was murdered. (AC, ¶¶ 60-62, 132, 243). Cruz thus played a key role in the scheme to **silence**, **threaten**, and **retaliate** against Montoya, culminating in **death threats** against Montoya and Montoya's **murder**. (Id., ¶¶ 53, 124, 158, 242). Also, contrary to Cruz's argument that Plaintiff does not allege that Montoya suffered emotional distress, the Amended Complaint states that Cruz's actions "**caused severe emotional distress to Eliud Montoya, up until the point of his murder**." (Id., ¶ 242 (emphasis added)). Accordingly, the Amended Complaint satisfies the requirements for pleading IIED against Cruz.

Lastly, diverging from his co-defendants, Cruz argues, "[a]s Plaintiff has failed to plead a single substantive claim against Cruz, his derivative Survival, OCGA § 13-6-11 and Punitive Damages claims fail as well and should therefore be dismissed." (Doc. 208, p. 24). As detailed above, however, the Amended Complaint successfully pleads multiple substantive claims against Cruz. Therefore, Plaintiff's derivative claims for survival, attorneys' fees, and punitive damages likewise beat Cruz's motion.

## IV.     Conclusion

For the foregoing reasons, Cruz's June 2024 motion to dismiss the Amended Complaint should be denied.

Respectfully submitted this 26th day of July, 2024.

*[Signatures on following page.]*

**GRIFFIN DURHAM TANNER & CLARKSON**

By:     */s/ James D. Durham*
        James D. Durham
        Georgia Bar No. 235515
        Samuel L. Mikell
        Georgia Bar No. 24114
        104 West State Street, Suite 200
        Savannah, Georgia 31401
        Ph/Fax: (912) 867-9140

**BONDURANT, MIXSON & ELMORE LLP**

By:     */s/ John E. Floyd*
        John E. Floyd
        Georgia Bar No. 266413
        One Atlantic Center
        1201 West Peachtree Street NW
        Suite 3900
        Atlanta, Georgia 30309
        (404) 881-4100

**SAVAGE, TURNER, PINCKNEY, SAVAGE & SPROUSE**

By:     */s/R. Bartley Turner*
        R. Bartley Turner
        Georgia Bar No. 006440
        102 East Liberty, 8th Floor
        Savannah, Georgia 31401
        Ph: (912) 231-1140

## <u>CERTIFICATE OF SERVICE</u>

I certify that I have this day served the foregoing through the Court's ECF system upon all counsel registered to receive service, and that I have served the foregoing via U.S. mail on the following: Pablo Rangel-Rubio (*Pro Se*), Register No. 22405-021, USP Atwater, Post Office Box 019001 6A-123, Atwater, California 95301

This 26th day of July, 2024.

**GRIFFIN DURHAM TANNER & CLARKSON**

By:    <u>/s/ *James D. Durham*</u>
James D. Durham
Georgia Bar No. 235515
104 West State Street, Suite 200
Savannah, Georgia 31401
Ph/Fax: (912) 867-9140