**IN THE UNITED STATES DISCTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

| | | |
|---|---|---|
| BRIAN J. HUFFMAN, ESQ., as | ) | |
| Administrator of the Estate of ELIUD | ) | |
| MONTOYA-ARCOS, Deceased, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION FILE |
| v. | ) | NO. 4:18-cv-00184 |
| | ) | |
| THE DAVEY TREE EXPERT COMPANY, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT MARJORIE L.
CONNER'S MOTION TO DISMISS**

Brian J. Huffman, Esq., as Administrator of the Estate of Eliud Montoya-Arcos, Deceased,

hereby responds in opposition to the motion to dismiss filed by Defendant Marjorie L. Conner

(Doc. 204). For the reasons that follow, Conner's motion to dismiss should be denied.

**I.      Preliminary Statement**

In late 2017, Montoya's widow filed a wrongful death case in the State Court of Chatham

County, *Maria Montoya v. Davey Tree, et al.* (STCV17-01873), against many of those responsible

for her husband Eliud Montoya's August 19, 2017 murder. After additional investigation,

Montoya's Estate filed claims in the State Court of Chatham County that only it could bring,

including claims under the Georgia RICO Act. Defendants removed the Estate's claims to this

Court.

Both actions remained stayed during the DOJ's multi-year prosecution of some of the crimes

related to Montoya's murder. Two of the individual Defendants here, Rangel and Cruz, who were

supervisors of The Davey Tree Company ("Davey Tree") and Wolf Tree, Inc. ("Wolf Tree") ("the

Corporate Defendants"), pled guilty to a host of crimes surrounding Montoya's murder, including conspiracy, retaliation against a federal witness resulting in death, harboring and concealing illegal aliens and money laundering. The Corporate Defendants recently paid to the United States almost $4 million to resolve criminal allegations associated with the murder of Montoya. *See* https://www.justice.gov/usao-sdga/pr/companies-employed-labor-whistleblower-and-his-killers-reach-criminal-civil-resolution (last visited Sept. 11, 2023).

Plaintiff filed an Amended Complaint on July 14, 2023. In compliance with the Court's March 27, 2024 Order (Doc. 193), Plaintiff filed a 108-page RICO Case Statement on April 24, 2024.[1] (Doc. 196). Conner then filed a renewed motion to dismiss, which regurgitates arguments previously made.

## II.    Statement of Especially Pertinent Facts[2]

Davey Tree and Wolf Tree (formed by Davey Tree as a wholly owned division in 2008) were in the business of trimming trees along power lines for utility companies. (AC, ¶ 16; RS, p. 3). Davey Tree and Wolf Tree's operation in the Savannah area was called the Savannah Call Center. (AC, ¶ 19; RS, p. 3). From 2008 through most of 2017, the vast majority of the employees working at the Savannah Call Center were illegal aliens, and Davey Tree and Wolf Tree knew it. (AC, ¶ 19; RS, p. 3). Indeed, all of the Defendants knew that the vast majority of the Savannah Call Center workforce were illegal aliens, with some learning later than others. (Id.).

---

[1] A RICO case statement is considered as part of the pleadings on a motion to dismiss. *O'Malley v. O'Neill*, 887 F.2d 1557, 1559 (11th Cir. 1989) (utilizing both complaint and RICO case statement filed by plaintiffs pursuant to an order entered by the district court to analyze plaintiffs' claims). *See also LABMD Inc. v. Boback*, 47 F.4th 164, 179 n. 11 (3rd Cir. 2022); *DTEX LLC v. BBVA Bancomer, S.A.*, 214 Fed. App'x 286 (4th Cir. 2007) (noting and affirming rule of the district court's treatment of RICO case statement as an amendment to the complaint); *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 13 (1st Cir. 2000) ("We narrate the allegations contained in the complaint *and RICO case statement* in the light most favorable to appellant." (Emphasis added)); *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992) (in determining whether complaint states a claim, facts set forth in a RICO case statement required by the local rules must be considered); *Tal v. Hogan*, 453 F.3d 1244, 1262 n. 18 (10th Cir. 2006) (considering the allegations made in a plaintiff's RICO case statement in conjunction with the complaint).
[2] The following facts are alleged in the Amended Complaint ("AC," Doc. 123) and RICO Statement ("RS," Doc. 196), but do not constitute all pertinent facts alleged therein.

Defendant Rangel, an illegal alien, was the paid supervisor of the Savannah Call Center. (Id.). In addition to serving as Davey Tree and Wolf Tree's paid supervisor, Rangel operated as an independent labor broker, locating and recruiting illegal aliens to work for Davey Tree and Wolf Tree and providing them with false identities and false identification documentation. (AC, ¶ 20; RS, p. 3). The false identities and false identification documents served to provide Wolf Tree and Davey Tree with a cheap, illegal workforce and concealed the illegal nature of that workforce from the authorities and from Davey Tree and Wolf Tree's customers. (AC, ¶ 20; RS, pp. 3-4).

Rangel charged the illegal aliens he recruited to work for Davey Tree and Wolf Tree for false identities and false identification documents. (AC, ¶ 22; RS, p. 4). The illegal aliens would also pay Rangel for securing them a job at the Savannah Call Center. (Id.). The Corporate Defendants sent Rangel paychecks and wire transfers totaling over $3 million, which Rangel and others divided among themselves and the illegal alien workforce. (AC, ¶ 23; RS, p. 4).

In addition to selling false identities, Rangel harbored and concealed many of the illegal aliens who worked for the Savannah Call Center. (AC, ¶ 25; RS, p. 4). Davey Tree and Wolf Tree were aware of Rangel's separate, illegal-alien harboring scheme and wired employees' pay to Rangel, in part to promote Rangel's harboring and concealing scheme. (AC, ¶¶ 25-26; RS, p. 4). In 2013, Defendant Cruz began assisting Rangel with his harboring-concealing-illegal-aliens scheme. (AC, ¶ 24; RS, p. 4).

Georgia Power was the Savannah Call Center's only customer. (AC, ¶ 27; RS, p. 4). Georgia Power paid Davey Tree and Wolf Tree millions of dollars each year to provide tree-trimming services. (AC, ¶ 28; RS, p. 4). For each Georgia Power contract signed, Davey Tree and Wolf Tree fraudulently certified and represented to Georgia Power that they verified the legality of their workforce. (AC, ¶ 29; RS, p. 4). Davey Tree and Wolf Tree also used Rangel and Cruz to provide

fictitious identification documents to Georgia Power to deceive Georgia Power into issuing identification cards to illegal aliens. (AC, ¶ 30; RS, pp. 4-5). Based on false representations of the legality of the Savannah Call Center workforce, Georgia Power transferred millions of dollars by interstate wires into Davey Tree and Wolf Tree's accounts. (AC, ¶¶ 28-29; RS, pp. 4-5).

Eliud Montoya was a U.S. citizen who worked as a tree trimmer and team leader for Wolf Tree and Davey Tree at the Savannah Call Center for over ten years before his murder in August 2017. (AC, ¶ 38; RS, p. 5). While a member of the Savannah Call Center, Montoya witnessed numerous violations of Georgia and federal law relating to the employment and mistreatment of illegal aliens. (AC, ¶ 42; RS, p. 5). In April 2017, pursuant to Davey Tree and Wolf Tree's whistleblower policy, Montoya contacted Davey Tree to report illegal and dangerous conduct. (AC, ¶ 49; RS, p. 5). Both orally and in writing, Montoya reported the following to Davey Tree and Wolf Tree: (a) most of the Savannah Call Center workers were illegal aliens; (b) the Savannah Call Center supervisor, Rangel, had sold false identifications to the illegal-alien employees; (c) Rangel paid the illegal-alien workers in cash; (d) Rangel took money from the illegal-alien workforce; and, (e) Rangel allowed illegal aliens to operate the Savannah Call Center's commercial vehicles without licenses. (AC, ¶ 50; RS, p. 5). In his reports to Davey Tree and Wolf Tree, Montoya stated he had reported, and intended to report again to law enforcement, the illegal and dangerous conduct he had observed. (AC, ¶ 51; RS, p. 5).

Montoya did not know that Wolf Tree and Davey Tree were already aware of many, if not all, of the reported criminal conduct. (AC, ¶ 47; RS, p. 5). Instead of lawfully addressing Montoya's reports of serious criminal and dangerous conduct, Defendant Conner and the other Defendants, aided and abetted by each other, engaged in a systematic effort to *silence* Montoya, through

***physical threats, economic threats, intimidation, retaliation, deception, and ultimately murder***. (AC, ¶ 53; RS, pp. 5-6).

Immediately after receiving Montoya's April 2017 written report, Defendant Conner, Davey Tree's In-House Counsel; Defendant Branch, Rangel's immediate supervisor; and other Wolf Tree and Davey Tree corporate officers decided not to investigate Montoya's confidential reports promptly or confidentially. (AC, ¶ 55; RS, p. 6). Instead, in flagrant disregard of Davey Tree and Wolf Tree's whistleblower policy, Conner, Branch and other Wolf Tree and Davey Tree corporate officers decided to provide Montoya's written whistleblower complaint ***to Rangel***, intending that he would ***silence*** Montoya.[3] (Id.).

As agreed by Branch, Conner and other Wolf Tree and Davey Tree officers, Branch provided Rangel with a copy of Montoya's written whistleblower report, and told Rangel that Montoya was the whistleblower. (AC, ¶ 56; RS, p. 6). Upon reading Montoya's report, Rangel confirmed to Branch that he had provided illegal aliens hired at the Savannah Call Center with false identifications in exchange for money. (Id.). Branch reported to Conner and other Wolf Tree and Davey Tree corporate officials Rangel's confirmation of serious criminal conduct. (Id.).

With the intent to threaten, intimidate, retaliate and prevent Montoya from further reporting to law enforcement, Branch, Conner and other Wolf Tree and Davey Tree officers decided to have Rangel deal with Montoya directly. (AC, ¶¶ 53-54,59-60; RS, pp. 6, 37). Branch, Rangel and Cruz then discussed calling a meeting of all Savannah Call Center employees during which Rangel

---

[3] As alleged in the Amended Complaint and RICO Statement, in 2016, Montoya made a similar oral whistleblower report to Davey Tree and Wolf Tree pursuant to the companies' whistleblower policy. (AC, ¶¶ 43-45; RS, pp. 17-18, 93). In his report, Montoya stated his intent to report the criminal activity he observed to both the Department of Transportation and the Department of Labor, agencies on the State or federal side with law enforcement authority. (AC, ¶ 45). As in 2017, Davey Tree and Wolf Tree blatantly violated their own policy by not investigating Montoya's report and by revealing the report ***to Rangel***, including telling Rangel that Montoya was the whistleblower. (AC, ¶¶ 43-48; RS, p. 18)

would disclose Montoya's whistleblower report, and the fact that Montoya was the whistleblower, to the other employees. (AC, ¶ 60; RS, p. 37).

In early May 2017, Rangel and Cruz called a meeting of the approximately 30 Savannah Call Center employees, including Montoya. (AC, ¶ 61; RS, p. 6). During the meeting, Rangel read Montoya's whistleblower report aloud, all the while threatening and intimidating Montoya. (Id.). Immediately, many of the illegal-alien employees became enraged, and **threatened Montoya with physical violence and death**. (Id.). After purposefully causing a **riot** and **assaults** against Montoya, Rangel told Montoya that "nothing was going to come of" his whistleblower report. (Id.). Cruz kept Branch updated on what was happening during the riot. (AC, ¶ 61; RS, pp. 6-7).

Montoya immediately reported Rangel's threatening and retaliatory actions to Davey Tree and Wolf Tree, but there was no response. (AC, ¶ 62; RS, p. 7). Branch, Conner and other Davey Tree and Wolf Tree officials were well aware of Rangel's threatening and retaliatory actions against Montoya, but they **purposefully did nothing** to prevent or correct them. (Id.). Rangel's retaliation against Montoya was sanctioned, ratified and aided by all Defendants and was meant to **deter** and **intimidate** Montoya from making further reports to law enforcement. (AC, ¶ 63; RS, p. 7).

In mid-May 2017, days after the riot, Montoya asked to speak in private with Davey Tree's Regional Safety Manager, who was in Savannah inspecting the Savannah Call Center. (AC, ¶ 64; RS, p. 7). Montoya provided the Safety Manager with a copy of his written, April 2017 whistleblower report. (AC, ¶ 65; RS, p. 7). He also identified for the Safety Manager the illegal-alien employees who were working under false names. (Id.). The Safety Manager was stunned and blown away by Montoya's report. (AC, ¶ 66; RS, p. 7). He contacted both his own supervisor and Branch to determine what should be done. (Id.). His supervisor and Branch both quickly told the

Regional Safety Manager not to take any further action, except to forward his notes regarding the matter to Conner. (Id.).

Faced again with a decision of whether to halt the illegal and dangerous conduct reported by Montoya, the Conner and the remaining Defendants chose to *retaliate, threaten* and *intimidate* Montoya. (AC, ¶ 67; RS, p. 7). A few days after Montoya provided his whistleblower report to Davey Tree's Regional Safety Manager, Branch and a Wolf Tree and Davey Tree corporate official directed Cruz to cite Montoya with an "unsatisfactory work" employee violation notice, which he did. (AC, ¶ 68; RS, pp. 7-8). The alleged employee violation was baseless and concocted by Cruz, Branch and others acting on behalf of Wolf Tree and Davey Tree. (AC, ¶ 69; RS, p. 8). The employee violation notice to Montoya was issued in retaliation for his whistleblower reports and meant to deter and intimidate Montoya from providing further reports to government authorities, including law enforcement. (AC, ¶¶ 69, 127; RS, p. 8).

In the summer of 2017, Montoya was informed that Conner was in charge of addressing his various whistleblower complaints. (AC, ¶ 70; RS, p. 8). Montoya had several conversations with Conner in the summer of 2017 about his knowledge of the criminal and dangerous activities outlined in his various whistleblower complaints. (Id.). Both Conner and Branch falsely assured Montoya that his 2017 whistleblower reports were being promptly investigated and taken seriously by Davey Tree and Wolf Tree in compliance with the companies' whistleblower policy. (AC, ¶ 72; RS, p. 8). Conner and Branch's statements to Montoya were intentionally misleading, and were meant to *hinder, delay* and *prevent* reports by Montoya to law enforcement and other government authorities regarding Montoya's knowledge of criminal and dangerous conduct. (AC, ¶ 72; RS, p. 8).

In July 2017, Conner requested that Montoya provide her with proof of the statements made in his whistleblower reports. (AC, ¶ 73; RS, p. 8). At the time of this request, Conner knew Rangel had confirmed his criminal activities to Branch and had caused a riot against Montoya. (Id.). Conner's request was intended to mislead Montoya, made with an intent to **hinder, delay** and **prevent** Montoya's communications with law enforcement. (Id.).

In reliance upon Conner's representations, Montoya again decided to provide information to Davey Tree and Wolf Tree instead of making reports to state and federal authorities. (AC, ¶ 74; RS, p. 9). At the time, Montoya still believed Conner, Branch and Davey Tree and Wolf Tree would take appropriate action to address the criminal conduct he outlined in his whistleblower complaints. (AC, ¶ 74). Montoya did not know Conner, Branch, Cruz, Rangel, Davey Tree, Wolf Tree and others were all working together to **silence** Montoya in an effort to protect their criminal enterprise. (Id.).

On August 7, 2017, in response to Conner's request, Montoya provided Conner signed statements by three illegal-alien employees at the Savannah Call Center. (AC, ¶ 75; RS, p. 9). The statements again confirmed that: (a) many Savannah Call Center employees were illegal; and (b) Rangel was providing multiple false identification documents to illegal-alien employees. (Id.).

Faced yet again with whether to halt Defendants' criminal and dangerous conduct, Wolf Tree, Davey Tree, Conner, Branch, Cruz, and Rangel again chose to protect their criminal enterprise by **retaliating against, threatening** and **intimidating** Montoya. (AC, ¶ 76; RS, p. 9). Despite knowing that Branch provided Rangel with Montoya's written whistleblower report resulted in Montoya's life being threatened, Conner provided the three signed statements to Branch. (AC, ¶ 77; RS, p. 9). *Branch then provided the signed statements to Rangel*. (Id.). Conner and Branch's actions were intended to solicit Rangel to silence Montoya and the three illegal-alien employees who provided

the signed statements. (Id.). Rangel responded with threats of violence against two of the illegal-alien employees. (Id., ¶ 78*)*.

On August 16, 2017, Davey Tree and Wolf Tree again acted to ***silence*** Montoya. (AC, ¶ 79; RS, p. 9). That day, an  officer of Davey Tree and Wolf Tree traveled to Savannah and suspended Montoya for three days on a false and fabricated "safe practice violation." (Id.). Wolf Tree and Davey Tree's suspension of Montoya was intended to ***intimidate*** Montoya, cause him ***economic harm, retaliate*** against him for his continued whistleblower reports, and to ***deter*** him from providing further reports to government authorities, including law enforcement. (AC, ¶ 80; RS, pp. 9-10). Conner, Branch, Rangel and Cruz all were aware that Montoya was suspended based upon a false and fabricated violation. (AC, ¶ 81; RS, p. 10)

After his suspension, Montoya realized Conner, Branch, Davey Tree and Wolf Tree would not take appropriate action to address the criminal and dangerous conduct outlined in his whistleblower complaints. (RS, p. 10). On August 16, 2017, Montoya informed Conner he was reporting the criminal and dangerous conduct of Rangel, Davey Tree, Wolf Tree and others to the EEOC, which he did on August 17, 2017. (AC, ¶¶ 82, 84; RS, p. 10).

Knowing that Rangel was a dangerous criminal, Conner and Branch ***informed Rangel of Montoya's efforts to report criminal activities to federal authorities***. (AC, ¶ 83; RS, p. 10). In so doing, Conner intended to solicit the obstruction of a federal investigation through **violent** means. (AC, ¶ 83). After Montoya's August 17, 2017, report to the EEOC, each of the Defendants were aware their previous efforts to ***mislead, threaten*** and ***intimidate*** had failed to silence Montoya. (AC, ¶ 85; RS, p. 10). On Friday, August 18, 2017, Rangel and Cruz informed all Savannah Call Center employees that work for Saturday, August 19, 2017, had been canceled. (AC, ¶ 86; RS, p. 10). There was no legitimate reason for the cancellation: The Savannah Call Center employees

always worked Saturdays and were already far behind in meeting the then-existing Georgia Power contracts. (Id.).

The next day, August 19, 2017, Montoya was brutally murdered, shot in the back twice and once in the back of the head. (AC, ¶ 87; RS, p. 10). Rangel planned the murder and enlisted his brother Juan, a Savannah Call Center employee, as the trigger man. (Id.).

### III.   Conner's Motion to Dismiss is Meritless.

In considering a motion to dismiss, this Court must "accept the allegations in the complaint as true, construing them in the light most favorable to the plaintiff." *Murphy v. FDIC*, 208 F.3d 959, 962 (11th Cir. 2000). All that is required is "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), that "give[s] the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Bell Atl. Co. v. Twombly*, 550 U.S. 544, 555 (2007).

#### A.  The Georgia RICO Counts (Counts 1, 2 and 3)

Plaintiff has alleged three separate violations of the Georgia RICO Act against Conner:  that Conner conducted and participated in an enterprise through a pattern of racketeering activity, in violation of O.C.G.A. § 16-14-4(b) (Count 1); that Conner acquired and maintained interest in an enterprise and property through a pattern of racketeering activity, in violation of O.C.G.A. § 16-14-4(a) (Count 2), and that Conner conspired and endeavored to violate § 16-14-4(a) and § 16-14-4(b), in violation of O.C.G.A. § 16-14-4(c) (Count 3). None of Conner's challenges to the allegations set out in those Counts demonstrate that dismissal is appropriate.

#### 1.  The RICO Counts Adequately Allege Proximate Cause.

A claim under Georgia's RICO Act requires Plaintiffs to "show that [their] injury flowed directly from at least one of the predicate acts." *Wylie v. Denton*, 323 Ga. App. 161, 166 (2013).

"[T]o survive a motion to dismiss, [Plaintiffs] asserting a RICO claim must allege more than that an act of racketeering occurred and [they were] injured." *Id*. Plaintiffs also must allege some "direct nexus" between a racketeering act and their injury, and that "[their] injury was the direct result of a predicate act targeted toward [them], such that [they were] the intended victim." *Id*.

Conner contends that the Amended Complaint fails sufficiently to allege a direct nexus between any predicate act alleged to have been committed, attempted, solicited or coerced and Montoya's injuries. In this regard, Conner advances two main arguments: (1) many of the predicate acts alleged to have been committed, attempted, solicited or coerced by certain Defendants did not injure Montoya; and, (2) the predicate acts that did injure Montoya are insufficiently pled against Conner. Both arguments are without merit.

### a.  There Is No Requirement that Montoya Be Injured by *Each* Predicate of a Pattern of Racketeering Activity.

Conner argues that Montoya was not directly injured by several of the predicate acts alleged in the Amended Complaint, including: Rangel and Cruz's harboring and concealing from detection illegal aliens; Rangel's sale of false identity documents to illegal aliens; Davey Tree and Wolf Tree's laundering of monies to fund Rangel's outside recruitment-harboring-concealing-illegal-alien scheme; Davey Tree and Wolf Tree's scheme to defraud Georgia Power; Rangel's assaults on illegal-alien employees; Cruz and Conner's perjury; and Conner's false statements to law enforcement.

However, "[w]hile it is certain that a plaintiff in a civil RICO suit must show an injury by reason of a violation . . . , there is no requirement that plaintiff suffer direct harm from **each and every** alleged predicate act introduced to show a pattern of racketeering activity." *InterAgency, Inc. v. Danco Fin. Corp.*, 203 Ga. App. 418, 424 (1992) (emphasis added).

Conner misses the point. Pattern and proximate cause are separate requirements. A claim based upon a substantive violation of O.C.G.A. § 16-14-4(a) or (b) requires proof of a pattern of racketeering activity. Under Georgia RICO, this requires only two related predicate acts. *Dorsey v. State,* 279 Ga. 534, 539-540 (2005); *Overton v. State,* 295 Ga. App. 223, 232 (2008); *Dover v. State,* 192 Ga. App. 429, 432 (1983). "This does not mean that *each* RICO defendant must commit at least two acts to come under the Act's prohibitions," *Faillace v. Columbus Bank & Trust Co.,* 269 Ga. App. 866, 868 (2004), because where a pattern of racketeering activity is present, each defendant that participates in that pattern, whether by one act or more, is liable. *Id.* Also, a pattern of racketeering activity may consist in part of acts which caused no harm, as well as acts which caused harm to persons other than the plaintiff. *InterAgency*, 203 Ga. App. at 423-24 (affirming verdict in favor of plaintiff based on a pattern of racketeering activity that consisted in part of acts committed against third parties).

Proximate cause, meanwhile, only requires that a plaintiff be injured by one or more of the predicate acts that comprise the pattern: "To satisfy the proximate cause element of RICO, a plaintiff must show that [his] injury flowed directly from at least *one* of the predicate acts." *Wylie*, 323 Ga. App. at 165 (emphasis added). *Accord, Nicholson v. Windham,* 257 Ga. App. 429, 430 (2002) (plaintiff must show a direct nexus between at least one predicate act and the injury she purportedly sustained). Accordingly, even if Defendants are correct that there is no direct nexus between some predicate acts and Montoya's injuries, that is no reason to dismiss the RICO Counts.

### b. The Amended Complaint Has Adequately Pled a Direct Nexus Between Conner's Racketeering Activity and Montoya's Injuries.

Conner participated in an association-in-fact enterprise, the Davey-Rangel Enterprise, for the common purpose of making money illegally and concealing and preventing detection of the enterprise's illegal activities. In April 2017, years into the commission of numerous state and

federal crimes relating to harboring and concealing an illegal-alien workforce and a multi-million dollar fraud scheme, Eliud Montoya submitted a written whistleblower complaint to Defendants Davey Tree and Wolf Tree, outlining a number of crimes associated with the Savannah Call Center workforce and advising that he had spoken with and planned to speak again with law enforcement about the various crimes he had witnessed. At this point, the Conner's participation in the Davey-Rangel Enterprise was for the common purpose of concealing and preventing detection of the enterprise's illegal activities, by means of "a systematic effort to silence Montoya through physical threats, economic threats, intimidation, retaliation, deception, and eventually murder." (AC, ¶ 53).

Although at times difficult to decipher, Conner appears to float between arguments that the allegations within the Amended Complaint were not "in fact" true, and arguments that the allegations in the Amended Complaint were insufficiently pled as to Conner, as they relate to proximate cause. Of course, arguments beyond the four corners of the Amended Complaint are improper in a motion to dismiss. *Rainge v. Fay Servicing Ctr., LLC*, No. CV 116-016, 2016 WL 6824390, at *4 (S.D. Ga. Nov. 17, 2016) ("Defendant's argument presents an issue of disputed fact inappropriate for determination on a motion to dismiss. Under the motion-to-dismiss standard, the Court may only look at the 'four corners of the complaint' and limited documents attached to the complaint")(citing *Speaker v. U.S. Dep't of Health & Hum. Servs. Ctrs. for Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010).

With regard to the adequacy of the proximate cause allegations against Conner, the Amended Complaint and RICO Statement more than adequately allege Conner's involvement in the predicate acts that injured Mr. Montoya, as shown in the following:

> There is a direct nexus between Montoya's injuries and all Defendants' May 2017 influencing witness and terroristic threats.

As alleged in the Amended Complaint, upon receipt of Montoya's confidential whistleblower report in April 2017, which outlined vast criminal conduct and stated an intent to continue speaking with law enforcement, Defendants Branch, Conner and officers of Davey Tree and Wolf Tree agreed to provide Montoya's confidential written whistleblower complaint to Rangel so that Rangel would deal with Montoya directly. (AC, ¶¶ 55, 60). Then, in early May 2017, Rangel and Cruz called a meeting of the approximately 30 Savannah Call Center employees, where Rangel read Montoya's written whistleblower report aloud, identified Montoya as the whistleblower, and threatened and intimidated Montoya. (Id., ¶ 61). Immediately, many of Davey Tree and Wolf Tree's illegal alien employees became enraged, began rioting, and threatened Montoya with physical violence and death, which was Rangel's intended purpose of his actions. (Id.). Cruz kept Branch updated on what was happening during the riot. (Id.). After the threats and assaults by Davey Tree and Wolf Tree illegal-alien employees, Rangel turned to Montoya and said "nothing was going to come of" his whistleblower report. (Id.).

O.C.G.A. § 16-10-93(b)(1)(C) (Influencing Witnesses) provides, "It shall be unlawful for any person knowingly to use intimidation, physical force, or threats . . . with intent to . . . [h]inder, delay, or prevent the communication to a law enforcement officer . . . of this state of information relating to the commission or possible commission of a criminal offense . . . ."

Montoya stated in his 2017 whistleblower report that most of the Corporate Defendants' Savannah employees were illegal aliens, that Rangel had sold false identification documents to these illegal aliens, that illegal aliens were operating the Corporate Defendants' commercial vehicles without licenses, and that he had reported the illegal and dangerous conduct to the Department of Labor, a law enforcement agency. (AC, ¶ 50). In his written report, Montoya also

expressed a continued intent to speak with law enforcement "if the problem [was] not solved" by the Corporate Defendants. (Id., ¶ 51).

With knowledge of widespread, ongoing, and vast criminal conduct, Montoya's contact with law enforcement and his stated intent to continue doing so, Conner, Branch, Cruz and the Corporate Defendants, in blatant violation of the companies' whistleblower policy, solicited Rangel to intimidate and threaten Montoya, with the intent to hinder, delay and prevent Montoya's communication with law enforcement, which Rangel did. (AC, ¶¶ 59-63, 125; RS, p. 26).

The early May 2017 "handling" of Montoya's whistleblower complaint by Rangel also constituted terroristic threats under Georgia law. Per O.C.G.A. § 16-11-37(b)(1), "[a] person commits the offense of a terroristic threat when he or she threatens to . . . [c]omit any crime of violence . . . ." As alleged in the Amended Complaint, in addition to personally threatening and intimidating Montoya, Rangel read aloud Montoya's whistleblower complaint to the illegal-alien workforce to purposefully cause a riot and assaults against Montoya. (Id., ¶ 61). Rangel's actions produced his intended results: members of the illegal-alien workforce threatened Montoya with serious bodily harm and death. "In so doing, Rangel, aided and abetted by Cruz and Branch, solicited and coerced other [Davey Tree and Wolf Tree illegal-alien employees] to make terroristic threats against Montoya." (Id., ¶ 126). Thus, the Amended Complaint has adequately plead a direct nexus between Conner's participation in the RICO predicate act associated with the May 2017 riot and Montoya's injuries.

> *There is a direct nexus between Montoya's injuries and Conner's and the other Defendants' continued efforts to silence Montoya after the May 2017 riot.*

Despite the threats and intimidation surrounding the May 2017 riot that were solicited and sanctioned by Conner and others, (AC, ¶¶ 55, 60; RS, pp. 36-37), Montoya continued to pursue his complaints of illegal and dangerous conduct he witnessed. (AC, ¶¶ 64-65). Montoya's

additional actions were again met with efforts by Conner and other Defendants to silence him with additional threats and intimidation. (Id., ¶ 67).

After Montoya's continued efforts to expose ongoing criminal activity, which included making his intent known to have further communications with law enforcement, all Defendants again chose to retaliate against, threaten and intimidate Montoya through the following predicate acts:

- After a discussion with Branch and Davey Tree and Wolf Tree corporate officials, Cruz was instructed on or about June 1, 2017, to threaten Montoya with economic harm by citing him with a baseless and concocted employee violation notice, with the intended purpose of delaying hindering, preventing or dissuading Montoya from further providing information to law enforcement. (Id., ¶¶ 68, 69 and 127);

- From April through August 7, 2017, both Branch and **Conner** had multiple conversations with Montoya where they knowingly and intentionally provided him with false and misleading information which was intended to hinder, delay and prevent further reports by Montoya to law enforcement and government authorities; that is, Branch and Conner falsely told Montoya his whistleblower reports were being promptly investigated and taken seriously by Davey Tree and Wolf Tree in compliance with the companies' whistleblower policy. (Id., ¶¶ 70, 72);

- In July of 2017, **Conner** requested that Montoya provide her with proof of the statements made in his whistleblower reports. (Id., ¶ 73). At the time of this request, Conner knew Rangel had confirmed his criminal activities to Branch and had caused a riot against Montoya. (Id.). Conner's request was intended to mislead Montoya, made with an intent to hinder, delay or prevent Montoya's communications with law enforcement. (Id.);

- On August 16, 2017, an officer of Davey Tree and Wolf Tree officer suspended Montoya on a false and fabricated "safe practice violation." (Id., ¶ 79). Wolf Tree and Davey Tree's suspension of Montoya was intended to intimidate Montoya and cause him economic harm and was made in retaliation for Montoya's continued whistleblower reports and to deter and intimidate Montoya from providing further reports to government authorities, including law enforcement. (Id., ¶ 80).

Regarding each of the predicate acts listed above alleging violations of O.C.G.A. § 16-10-93 (Influencing Witnesses) by Conner**,** Conner's false and misleading assurances to Montoya, as alleged in the Amended Complaint, "were meant to hinder, delay or prevent Montoya's reports to

a law enforcement officer of information relating to the commission or possible commission of criminal offenses." (AC, ¶ 128).

> *Violent retaliation against a federal witness solicited by Conner is another predicate with a direct nexus to Montoya's injuries.*

As alleged in the Amended Complaint, after his suspension by the Corporate Defendants, Montoya informed Conner on or about August 16, 2017, that he was reporting the criminal and dangerous conduct of Rangel, Davey Tree and Wolf Tree and others to the EEOC. (Id., ¶ 131). *Knowing Rangel was a dangerous criminal*, Conner and Branch informed Rangel of Montoya's efforts to report criminal activities to federal authorities, *with the intent to **solicit** the violent retaliation against a federal witness*, in violation of 18 U.S.C. § 1513. (Id., ¶¶ 83, 131). Three days later, on August 19, 2017, Rangel caused the murder of Montoya, in violation of 18 U.S.C. § 1513 (Federal Witness Retaliation) and O.C.G.A. § 16-5-1 (Murder). (Id., ¶ 133).

Each Defendant, including Conner, denies any involvement in Montoya's murder. Conner's denial of factual allegations in the Amended Complaint, however, have no relevance in determining whether the Amended Complaint has been properly pled. The direct nexus of each Conner's involvement in the violent retaliation against Montoya, a federal witness, has been properly pled.

And, with regard to the Defendants' direct nexus to Montoya's injuries, it should be noted that Defendant Conner erroneously argues that the only injury alleged to have been suffered by Montoya relates to damages arising from the Retaliation Against a Federal Witness / Murder predicates. As alleged in the Amended Complaint, however:

> Plaintiff suffered injuries and damages by reason of the Defendants' violation of O.C.G.A. §16-14-4(b). Many of the racketeering acts were specifically directed at Montoya; intended to cause him injury; and did in fact cause him injury. ***In addition to*** the injuries and damages suffered as the result of his murder, Montoya suffered injuries and damages caused by the threats of death and serious bodily injury in violation of Georgia law, and

the attempts to influence and retaliate against him through intimidation, threats, misleading conduct and economic harms, all in violation of Georgia and federal law.

(Id., ¶ 143 (emphasis added)). Thus, Conner's attempts to cabin the direct nexuses between their acts and Montoya's injuries to only retaliation against a federal witness and murder is invalid.

### 2.   Count 2 and "Acquisition Injury"

Conner references in passing the same "acquisition injury" argument urged by the Corporate Defendants. (See Doc. 204, p. 15). In response, Plaintiff adopts and incorporates as if stated fully herein his arguments and citations of authority found in Section III(A)(2) of his response brief to Defendants Davey Tree and Wolf Tree's June 2024 motion to dismiss.

### 3.   Count 3 Adequately Alleges a RICO Conspiracy.

Conner contends that Count 3, which alleges a conspiracy to violate the Georgia RICO Act, must fail because "[t]here are no factual allegations within that claim that are specific to Ms. Conner [and] . . . [t]here is not even an allegation that Ms. Conner agreed to join a conspiracy." (Doc. 204, p. 16). First, Count 3 (Civil RICO) of the Amended Complaint states, in part, that "[t]he Defendants [including Conner] have conspired with each other and others to conduct and participate in, directly or indirectly, the Davey-Rangel enterprise through a pattern of racketeering activity," and that Conner and the other Defendants "have committed overt acts . . . in furtherance of the conspiracy." (AC, ¶ 166). Second, Count 3 of the Amended Complaint specifically incorporates the allegations involving the overt acts committed by Conner (see Id.), including misleading a witness, (Id., ¶ 128), soliciting terroristic threats (Id., ¶ 129), and soliciting retaliation against a federal witness. (Id., ¶ 131).

### 4.   To the Extent Necessary, the Amended Complaint Clears the Heightened Standard of Fed. R. Civ. P. 9(b).

Conner argues that the Amended Complaint does not satisfy the heightened pleading standard of Fed. R. Civ. P. 9(b) and, therefore, should be dismissed. Rule 9(b) provides, "[i]n alleging *fraud*

or *mistake*, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b) (emphasis added).[4] "Despite the heightened standard . . . the purpose of Rule 9(b) remains that a complaint must provide the defendant with 'enough information to formulate a defense to the charges.'" *United States v. SouthernCare, Inc.*, No. CV410-124, 2015 WL 5278413, at *2 (S.D. Ga. Sept. 9, 2015) (Moore, J.) (citing *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1313 n.24 (11th Cir. 2002)). "The Eleventh Circuit has emphasized that [t]he application of Rule 9(b) . . . must not abrogate the concept of notice pleading.'' *Id.* (citing *Tello v. Dean Witter Reynolds, Inc.*, 494 F.3d 956, 972 (11th Cir. 2007) (internal quotation marks omitted)). "Rule 9(b)'s standard should not be conflated with that used on a summary judgment motion." *Id.* (citing *United States ex rel. Rogers v. Azmat,* No. CV 507-092, 2011 WL 10935176, at *3 (S.D. Ga. May 17, 2011) (unpublished)). "[U]nder Rule 9(b), it is sufficient to plead the who, what, when, where, and how of the allegedly false statements and then allege generally that those statements were made with the requisite intent." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008). Under any applicable standard, the Amended Complaint is properly pled.

---

[4] Only ***some*** of the RICO predicate acts alleged by the Amended Complaint, those requiring proof of fraud or a misrepresentation, must satisfy the heightened pleading standard of Rule 9(b). *See Liquidation Comm'n of Banco Intercontinental, S.A. v. Renta*, 530 F.3d 1339, 1355–56 (11th Cir. 2008) ("RICO predicate acts ***not sounding in fraud*** need not necessarily be pleaded with the particularity required by Fed.R.Civ.P. 9(b)." (Emphasis added)). Many of the predicate acts alleged in the Amended Complaint require no proof of fraud or a misrepresentation. *See, e.g.*, AC, ¶¶ 133 (murder); 125 (intimidating and threatening with intent to hinder, delay or prevent communication to a law enforcement officer, in violation of O.C.G.A. § 16-10-93); 126 (soliciting and coercing others to make terroristic threats, in violation of O.C.G.A. § 16-11-37); 129 (making terroristic threats, in violation of O.C.G.A. § 16-11-37); and 131-132 (aiding, abetting and soliciting retaliation against a federal witness, in violation of 18 U.S.C. § 1513). These predicate acts are subject only to "Rule 8's more relaxed notice-pleading standard." *SEC v. Bankatlantic Bancorp, Inc.*, No. 12-60082-CIV, 2012 WL 12837291, at *2 (S.D. Fla. Dec. 7, 2012).

### B.  The Non-RICO Counts

#### 1.  Assault and Battery

Conner contends that the Amended Complaint fails to state claims against her for assault and battery. "A cause of action for battery will lie for ***any*** unlawful touching . . . ." *Lawson v. Bloodsworth*, 313 Ga. App. 616, 618 (2012) (internal citation omitted) (emphasis added). Conner argues that she never unlawfully touched Montoya, and, therefore, cannot be held liable for battery. As the Amended Complaint explains, however, Davey Tree and Wolf Tree "put in place actions to the intimidation and physical injury of Eliud Montoya. These actions include, but are not limited to, repeated ***gunshots*** made by [Conner's colleague] Juan Rangel, at the direction of [Conner's other colleague] Defendant Pablo Rangel, ***into Montoya's body*** . . . ." (AC, ¶ 177 (emphasis added)). As the Amended Complaint also outlines, Conner's conduct directly and proximately caused the unlawful shooting of Montoya. (AC, ¶ 179). Altogether, the allegations in the Amended Complaint sufficiently state a claim against Conner for battery.

Conner next asserts that the Amended Complaint fails to state a claim against her for assault. "To constitute an assault no actual injury need be shown, it being only necessary to show an intention to commit an injury, coupled with an apparent ability to do so." *Wallace v. Stringer*, 250 Ga. App. 850, 853 (2001) (internal citations and quotation marks omitted) (emphasis added). Conner argues, "Plaintiff does not allege that **Ms. Conner** threatened Mr. Montoya at any time. Plaintiff does not allege that **Ms. Conner** had an intention to commit an injury to Mr. Montoya, coupled with the apparent ability to do so." (Doc. 204, p. 18 (internal citations omitted)). The Amended Complaint, however, outlines in detail how each of the Defendants, including Conner, "engaged in a systematic effort to silence Montoya, through *physical threats*, economic threats, intimidation, retaliation, deception, and eventually *murder*." (AC, ¶ 53 (emphasis added)). The

Amended Complaint further states, for example: "Knowing that Rangel was a dangerous criminal, Conner made sure Rangel knew of Montoya's efforts to report criminal activities to federal authorities. In so doing, **Conner intended** to solicit the obstruction of a federal investigation ***through violent means***." (Id., ¶ 83 (emphasis added)). The Amended Complaint makes plain that Conner—through her colleagues, Cruz and Rangel—"threatened Montoya with violence and had the apparent ability to perform said acts of violence. Said threats began in early May of 2017." (Id., ¶ 181). The Amended Complaint continues that Conner—through another colleague, Juan Rangel—"***threatened Montoya with physical injury on August 9, 2017, in the moments leading up to his death***." (Id., ¶ 182 (emphasis added)). Thus, Plaintiff has sufficiently pled that Conner intended to injure Montoya, and the Amended Complaint sufficiently states a claim against her for assault.

### 2. Negligence

Diverging from her co-defendants, Conner argues that the Amended Complaint fails to state a claim against her for *negligence*.[5] Conner summarizes her arguments seeking dismissal of Plaintiff's negligence claim as follows: "Plaintiff has failed to state a claim for negligence against Ms. Conner because Plaintiff has failed to state a legal duty owed to Mr. Montoya by Ms. Conner." (Doc. 204, pp. 22-23). This is incorrect. Per the Amended Complaint, "Defendant Conner, through her employment as an officer and as corporate counsel for Davey and Wolf, had a duty to provide Montoya and others a safe work environment free from harassment and intimidation by company employees such as Branch, Rangel and Cruz." (AC, ¶ 187). Further, "Defendant Conner had a duty

---

[5] Conner's co-defendant, Christopher Branch, for example, filed a motion to dismiss similar to Conner's, but his motion does not seek dismissal of Plaintiff's negligence claim. (*See generally* doc. 207). In fact, Branch's motion suggests that a more appropriate time to seek dismissal of Plaintiff's negligence claim would be by a motion for summary judgment. (Doc. 207, p. 1, n. 1).

to adequately review and address Montoya's April of 2017 whistleblower reports, which referenced numerous illegal and dangerous activities." (AC, ¶ 188).

Conner's above-described duties arise from Section 324A of the Second Restatement of Torts, which provides a cause of action for negligence performance of an undertaking:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

RESTATEMENT (SECOND) OF TORTS § 324A (1965). Section 324A is recognized "as an accurate statement of common law." *Herrington v. Gaulden*, 294 Ga. 285, 287 (2013); *Huggins v. Aetna Cas. & Sur. Co.*, 245 Ga. 248, 249 (1980) (adopting "the majority rule" as stated in Section 324A); *Ga. CVS Pharm., LLC v. Carmichael*, 316 Ga. 718 (2023). "Section 324A of the Restatement (Second) of Torts does provide for liability to third persons for negligent performance of an undertaking . . . ." *Hill v. Konecranes, Inc.*, No. 4:17-CV-165, 2020 WL 3259178, at *14 (S.D. Ga. June 16, 2020) (Baker, J.) (internal citation and quotation marks omitted).

Here, the Amended Complaint states a claim against Conner for negligent performance of an undertaking, namely, as stated above, to review and address Montoya's whistleblower reports. (AC, ¶ 188). Further, Conner breached that duty when, "in flagrant disregard of Davey Tree and Wolf Tree's Whistleblower Policy, Conner . . . decided to silence Montoya: [she] provided Montoya's written whistleblower complaint to Rangel and told Rangel that Montoya was the whistleblower." (AC, ¶ 55). Moreover, Conner "falsely assured Montoya that his 2017 whistleblower reports were being promptly investigated and taken seriously by Davey Tree

and Wolf Tree, in compliance with the Whistleblower Policy." (AC, ¶ 72). These allegations sufficiently state a claim against Conner for negligence.

Conner further claims that "Plaintiff has also failed to adequately plead causation . . . ." As explained above and in the Amended Complaint, the Amended Complaint sets forth in exhaustive detail a direct nexus between Conner's conduct and Montoya's injuries and death. *See* Section III(A)(1)(b) of this brief. Also for this proposition, Conner cites case law stating that, "where there is intervening criminal conduct, unless the intervening criminal conduct was foreseeable to the defendant, the intervening criminal conduct will be considered the proximate cause of the injury." (Doc. 204, p. 23). Conner's point here fails to mention that the Amended Complaint, in the very count she seeks to dismiss, states, "***[i]t was foreseeable that Rangel and others would retaliate against Montoya upon learning of the whistleblower report that described Rangel's and others' illegal and dangerous activities.***" (AC, ¶ 193 (emphasis added)). Conner is not entitled to dismissal of the negligence claim against her.

### 3.  Intentional Infliction of Emotional Distress

Lastly, Conner avers that the Amended Complaint fails to state a claim against her for intentional infliction of emotional distress (IIED). "To prevail on a claim for [IIED], Plaintiffs must show that: (1) defendants' conduct was intentional or reckless; (2) defendants' conduct was extreme and outrageous; (3) a causal connection existed between the wrongful conduct and the emotional distress; and (4) the emotional harm was severe." *Gifford v. City of Broxton, Georgia*, No. CV 508-084, 2010 WL 11607353, at *12 (S.D. Ga. Sept. 24, 2010) (internal citation and quotation marks omitted). In *Gifford*, this Court denied summary judgment on the plaintiff's IIED claim where the defendant police officer threatened to kill the plaintiff. *Id.* at *6, 12.

Here, the Amended Complaint sufficiently states a claim against Conner for IIED. First, it alleges, "Defendant Conner engaged in a course of extreme and outrageous conduct as fully set forth above with the intention of causing, or reckless disregard of the probability of causing, emotional distress to Eliud Montoya." (AC, ¶ 258). Some of Conner's extreme and outrageous conduct outlined in the Amended Complaint are that she: (1) inspired ***death threats*** against Montoya, by helping incite a riot against him; (2) aided, abetted, and solicited retaliation against Montoya; and (3) acted with the specific intent to expose Montoya's identity and complaints to Rangel, in an effort to ***silence*** Montoya. (AC, ¶¶ 60-62, 131, 260). Conner thus played a key role in the scheme to ***silence***, ***threaten***, and ***retaliate*** against Montoya, culminating in ***death threats*** against Montoya and Montoya's ***murder***. (Id., ¶¶ 53, 124, 158, 259). Also, contrary to Conner's argument that Plaintiff does not allege that Montoya suffered emotional distress, the Amended Complaint states that Conner's actions "***caused severe emotional distress to Eliud Montoya, up until the point of his murder***." (Id., ¶ 259 (emphasis added)). Accordingly, the Amended Complaint satisfies the requirements for pleading IIED against Conner.

## IV.    Conclusion

For the foregoing reasons, Conner's June 2024 motion to dismiss the Amended Complaint should be denied.

Respectfully submitted this 26th day of July, 2024.

*[Signatures on following page.]*

-24-

**GRIFFIN DURHAM TANNER & CLARKSON**

By:    */s/ James D. Durham*
      James D. Durham
      Georgia Bar No. 235515
      Samuel L. Mikell
      Georgia Bar No. 24114
      104 West State Street, Suite 200
      Savannah, Georgia 31401
      Ph/Fax: (912) 867-9140

**BONDURANT, MIXSON & ELMORE LLP**

By:    */s/ John E. Floyd*
      John E. Floyd
      Georgia Bar No. 266413
      One Atlantic Center
      1201 West Peachtree Street NW
      Suite 3900
      Atlanta, Georgia 30309
      (404) 881-4100

**SAVAGE, TURNER, PINCKNEY, SAVAGE & SPROUSE**

By:    */s/R. Bartley Turner*
      R. Bartley Turner
      Georgia Bar No. 006440
      102 East Liberty, 8th Floor
      Savannah, Georgia 31401
      Ph: (912) 231-1140

## CERTIFICATE OF SERVICE

I certify that I have this day served the foregoing through the Court's ECF system upon all counsel registered to receive service, and that I have served the foregoing via U.S. mail on the following: Pablo Rangel-Rubio (*Pro Se*), Register No. 22405-021, USP Atwater, Post Office Box 019001 6A-123, Atwater, California 95301

This 26th day of July, 2024.

**GRIFFIN DURHAM TANNER & CLARKSON**

By:    /s/ *James D. Durham*
James D. Durham
Georgia Bar No. 235515
104 West State Street, Suite 200
Savannah, Georgia 31401
Ph/Fax: (912) 867-9140