**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

BRIAN J. HUFFMAN, as Administrator of the
Estate of Eliud Montoya-Arcos, Deceased,

                Plaintiff,

      v.

THE DAVEY TREE EXPERT COMPANY;
WOLF TREE, INC.; MARJORIE L.
CONNER; CHRISTOPHER BRANCH;
OSCAR CRUZ; and PABLO RANGEL, a/k/a
PABLO RANGEL-RUBIO,

           Defendants.

CIVIL ACTION NO.: 4:18-CV-184

# O R D E R

This case arises from the events surrounding the tragic murder of Eliud Montoya-Arcos ("Montoya"). In this action, Plaintiff, as administrator of Montoya-Arcos's estate, has sued Defendants The Davey Tree Expert Company ("Davey Tree"); Wolf Tree, Inc. ("Wolf Tree"); Marjorie Conner; Christopher Branch; Oscar Cruz; and Pablo Rangel, alleging civil RICO violations and other torts. (Doc. 123.) Presently before the Court is Conner's Motion to Dismiss, (doc. 204), Branch's Motion to Dismiss, (doc. 207), Cruz's Motion to Dismiss, (doc. 208), Davey Tree and Wolf Tree's Motion to Dismiss, (doc. 209), Defendants' joint motion for oral argument on these motions, (doc. 210), and two Motions for partial Summary Judgment on non-RICO claims by Davey Tree, Wolf Tree, and Conner, (docs. 161, 163). The matters have been fully briefed. (Docs. 161, 163, 169, 204, 222, 230, 207, 223, 231, 208, 221, 232, 209, 220, 233, 236, 210 & 213.)

For the reasons below, the Court **GRANTS** Defendants' Motions to Dismiss. (Docs. 204, 207, 208 & 209.) Because Plaintiff failed to plausibly allege the proximate causation required for

RICO standing, Plaintiff's RICO claims (Counts I, II and III) are **DISMISSED with prejudice** against the moving Defendants.[1]  (Doc. 123.)  Additionally, Plaintiff's claims for battery (Count IV), assault (Count V), and intentional infliction of emotional distress ("IIED") (Counts XIII, XV, XVII & XIX) are **DISMISSED with prejudice** as to all moving Defendants.  (Id.)  With no claims thereby remaining against Cruz, Cruz is **DISMISSED from this case**.  The negligence claim against Conner (Count VI) is also **DISMISSED with prejudice**, because, as alleged, Conner owed no duty to Montoya.  With no claims thereby remaining against Conner, Conner is **DISMISSED from this case** and Conner's Motion for Partial Summary Judgment is **DENIED as moot**.  (Doc. 163.)  For all remaining claims, the parties shall confer and submit a joint status report with proposed deadlines **within seven (7) days** of this Order.  Davey Tree and Wolf Tree's Motion for partial Summary Judgment is **DENIED without prejudice**.  (Doc. 161.)  Defendants' joint Motion for Oral Argument is **DENIED as moot**.  (Doc. 210.)

**BACKGROUND**

## I.    Factual Background

The facts below are alleged in Plaintiff's Amended Complaint.  (Doc. 123.)

Defendant Davey Tree and its wholly owned subsidiary, Defendant Wolf Tree, are in the business of trimming trees along power lines for utility companies.  (Id.)  From 2008 through August 2017, the majority of Davey Tree and Wolf Tree's employees were undocumented immigrants who were in the United States unlawfully.  (Id. at p. 5.)  One of these unlawful employees was Defendant Pablo Rangel, the supervisor of Davey Tree and Wolf Tree's operations in the Savannah, Georgia, area (the "Savannah Call Center").  (Id.)  Rangel[2] located and recruited

---

[1]  These claims remain pending, however, against Defendant Rangel.

[2]  For the remainder of this Order, "Rangel" refers to Defendant Pablo Rangel.  When the Court refers to Juan Rangel, his first and last name will both be used.

2

other undocumented immigrants to work for Davey Tree and Wolf Tree, procuring false identification documents for the workers and charging them for his services. (Id. at pp. 5–6.) The Savannah Call Center's only customer was Georgia Power. (Id. at p. 8.) As required for every bid and contract with Georgia Power, Davey Tree and Wolf Tree verified the legality of their workforce, though Davey Tree and Wolf Tree knew their verification was false. (Id. at p. 9.) Georgia Power would have never entered into these contracts had it known of the illegality of the work force. (Id. at p. 10.)

In or around 2013, Rangel solicited Defendant Oscar Cruz to assist in the scheme. (Id. at p. 7.) At Rangel's direction, Cruz knowingly executed financial transactions to provide cash payments to the undocumented workers. (Id.) In exchange for this service, Rangel paid Cruz using money from Wolf Tree and Davey Tree. (Id.)

Montoya was a United States citizen who worked as a tree trimmer for Wolf Tree at the Savannah Call Center. (Id. at p. 11.) As an employee in the Savannah Call Center, Montoya witnessed this illegal scheme to use undocumented workers. (Id. at pp. 11–12.) In 2016, Montoya submitted a whistleblower report to Wolf Tree and Davey Tree, detailing the scheme. (Id. at p. 12.) At the time Montoya submitted this report, Davey Tree and Wolf Tree were already aware of many, if not all, of the information contained within Montoya's complaints. (Id. at p. 13.) Montoya stated in the 2016 report that he wished to maintain anonymity. (Id. at p. 12.) Montoya added that he intended to speak with the Department of Transportation and the Department of Labor about the criminal conduct that he had witnessed. (Id.) Davey Tree and Wolf Tree subsequently informed Rangel of the details of Montoya's 2016 report—and the fact that Montoya was the whistleblower. (Id. at p. 13.) In their written whistleblower policy, Davey Tree and Wolf Tree guaranteed to protect whistleblowers against retaliation. (Id. at p. 11.)

A year later, in April 2017, Montoya again contacted Davey Tree to report the illegal conduct both orally and in writing. (Id. at p. 13.) Orally, Montoya again informed Davey Tree that he intended to speak with the Department of Labor. (Id. at pp. 13–14.) In a written report, Montoya informed Davey Tree and Wolf Tree that he, in fact, had reported their illegal conduct to the Department of Labor and that the Department had informed him it would take the case "if the problem is not solved." (Id. at p. 14.)

Defendant Marjorie Conner was Davey Tree's in-house legal counsel, and Defendant Christopher Branch was Rangel's immediate supervisor. (Id. at p. 15.) After receiving Montoya's April 2017 written report, Conner and Branch decided not to investigate the report. (Id.) Instead, they provided the report to Rangel and told Rangel that Montoya was the whistleblower. (Id.) Rangel confirmed to Branch that, in exchange for money, he provided undocumented workers with false identifications. (Id.) Branch, in turn, reported this to Conner and other corporate officials at Davey Tree and Wolf Tree. (Id.) Davey Tree and Wolf Tree, however, did not inform Georgia Power of these developments and continued funneling money to Rangel to facilitate the scheme. (Id. at pp. 15–16.)

Branch, Rangel, and Cruz discussed calling a meeting of all Savannah Call Center employees, during which Rangel would disclose to the employees Montoya's report, and the fact that Montoya was the whistleblower. (Id. at p. 16.) In early May 2017, Rangel and Cruz called the meeting of around thirty employees, including Montoya. (Id.) During the meeting, Rangel read the whistleblower report aloud and threatened and intimidated Montoya. (Id.) Many of the other employees "became enraged, began rioting, and threatened Montoya with violence and death." (Id. at pp. 16–17.) After purposefully causing this riot, Rangel told Montoya that "nothing

was going to come of" Montoya's whistleblower report.  (Id. at p. 17.)  Sometime during the meeting, Branch contacted Cruz for an update on what was happening.  (Id.)

Immediately after the meeting, Montoya reported Rangel's threatening actions to Davey Tree and Wolf Tree, but there was no response.  (Id.)  In mid-May 2017, days after the meeting, Montoya asked to speak privately with Davey Tree's Regional Safety Manager and provided the Safety Manager with a copy of the April 2017 whistleblower report.  (Id.)  The Safety Manager was stunned, took notes of the conversation, and reached out to his own supervisor as well as Branch.  (Id. at p. 18.)  Branch told the Safety Manager not to take any further action, except to forward his notes to Conner.  (Id.)  The Safety Manager abided by Branch's instructions.  (Id.)

A few days after Montoya's meeting with the Safety Manager, Cruz overheard Branch, David Jackson (Branch's supervisor), and another Davey Tree and Wolf Tree corporate officer discussing how to construct a "paper trail" that would facilitate the quiet removal of Montoya. (Id.)  A corporate officer then directed Cruz to cite Montoya with an "unsatisfactory work" employee violation notice, which Cruz did.  (Id.)

In the summer of 2017, Montoya was informed that Conner would address his whistleblower complaints.  (Id. at p. 19.)  Conner and Branch falsely assured Montoya that his complaints were being investigated and taken seriously.  (Id.)  In July 2017, Conner asked Montoya to provide proof of the contents of his whistleblower reports, even though Conner already knew that Rangel had confirmed his criminal activities to Branch and caused a riot against Montoya. (Id.)  Relying on these assurances, Montoya followed the instructions and provided information to Davey Tree and Wolf Tree rather than reporting to state or federal authorities.  (Id. at pp. 19–20.)

On August 16, 2017, David Jackson suspended Montoya for three days for a fabricated "safe practice violation."  (Id. at p. 21.)  Conner, Branch, Rangel, and Cruz were all aware of this

fabricated suspension.  (Id.)  Montoya realized that Conner, Branch, Davey Tree, and Wolf Tree would not address the criminal conduct and, on that same day (August 16, 2017), he informed Conner that he was reporting the criminal conduct to the United States Equal Employment Opportunity Commission ("EEOC").  (Id.)  Conner made sure Rangel knew of Montoya's efforts to report criminal activities to federal authorities.  (Id.)

On Thursday, August 17, 2017, Montoya provided a written report of the criminal activities to the EEOC.  (Id. at p. 22.)  On Friday, August 18, 2017, Rangel and Cruz informed the Savannah Call Center employees that work for the next day, Saturday, August 19, 2017, was cancelled—even though the Savannah Call Center "always" operated on Saturdays.  (Id.)

On Saturday, August 19, 2017, Montoya was murdered.  (Id.)  Rangel planned the murder and enlisted Juan Rangel, his brother and coworker at the Savannah Call Center, as the "trigger man."  (Id.)  The two were driven to Montoya's neighborhood by Higinio Perez-Bravo, who was not employed by Wolf Tree or Davey Tree.  (Id.)  Rangel paid Perez-Bravo thousands of dollars for this service.  (Id.)  Montoya was then shot and killed.  (Id.)

In the ensuing investigation, Conner falsely told police that she had determined that Montoya's complaints "lacked credibility."  (Id. at p. 23.)  Additionally, in a February 2018 interview, Conner testified under oath that her investigation of Montoya's complaints was ongoing at the time of his murder, even though she had ended her investigation before the murder.  (Id.)  Cruz also falsely testified in a February 2018 deposition that he did not know that any Savannah Call Center employees were working illegally.  (Id. at pp. 23–24.)

In December 2018, Cruz pleaded guilty to a four-year conspiracy to conceal, harbor, and shield illegal aliens in violation of 8 U.S.C § 1324(a)(1)(A)(v)(I).  (Id. at p. 24.)  In March 2022,

Rangel pleaded guilty to several crimes related to the undocumented workers scheme and Montoya's murder.  (Id.)

## II.    Procedural Background

On July 3, 2018, Plaintiff Brian Huffman, as administrator of Montoya's estate, sued Defendants Davey Tree, Wolf Tree, Conner, Branch, Cruz, and Rangel in the State Court of Chatham County, Georgia, alleging violations of Georgia civil Racketeer Influenced and Corrupt Organizations ("RICO") statutes, O.C.G.A. § 16-14-4(a–c), as well as claims of battery, assault, and negligence.  (Doc. 1-2.)  Davey Tree and Wolf Tree, joined by Conner, Branch, and Cruz, subsequently removed the case to this Court.[3]  (Doc. 1.)  The purported basis for removal was that Plaintiff's civil RICO claims implicated significant federal issues in that they alleged that Defendants engaged in various violations of federal law, including mail fraud in violation of 18 U.S.C. § 1341; wire fraud in violation of 18 U.S.C. § 1343; money laundering in violation of 18 U.S.C. § 1956; and the use of false identification documents to verify employment in violation of 18 U.S.C. § 1546.  (Doc. 1, pp. 2–3 (citing doc. 1-2, pp. 16–18).)

In July 2023, Plaintiff filed an Amended Complaint that brought twenty-two counts against Defendants.  (Doc. 123.)  Three counts assert claims against all Defendants under Georgia civil RICO statutes: Count I alleges Defendants violated O.C.G.A. § 16-14-4(b) by participating in an enterprise through a pattern of racketeering activity; Count II alleges Defendants violated O.C.G.A. § 16-14-4(a) by maintaining control of an enterprise or property through a pattern of racketeering activity; and Count III alleges Defendants violated O.C.G.A. § 16-14-4(c) by conspiring or endeavoring to violate the provisions of §§ 16-14-4(a–b).[4]  (Id. at pp. 25–44.)  The

---

[3]  Although defendant Rangel did not join in the removal, the participating parties provided a copy of Rangel's signed consent to removal of the action to this Court.  (Doc. 1, p. 2; doc. 1–10.)

[4]  The Amended Complaint's headings for Counts I and III both reference Chapter 4 of O.C.G.A. Title 16, with Count I listing § 16-4-4(b) and Count III listing § 16-4-4(c).  (Doc. 123, pp. 25, 42.)  However, it is

next sixteen counts allege an assortment of tort claims against various Defendants: battery against all Defendants (Count IV); assault against all Defendants (Count V); negligence against Conner (Count VI); respondeat superior against Davey Tree based on Conner's conduct (Count VII); negligence against Branch (Count VIII); respondeat superior against Wolf Tree based on Branch's conduct (Count IX); negligent hiring and retention against Davey Tree and Wolf Tree (Count X); intentional infliction of emotional distress against Rangel (Count XI); respondeat superior against Davey Tree and Wolf Tree based on Rangel's conduct (Count XII); intentional infliction of emotional distress against Cruz (Count XIII); respondeat superior against Davey Tree and Wolf Tree based on Cruz's conduct (Count XIV); intentional infliction of emotional distress against Branch (Count XV); respondeat superior against Davey Tree and Wolf Tree based on Branch's conduct (Count XVI); intentional infliction of emotional distress against Conner (Count XVII); respondeat superior against Davey Tree and Wolf Tree based on Conner's conduct (Count XVIII); and intentional infliction of emotional distress against Davey Tree (Count XIX).  (Id. at pp. 45–58.)  The final three counts are a survival claim (Count XX); a claim for attorneys' fees (Count XXI); and a claim for punitive damages (Count XXII).  (Id. at pp. 58–60.)

In August 2023, all Defendants other than Rangel moved to dismiss the RICO claims for failure to state a claim and, in turn, to dismiss all state-law claims for the resulting lack of subject matter jurisdiction.  (See docs. 141, 142, 144 & 151.)  Then, in September 2023, Davey Tree and Wolf Tree moved for partial summary judgment on the negligence claims against them, (doc. 161), and Conner moved for partial summary judgment on all non-RICO claims against her, (doc. 163).  The Court deferred judgment on these partial summary judgment motions pending the resolution of Defendants' preceding motions to dismiss the RICO claims, anticipating that such dismissal

---

clear from the substance of these counts that Plaintiff intends to assert violations of Chapter 14: Count I is for violations of § 16-14-4(b), and Count III for § 16-14-4(c).  (Id.)

may divest the Court of federal question jurisdiction and render moot the summary judgment motions.  (Doc. 189.)

In considering these motions, however, it became apparent that Plaintiff had not complied with Local Rule 9.1 because he had not completed and filed the Court's form "RICO statement" summarizing the basis of his claims.  (See doc. 193, p. 2 (citing S.D. Ga. L.R. 9.1).)  Accordingly, in March 2024, the Court denied Defendants' motions to dismiss without prejudice, (docs. 141, 142, 144 & 151), and ordered Plaintiff to comply with Local Rule 9.1.  (Doc. 193, p. 3.)

Plaintiff then filed a 108-page RICO statement, (doc. 196), and, in June 2024, all Defendants except Rangel filed new motions to dismiss Plaintiff's Amended Complaint, (docs. 204, 207, 208 & 209), along with a joint motion for oral argument on the matter, (doc. 210).  Thus, the following motions are pending before the Court: Conner's Motion to Dismiss, (doc. 204); Branch's Motion to Dismiss, (doc. 207); Cruz's Motion to Dismiss, (doc. 208); Davey Tree and Wolf Tree's Motion to Dismiss, (doc. 209); and the moving Defendants' joint motion for oral argument as to each of these motions, (doc. 210).  Also before the Court are Davey Tree, Wolf Tree, and Conner's still-remaining motions for partial summary judgment on all the non-RICO claims asserted directly against them.  (Docs. 161, 163.)

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must . . . state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotations omitted).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  When evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court must "accept[] the allegations in the complaint as true and constru[e] them in the light most favorable to the plaintiff."  Belanger

v. Salvation Army, 556 F.3d 1153, 1155 (11th Cir. 2009). However, this tenet "is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft, 556 U.S. at 678. Rather, "[a] complaint must state a facially plausible claim for relief, and '[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Reese v. Ellis, Painter, Ratterree & Adams, LLP, 678 F.3d 1211, 1215 (11th Cir. 2012) (quoting Ashcroft, 556 U.S. at 678).

The plausibility standard is "not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Ashcroft, 556 U.S. at 678 (internal quotation marks and citation omitted). Dismissal under Rule 12(b)(6) is also permitted "when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist., 992 F.2d 1171, 1174 (11th Cir. 1993); see also Neitzke v. Williams, 490 U.S. 319, 326–27 (1989) (explaining that Rule 12 allows a court "to dismiss a claim on the basis of a dispositive issue of law").

"Civil RICO claims, which are essentially a certain breed of fraud claims, must be pled with an increased level of specificity." Ambrosia Coal & Const. Co. v. Pages Morales, 482 F.3d 1309, 1316 (11th Cir. 2007).[5] Thus, "RICO allegations must comply not only with the plausibility criteria articulated in Twombly and Iqbal but also with [Rule] 9(b)'s heightened pleading standard." Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1291 (11th Cir. 2010)

---

[5] Federal Rule of Civil Procedure 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

## DISCUSSION

### I.    Plaintiff's Georgia RICO Claims

Defendants[6] move to dismiss Plaintiff's Georgia RICO claims (Counts I–III) because the Amended Complaint fails to plead that Defendants' alleged RICO violations proximately caused Plaintiff's injury.

Georgia's RICO statute makes it unlawful for any person, "through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money." O.C.G.A. § 16-14-4(a).[7] It is also unlawful for any person to conspire to violate subsection (a). O.C.G.A. § 16-14-4(c).[8]

### A.    RICO Standing and Causation

To have standing to bring a civil claim under the statute, a plaintiff must show that an alleged RICO violation—particularly, one of the "predicate acts" enumerated in O.C.G.A. § 16-14-3(5)[9]—was both the cause-in-fact and the proximate cause of their injury. Holmes v. Sec. Inv.

---

[6] For the remainder of this Order, "Defendants" refers only to the Defendants that have moved to dismiss, which is every Defendant except Rangel. (See docs. 204, 207, 208 & 209.)

[7] Under O.C.G.A. § 16-14-3(5)(A), "racketeering activity" means "to commit, to attempt to commit, or to solicit, coerce, or to intimidate another person to commit any crime which is chargeable by indictment under the laws of" Georgia, including: O.C.G.A. § 16-5-1 (homicide); § 16-11-37 (terroristic threats); § 16-8-3 (theft by deception); § 16-10-70 (perjury); § 16-10-93 (influencing witnesses); § 16-10-32 (threatening witnesses); § 16-9-121 (identity fraud); and § 16-10-20 (false statements). See O.C.G.A. §§ 16-14-3(5)(A)(iv), (xxx), (xii), (xxv), (xxvii), (xxiv), (xx), (xxii).

[8] "The Georgia RICO provisions are modeled after the federal provisions, and the same analysis is generally applied to both." Simpson v. Sanderson Farms, Inc., No. 7:12-CV-28 (HL), 2012 WL 4049435, at *1 n.3 (M.D. Ga. Sept. 13, 2012) (citation omitted); see also Maddox v. S. Eng'g Co., 500 S.E.2d 591, 594 (Ga. Ct. App. 1998) (citations and internal marks omitted) ("[B]ecause the state RICO act is modeled upon and closely analogous to the federal RICO statute, [the Court] look[s] to federal authority[.]").

[9] See predicate acts enumerated supra note 6.

Prot. Corp., 503 U.S. 258, 266–68 (1992).  Though Plaintiff correctly points out that he need not show "each and every" alleged RICO violation proximately caused the injury,[10] the standing threshold requires a plaintiff to demonstrate "a direct nexus between at least one of the predicate acts listed under the RICO Act and the injury [the plaintiff] purportedly sustained."  Rosen v. Protective Life Ins. Co., 817 F. Supp. 2d 1357, 1381 (N.D. Ga. 2011), aff'd sub nom. Rosen v. Am. Guarantee & Liab. Ins. Co., 503 F. App'x 768 (11th Cir. 2013) (internal quotation omitted). "To establish this nexus, the plaintiff must show that one of the predicate acts directly harmed [him], not a third party," and that his "injury flowed directly from the predicate acts targeted at [him], not merely that [his] injury was an eventual consequence of the [acts] or that [he] would not have been injured but for the [acts]."  Smith v. Morris, Manning & Martin, LLP, 666 S.E.2d 683, 695–96 (Ga. Ct. App. 2008) (internal quotation omitted); see also Anza v. Ideal Steep Supply Corp., 547 U.S. 451, 461 (2006) ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries.").  That is, "to survive a motion to dismiss, a plaintiff asserting a RICO claim must allege more than that an act of racketeering occurred and that [he] was injured.  Rather, [he] must show that [his] injury was the direct result of a predicate act targeted toward [him], such that [he] was the intended victim."  Wylie v. Denton, 746 S.E.2d 689, 694 (Ga. Ct. App. 2013) (citation omitted).

Plaintiff alleges Montoya suffered injuries because of the Defendants' predicate acts.  Specifically, Plaintiff alleges that, "[i]n addition to the injuries and damages suffered as the result of his murder, Montoya suffered injuries and damages caused by the threats of death and serious

---

[10]  See doc. 220, pp. 11–12 ("[T]here is no requirement that plaintiff suffer direct harm from each and every alleged predicate act introduced to show a pattern of racketeering activity." (citing InterAgency, Inc. v. Danco Fin. Corp., 417 S.E.2d 46, 53 (Ga. Ct. App. 1992))).

bodily injury, . . . and the attempts to influence and retaliate against him through intimidation, threats, misleading conduct and economic harms . . ."  (Doc. 123, pp. 37–38.)

To begin with, there are two alleged categories of "predicate acts" the Court can quickly dispose of for the sake of its standing analysis.  First, the requirement that the predicate act specifically *targeted* Montoya prevents Plaintiff from relying on Defendants' scheme to hire undocumented workers and/or to defraud Georgia Power as the underlying predicate act.  "A RICO plaintiff 'can only recover for injuries incurred as a result of predicate acts directed towards [him], as opposed to predicate acts directed towards third parties.'"  Lockhart v. Columbian Chems. Co., No. 1:07-CV-0669-BBM, 2007 WL 9706424, at *3 (N.D. Ga. Aug. 31, 2007) (quoting Am. Gen. Life & Accident Ins. Co. v. Ward, 509 F. Supp. 2d 1324, 1331 (N.D. Ga. 2007)).  When persons or entities are accused of defrauding the government or other third parties, those defrauded victims are the appropriate RICO plaintiffs.  See Anza, 547 U.S. at 460 ("[The civil RICO plaintiff] accuses the [defendant] of defrauding the State of New York out of a substantial amount of money.  If the allegations are true, the State can be expected to pursue appropriate remedies . . . . There is no need to broaden the universe of actionable harms to permit RICO suits by parties who have been injured only indirectly.")[11]  Plaintiff here does not allege that Montoya was the target or direct victim of the illegal-employment scheme.  The harmed parties, rather, would be the United States Government and Georgia Power, not Montoya himself.  Accordingly, predicate acts related to the scheme to hire undocumented workers or defraud Georgia Power must be set aside for purposes of proximate causation.

---

[11]  Georgia's civil RICO statute includes the same "by reason of" language from which the federal RICO direct-nexus standing requirement derives, "[t]herefore, Georgia RICO cases [also] require some direct relation between the alleged injury and the prohibited conduct."  KJ's Gen. Contractors, Inc. v. J.E. Dunn Constr. Co., No. CV414–181, 2015 WL 5680379, at *4 (S.D. Ga. Sept. 25, 2015); see O.C.G.A. § 16-14-6(c).

Second, the Court's proximate cause analysis must also set aside any alleged predicate acts that took place *after* Montoya's death. Plaintiff alleges that Conner and Cruz made false statements and committed perjury following the murder. (Doc. 123, pp. 23–24, 27, 35–36.) In the civil RICO context, however, a "plaintiff destroys standing by pleading predicate acts which occur after the injury." Testone v. Niagara Mohawk Power Corp., No. 91–CV–1042, 1992 WL 72145, at *10 (N.D.N.Y. Mar. 26, 1992). That is, a *later* predicate act cannot be the direct cause of an injury that has *already* occurred.

The Court is left with three categories of RICO predicate acts which Plaintiff contends share a direct nexus with Montoya's injuries: (1) the events of the May 2017 meeting; (2) Defendants' continued efforts to silence Montoya after the riot; and (3) the events surrounding Montoya's murder. (Doc. 221, pp. 14–19; doc. 222, pp. 13–18; doc. 220, pp. 13–20; doc. 223, pp. 13–16.) The Court will address each category in reverse order.

### (1)    Events Surrounding Montoya's Murder

Plaintiff argues that Montoya's murder offers a direct nexus between an alleged predicate act by Defendants and the injury suffered by Plaintiff. (Doc. 221, pp. 18–19; doc. 222, pp. 12–18; doc. 223, pp. 12–17; doc. 220, pp. 13–20.) Though Plaintiff concedes that none of the moving Defendants actually murdered Montoya, he maintains that they "solicit[ed] the violent retaliation" against him. (Doc. 220, p. 19; doc. 221, p. 18; doc. 222, p. 17; doc. 223, pp. 16–17.) However, Plaintiff's factual allegations fail to establish the predicate act of solicitation at all—let alone the proximate cause required for standing.

In Georgia, a person commits solicitation "when, with intent that another person engage in conduct constituting a felony, he solicits, requests, commands, importunes, or otherwise attempts to cause the other person to engage in such conduct." O.C.G.A. § 16-4-7(a). "[O]nly a relatively

overt statement or request intended to bring about action on the part of another person will bring a defendant within the [solicitation] statute." State v. Davis, 272 S.E.2d 721, 722 (Ga. 1980).  The Amended Complaint fails to allege any specific facts suggesting any of the Defendants made such an "overt statement or request" to another person asking for the murder of Montoya.  (See generally doc. 123.)  Rather, Plaintiff acknowledges that it was *Rangel* who "planned the murder and enlisted his brother . . . as the trigger man."  (Doc. 220, p. 10; doc. 223, p. 10; doc. 222, p. 10; doc. 221, p. 10.)  The only allegations of acts of solicitation by the *moving* Defendants are threadbare recitations that they "solicit[ed] the violent retaliation against a federal witness, in violation of 18 U.S.C. § 1513."  (Doc. 220, p. 19; see also doc. 123, p. 22 ("Conner intended to solicit the obstruction of a federal investigation through violent means"); id. at p. 35 ("Conner and Branch . . . solicited retaliation against a federal witness.")  These allegations are wholly conclusory and, therefore, are insufficient to state a solicitation claim against Defendants.  See Ashcroft, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.")  Because Plaintiff has failed to allege that any of the moving Defendants committed a predicate act in relation to Montoya's murder, the events surrounding the murder cannot confer standing for Plaintiff's RICO claims against them.

### (2)   Defendants' Continued Efforts to Silence Montoya

"Defendants' continued efforts to silence Montoya" likewise fail to establish the proximate cause needed for standing.  Plaintiff argues that the June 1, 2017, employee violation notice and the August 16, 2017, safe-practice violation suspension amount to retaliation against Montoya by "all Defendants" in their continued efforts to silence Montoya's exposure of Defendants' scheme.  (Doc. 221, pp. 16–18; doc. 220, pp 15–18; doc. 222, pp. 15–17; doc. 223, pp. 15–16.)  Rather than the murder, the alleged injury here is that Montoya suffered—while still alive—from receiving

this intimidation and threatened economic harm.  (See id.; see also doc. 123, pp. 37–38.)  However, the alleged predicate acts associated with these injuries are essentially allegations of employment retaliation, and the Eleventh Circuit Court of Appeals routinely dismisses civil RICO claims where the plaintiff's purported injury is employment-related retaliation for reporting alleged racketeering activity.

For example, in O'Malley v. O'Neill, 887 F.2d 1557 (11th Cir. 1989), the plaintiff asserted RICO claims based on predicate acts of mail fraud.  Id. at 1561.  Their complaint, however, "allege[d] that their injury arose as a result of their refusal to participate in or to conceal the fraudulent scheme."  Id.  The Eleventh Circuit accordingly found that, "by their own allegations, the proximate cause of the plaintiffs' injuries was [the defendant's] decision to fire them for refusing to participate in or to conceal the scheme—not the mail fraud scheme itself."  Id. (citations omitted).  The Eleventh Circuit explained that, though it "may well [have been] true that the commission of the predicate acts constituted the 'but for' cause of the firings," such a "tenuous [] relation between the harm and the predicate acts [was] not sufficient to confer standing."  Id.  This is because "RICO does not provide a remedy for every injury that may be traced to a predicate act," but instead requires that the act proximately cause the plaintiff's injury.  Id.  (citations omitted).  The injury in O'Malley was proximately caused "not [by] . . . the RICO violation, but rather [by] the tangentially related decision to fire [the plaintiffs]."  Id. at 1563; see also Parker v. Diverse Staffing Georgia, Inc., No. 1:20-cv-01913-TWT-RGV, 2020 WL 10575029, at *10 (N.D. Ga. Dec. 23, 2020) (quoting O'Malley, 887 F.2d at 1563), report and recommendation adopted, 2021 WL 3367263, at *1 (N.D. Ga. Jan. 12, 2021); Anderson v. Brown Indus., No. 4:11–CV–00225–HLM–WEJ, 2012 WL 12860887, at *8–9 (N.D. Ga. June 13, 2012) ("[T]o the extent that [the p]laintiff alleges an injury under RICO because his superiors terminated him for opposing

their RICO violations, . . . he lacks standing.  Similarly, the 'harassment' and 'discrimination' that Plaintiff alleges he suffered at the hands of his subordinates and superiors as a result of his opposition to [the] alleged RICO violations are insufficient to confer standing.").[12]

Plaintiff's allegations of "Defendants' continued efforts to silence Montoya" through pretextual employment violations likewise fail to confer standing.  The alleged predicate act is Defendants' scheme to employ undocumented workers.  Plaintiff accordingly must show that *this* RICO violation—not a separate act of employment retaliation—proximately caused his injuries.  To be sure, as in <u>O'Malley</u>, the undocumented-workers scheme might be a "'but for' cause" of Plaintiff's injuries given that Montoya's threatened exposure of the scheme is what allegedly prompted Defendants' retaliatory conduct.  <u>See</u> <u>O'Malley</u>, 887 F.2d at 1561.  This connection, however, is too tenuous for proximate cause.  <u>Id.</u>  Rather than Defendants' RICO violation itself, the proximate cause of Plaintiff's injury was Defendants' "tangentially related decision" to retaliate by fabricating employment violations.  <u>Id.</u>  Defendants' efforts to silence Montoya therefore do not provide standing for Plaintiff's claims.

### (3)    The May 2017 Meeting

Plaintiff also alleges a separate set of injuries related to the May 2017 meeting.  (Doc. 123, pp. 16–17, 37–38.)  Specifically, Plaintiff alleges that during the meeting, "Montoya suffered

---

[12]  Other circuits have also concluded that the proximate cause needed for RICO standing is not present when the alleged injury is a defendant-employer's retaliation against a plaintiff-employee for the plaintiff's opposition to the defendant's unlawful practices.  <u>See</u> <u>Burdick v. Am. Express Co.</u>, 865 F.2d 527, 529 (2d Cir. 1989) (per curiam) (no standing for a stockbroker who alleged being fired and losing his client base for complaining about his employer's questionable practices); <u>see also</u> <u>Cullom v. Hibernia Nat'l Bank</u>, 859 F.2d 1211, 1216 (5th Cir. 1988) (no standing for employee constructively discharged for refusing to participate in fraudulent loan transactions); <u>Pujol v. Shearson/Am. Express, Inc.</u>, 829 F.2d 1201, 1204–05 (1st Cir. 1987) (no standing for whistle-blowing employee constructively discharged for reporting fraudulent securities transactions); <u>Nodine v. Textron, Inc.</u>, 819 F.2d 347, 348–49 (1st Cir. 1987) (no standing for employee fired for registering objections to employer's customs law violations).

injuries and damages caused by the threats of death and serious bodily injury . . . and the attempts to influence and retaliate against him through intimidation threats [and] misleading conduct . . ." (Id. at pp. 37–38.)   Notwithstanding the previously discussed lack of proximate cause as to Montoya's death and workplace discipline, the relevant question here is whether Montoya suffered harm as a *direct result* of distinct predicate acts associated with the May 2017 meeting.

Plaintiff alleges that "Defendants devoted their efforts to silencing Montoya," and "Branch, Conner[,] and other Wolf Tree and Davey Tree corporate officers decided to have Rangel deal with Montoya directly."  (Id. at p. 16.)  This culminated in May 2017 when Rangel and Cruz "called a meeting . . . [d]uring [which], Rangel read Montoya's whistleblower report aloud to all of the employees, stated that Montoya was the whistleblower, and threatened and intimidated Montoya."  (Id.)  As a result, "many of the . . . employees became enraged, began rioting, and threatened Montoya with physical violence and death."  (Id. at pp. 16–17.)

These events, according to Plaintiff, represent a distinct set of injuries that were proximately caused by various RICO predicate acts.  (Id. at pp. 37–38.)  First, Defendants' predicate act of unlawfully employing workers allegedly caused Plaintiff to suffer injury during the meeting because the meeting was part of "Defendants' continued effort[] to silence" Montoya's opposition to that scheme.  (See doc. 220, p. 15.)  Second, Plaintiff asserts that, in conducting the meeting, Defendants injured Montoya through the predicate acts of "influencing a witness," (O.C.G.A. § 16-10-93), and making "terroristic threats," (O.C.G.A. § 16-11-37).[13]  (Doc. 123, p.

---

[13] O.C.G.A. § 16-10-93(b)(1)(C) ("influencing a witness") makes it unlawful for a person to "knowingly [] use intimidation, physical force, or threats . . . with intent to . . . [h]inder, delay, or prevent the communication to a law enforcement officer . . . of information relating to the commission or possible commission of a criminal offense."  O.C.G.A. § 16-11-37(b)(1) ("terroristic threats") is violated when a plaintiff shows "(a) that the defendant threatened to commit a crime of violence against the victim, and (b) that the defendant did so with the purpose of terrorizing the victim."  State v. Stubbs, 879 S.E.2d 716, 719 (Ga. Ct. App. 2022) (quoting Clement v. State, 710 S.E.2d 590, 592 (Ga. Ct. App. 2011)).

33; see also doc. 220, pp. 13–15; doc. 223, pp. 13–15; doc. 221, pp. 14–16; doc. 222, pp. 13–15.) For many of the same reasons Plaintiff's other arguments fail, these theories are likewise insufficient to confer standing.

To the extent Plaintiff's argument relies on Defendants' alleged retaliation against Montoya for exposing the scheme, the argument fails for the same reasons detailed in Part I.A(2), above.  Actions against an individual for reporting a scheme or refusing to participate in a scheme are collateral to the scheme itself, rather than a *direct result* of the scheme.  See O'Malley, 887 F.2d at 1562.  Accordingly, "the 'harassment' . . .  that Plaintiff alleges he suffered at the hands of his subordinates and superiors as a result of his opposition to Defendant[s'] alleged RICO violations [is] insufficient to confer standing."   Anderson, 2012 WL 12860887, at *8 (citing O'Malley, 887 F.2d at 1558, 1562).  Defendants' alleged use of the May 2017 meeting to silence Montoya or retaliate against his reporting on the illegal-alien scheme therefore does not establish the proximate cause needed for Plaintiff to state a RICO claim.

The "influencing a witness" and "terroristic threats" arguments fail for the reasons set forth in Part I.A(1), above: Plaintiff asserts that Defendants perpetrated these predicate acts through "solicitation," but he does not allege any facts that adequately support this claim.  As with Montoya's murder, Plaintiff concedes that Rangel called and facilitated the May 2017 meeting that caused other, unnamed workers to threaten Montoya. (Doc. 123, p. 33.)  Plaintiff accordingly does not allege that any Defendants personally violated either the "influencing a witness" or the "terroristic threats" statute.  (Id.)  He instead asserts that Defendants committed a RICO predicate act by *soliciting* Rangel's violative conduct at the meeting.[14]  (Id. ("Rangel's actions [at the May

---

[14]  Additionally, Plaintiff fails to specify the actual *content* of the threats allegedly solicited by Defendants.

2017 meeting] were solicited by Conner, Branch and others.").)    Thus, there are no proper allegations of solicitation.  (See id.)

Again, while solicitation of a RICO violation can be a sufficient predicate act for standing, "only a relatively overt statement or request intended to bring about action on the part of another person will bring a defendant within the [solicitation] statute."  Davis, 272 S.E.2d at 722.  The Amended Complaint fails to allege *any* "overt statement or request" by *any* of the Defendants— let alone any statements related to the May 2017 meeting.  (See generally doc. 123.)  Without such allegation, claims that Defendants solicited Rangel to carry out either terroristic threats or the influencing of a witness cannot be plausible on their face.  As with the allegations concerning Montoya's murder, Plaintiff's continued, conclusory allegations that such solicitation occurred are insufficient.[15]  See Ashcroft, 556 U.S. at 678.

---

[15]  This issue with Plaintiff's Amended Complaint is not specific to the allegations of the May 2017 meeting. Across the board, "[Plaintiff]'s amended complaint simply tracks the language of the statutes he relies upon, making the very formulaic recitations that the [] Supreme Court has long deemed insufficient."  Parker, 2020 WL 10575029, at *11 (internal quotations omitted).  Plaintiff's Amended Complaint is replete with "conclusory allegations, unwarranted deductions of facts [and] legal conclusions masquerading as facts." Oxford Asset Mgmt., Ltd. v. Jaharis, 297 F.3d 1182, 1188 (11th Cir. 2002).  (See, e.g., doc. 123 ("[E]ach of the Defendants, aided and abetted by each other, engaged in a systematic effort to silence Montoya, through physical threats, economic threats, intimidation, retaliation, deception, and eventually murder;" "The Defendants' retaliatory efforts against Montoya were intended to hinder, delay, dissuade, and prevent Montoya from reporting to, providing documents to, or testifying before law enforcement or official proceedings;" "Defendants and others sought to silence Montoya through threats, retaliation, deception, and ultimately, murder;" "Rangel's actions were solicited by Conner, Branch and others;" "Rangel, aided and abetted by Cruz and Branch, solicited and coerced others to make terroristic threats against Montoya, in violation of O.C.G.A. § 16-11-37;" "[Defendants] maintained control of the enterprise through [their] efforts to unlawfully influence Montoya, and by aiding and abetting Rangel's threats and violent retaliations against Montoya and others, all in violation of Georgia and federal law;" "The Defendants have conspired with each other and others to conduct or participate in, directly or indirectly, the Davey-Rangel Enterprise through a pattern of racketeering activity, in violation of O.C.G.A. §16-14-4(c)(1).  Each of the Defendants have committed overt acts, which include the acts of racketeering identified above, in furtherance of the conspiracy;" "As part of the conspiracy, Defendants agreed to a common unlawful objective and committed overt acts, including, but not limited to, acts of racketeering activity in furtherance of the conspiracy.").)

Moreover, as Defendants argue, Plaintiff's pleading of these predicate acts contains inherent deficiencies characteristic of a "shotgun pleading." (Doc. 209, pp. 19–21.) Both the "influencing a witness" and the "terroristic threats" statutes list the types of prohibited conduct in individual subsections, but Plaintiff only cites the statutes using their overarching title provisions in his Amended Complaint.[16] That is, the Amended Complaint does not specify *which* section of each statute was violated, and it also does not specify *which* Defendant committed a given violation. (Id.) In Plaintiff's Replies in Opposition to the Motions to Dismiss, Plaintiff specifies the subsections as O.C.G.A. § 16-10-93(b)(1)(C) and § 16-11-37(b)(1), (doc. 220, pp. 14–15; doc. 222, pp. 14–15; doc. 221, pp. 14–15; doc. 223, pp. 14–15), but his Amended Complaint does not mention these subsections, (see generally doc. 123). Even Plaintiff's 108-page RICO statement never once specifies which subsection of O.C.G.A. § 16-11-37 is at issue, and never specifies the relevant subsection of O.C.G.A. § 16-10-93 as it relates to the May 2017 meeting. (See generally doc. 196). The Amended Complaint, in this respect, is indicative of a "shotgun pleading" because it "fail[s] . . . to give the defendants adequate notice of the claims against them." Weiland v. Palm Beach Cty. Sheriff's Off., 792 F.3d 1313, 1323 (11th Cir. 2015). At any rate, regardless of the inartful nature of his pleadings, Plaintiff has failed to show that—in connection with the May 2017 meeting—Defendants committed RICO predicate acts that proximately caused his injuries. The events surrounding the meeting therefore do not confer standing. Accordingly, Counts I and II of the Amended Complaint are **DISMISSED with prejudice** as to the moving Defendants. They remain pending, however, against Defendant Rangel.

### B.    RICO Conspiracy

---

[16]  See doc. 123, pp. 28, 33, 34 (asserting violations of only the title provision of the "terroristic threats" statute, O.C.G.A. § 16-11-37); id. at pp. 28, 34 (asserting violations of only the title provision of the "influencing a witness" statute, O.C.G.A. § 16-10-93).

Plaintiff alleges in Count III of his Amended Complaint that, in addition to the substantive violations of Georgia's RICO statute, Defendants also ran afoul of O.C.G.A. § 16-14-4(c) by conspiring with each other to carry out those violations. (Doc. 123, pp. 42–44.) However, the Eleventh Circuit has made clear that when underlying RICO claims are substantively deficient and a plaintiff's RICO conspiracy claims do not add any new allegations,[17] the conspiracy claims must be dismissed alongside the substantive ones. See Jackson v. BellSouth Telecomms., 372 F.3d 1250, 1269 (11th Cir. 2004) ("We have already found that the complaint failed to state a substantive RICO claim, and the RICO conspiracy adds nothing. It simply concludes that the defendants 'conspired and confederated' to commit conduct which in itself does not constitute a RICO violation."); see also Doe #1 v. Red Roof Inns, Inc., 21 F.4th 714, 728 (11th Cir. 2021) ("[The plaintiffs'] conspiracy counts rel[y] on the same threadbare allegations as the substantive RICO claims. Because those allegations are insufficient to plausibly allege any RICO violation, the district court also correctly dismissed the [plaintiffs'] conspiracy counts.") Here, as detailed above, Plaintiff's substantive RICO claims are deficient because he has failed to allege the proximate causation required to confer standing.[18] Accordingly, Count III, containing RICO conspiracy claims, are **DISMISSED with prejudice** as to the moving Defendants.

---

[17]  All of Plaintiff's allegations regarding RICO conspiracy are, indeed, either reincorporated factual allegations or wholly conclusory recitations of the law. (See, e.g., doc. 123, pp. 42–44; see also id. at pp. 42–43 ("Defendants endeavored to conduct or participate in, directly or indirectly, the Davey-Rangel Enterprise through a pattern of racketeering activity;" "Each Defendant committed overt acts in furtherance of the endeavor . . . which acts proximately caused injury to Montoya;" "As part of the conspiracy, Defendants agreed to a common unlawful objective and committed overt acts, including, but not limited to, acts of racketeering activity in furtherance of the conspiracy.").) Such conclusory allegations are insufficient.

[18]  Though Rangel has not moved to dismiss—meaning the RICO claims against him necessarily remain— the Court has analyzed whether the failure of underlying RICO claims dooms related RICO conspiracy claims on a Defendant-by-Defendant basis. See Aquino v. Mobis Alabama, LLC, No. 3:22-CV-145-TCB, 2024 WL 2764047, at *29–30 (N.D. Ga. May 28, 2024) (finding the plaintiff adequately alleged a RICO conspiracy claim as to the defendants against whom the substantive RICO claims were adequately pled, but also finding that plaintiff failed to allege a RICO conspiracy against the defendants who had insufficient RICO claims brought against them). That is, because the underlying RICO claims are insufficient as to the

## II.    Plaintiff's Non-RICO Claims

In addition to the RICO claims, Plaintiff also alleges several non-RICO claims against Defendants.  (Doc. 123, pp. 45–58).  Davey Tree and Wolf Tree argue that, if the Court grants their motions to dismiss the RICO claims against them, then it should decline to exercise supplemental jurisdiction over these non-RICO claims.  (Doc. 209, p. 31.)  In making this argument, Defendants assert that "[t]he Court may decline to exercise jurisdiction over state-law claims, where the Court has dismissed all the federal claims over which it has original jurisdiction." (Id. (citing McCulloch v. PNC Bank Inc., 298 F.3d 1217, 1227 (11th Cir. 2002)); see also 28 U.S.C. § 1367(c)(3).)  While this might be an accurate statement of law, it does not apply here. Even after dismissing all the RICO claims against the moving Defendants, there are still federal claims remaining before the Court: Rangel is still a Defendant and has *not* moved to dismiss Plaintiff's Amended Complaint.  (See generally doc. 123.)  Thus, despite the Court's dismissal of the RICO claims against the *moving* Defendants, other RICO claims nevertheless remain.  (See id. at pp. 25–44 (asserting RICO claims against all Defendants, including Rangel).)  None of the moving Defendants explicitly acknowledged that the RICO claims against Rangel would remain pending even if the Court granted their Motions to Dismiss, much less did they discuss the impact of those claims on their argument that, if the Court granted their Motions, there would be no basis for the Court to exercise original jurisdiction.  (See generally docs. 204, 207, 208, 209, 230, 231, 232, 233.)  As the Court has not dismissed all the federal claims over which it has original jurisdiction, Defendants' jurisdictional arguments on this matter are inapplicable and the Court rejects their request that it decline to exercise jurisdiction over the state law claims.

---

*moving* Defendants, the RICO conspiracy claims against *those* Defendants also fail because they add no new allegations.

Separately, in their Reply, Davey Tree and Wolf Tree introduce a new argument for declining to exercise supplemental jurisdiction—comity. (Doc. 233, pp. 22–23.) Defendants assert that the state court in the parallel proceeding "dismissed the principal negligence, negligent hiring and retention, and related respondeat superior claims underlying the Complaint," and argue that this Court therefore should not "give [Plaintiff] a second-bite [sic] at the apple." (Id.) Plaintiff responds that the state court ruling does not raise comity concerns because it hinged on Davey Tree's status as the sole remaining Defendant in that case (making the ruling irrelevant here), and because there remains a negligence claim against Davey Tree in the state court proceedings. (Doc. 236, pp. 9–10.) Additionally, Plaintiff points out that the state court ruling was on a motion for summary judgment and applied a different standard than the one applicable to the motions to dismiss that are currently before this Court. (Id. at p. 10.) Neither side cites any caselaw supporting their arguments. (See docs. 233, 236.)

Foregoing a more thorough analysis of the state court ruling, the Court is entitled to reject Defendants' comity argument for a simpler reason: The Court will not consider new arguments first made in a reply brief. See Riechmann v. Fla. Dep't of Corr., 940 F.3d 559, 579 (11th Cir. 2019) (citing Herring v. Sec'y, Dep't of Corr., 397 F.3d 1338, 1342 (11th Cir. 2005)). Davey Tree and Wolf Tree's original argument that this Court lacks subject matter jurisdiction over the remaining claims relied solely on the notion that all the federal claims would be dismissed. (Doc. 209, p. 31.) Because that is not true (since the RICO claims against Rangel remain), the Court will not decline to exercise supplemental jurisdiction over Plaintiff's remaining, non-RICO claims.

### A.    Battery & Assault

Plaintiff brought claims for battery (Count IV) and assault (Count V) against all Defendants. (Doc. 123, pp. 45–46.) Plaintiff alleges that Defendants committed battery because

they "put in place actions to the intimidation and physical injury of [Montoya]," and that Defendants committed assault because, "through Cruz and Rangel, [they] threatened Montoya with violence and had the apparent ability to perform said acts." (Id. at p. 45.)

Aside from mentioning Cruz in his assault claim, Plaintiff did not make any factual allegations against any other specific individual Defendant as it relates to the assault or battery claim. (See id. at pp. 45–46.) There are no allegations that Conner, Branch, or Cruz personally battered Montoya, nor are there allegations that Conner or Branch personally assaulted Montoya. (Id.) Plaintiff, moreover, does not allege that the battery and assault claims against Davey Tree or Wolf Tree are based on vicarious liability. (Id.) Simply put, the Amended Complaint lumps Defendants together and indiscriminately asserts battery and assault claims against all of them. This is characteristic of a shotgun pleading. See Barmapov v. Amuial, 986 F.3d 1321, 1325 (11th Cir. 2021) (complaint that asserts claims against "multiple defendants without specifying which of the defendants are responsible for which acts or omissions" is a shotgun pleading (quoting Weiland, 792 F.3d at 1322)). On this deficiency alone, the Court has authority to dismiss the battery claim against all moving Defendants, and to dismiss the assault claim against all moving Defendants except Cruz. See Weiland, 792 F.3d at 1320 (district court's "inherent authority to control its docket and ensure the prompt resolution of lawsuits" includes the ability to dismiss complaints on shotgun pleading grounds). Nevertheless, the Court will consider the sufficiency of the battery and assault claims as to each moving Defendant.

### (1) Battery

As to Plaintiff's battery claim, Defendants all argue that the claim should be dismissed because they never made physical contact with Montoya. (Doc. 204, p. 17; doc. 230, p. 5; doc. 207, p. 17; doc. 231, pp. 10–11; doc. 208, p. 22; doc. 209, pp. 32–33; doc. 233, pp. 24–25.) A

person commits a battery under Georgia law when he or she either "[i]ntentionally makes physical contact of an insulting or provoking nature with the person of another," or "[i]ntentionally causes physical harm to another."  O.C.G.A. § 16-5-23(a)(1)–(a)(2).  Accordingly, claims for battery under Georgia law require that the defendant make physical contact with the victim.  See Lawson v. Bloodsworth, 722 S.E.2d 358, 359 (Ga. Ct. App. 2012) ("A cause of action for battery will lie for any unlawful touching . . . ."); see also Sanchez v. Clark, No. CV 308-054, 2008 WL 11419018, at *4 (S.D. Ga. Nov. 25, 2008) (plaintiff "ha[d] not alleged facts sufficient to state a claim . . . [for] battery" when she only alleged defendant *concealed* battery by suppressing investigations and reporting whistleblowers); Hammett v. Paulding Cnty., No. 4:14-CV-0260-HLM, 2016 WL 7386983, at *16–17 (N.D. Ga. Aug. 1, 2016), *aff'd sub nom.*, 875 F.3d 1036 (11th Cir. 2017) (where there is "no touching by [the defendant]," the plaintiff "fails to state a claim for battery against [that defendant]").

Here, as to the moving Defendants who are natural persons (Conner, Branch, and Cruz), Plaintiff has made no allegations that any of them made physical contact with Montoya.  (See generally doc. 123.)  The only physical harm Plaintiff mentions in Count IV of the Amended Complaint are the gunshot wounds suffered by Montoya.  (Id. at p. 45.)  With no allegations that Conner, Branch, or Cruz unlawfully touched Montoya, Plaintiff has failed to state a claim for battery against those Defendants.

The corporate Defendants, Davey Tree and Wolf Tree, argue that battery and assault "cannot be committed 'through' someone else."  (Doc. 209, p. 33.)  Plaintiff, in response, cites caselaw supporting the proposition that corporate entities can be held civilly liable for the intentional torts of their employees.  (See doc. 220, p. 40.)  Specifically, Plaintiff cites Georgia Messenger Services, Inc. v. Bradley, 715 S.E.2d 699 (Ga. Ct. App. 2011), and Ellison v. Burger

King Corp., 670 S.E.2d 469 (Ga. Ct. App. 2008). (Doc. 220, p. 40.) In <u>Bradley</u>, the Georgia Court of Appeals affirmed the denial of a defendant messenger service's motion for summary judgment where the messenger service was sued under a theory of respondeat superior after its employee kicked the plaintiff in the head. <u>Bradley</u>, 715 S.E.2d at 701–03. In <u>Ellison</u>, the Georgia Court of Appeals reversed the lower court's grant of summary judgment in the corporate defendant's favor "as to . . . respondeat superior for the battery" after an employee allegedly put a customer in a headlock. <u>Ellison</u>, 670 S.E.2d at 471, 474–77.

Davey Tree and Wolf Tree contend these cases are inapposite because they address vicarious liability under a theory of respondeat superior, whereas here, Plaintiff indiscriminately asserts his battery and assault claims directly against *all* Defendants with no mention that the corporate Defendants should be held *vicariously* liable. (Doc. 233, pp. 24–25; <u>see also</u> doc. 123, pp. 45–46.) Thus, because the entities themselves did not unlawfully touch Montoya, Davey Tree and Wolf Tree argue that the battery claim against them must be dismissed. (Doc. 209, pp. 32–33; doc. 233, pp. 24–25.)

It is true that Plaintiff's battery claim fails to plead a vicarious liability or respondeat superior theory against the corporate Defendants. (<u>See</u> doc. 123, pp. 45–46.) Elsewhere in the Amended Complaint, however, Plaintiff does plead numerous separate counts of "respondeat superior" against Davey Tree and Wolf Tree for the conduct of their various employees, including Rangel and Cruz. (<u>Id.</u> at pp. 47–50, 53–57 (Counts VII, IX, XII, XIV, XVI, and XVIII).) Plaintiff generally alleges in these counts that Davey Tree and Wolf Tree can be held liable for the misconduct of their employees—but he fails to specify what employee misconduct should give rise to this liability. (<u>Id.</u>)

Even assuming the imprecise "respondeat superior" counts are based on the misconduct alleged in Plaintiff's separate counts for battery against individual employees, the battery claims against the corporate Defendants still must be dismissed. "[U]nder Georgia law, '[t]wo elements must be present to render a master liable for his servant's actions under respondeat superior: first, the servant must be in furtherance of the master's business; and, second, he must be acting within the scope of his master's business.'" Bradley, 715 S.E.2d at 703 (quoting Drury v. Harris Ventures, Inc., 691 S.E.2d 356, 358 (Ga. Ct. App. 2010)). "If a tortious act is committed not in furtherance of the employer's business, but rather for purely personal reasons disconnected from the authorized business of the master, the master is not liable." Piedmont Hosp., Inc. v. Palladino, 580 S.E.2d 215, 217 (Ga. 2003) (internal quotations omitted). "In other words, the doctrine of respondeat superior holds an employer liable for the negligent or intentional torts of its employee when 'the tort was done within the scope of the actual transaction of the [employer's] business for accomplishing the ends of his employment.'" Prodigies Child Care Mgmt., LLC v. Cotton, 893 S.E.2d 640, 646 (Ga. 2023) (quoting Johnson St. Props., LLC v. Clure, 805 S.E.2d 60, 66 (Ga. 2017)).

For starters, the gunshots that killed Montoya—the *only* unlawful touching alleged by Plaintiff—were fired by *Juan* Rangel, not *Pablo* Rangel. (See doc. 123, p. 45 ("repeated gunshots made by Juan Rangel").) While Plaintiff alleges a count of respondeat superior against Davey Tree and Wolf Tree for the conduct of Pablo Rangel, (id. at pp. 53–54), there is no respondeat superior allegation attempting to hold the corporate Defendants liable for the actions of Juan Rangel, even though he was also a Savannah Call Center employee, (see generally id.). This alone distances the corporate Defendants from Plaintiff's battery claim.

Furthermore, even if the Court were to assume without deciding that Plaintiff sufficiently pled a battery claim against *Pablo* Rangel, the killing of Montoya could not make the corporate Defendants vicariously liable through respondeat superior. Montoya's murder clearly did not take place "within the scope of the actual transaction of the [employer's] business." Cotton, 893 S.E.2d at 646 (quoting Clure, 805 S.E.2d at 66). Pablo Rangel was not working the day of Montoya's killing, nor was he in any way acting in his capacity as the corporate Defendants' employee. It also bears noting that using a company vehicle to commit a tort or committing a tort while commuting to or from work is typically insufficient to impose vicarious liability, and here, Rangel's alleged conduct is even further removed from his employer. See Ga. Interlocal Risk Mgmt. Agency v. Godfrey, 614 S.E.2d 201, 204–05 (Ga. Ct. App. 2005) (police trainee not operating within scope of employment when he used police car to facilitate crimes because crimes "did not take place during [his] work shift"); see also Cotton, 893 S.E.2d at 647 ("[R]espondeat superior generally does not apply when an employee commits a tort during her work commute."). Rangel was not using a company vehicle and he was not traveling to or from work (as it was not a workday). (Doc. 123, p. 22.) The only relation to Rangel's employment is that his alleged conduct was for the "purely personal reason" of illegally responding to a conflict that originated in the workplace. Palladino, 580 S.E.2d at 217. Rangel's alleged conduct that day was certainly not to further the "*authorized* business of the master." Id. (emphasis added). Plaintiff alleges only that "Rangel planned the murder." (Doc. 123, p. 22.) An employee who plans a murder, enlists his brother as the "trigger man," pays a non-employee to drive them in a non-company vehicle, on an off day, to a location off company property, cannot be said to be acting in the scope of his employment. See Schmidt v. HTG, Inc., 961 P.2d 677, 694–96 (Kan. 1998) (no liability for defendant employer where former employee assaulted and murdered current employee outside of

working hours and away from company premises).  For purposes of the battery claim, Davey Tree and Wolf Tree will not be vicariously liable for Rangel's conduct.

Because Plaintiff did not allege that any moving individual Defendants unlawfully touched Montoya, and because Plaintiff has not pled facts sufficient to impose vicarious liability for battery against the corporate Defendants, Plaintiff's claims for battery (Count IV) are **DISMISSED with prejudice** as to all moving Defendants.

### (2) Assault

Plaintiff also fails to state a claim of assault against the moving Defendants.  (Doc. 123, pp. 45–46 (Count V).)  A person commits the offense of assault under Georgia law when he or she "attempts to commit a violent injury to the person of another" or "commits an act which places another in reasonable apprehension of immediately receiving a violent injury."  O.C.G.A. § 16-5-20(a).  "[T]he mere threat to commit a violent injury on a victim, without more, does not constitute an assault."  Lewis v. State, 560 S.E.2d 73, 75 (Ga. Ct. App. 2002).  Rather, assault requires "an intention to commit an injury, coupled with an apparent ability to do so."  Wallace v. Stringer, 553 S.E.2d 166, 169 (Ga. Ct. App. 2001).  The moving Defendants argue that the Amended Complaint fails to allege in any non-conclusory manner that any of them threatened Montoya or caused him to apprehend an immediate violent injury.  (Doc. 204, pp. 17–18; doc. 230, p. 5; doc. 207, p. 17; doc. 231, pp. 10–11; doc. 208, pp. 22–23; doc. 209, pp. 32–33; doc. 233, pp. 24–25.)

Plaintiff specifically alleged that, beginning in May 2017, "Defendants, through Cruz and Rangel, threatened Montoya with violence and had the apparent ability to perform said acts of violence."  (Doc. 123, p. 45.)  Plaintiff added that, on August 19, 2017, "Defendants, through Juan Rangel, threatened Montoya with physical injury . . . in the moments leading up to his death.  In making these threats, Juan Rangel possessed the apparent ability to harm Eliud Montoya."  (Id.)

Plaintiff contends the factual allegations in the Amended Complaint are sufficient to plead assault, citing to such language as: "Defendants, aided and abetted by each other, engaged in a systematic effort to silence Montoya, through physical threats, economic threats, intimidation, retaliation, deception, and eventually murder[,]" and "[m]any of the racketeering acts committed to maintain control of the enterprise were specifically directed at Montoya [and] intended to cause injury to him." (Doc. 220, p. 39 (citing doc. 123, pp. 14, 41).) Notwithstanding the previously discussed shortcomings of Plaintiff's battery and assault pleadings, the Court will still consider the sufficiency of the assault claim as to each moving Defendant.

### a. Assault Claims against Branch and Conner

As to Branch and Conner, the Amended Complaint lacks allegations that either ever threatened Montoya or intended to injure him with the apparent ability to do so. (See doc. 123.) Plaintiff alleged that it was Rangel and Cruz who called the May 2017 meeting, and that it was other, unnamed workers who made unspecified threats against Montoya during that meeting. (Id. at pp. 16–17, 33.) Nevertheless, Plaintiff argues that Conner and Branch committed assault and battery "*through* [their] colleagues, Cruz and Rangel," but offers no law to support a civil claim for assault or battery based on the actions of a third person. (Doc. 222, p. 21; doc. 223, p. 21 (emphasis added).) An assault claim against a defendant fails where "[n]o evidence shows that [the victim] ever apprehended a violent injury coming from [that defendant]." Hammett, 2016 WL 7386983, at *16. Here, there are no factual allegations that Montoya ever apprehended a violent injury from either Branch or Conner. Thus, the assault claims against Branch and Conner are due to be dismissed.

#### b.  Assault Claim against Cruz

As to Cruz, Plaintiff specifically alleged that "Cruz . . . threatened Montoya with violence and had the apparent ability to perform said acts of violence.  Said threats began in early May of 2017." (Doc. 123, p. 45.)  Cruz argues that, though Plaintiff specifically identifies him in the Amended Complaint, "Plaintiff has failed to allege a single specific factual occurrence wherein Cruz actually threatened Montoya, much less a circumstance where Cruz did so with the intent and apparent ability to harm Montoya." (Doc. 208, p. 22.)  The Court finds that Cruz is correct.

Plaintiff responds by echoing his conclusory allegations that Cruz "'engaged in a systematic effort to silence Montoya, through physical threats,'" and that Cruz's alleged racketeering acts "were specifically directed at Montoya [and] intended to cause him injury." (Doc. 221, p. 29 (emphasis omitted) (quoting doc. 123, pp. 14, 37).)  For one thing, these referenced allegations from the Amended Complaint actually refer to "the Defendants" collectively—not Cruz specifically.  (See doc. 123, pp. 14, 37.)  Furthermore, the allegation that is specific to Cruz—that he called the May 2017 meeting—lacks mention that Cruz ever threatened Montoya.  (See id. at pp. 16–17.)  Plaintiff only alleges that it was Rangel and other, unnamed employees who "threatened and intimidated Montoya." (Id.)  There is no indication or allegation that Cruz was present for any alleged assault that occurred on August 19, 2017, and Plaintiff does not otherwise allege that Montoya ever apprehended an immediate injury at the hands of Cruz. (See generally id.)  Because Plaintiff has not alleged that Montoya ever apprehended a violent injury from Cruz, the assault claim against Cruz is insufficient and due to be dismissed.  See Hammett, 2016 WL 7386983, at *16.

#### c.  Assault Claims against Davey Tree and Wolf Tree

As for the assault claims against Davey Tree and Wolf Tree, the relevant arguments are largely the same as those addressed in the context of Plaintiff's battery claims against these Defendants.  That is, Plaintiff argues the corporate Defendants assaulted Montoya "*through* employees Cruz and Rangel*,*" (doc. 220, p. 39), while the corporate Defendants again argue that "these torts cannot be committed 'through' someone else," (doc. 209, p. 33).  In response, Plaintiff relies on the same respondeat superior argument that he did for his battery claim.  (See doc. 220, p. 40.)

As with his battery claim, Plaintiff does not mention vicarious liability or respondeat superior within his claim for assault in the Amended Complaint.  (Doc. 123, pp. 45–46 (Count V).) Again, however, Plaintiff does allege separate counts for "respondeat superior" against the corporate Defendants for the conduct of the Defendant employees.  (Id. at pp. 47–50, 53–57 (Counts VII, IX, XII, XIV, XVI & XVIII).)  As it did with the battery claim, the Court will consider whether Plaintiff has alleged facts sufficient to support an assault claim against the corporate Defendants based on vicarious liability—notwithstanding the arguable defects in Plaintiff's pleadings.

The assault claim contemplates the events of both May 2017, when the meeting occurred, and August 19, 2017, the day Montoya was murdered.  (See id. at pp. 45–46.)  As to the factual allegations on August 19, 2017, the same respondeat superior analysis that applied to the battery claim likewise applies to the assault claim.  See Discussion Section II.A(1), supra.  The May 2017 conduct, however, presents new considerations not previously discussed.

Plaintiff has alleged that Montoya was assaulted beginning in May 2017 as the recipient of threats from people who had the apparent ability to harm him.  (Doc. 123, pp. 45–46.)  The May 2017 meeting, which seemingly occurred during working hours and on the corporate Defendants'

property, allegedly resulted in unnamed employees becoming enraged, rioting, and threatening Montoya with physical violence and death. (Id. at pp. 16–17.) At first glance, it might appear that there is a stronger connection between this employee conduct and the corporate Defendants. However, there are no respondeat superior allegations in the Amended Complaint that seek to hold Davey Tree and Wolf Tree vicariously liable for the conduct of any employees except Conner, Branch, Rangel, and Cruz. (See generally id.) That is, Plaintiff does not seek to hold Davey Tree or Wolf Tree responsible for the actions of the unnamed employees who allegedly threatened Montoya with death, nor does Plaintiff bring an assault claim against those employees. (Id.) Though Plaintiff alleges that Rangel and Cruz called the meeting, there are no factual allegations that Montoya apprehended injury at their hands. (Id. at pp. 16–17.) Plaintiff alleges in the most general terms that Rangel "threatened" Montoya, (id.), but again, "the mere threat to commit a violent injury on a victim, without more, does not constitute an assault," Lewis, 560 S.E.2d at 75. That is, even had it been a threat of violent injury, this allegation alone would be insufficient, and here, Plaintiff alleged even less. Thus, there are no remaining assault allegations for which the corporate Defendants can be vicarious liability.

Plaintiff's assault claim (Count V) is **DISMISSED with prejudice** as to all moving Defendants.

**B.    Intentional Infliction of Emotional Distress**

Plaintiff alleged five counts of Intentional Infliction of Emotional Distress, with one count each against Rangel (Count XI), Cruz (Count XIII), Branch (Count XV), Conner (Count XVII), and Davey Tree (XIX).[19] (Doc. 123, pp. 52–58.)

---

[19]  Plaintiff's Response insists that Plaintiff "state[d] claims against the Corporate Defendants for IIED" and that "[t]he Corporate Defendants . . . played a key role [in the actions giving rise to the IIED claims]," but Plaintiff's Amended Complaint does not bring an IIED claim against Wolf Tree. (Doc. 220, p. 38; see

> Georgia has long recognized a cause of action for intentional infliction of emotional distress. However, the burden which the plaintiff must meet in order to prevail in this cause of action is a stringent one. To prevail, a plaintiff must demonstrate that: (1) the conduct giving rise to the claim was intentional or reckless; (2) the conduct was extreme and outrageous; (3) the conduct caused emotional distress; and (4) the emotional distress was severe. The defendant's conduct must be so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Whether a claim rises to the requisite level of outrageousness and egregiousness to sustain a claim for intentional infliction of emotional distress is a question of law.

Mayorga v. Benton, 875 S.E.2d 908, 913 (Ga. Ct. App. 2022). A complaint that fails to allege any form of non-conclusory emotional distress warrants dismissal. See Roberts v. JP Morgan Chase Bank, Nat'l Ass'n, 802 S.E.2d 880, 885 (Ga. Ct. App. 2017) ("[The plaintiff's] complaint says nothing at all about humiliation, embarrassment, fright, extreme outrage, or severe emotional distress . . . . [F]or this reason, [the plaintiff] fails to state a claim for intentional infliction upon which relief can be granted.") (internal quotations omitted); see also Monsrud v. Regnerative Orthopaedics & Spine Inst., P.C., No. 1:20-CV-1571-AT-WEJ, 2020 WL 12654451, at *10 (N.D. Ga. Sept. 9, 2020), report & recommendation adopted sub nom., No. 1:20-CV-1571-AT, 2020 WL 12654449 (N.D. Ga. Sept. 29, 2020) ("[The plaintiff] also fails to allege facts showing that she has suffered extreme emotional distress. She alleges that the work environment 'led to unnecessary stress on her pregnancy' and that she suffered 'severe emotional distress' . . . . But, simply alleging that she was under stress and forced to seek medical care, with no allegation about any resulting treatment or diagnosis of severe emotional distress, is insufficient . . . .") (internal citations omitted).

The moving Defendants all argue both that Plaintiff failed to allege conduct sufficiently extreme and outrageous, and that the Amended Complaint is silent as to any actual emotional

---

generally doc. 123.) With no IIED claim against Wolf Tree in the Amended Complaint, the Court concludes that Davey Tree is the only corporate Defendant against whom Plaintiff brought an IIED claim.

distress.  (Doc. 204, pp. 23–25; doc. 230, pp. 7–9; doc. 207, pp. 15–17; doc. 231, pp. 9–10; doc. 208, pp. 23–24; doc. 209, pp. 31–32; doc. 233, pp. 23–24.)  The Court agrees that Plaintiff has failed to allege any non-conclusory emotional distress, warranting dismissal of Plaintiff's IIED claims against all moving Defendants.[20]

In his response, Plaintiff emphasizes that he alleged that Defendants' actions "caused severe emotional distress to Eliud Montoya, up until the point of his murder."  (Doc. 220, p. 38 (citing doc. 123, p. 58); doc. 221, p. 30 (citing doc. 123, p. 54); doc. 222, p. 24 (citing doc. 123, p. 56); doc. 223, p. 21 (citing doc. 123, p. 55).)  But such allegations are wholly conclusory, and thus cannot withstand a motion to dismiss.  See Jaharis, 297 F.3d at 1188 ("[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal.").  As Davey Tree correctly states,

> Plaintiff has not set forth a single fact concerning emotional distress, let alone severe emotional distress . . . . [Plaintiff] does not allege that [Montoya] suffered from any particular type of emotional distress (*e.g.*, terror, anxiety), experienced any physical manifestations or mental health symptoms (*e.g.*, psychotic break, despondency), or that he sought out or obtained any treatment.

(Doc. 209, p. 32.)  Indeed, Georgia courts have regularly found far more considerable allegations of emotional distress insufficient to state an IIED claim.  For example, even when plaintiffs alleged that they sought counseling for their emotional distress, courts have found the "severe emotional distress" requirement unsatisfied without any accompanying allegation of diagnosis or treatment.  See Monsrud, 2020 WL 12654451, at *10 (even where the plaintiff alleged that she suffered "severe emotional distress" that "caused her to seek medical care," the absence of any resulting treatment or diagnoses rendered the IIED pleading insufficient); see also Ghodrati v. Stearnes, 723

---

[20]  That is, Plaintiff failed to allege the third (and by extension the fourth) element of IIED—that the conduct caused emotional distress, and that the emotional distress was severe.  See Mayorga, 875 S.E.2d at 913. Because this alone dooms Plaintiff's IIED claims, the Court need not assess whether each Defendant's alleged conduct was sufficiently extreme or outrageous.

S.E.2d 721, 723–24 (Ga. Ct. App. 2012) (merely seeking counseling, without providing record of a diagnosis, could not meet plaintiff's burden of establishing severe emotional distress to avoid summary judgment).  Here, Plaintiff alleges even less.

Ultimately, "the allegations of the Amended Complaint about the intentional conduct which caused Plaintiff severe emotional distress are mostly formulaic recitations of the elements of the IIED claim, which fall short of meeting the relevant pleading standard."  Monsrud, 2020 WL 12654451, at *9; see also Carroll v. Bank of Am., N.A., No. 1:12-CV-02506-RWS, 2013 WL 1320755, at *5 (N.D. Ga. Mar. 28, 2013), aff'd sub nom., 537 F. App'x 933 (11th Cir. 2013) (per curiam) (dismissing IIED claim where complaint made conclusory statements reciting elements of cause of action which did not satisfy pleading requirements).  Likewise, here, Plaintiff's IIED claims against all moving Defendants (Counts XIII, XV, XVII, and XIX) are **DISMISSED with prejudice**.  With the dismissal of the RICO claims against all moving Defendants (Counts I–III), the battery and assault claims against all moving Defendants (Counts IV–V), and the intentional infliction of emotional distress claim against Cruz (Count XIII), no substantive claims against Cruz remain.  Defendant Cruz is **DISMISSED** from this case.

### C.    Negligence against Conner

Though Plaintiff brought negligence claims against Conner (Count VI) and Branch (Count VIII), only Conner moved to dismiss the negligence claim against her. [21]  (Doc. 204, pp. 19–23; see generally doc. 207.)  Conner argues that Plaintiff has failed to state a negligence claim against her because he has not sufficiently pled duty or causation.  (Doc. 204, pp. 19–23.)  Regarding duty, Plaintiff's Amended Complaint asserts two theories: (1) as an officer of Davey Tree and Wolf

---

[21]  Defendant Branch indicates he will address the negligence claim against him in a Motion for Summary Judgment "at the appropriate time."  (Doc. 207, p. 1 n.1.)

Tree, Conner owed Montoya a duty to provide a safe work environment free of harassment; and (2) as corporate counsel, Conner had a duty to adequately review and address Montoya's whistleblower reports.  (Doc. 222, pp. 21–22 (citing doc. 123, p. 46).)  Conner, on the other hand, argues she owed no legal duty to Montoya because she was neither Montoya's employer nor his personal counsel.  (Doc. 204, pp. 19–23.)  After review, the Court agrees with Conner.

To sustain a claim for negligence, a plaintiff must be able to establish "(1) a legal duty; (2) a breach of this duty; (3) an injury; and (4) a causal connection between the breach and the injury." Persinger v. Step By Step Infant Dev. Ctr., 560 S.E.2d 333, 335 (Ga. Ct. App. 2002) (quoting Vaughan v. Glymph, 526 S.E.2d 357, 359 (Ga. Ct. App. 1999)).  Conner contends Plaintiff has failed to establish the first and fourth elements.  (Doc. 204, pp. 19–23.)  Specifically, Conner contends that she did not owe a duty to Montoya and that "[t]here is no claim that sounds in ordinary negligence against a lawyer for actions undertaken in the performance of legal duties." (Id. at pp. 19, 21.)  As to the claim that she failed to provide a safe work environment, Conner argues such duty applies only to the *employer* (and that it only requires provision of a work environment that is *physically* safe).  (Id. at pp. 20–21.)

Conner is correct in arguing that, as in-house counsel for Davey Tree, any duty to review Montoya's allegations would be a duty owed to Davey Tree, not to Montoya.  (Id. at pp. 21–22.) Indeed, "[n]umerous Georgia cases have discussed the element of duty in the context of attorneys' relationships with nonclients," and have observed that demonstrating an attorney-client relationship between the plaintiff and the defendant attorney "is essential in establishing the *element of duty that is necessary to every lawsuit based upon a theory of negligence.*"  McKenna Long & Aldridge, LLP v. Keller, 598 S.E.2d 892, 894 (Ga. Ct. App. 2004) (quoting Legacy Homes, Inc. v. Cole, 421 S.E.2d 127, 128 (Ga. Ct. App. 1992)); see also Driebe v. Cox, 416 S.E.2d

314, 315 (Ga. Ct. App. 1992) ("Before an action for malpractice or negligence can lie against an attorney, there must be a legal duty from the attorney to the plaintiff.").  Plaintiff does not allege that Conner and Montoya were in an attorney-client relationship.  (See doc. 123, pp. 46–47.)  Unlike with medical negligence, there is no distinction between "professional negligence" and "ordinary negligence" when bringing a negligence claim against an attorney.  See McKenna, 598 S.E.2d at 894.  Absent any allegation that Montoya was Conner's client, Conner owed no legal duty to Montoya.  See id.; see also Hare Krishna Roswell Hotel, LLC v. Corsino, 892 S.E.2d 785, 788 (Ga. Ct. App. 2023) ("[T]he Supreme Court of Georgia expressly rejected any precedent to the extent that it created a general legal duty to all the world not to subject others to an unreasonable risk of harm.") (internal quotation omitted).

To be sure, beyond this, Plaintiff seemingly argues that Conner's alleged violation of Davey Tree and Wolf Tree's internal whistleblower policy makes Conner liable for negligence. (Doc. 222, p. 22 ("Conner breached [her duty to Montoya] when, 'in flagrant disregard of Davey Tree and Wolf Tree's Whistleblower Policy, Conner . . . provided Montoya's written whistleblower complaint to Rangel and told Rangel that Montoya was the whistleblower." (quoting doc. 123, p. 15)).)  However, regardless of Davey Tree's whistleblower policy, Conner still did not owe Montoya a duty.  Georgia courts "have rejected the idea that a company's internal policy and/or procedures manual can give rise to a legal duty owed to third parties."  Corsino, 892 S.E.2d at 789; see also Sheaffer v. Marriott, 826 S.E.2d 185, 189 (Ga. Ct. App. 2019) (hotel staff did not owe duty to guests to staff phone lines or front desk despite internal policy); Doe v. HGI Realty, 561 S.E.2d 450, 452 (Ga. Ct. App. 2002) (affirming summary judgment for landlord on grounds that landlord's internal security manual stating that guards should patrol stores did not create affirmative duty to do so).  This is because "[a] legal duty sufficient to support liability in

39

negligence is either a duty imposed by a valid statutory enactment of the legislature or a duty imposed by a recognized common law principle declared in the reported decisions of our appellate courts." Reg'l Fin. Co. of Ga., LLC v. Pearson, 908 S.E.2d 643, 647 (Ga. Ct. App. 2024) (internal citations omitted).  Because a company's internal policies are neither, "a private corporation's internal policies do not create a duty upon which a tort action may independently lie." Othman v. Navicent Health Inc., 908 S.E.2d 223, 229 (Ga. Ct. App. 2024).  This appears to hold true even if the prospective plaintiff works at the company.  See id. at 224–230 (finding plaintiff physician could not rely on hospital's internal policies to create a duty upon which he could bring a negligence claim against hospital operators).  Accordingly, any alleged violation of company policy here, without more, cannot state a negligence claim.

Likewise, Conner did not owe Montoya any duty to provide a safe work environment.  The duty to provide employees a reasonably safe workplace is the duty of the employer.  Phelps v. CSX Transp., Inc., 634 S.E.2d 112, 117 (Ga. Ct. App. 2006) ("The *employer* has a duty to provide the employee a reasonably safe workplace which includes safe conditions, tools, facilities, and supervision.") (emphasis added).  Plaintiff does not allege that Conner was somehow Montoya's employer.  (See generally doc. 123.)  The Court need not assess what allegations (if any) relate to the physical safety of Montoya's workplace, because any shortcomings of this sort would only be relevant to claims against Montoya's employer, not against Conner.

The Court need not engage in any causation analysis because Plaintiff's negligence allegations against Conner fail at element one—duty.  With no factual allegations to establish that Conner owed a legal duty to Montoya, Plaintiff has failed to state a negligence claim against Conner.  Accordingly, Plaintiff's negligence claim against Conner (Count VI) is **DISMISSED with prejudice**.  With the dismissal of the RICO claims against all moving Defendants (Counts

I–III), the battery and assault claims against all moving Defendants (Counts IV–V), the negligence claim against Conner (Count VI), and the intentional infliction of emotional distress claim against Conner (Count XVII), no substantive claims against Conner persist. Defendant Conner is **DISMISSED** from this case.

III.    **Motions for Partial Summary Judgment**

Still pending before the Court are Davey Tree and Wolf Tree's Motion for Partial Summary Judgment, (doc. 161), and Conner's Motion for Partial Summary Judgment, (doc. 163). When the Court deferred ruling on these motions, it noted that, "[i]n the event this case remains in federal court following the rulings on all pending motions to dismiss, the parties shall propose a summary judgment briefing schedule in their joint status report." (Doc. 189, p. 2 (internal citation omitted); see also doc. 178, p. 8 ("Should any portion of the case remain after resolution of the motions to dismiss, the parties shall confer and submit a joint status report, with proposed case deadlines, within seven days of the presiding District Judge's ruling.").)

Because portions of this case remain before this Court, the Court will adhere to its prior orders. Within **SEVEN (7) DAYS** of this Order, the parties **SHALL CONFER** and **SUBMIT** a joint status report with proposed case deadlines. Any new motions for summary judgment and related briefing shall only pertain to claims that remain following this Order. Because Connner is now dismissed from this action with no remaining claims against her, Conner's Motion for Partial Summary Judgment is **DENIED as moot**. (Doc. 163.) In anticipation of an updated motion from the Corporate Defendants on the remaining claims, the Court **DENIES without prejudice** Davey Tree and Wolf Tree's pending Motion for Partial Summary Judgment. (Doc. 161.)

**CONCLUSION**

For these reasons, the Court **GRANTS** Defendants' Motions to Dismiss. (Docs. 204, 207, 208 & 209.) Plaintiff's RICO claims (Counts I–III of Plaintiff's Amended Complaint) are **DISMISSED with prejudice** against all moving Defendants for failure to plausibly allege proximate causation. (Doc. 123.) Plaintiff's non-RICO claims for battery (Count IV), assault (Count V), and intentional infliction of emotional distress (Counts XIII, XV, XVII & XIX) are **DISMISSED with prejudice** as to all moving Defendants. (Id.) With no claims thereby remaining against Cruz, Cruz is **DISMISSED** from this case. Additionally, Plaintiff's negligence claim against Conner (Count VI) is also **DISMISSED with prejudice** for failure to allege that Conner owed Montoya a duty of care. With no claims thereby remaining against Conner, Conner is **DISMISSED** from this case and Conner's Motion for Partial Summary Judgment is **DENIED as moot**. (Doc. 163.) For all remaining claims, the parties **SHALL CONFER** and **SUBMIT** a joint status report with proposed deadlines within **SEVEN (7) DAYS** of this Order. Davey Tree and Wolf Tree's Motion for Partial Summary Judgment is **DENIED without prejudice**. (Doc. 161.) Defendants' joint Motion for Oral Argument on these motions, (doc. 210), is **DENIED as moot**.[22]

**SO ORDERED**, this 3rd day of March, 2025.

_____
R. STAN BAKER, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

---

[22] The parties have thoroughly briefed the issues before the Court, and the Court concludes that oral argument would not help resolve Defendants' motions.

42