IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| BRIAN J. HUFFMAN, as Administrator of the Estate of Eliud Montoya-Arcos, Deceased,<br><br>            Plaintiff,<br><br>      v.<br><br>THE DAVEY TREE EXPERT COMPANY, et al.,<br><br>            Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)    CV 418-184<br>)<br>)<br>)<br>)<br>) |

**O R D E R**

Before the Court is a Motion for Disclosures and Inquiry filed by Defendants The Davey Tree Expert Company ("Davey Tree") and Wolf Tree, Inc. (collectively, "Corporate Defendants"). (Doc. no. 242.) Defendants Marjorie L. Conner and Oscar Cruz joined the motion by notice, (doc. nos. 245, 248), and the Court **GRANTS** Defendant Christopher Branch's motion to join, (doc. no. 244). For the reasons discussed below, the Court **DENIES** the Motion for Disclosures and Inquiry. (Doc. no. 242.)

**I.    PROCEDURAL BACKGROUND**

This civil action arises out of a workplace complaint in April 2017 by Eliud Montoya-Arcos alleging a payroll-skimming scheme by Mr. Rangel, Mr. Montoya's supervisor at Wolf Tree, Inc. In 2022, Mr. Rangel was convicted in this Court of crimes related to the scheme and Mr. Montoya's murder. See United States v. Pablo Rangel-Rubio, No. CR 422-030 (S.D. Ga. Jan. 8, 2023) (hereinafter "CR 422-030"); see also United States v. Pablo Rangel-Rubio, No. CR 418-064 (S.D. Ga. July 10, 2018).

On November 9, 2017, Mr. Montoya's widow brought suit in the State Court of Chatham County, Georgia, asserting claims arising out of the scheme and murder. Montoya v. Davey Tree Expert Co., Civ. Act. No. STCV1701873 (St. Ct. Chatham Cnty.) ("Montoya"). Montoya is set for trial in June 2025 against Davey Tree only. The case *sub judice*, filed by the Estate Administrator, involves the same allegations and defendants.

The present motion concerns a September 2023 trip by W. Dow Bonds, Mr. Rangel's CJA counsel, to visit Mr. Rangel at U.S. Penitentiary Atwater. Accompanying Mr. Bonds on the trip was Robert Bartley Turner, counsel for Plaintiffs here and in Montoya. By request of the Corporate Defendants, the State Court authorized limited discovery concerning this trip that included the depositions of Mr. Bonds, Mr. Rangel, and Joyce Horrocks, a California notary public. (See doc. nos. 243-3, 243-7, 243-14.) The parties agreed to incorporate discovery from Montoya here. (See doc. no. 97, p. 3; doc. no. 108, p. 2; doc. no. 242, p. 8 n.5.) The relevant facts gleaned from the Montoya inquiry are as follows.

## II.     FACTUAL BACKGROUND

In the spring of 2023, prior to Mr. Rangel filing a *pro se* appeal of his conviction, Plaintiff's attorney Mr. Turner of the law firm Savage & Turner, P.C., called Mr. Bonds to ask whether he still represented Mr. Rangel in the federal criminal case. (Doc. no. 243-14, ("Bonds Dep."), pp. 118-19.) Mr. Bonds explained he was "pretty much the attorney of record on the case until the very bitter end regardless of what happens." (Id. at 119-20.) He further explained, however, there was "nothing, at least at th[at] point, pending." (Id. at 120.)

Mr. Turner explained he represented the plaintiff in Montoya and wanted Mr. Rangel to verify a letter he wrote after his indictment accusing the Corporate Defendants of knowingly employing illegal workers and requesting assistance with his criminal defense. (Id.; see also

2

doc. no. 243-13, pp. 3-10.)  Mr. Turner explained he wanted to use the letter as evidence in <u>Montoya</u>, and asked whether Mr. Bonds had any need to see Mr. Rangel.  (Bonds Dep., p. 120.)  Mr. Bonds said yes but he could no longer bill for his time because more than forty-five days had expired since entry of the criminal judgment.  (<u>Id.</u>)  Accordingly, he would "have to rely on a phone call or letters, which [he] really do[esn't] like to do."  (<u>Id.</u>)

Mr. Turner proposed his firm could fund a trip for Mr. Bonds to visit Mr. Rangel, accompanied by a notary, during which Mr. Bonds could discuss criminal matters with Mr. Rangel and the notary could notarize a verification if Mr. Rangel agreed to sign it.  (<u>Id.</u> at 120-21.)  Mr. Bonds believed there was no chance Mr. Rangel would sign a verification but did not disclose this belief to Mr. Turner.  (<u>Id.</u> at 266-67.)  Mr. Bonds further believed, while the letter could "technically" harm Mr. Rangel's defense in the civil cases, it would not hurt Mr. Rangel "in the reality standpoint" because (1) the letter had already been produced by the government in the underlying criminal case; (2) Mr. Rangel had already pled guilty in the criminal case; (3) Mr. Rangel had already admitted in his guilty plea allocution many of the facts contained in the letter; (4) Mr. Bonds saw no possibility the letter could be used against Mr. Rangel in a subsequent criminal appeal or new trial; and (5) Mr. Rangel was serving a nearly fifty-year sentence and had no assets.  (Bonds Dep., pp. 239-40, 242-43, 247-51, 267, 268, 297.)

Mr. Bonds did not ask Mr. Turner why he would not ask Mr. Rangel directly to verify the letter and assumed it was because ethical rules, to Mr. Bonds' understanding, prohibited an attorney representing an adverse party in a civil matter from contacting a *pro se* party directly.  (<u>Id.</u> at 160-61.)  Mr. Bonds agreed to the trip, with the understanding Savage & Turner would only pay his travel expenses.  (<u>Id.</u> at 121-22.)  This was the first time in nearly

3

twenty years of criminal defense work Mr. Bonds had planned to visit any client outside of Georgia. (Id. at 121.)

Mr. Bonds testified his purpose for visiting Mr. Rangel "ha[d] to do with his plea, the specific plea he entered, and the consequences of certain things." (Id. at 170-71.) He also explained Mr. Rangel "had filed some scurrilous . . . accusations" in a habeas corpus petition "so he was kind of stirring the pot" and his need to speak to Mr. Rangel "may have been about that." (Id. at 171.) Mr. Bonds considered Mr. Rangel's filing of a *pro se* appeal and habeas corpus petition to "elevate everything" concerning Mr. Rangel's case and following the filing of those documents, Mr. Bonds wanted to "meet with him and go over his case, because things had actually gotten more concerning . . . from the things he had filed." (Id. at 171, 178.) Mr. Bonds also explained he was interested in visiting a high-security federal prison because he had never done so. (Id. at 174.) When confronted in his deposition with the fact that Mr. Rangel's appeal and habeas corpus petition were not filed until several months after he agreed to visit Mr. Rangel, and a few weeks before the prison visit, Mr. Bonds testified there were other matters outside those filings he needed to discuss. (Id. at 169-73.)

After speaking with Mr. Turner, Mr. Bonds informed Mr. Rangel of the phone call he received from Mr. Turner and the proposed visit to Mr. Rangel to "talk to [him] about [his] appeal in the federal case and other issues relating to his case," as well as to discuss a letter Mr. Turner wanted Mr. Rangel to verify with a notary hired by Mr. Turner. (Id. at 126-27.) Mr. Bonds further explained to Mr. Rangel that verifying the letter could hurt him in the civil case, and it was Mr. Rangel's choice whether to do so. (Id. at 268.) Mr. Bonds also told Mr. Rangel that Savage & Turner would be paying for the trip. (Id. at 190.) Mr. Bonds provided no other advice to Mr. Rangel concerning the civil case because he is "not qualified to give

4

legal advice about a pending civil matter that [he] ha[s] no interest in or a part in." (Id. at 105.) Mr. Rangel replied he looked forward to seeing Mr. Bonds. (Id. at 121, 127.) Mr. Rangel testified he understood from the phone call Mr. Bonds wanted to meet to discuss the civil case and would be accompanied by another person, but Mr. Rangel did not know who that person would be. (See doc. no. 243-3, pp. 119-21.)

In July 2023, the Bureau of Prisons ("BOP") transferred Mr. Rangel to USP Atwater and Mr. Bonds coordinated with BOP officials to arrange the visit. (Bonds Dep., pp. 167-69.) Meanwhile, Savage & Turner coordinated with Ms. Horrocks, a California notary, to accompany Mr. Bonds on the visit. (Id. at 156; Horrocks Dep., pp. 37-39.) Mr. Bonds and Ms. Horrocks filed paperwork with the BOP to obtain authorization to visit Mr. Rangel. (Doc. no. 242, p. 12; doc. no. 251, p. 13.) In relevant part, the form completed for Ms. Horrocks' authorization to enter USP Atwater stated:

> STATEMENT OF APPLICANTS SEEKING TO ENTER AN INSTITUTION TO VISIT OR TO CORRESPOND WITH A FEDERAL [SIC] AS THE REPRESENTATIVE OF A LICENSED ATTORNEY
> 
> I certify that I am authorized to act as the legal representative of <u>Dow Bonds</u>, who is a licensed member of the bar of the State of _____. I request that I be allowed to interview and correspond with <u>Pablo Rangel-Rubio</u>, who is confined at <u>Atwater USP</u>. I am aware of my responsibility as a representative of the above-named attorney and certify that I am able to meet this responsibility. I am also aware of the Bureau of Prison's Policy on Inmate Legal Activities and certify that I am able to and will adhere to the requirements of this policy. I pledge to abide by Bureau of Prisons regulations and Institution guidelines.
> 
> I hereby certify that all of the information contained in this questionnaire is true and correct to the best of my knowledge. Furthermore, I understand that all information contained in this questionnaire may be investigated and verified through the use of federal, state, and local authorities.

(Doc. no. 243-5, p. 2.) Ms. Horrocks signed this statement and dated it August 29, 2023. Below Ms. Horrocks' statement was the following "Statement of Sponsoring Attorney":

5

> I hereby certify that I am a licensed member of the bar of the state of <u>Georgia</u> and that I employ or supervise <u>Joyce D. Horrocks</u>. I authorize <u>Joyce D. Horrocks</u> to represent me and request that as my representative he/she be allowed to interview and correspond with <u>Pablo Rangel-Rubio</u> who is currently confined at <u>Atwater USP</u>. I further certify that <u>Joyce D. Horrocks</u> is aware of the responsibility of his/her role as my representative and is able to meet this responsibility. I pledge that I will supervise my representative's activities. I accept personal and professional responsibility for all acts of my representative which affect the institution, its inmates or staff.

(<u>Id.</u>; <u>see also</u> doc. no. 242, p. 13.) Mr. Bonds signed this statement and dated it August 31, 2023. (Doc. no. 242, p. 13.) Mr. Bonds testified that, by signing the statement, he was "accepting responsibility for her actions at the prison if anything goes wrong" and "it was on [Mr. Bonds] to make sure [Ms. Horrocks] . . . adhered to the guidelines and regulations of the prison." (Bonds Dep., pp. 211, 214; <u>see generally</u> <u>id.</u> at 211-225.)

A week prior to the trip, Mr. Turner, Ms. Horrocks, and Mr. Bonds met by videoconference to discuss the process for entering USP Atwater, coordinate travel plans, and establish Ms. Horrocks would accompany Mr. Bonds to see whether Mr. Rangel would authenticate the letter. (Doc. no. 243-8; Bonds Dep., pp. 155-56.) On September 19, 2023, Messrs. Bonds and Turner flew to California. (Bonds Dep., p. 256; doc. no. 243-9, p. 13.) Mr. Turner picked up a rental car, took Mr. Bonds to dinner, and they checked into a run-of-the-mill hotel near the airport. (Bonds Dep., p. 264.) The next morning, Mr. Turner drove Mr. Bonds and Ms. Horrocks to USP Atwater. (<u>Id.</u> at 270.) The three made small talk but did not discuss the purpose of the visit. (<u>Id.</u> at 271-72, 274, 277-78; Horrocks Dep., pp. 47-51.)

Upon arriving at USP Atwater, Mr. Bonds and Ms. Horrocks entered the facility, leaving Mr. Turner waiting in the rental car. (Bonds Dep., p. 279; Horrocks Dep., pp. 50-51, 60-61.) Mr. Bonds believed Mr. Turner did not join in the visit because there was a limit of two visitors per inmate and because, at least as Mr. Bonds understood the ethical rules,

6

attorneys representing an adverse party cannot communicate directly with *pro se* parties in civil litigation. (Bonds Dep., pp. 175-77.) After completing the security process, Mr. Bonds and Ms. Horrocks were escorted into a gymnasium-type room, where they waited to be let into a private conference room. (Horrocks Dep., pp. 51-52, 62-64; Bonds Dep., pp. 279.) Before they entered the conference room, Mr. Bonds explained to Ms. Horrocks he needed to speak with Mr. Rangel and he would excuse Ms. Horrocks from the room while they had a discussion. (Horrocks Dep., p. 112.) Prison officials brought Mr. Rangel into the gymnasium, where Mr. Bonds briefly greeted Mr. Rangel privately and explained Ms. Horrocks was the notary he mentioned during their prior phone call. (Bonds Dep., pp. 279-80.)

Mr. Bonds, Ms. Horrocks, and Mr. Rangel were escorted to a private conference room, where Mr. Bonds introduced Ms. Horrocks and explained Mr. Rangel was not required to speak to her or sign anything she presented if he did not want to. (Id. at 280.) Ms. Horrocks presented Mr. Rangel with a copy of the October 2018 letter and asked whether the letter was his. (Horrocks Dep., p. 115.) Mr. Rangel confirmed it was his letter and, when presented with the affidavit to sign verifying the same, asked Ms. Horrocks, "What's in it for me?" (Id.) Mr. Bonds explained there was nothing in it for Mr. Rangel, said, "[o]kay, we're done here," and excused Ms. Horrocks from the conference room. (Bonds Dep., pp. 285-86; see also Horrocks Dep., pp. 115-18.) Ms. Horrocks left the conference room. (Horrocks Dep., p. 118; Bonds Dep., p. 286.)

Mr. Bonds met privately with Mr. Rangel for approximately forty-five minutes regarding the criminal case and they did not discuss the civil case after Ms. Horrocks' departure. (Bonds Dep., pp. 287-88.) During their private conversation, Mr. Rangel explained he no longer needed Mr. Bonds' assistance with the appeal because a paralegal at the prison

7

was helping him. (Id. at 299-300.) Mr. Bonds replied he could not continue representing Mr. Rangel anyway because, from his perspective, the appeal violated the appeal waiver provision in Mr. Rangel's plea agreement. (Id.)

When Mr. Bonds finished his discussion with Mr. Rangel, he and Ms. Horrocks located Mr. Turner in the parking lot and explained Mr. Rangel declined to sign the affidavit. (Id. at 289-92; Horrocks Dep., p. 92.) Mr. Turner drove the group to lunch, dropped off Ms. Horrocks at her car, and Mr. Bonds and Mr. Turner returned to the hotel. (Horrocks Dep., pp. 128-37; Bonds Dep., pp. 260, 292-93, 295.) There was no discussion of Mr. Rangel aside from noting his refusal to sign the affidavit. (See Horrocks Dep., pp. 92-93, 128-30, 133-36; Bonds Dep., pp. 291-92, 295.) Messrs. Bonds and Turner returned to Savannah the following day. (Doc. no. 243-9, p. 13.) Savage & Turner covered Mr. Bonds' travel expenses and Mr. Bonds did not receive any other type of payment. (Bonds Dep., pp. 264-65.)

The day after the prison visit, on September 21, 2023, Mr. Turner contacted Ms. Horrocks and asked her to provide an affidavit, "affirming that Mr. Rangel did affirm that it was his letter, that did he write it and he did sign it." (Horrocks Dep., pp. 137, 140, 151-52; see also doc. no. 243-10.) Ms. Horrocks complied. (Horrocks Dep., pp. 137, 154.) When the State Court authorized limited discovery concerning the prison visit last year, Mr. Rangel testified at deposition that he wrote the October 2018 letter. (Doc. no. 243-3, pp. 133-34.)

## III. DISCUSSION

Defendants argue the Court should authorize additional discovery concerning the prison visit to supplement the already substantial evidentiary record developed in State Court. (See doc. no. 242.) They believe such inquiry will uncover conclusive proof of wrongdoing to justify sanctions and exclusion of the letter from evidence. (See id. at 16-25.) Plaintiff

8

argues Defendants are fishing and have failed to identify any sanctionable conduct warranting additional discovery or inquiry. (Doc. no. 251, pp. 17-25.) The Court agrees with Plaintiff.

The Court "has the inherent power to investigate the scope and extent of [a] scheme that it deem[s] to threaten the integrity of the court." Johnson v. 27th Ave. Caraf, Inc., 9 F.4th 1300, 1314 (11th Cir. 2021); see also Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991) ("[A] court has the power to conduct an independent investigation in order to determine whether it has been the victim of fraud."). The Court has such inherent authority here because the alleged misconduct involves an attorney appointed by the Court to represent a defendant in a criminal case pending in the Court, and the letter at the center of this discovery dispute is relevant to this civil action. However, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." Chambers, 501 U.S. at 44.

Defendants paint a picture of collusion and deceit, relying primarily on the following characterizations of the evidence:

1. Savage & Turner used Mr. Bonds "as their Trojan horse" to "lull Mr. Rangel into signing an affidavit under the auspices of a trusted attorney-client relationship." (Doc. no. 242, p. 21.)

2. Savage & Turner utilized Mr. Bonds as a communications surrogate to circumvent unspecified ethical rules that "likely" prohibited direct communications between Mr. Rangel and Savage & Turner. (Id. at 21-22.)

3. Savage & Turner submitted false certifications to BOP, representing Ms. Horrocks as a representative of Mr. Bonds rather than an agent of Savage & Turner.

4. Mr. Bonds claimed he needed to discuss the criminal case with Mr. Rangel but Mr. Rangel's *pro se* appeal and habeas corpus petition had yet to be filed.

5. Mr. Bonds accepted an "all-expense paid trip" and took three unpaid days away from his practice to visit his client, rather than attempting to seek travel funds from the Court for the visit. (Doc. no. 255, p. 3.) Mr. Bonds did not ask for the Court to reimburse the trip as a CJA expense because "the real and actual purpose of the trip was wholly *antithetical* to his duty of representing Mr. Rangel's interests." (Id. at 5.)

9

> 6. At Mr. Turner's direction, Mr. Bonds never told Mr. Rangel that Mr. Turner traveled with Mr. Bonds to the prison. (Id. at 3.)

When stripped of all accusatory adornment, however, the facts read less like a Grisham novel weaving a web of legal deceit and intrigue and more like an unconventional and elaborate, yet blameless, attempt to verify an exhibit.

Concerning the first accusation, there was no deception of Mr. Rangel. When Mr. Bonds first raised the topic of a prison visit on a phone call with Mr. Rangel, he explained (1) Plaintiff's counsel wanted Mr. Rangel to verify the letter; (2) verifying the letter could hurt Plaintiff in the civil case, and Plaintiff had no obligation to verify it; (3) Plaintiff's counsel would pay Mr. Bonds' travel expenses; (4) a notary would accompany Mr. Bonds on the prison visit; and (5) Mr. Rangel need not answer her questions or even speak with her. (Bonds Dep., pp. 126-27, 268, 280-81.) Mr. Bonds again reiterated this when he saw Mr. Rangel in person at USP Atwater. (Id. at 279-80.) When Mr. Rangel asked, "What's in it for me?", Mr. Bonds said "nothing, you don't have to sign it," and asked Ms. Horrocks to leave the room. (Bonds Dep., pp. 285-86.)

Mr. Rangel's description of the initial phone conversation during his deposition differs somewhat but Mr. Rangel is not a credible witness. Indeed, he testified in the same deposition he is innocent of the criminal charges for which he pled guilty in this Court despite swearing under penalty of perjury during his change of plea hearing that he was, in fact, guilty, his guilty plea was completely voluntary, and no one forced or pressured him into pleading guilty. See Court's recording system, *For the Record*, CR 422-030, Jan. 30, 2023, 2:40:09-2:40-59, 3:09:01-3:09:13, 3:15:48-3:15:55, 3:17:43-3:18:00, 3:29:33-3:30:13; see also CR 422-030, doc. no. 17, pp. 3, 23. Taking his word over Mr. Bonds, a highly regarded and conscientious

10

member of this Court, would be folly. In addition, the Court has carefully read the deposition of Mr. Bonds and it is candid in every respect.

With respect to the second accusation, there was no circumvention of ethical rules because no ethical rule prohibited Mr. Turner from asking Mr. Rangel directly whether he was willing to verify the letter. Rule 4.3 of the Georgia Rules of Professional Conduct provides as follows:

> Rule 4.3 - Dealing with Unrepresented Person
> In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not:
>> (a) state or imply that the lawyer is disinterested; when the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding; and
>> (b) give advice other than the advice to secure counsel, if a lawyer knows or reasonably should know that the interests of such a person are or have a reasonable possibility of being in conflict with the interests of a client.
> The maximum penalty for a violation of this Rule is disbarment.

The Comments to this rule provide, in pertinent part, as follows:

> This Rule does not prohibit a lawyer from negotiating the terms of a transaction or settling a dispute with an unrepresented person. So long as the lawyer has explained that the lawyer represents an adverse party and is not representing the person, the lawyer may inform the person of the terms on which the lawyer's client will enter into an agreement or settle a matter, prepare documents that require the person's signature and explain the lawyer's own view of the meaning of the document or the lawyer's view of the underlying legal obligations.

According to the plain language of Rule 4.3 and the comments, Mr. Turner could have asked Mr. Rangel to verify the letter so long as he identified himself as an attorney representing the plaintiff in <u>Montoya</u>, which of course Mr. Rangel already knew from the state court pleadings. Mr. Bonds explained as much to Mr. Rangel, telling him Ms. Horrocks was hired by Plaintiff's counsel in <u>Montoya</u>, explaining verification of the letter could hurt him in the civil case, and emphasizing it was Mr. Rangel's choice whether to do so. There were no ethical

11

violations. Furthermore, courts encourage parties to narrow facts in dispute by, among other things, stipulating to the authenticity of exhibits. And finally, Mr. Rangel admitted to authoring the letter during his deposition, which occurred ironically during the State Court inquiry into Defendants' accusation that seeking Mr. Rangel's verification was unethical in the first instance. (Rangel Dep., pp. 133-34.) Moreover, there is a simple explanation why Mr. Turner could not have asked Mr. Rangel to verify the letter himself in person: Mr. Turner, as Plaintiff's counsel, did not fall into the category of attorneys permitted to visit an inmate at a BOP facility. See 28 C.F.R. § 543.13(a) ("The Warden shall . . . permit visits by the retained, appointed, or prospective attorney of an inmate or by an attorney who wishes to interview an inmate as a witness.").

As to the third accusation, Mr. Bonds and Ms. Horrocks committed no fraud when completing the BOP visitor form, which is the only logical conclusion when one carefully considers the context and plain language of the form. As to context, the undisputed facts are that, while Savage & Turner paid for Ms. Horrocks' services, her purpose was to accompany Mr. Bonds on the prison visit to notarize the verification if Mr. Rangel decided he wanted to verify the letter. By executing the form, Mr. Bonds certified he was a licensed member of a state bar, authorized Ms. Horrocks to "represent" him, requested that she be permitted to speak with Mr. Rangel, pledged to "supervise [her] activities," and accepted "personal and professional responsibility" for any action by her that might affect the BOP facility, its staff, or inmates. In turn, by signing the same form, Ms. Horrocks certified she was "authorized to act as the legal representative of Dow Bonds," requested permission to speak with Mr. Rangel, and pledged that she would comply with BOP regulations and guidelines.

No misrepresentations occurred by execution of this form. Simply stated, Mr. Bonds appointed Ms. Horrocks as his representative for purposes of the prison visit by executing his portion of the form, and she confirmed this appointment by executing her portion of the form. Mr. Bonds testified what he understood to be certifying by completing the form as follows:

> I think for purposes of the trip there [Ms. Horrocks] was my representative as far as walking into that prison and being there with me. And so that's how I view that. She was with me at the time, and I would be responsible for any acts or omissions or anything that she did while she was there. And I was certifying that, you know, that she was with me at the prison visit.

(Bonds Dep., p. 210.) His testimony is entirely consistent with the purpose and plain language of the form.

The fourth accusation is Mr. Bonds lied by testifying he needed to discuss the criminal case with Mr. Rangel because there was no activity in the criminal case at the time of the prison visit, and Mr. Rangel proceeded *pro se* when filing his appeal and habeas corpus petition. When Mr. Turner first contacted Mr. Bonds in the spring of 2023, Mr. Bonds explained to Mr. Turner he was "pretty much the attorney of record on the case until the very bitter end regardless of what happens." (Bonds Dep., pp. 119-20; see also id. at 76-77.) The statement was true.

Because the Court appointed Mr. Bonds as CJA counsel, he was duty-bound to represent Mr. Rangel on appeal, even when Mr. Rangel filed a *pro se* appeal, until he sought and received permission from the Eleventh Circuit to withdraw as counsel on February 29, 2024, five months after the Atwater prison visit. See, e.g., 11th Cir. Rule 46-10(c) ("If a party was represented in the district court by counsel appointed under the Act, such counsel shall be mindful of the obligation and responsibility to continue representation on appeal until either successor counsel is appointed under the Act or counsel is relieved by order of this court.");

13

Addendum Four, Eleventh Circuit Plan Under the Criminal Justice Act ("Counsel appointed by the trial court shall not be relieved on appeal except in the event of incompatibility between attorney and client or other serious circumstances."); L.R. Crim. 44C(d) ("Defendant's counsel shall continue representing the Defendant through conclusion of all trial-court proceedings and any appeal unless terminated by this Court or the appellate court."); CR 422-030, doc. nos. 6, 9; see also Criminal Docketing Notice, Rangel-Rubio, No. 23-12530 (11th Cir. Aug. 2, 2023), ECF No. 1 (listing Mr. Bonds as counsel of record).

Mr. Bonds was thus counsel of record at the time of the prison visit with the attendant obligation to meet and confer with his client as necessary. Defendants quibble with the reasons Mr. Bonds provided for needing to speak with his client, but he was attorney of record in a criminal case with a client facing nearly fifty years of imprisonment, and the Court need not inquire further. The death knell to this accusation is Ms. Horrocks' testimony that, after Mr. Rangel declined to sign the verification, Mr. Bonds excused her from the room for a privileged conversation concerning the criminal case that, in fact, lasted forty-five minutes.

While further consideration of the fourth accusation is unnecessary, the substance of the prison conversation removes any remaining vestige of doubt in Mr. Bonds' motives. Mr. Rangel filed a *pro se* Notice of Appeal seven weeks prior to the prison visit. See CR 422-030, doc. no. 35; Criminal Docketing Notice, Rangel-Rubio, No. 23-12530 (11th Cir. Aug. 2, 2023), ECF No. 1. During their private conversation, Mr. Rangel explained he no longer needed Mr. Bonds' assistance with the appeal because a paralegal at the prison was helping him. (Bonds Dep., pp. 299-300.) Mr. Bonds replied he could not continue representing Mr. Rangel anyway because, from his perspective, the appeal violated the appeal waiver provision in Mr. Rangel's plea agreement. (Id.) Shortly after this conversation, Mr. Bonds moved to withdraw from the

appeal pending in the Eleventh Circuit, explaining he recently visited Mr. Rangel at USP Atwater, where Mr. Rangel expressed his desire to represent himself on appeal. Motion to Withdraw, Rangel-Rubio, No. 23-12530 (11th Cir. Sept. 25, 2023), ECF No. 8. Accordingly, there is no merit to the bombastic claim Mr. Bonds "had absolutely no reason to meet with Mr. Rangel" and merely served as a "Trojan horse" for Mr. Turner.

The fifth accusation is Mr. Bonds must not have visited Mr. Rangel to discuss the criminal case because he did not submit a CJA bill for his time and travel expenses and instead allowed Savage & Turner to foot the travel bill. The trip stood no chance of reimbursement with the limited funds available for indigent defense. Defendants cite no ethical rule or legal authority suggesting Mr. Bonds acted inappropriately by leveraging Mr. Turner's need for verification of the letter to gain a free trip to see his client, with the added benefit of being able to tour a high-security federal prison for the first time in his legal career. All the while and unbeknownst to Mr. Turner, Mr. Bonds knew there was little chance of Mr. Rangel signing a verification. As Mr. Bonds testified, "[M]y job there was to speak with him. And that was my opportunity to do it. [Savage & Turner] provided the opportunity for me to get out there to see him." (Bonds Dep., p. 178.) Nor was the trip exorbitant. Mr. Bonds stayed in a run-of-the-mill airport hotel.

Defendants relatedly imply Mr. Bonds must have received money under the table. Why else would an attorney take three days away from work to travel across the country to see a client? But Mr. Bonds testified unequivocally he received no other remuneration. (Bonds Dep., p. 262, 265, 309-10.) He obviously does not view time exclusively through the money prism like so many modern professionals. Indeed, in a situation most assuredly unfathomable to civil attorneys, Mr. Bonds never submitted a CJA bill for more than one year of work on

Mr. Rangel's criminal case. (Bonds Dep., p. 89.) As Mr. Bonds testified, "I don't mind doing things for free, put it that way, for former clients without the expectation of getting paid." (Id. at 81.)

The final accusation is Mr. Bonds never told Mr. Rangel that Mr. Turner accompanied him on the trip to California and was waiting outside of the prison in a rental car. This fact is immaterial. Mr. Bonds did explain that opposing counsel in Montoya wanted the verification, paid for his trip with this goal in mind, and hired Ms. Horrocks for that purpose. Mr. Bonds also explained verification could be harmful and Mr. Rangel had no obligation to sign the verification. Mr. Rangel declined. It matters not whether Mr. Rangel knew Mr. Turner was sitting outside in a rental car at the time of declination.

For all of these reasons, there is no reason to supplement the ample discovery permitted by the State Court in Montoya regarding the prison visit. The key facts are known and firmly establish no wrongdoing. Should Defendants believe otherwise, they may file appropriate motions for relief based on the existing record. As the Court previously remarked, "[l]itigating the litigation is rarely necessary and nearly always results in nothing important aside from delay and unnecessary expense, which flies in the face of the procedural rules' overarching goals 'to secure the just, speedy, and inexpensive determination of every action and proceeding.'" (Doc. no. 197, p. 14 (quoting Fed. R. Civ. P. 1).) Accordingly, the Court **DENIES** Defendants' motion. (Doc. no. 242.)

SO ORDERED this 28th day of March, 2025, at Augusta, Georgia.

_____
BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA